## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

M.J.J.,

       Plaintiff,

v.

POLK COUNTY ,
DARRYL L. CHRISTENSEN,

       Defendants

And

WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

       Intervenor.

Civil Action No. 15-cv-433-wmc

---

J.K.J.,

Plaintiff,

v.

POLK COUNTY ,
DARRYL L. CHRISTENSEN,

Defendants

And

WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

       Intervenor.

Civil Action No. 15-cv-428-wmc

---

## PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANT POLK COUNTY'S
## MOTION FOR SUMMARY JUDGEMENT

---

## INTRODUCTION

Defendant Polk County has not and does not take the prevention of prison rape seriously. Despite prison rape being identified as a federal epidemic in 2003, comprehensive federal suggestions to eradicate prison rape as early as 2009, and mandatory laws in 2012 (The Prison Rape Elimination Act ["PREA"]), Polk County has done and continues to do almost **zero** to prevent and detect prison rape. In fact, there were two separate allegations and investigations into employees (one of them being Defendant Darryl Christensen ("Christensen")) having sexual relations with inmates and Polk County continues to deliberately choose not to comply with the mandates of PREA. In the history of Polk County, they have provided PREA training to their staff only once (taser training was also provided), and this was after most of the assaults had already occurred to Plaintiffs. Christensen did not attend this training. The day after the meeting, jail Captain Scott Nargis ("Nargis"), sent out an email to the staff indicating that other jails were "in a tizzy" about PREA. In the face of a well-known national epidemic, Nargis trivialized the subject. Even with prior allegations of sexual contact with inmates, Nargis did not take the subject seriously. Nargis even engaged in and fostered sexually charged work-place behavior amongst staff that included "dark humor" and "tier talk." Nargis admitted that he allowed his guards to make sexual comments about each other and has probably overheard inappropriate comments made by jailers about inmates and failed to correct the behavior, even though he is in a supervisory position.  Even undoubtedly knowing that inmates were assaulted in "his" jail, Nargis still does not feel that he needs to obtain a PREA consultant to prevent additional assaults.

PREA requires Polk County to provide information to inmates regarding their rights and safe reporting procedures of sexual assault by inmates or guards.  The Wisconsin Department of Corrections (DOC) offered Polk County access to free training on PREA for staff and inmates.

Polk County did not access the free training. DOC offered materials in the form of posters to inform inmates of their rights according to PREA standards. Polk County deliberately refused to use the posters or provide inmates safe methods of reporting sexual assault as required by PREA.

Not only was Christensen previously investigated for sexual harassment of an inmate, but he also received numerous write ups for poor behavior. Curiously, almost all write ups for poor behavior indicated that Nargis was surprised by the conduct because Christensen was a long time jailer and the conduct was out of character. While Polk County eventually figured out that Christensen was not the upstanding guard they thought him to be, that late realization came at an extreme cost to the Plaintiffs when his deficiencies in performance were continually ignored.

Polk County was deliberately indifferent to the rights of Plaintiffs which caused violations of their Eighth Amendment rights against Cruel and Unusual Punishment and their 14th Amendment rights for due process. Polk County was deliberately indifferent when it failed to train their officers on PREA, failed to train inmates on PREA, and when it created a sexually charged atmosphere that allowed, encouraged, and caused inappropriate sexual harassment and abuse to the Plaintiffs. Polk County had notice of the risk to inmates of sexual abuse, not only through federal legislation indicating a national prison rape epidemic, but also through the two prior allegations of sexual abuse/harassment from inmates against guards in the Polk County Jail. As a direct result of Polk County's deliberate indifference, Plaintiffs were sexually assaulted by Christensen. At the very minimum, whether Polk County was deliberately indifferent and whether or not this caused injury to the Plaintiffs is a factual question that is not appropriate for decision on a summary judgment motion.

In addition, Polk County is not entitled to immunity and should be required to indemnify Christensen if judgment is taken against him. Christensen was acting within his scope of

employment when he sexually assaulted Plaintiffs. Jailers occupy a unique position in our society and are given vast amounts of power. While in a jail, an inmate is 100% at the whim of a jailer. Jailers are responsible for protecting individuals within their care. Due to the immense power that a jailer has, Christensen was acting within his scope of employment when he sexually assaulted Plaintiffs. Summary judgment must be denied.

## DOCUMENTS COMPRISING THE RECORD

1. Deposition transcript of M.J.J. taken on April 5, 2016, MJJ ECF 45; JKJ ECF 46
2. Deposition transcript of J.K.J. taken on May 24, 2016, MJJ ECF: 47; JKJ ECF 46
3. Deposition transcript of Darryl Christensen taken on May 19, 2016, MJJ ECF 49; JKJ ECF 47
4. Deposition transcript of Scott Nargis taken on June 2, 2016, MJJ ECF 49; JKJ ECF 48
5. Deposition transcript of Steve Moe taken on June 2, 2016, MJJ ECF : 59; JKJ  ECF 58
6. Deposition transcript of Peter Johnson taken on June 2, 2016, MJJ ECF 53; JKJ ECF 52
7. Deposition transcript of Lynelle Manning taken on June 2, 2016, MJJ ECF 52; JKJ ECF 51
8. Deposition transcript of Scott Pittman taken on June 2, 2016, MJJ ECF 51, JKJ ECF 50
9. Deposition transcript of Jeff Eiser taken on June 8, 2016 MJJ ECF 77, JKJ ECF 76
10. Declaration of Jeff Eiser dated July 28, 2016
11. Declaration of Melinda Juleen dated July 27, 2016
12. Declaration of Jennifer Johnson dated July 27, 2016
13. Affidavit of Lida Bannink dated July 29, 2016

## FACTS

See Plaintiffs' Proposed Findings of Fact ("PPFF") as well as admissions made to Polk County Sheriff's Department's Proposed Findings of Fact ("PCPFOF").

## ARGUMENT

### I.   Summary Judgment Standard

It is well known that summary judgment is to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." (WCMIC Br. 2, *quoting* Fed. R. Civ. P. 56(c)).

However, summary judgment is a "form of relief which should be applied with caution to the end that litigants be allowed a trial on bona fide factual issues." *Int'l Ass' of Machinists and Aerospace Workers, Dist. No. 8, AFL-CIO v. J.L. Clark Co.*, 471 F.2d 694, 697 (7th Cir. 1972). Summary judgment is never warranted except on a clear showing that no genuine issue as to any material fact remains for trial. *Peoples Outfitting Co. v. Gen. Elec. Credit Corp.*, 549 F.2d 42, 45 (7th Cir. 1977). In evaluating a motion for summary judgment, a court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party when determining whether a genuine issue of material fact exists. *Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 551 (7th Cir. 1999).

In *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* the United States Supreme Court made clear that to defeat summary judgment the opposing party need only demonstrate a factual dispute requiring a trial:

> [T]he issue of material fact required by Rule 56(e) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

391 U.S. 253, 288-289, 88 S. Ct. 1575, 1592, 20 L. Ed. 2d 569 (1968)

## II.     Defendant Polk County is Not Entitled to Summary Judgment on Plaintiff's *Monell* Claims; the Record Contains Substantial Evidence of Polk County's Deliberate Indifference to the Possibility that Inmates Would be Sexually Assaulted.

Polk County is correct in that the Plaintiffs' Complaints indicate that they were deprived of their Eighth Amendment right to be free from cruel and unusual punishment as convicted prisoners, and their Fourteenth Amendment right to due process as pretrial detainees. Because the sexual conduct spanned many years, Plaintiffs were convicted inmates and pretrial detainees at the time of various incidents. Polk County is also correct when it indicates that proceeding under an Eighth Amendment Analysis or a Fourteenth Amendment analysis is a distinction

without a difference as courts have indicated that the standards are the same under both amendments. *Weiss v. Cooley,* 230 F. 3d 1027, 1032 (7th Cir. 2000); *see also Mayoral v. Sheahan,* 245 F.3d 934, 938 (7th Cir. 2001).

### A.       *Municipal liability under § 1983*

Title 42 USC § 1983 ("§ 1983") states in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State… subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

A municipality may be liable under § 1983 only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978)). A "plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cit. 2008) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997)). In short, to establish municipal liability under § 1983, a plaintiff must prove that "action pursuant to official policy" caused the alleged constitutional injury. *Connick*, 563, U.S. at 60 (internal quotation marks omitted).

A municipal policy may be pronounced or tacit and reflected in either action or inaction. In the latter respect, a "city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick*, 563 U.S. at 61-62 (internal quotation marks omitted); *see also City of*

*Canton v. Harris*, 489 U.S. 378, 396, 109 S. Ct. 1197, 1208, 103 L. Ed. 2d 412 (1989) (O'Connor, J., Concurring in part and dissenting in part) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied."). Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (internal quotation marks omitted).

As the Supreme Court has cautioned, "deliberate indifference" is a "stringent standard of fault," *Connick*, 563 U.S. at 61 (internal quotations omitted), and necessarily depends on a careful assessment of the facts at issue in a particular case. *See generally Amnesty Am*, 361 F. 3d at 128 (holding that deliberate indifference determination "need not rely on any particular factual showing"). The operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of a "conscious choice" and not "mere negligence." *Id*. (internal quotation marks omitted); *see City of Canton*, 489 U.S. at 389. Deliberate indifference may be inferred where "the need for more or better supervision to protection against constitutional violations was obvious," *Van v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), but the policymaker "fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs," *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007); *see also Board of Cnty. Comm'rs v. Brown*, 520 U.S. at 407 (internal quotation marks omitted).

**B.      Nargis is a policymaker for Polk County as it relates to jail operations pursuant to § 1983 and Monell.**

It appears from Polk County's brief that the Polk County believes that Nargis is not a "policymaker" for the purposes of a § 1983 and *Monell* claim. (Polk County Brief ("PC BR.") at 11-12). Nargis is a policymaker for Polk County as it relates to jail operations and raining as he has the final decision making authority without oversight.

The U.S. Supreme Court has grappled with the question of where the policymaking authority lies for purposes of a §1983 claim. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S. Ct. 2702, 2723-24, 105 L. Ed. 2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S. Ct. 915, 99 L.Ed.2d 107 (1988), (plurality opinion). In *Praprotnik,* the plurality reaffirmed the teachings of prior cases to the effect that "whether a particular official has 'final policymaking authority' is a question of *state law.*" *Id.,* at 123, (emphasis in original), quoting *Pembaur,* 475 U.S. 469, 483, 106 S. Ct. 1292, 1300, 89 L. Ed. 2d 452 (1986) (plurality opinion). The trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. at 737.

The inquiry "is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker 'in a particular area, or on a particular issue'." *Congine v. Vill. of Crivitz*, 947 F. Supp. 2d 963, 975 (E.D. Wis. 2013); *Valentino v. Vill. of S. Chicago Heights,* 575 F.3d 664, 676 (7th Cir. 2009) (quoting *Kujawski v. Bd. of Comm'rs of Bartholomew County, Ind.,* 183 F.3d 734, 738 (7th Cir. 1999)). In determining whether an official is a final decision maker, it is also helpful to determine "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision

on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Congine*, 947 F. Supp. 2d at 975 (internal quotations omitted); *Vodak,* 639 F.3d 738, 748 (7th Cir. 2011). A key question is whether the decision maker "was at the apex of authority for the action in question." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1,* 274 F.3d 464, 468–69 (7th Cir. 2001).

Once the officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, see *Monell,* 436 U.S. at 661, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. at 737; *see Pembaur,* 475 U.S. at 485–487 (WHITE, J, concurring).

Sheriff Johnson clearly delegated all duties of jail operations to Nargis. Sheriff Johnson was never involved in jail operations prior to becoming sheriff and his only training since becoming sheriff has been "very limited." (PPFF ¶ 42.) Johnson stated that, "I don't get down into a lot of the minutia of running the jail." (PPFF ¶ 43.) When asked whether the "minutia involve[s] training" Sheriff Johnson stated "[y]es, I would say training is definitely the captain's area" and that he does not get involved with such issues unless they are brought to his attention. (PPFF ¶ 43.) When Nargis would go to external continuing education regarding jail administration or training, he would only come to Sheriff Johnson to discuss the content of the training if the issue involved a budgetary change. (PPFF ¶ 44.)

Sheriff Johnson indicated that Nargis reported directly to Chief Deputy Steve Moe ("C.D. Moe"), who was Chief Deputy for all relevant time periods until March of 2016, when he retired. (PPFF ¶ 45.) C.D. Moe indicated that the jail administrator/jail captain was primarily responsible

for training jail staff. (PPFF ¶ 46.) When asked whether C.D. Moe was responsible for making

sure that the training was adequate, he responded: "Ultimately, yes. Realistically, I didn't

become involved in the hands-on training of the jail. That was the function that would typically

be done by the jail captain."  (PPFF ¶ 46.) If there were discussions regarding the context or

quality of training between C.D. Moe and Nargis, "it was done kind of like in passing in the hall

kind of conversations, as opposed to a meeting that may have been established for that purpose."

(PPFF ¶ 47.)

Nargis created the training program for all time periods relevant to Plaintiffs' complaints

(PPFF ¶ 48.), no one conducts a meaningful review of Nargis' training program, and everyone

agrees that creating a training program is within the realm of Nargis' duties. Finally, the jail

inspector, Brad Hompe ("Hompe"), has never had any conversations regarding policy decisions

or sent his inspection reports to any of the County Commissioners; these conversations and

documents are always directed to Sheriff Johnson and Nargis. (PPFF ¶ 49.) It would be absurd to

make the argument that the County Board or the County Administrator has policymaking

authority over the administration and training in the Polk County Jail. Nargis is the policy maker

for Polk County Jail administration and training.

###### C.      *Prison Rape Elimination Act*

The Prison Rape Elimination Act of 2003 ("PREA") was signed into law by President

George Bush on September 4, 2003. 42 U.S.C. § 15601. The purpose of the law, amongst others,

is to:

1) Establish a zero-tolerance standard for the incident of prison (<u>by definition includes
   local jails</u>) rape in the United States
2) Make the prevention of prison rape a top priority in each prison system
3) Develop and implement national standards for the detection, prevention, and
   reduction of prison rape
4) Increase the accountability of those who fail to detect, prevent, and reduce prison
   rape,

5) Protect the Eighth Amendment rights of local prisoners

42 U.S.C. § 15601.  In creating the law, Congress recognized the epidemic of prison rape and

made the following findings, among others:

1) Experts conservatively estimated that at least 13% of inmates have been sexually assaulted while incarcerated. This equated to nearly 200,000 inmates that where then incarcerated that had been or would be victims of prison rape. The total number in the 20 years prior was estimated to exceed 1,000,000 individuals.
2) Most prison (by definition includes local jails) staff are not adequately training to prevent or report inmate sexual assaults.
3) Prison rape often "goes unreported, and inmate victims often receive inadequate treatment for the severe physical and psychological effects of sexual assault."
4) Victims of prison rape "suffer severe physical and psychological effects that hinder their ability to integrate into the community and maintain stable employment upon their release from prison."
5) Members of the "public and government officials are largely unaware of the epidemic character of prison rape and the day-to-day horror experienced by victimized inmates."
6) The "**high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution**." In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court ruled that deliberate indifference to the substantial risk of sexual assault violates prisoners' rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment and the Due Process clause of the Fourteenth Amendment. "Pursuant to the power of Congress under Section Five of the Fourteenth Amendment, Congress may take action to enforce those rights in States where officials have demonstrated such indifference. **States that do not take basic steps to abate prison rape by adopting standards that do not generate significant additional expenditures demonstrate such indifference**."

42 U.S.C. § 15601 (emphasis added).

PREA was created because "states and local jails…had their heads stuck in the ground"

when it came to prison rape. (Case No. 15-c-433. ECF No. 77 at 76:7-13; Case No. 15-c-428,

ECF No. 76 at 76:7-13.) The local facilities were not doing anything different than they had been

doing for the past century to address the problem of prison rape. "Things weren't changing. The

problem was still proliferating." (Case No. 15-c-433. ECF No. 77 at 76:10-16; Case No. 15-c-

428, ECF No. 76 at 76:10-16.) PREA's goal was also to "push those particular county jails or

small facilities or jails that they live in their own bubble, when they don't,… [and] to protect the

inmates no matter what jail they're in." (Case No. 15-c-433. ECF No. 77 at 98:7-18; Case No. 15-c-428, ECF No. 76 at 98:7-18.) PREA was created to target three separate goals: 1) prevent prison rape, 2) detect prison rape, and 3) respond to prison rape. (Case No. 15-c-433. ECF No. 77 at 70:1-71:9, 75:20-76:16; Case No. 15-c-428, ECF No. 76 at 70:1-71:9, 75:20-76:16.)

PREA created a National Prison Rape Elimination Commission ("NPREC") which was charged with undertaking a "comprehensive legal and factual study of the penalogical, physical, mental, medical, social, and economic impacts of prison rape in the United States on Federal, State, and local governments and communities. 42 U.S.C. § 15606(d)(1).  NPREC was to put together a report that contained its findings and recommendations for national standards to reduce prison rape. 42 U.S.C. § 15606(d)-(n). The Attorney General was then required to publish a final rule adopting national standards for the detection, prevention, reduction, and punishment of prison rape after receiving the NPREC's conclusions and recommendations.  42 U. S. C. § 15607. The Attorney general "**shall not** establish a national standard under this section that would impose substantial additional costs compared to the costs presently expended by… local prison authorities." (*Id*.)(emphasis added.) After almost a decade of research, on June 20, 2012, the U.S. Department of Justice ("DOJ") issued Prison Rape Elimination Act National Standards and related commentary. 28 C.F.R § 115; National Standards To Prevent, Detect, and Respond to Prison Rape, 77 FR 37106-01.

The final rule from the DOJ mandated "agencies" to employ standards to prevent, eliminate, respond to, and punish prison rape.  28 C.F.R § 115. An "agency" is defined as "the unit of …**local**… authority… with direct responsibility for the operation of any facility that confines inmates." 28 C.F.R § 115.5 (emphasis added.) Amongst other things, "agencies":

1) **Shall** have written policies mandating zero tolerance toward all forms of sexual abuse and harassment <u>and</u> outline the agency's approach to preventing such conduct. 28

C.F.R § 115.11(a).

2) **Shall** employ or designate an upper-level agency-wide PREA coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with the PREA standards. 28 C.F.R § 115.11(b).

3) **Shall** ensure that each facility "**shall** develop, document, and make its best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing and, where applicable, video monitoring, to protect inmates against sexual abuse." 28 C.F.R § 115.13.

4) **Shall** "implement policies and procedures that enable inmates to shower, perform bodily functions, and to change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks." 28 C.F.R § 115.15.

5) **Shall** train all employees who may have contact with inmates on:
   a. Its zero tolerance policy for sexual abuse and harassment;
   b. How to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention and detection;
   c. The right of inmates to be free from retaliation for reporting sexual abuse and harassment;
   d. The dynamics of sexual abuse and harassment in confinement;
   e. The common reactions of sexual abuse and harassment victims;
   f. How to detect and respond to signs of threatened and actual sexual abuse
   g. How to avoid inappropriate relationships with inmates;
   h. How to communicate effectively and professionally with inmates.

   28 C.F.R § 115.31.

6) During intake the inmates:
   a.  "[**S**]**hall** receive information explaining the agency's zero tolerance policy regarding sexual abuse and sexual harassment and how to report incidents";
   b. Within 30 days of intake, the agency **shall** provide comprehensive education in person or through video of their right to be free from sexual abuse and harassment and to be free from retaliation for reporting such incidents;
   c. **Shall** be provided inmate education in formats accessible including those who have limited reading skills;
   d. **Shall** be continuously and readily provided with key information of their rights through posters, inmate handbooks, or other written formats.

   28 C.F.R § 115.33.

7) **Shall** provide multiple internal ways for inmates to privately report sexual abuse and harassment. 28 C.F.R § 115.51(a).

8) **Shall also** provide at least one way for inmates to report abuse or harassment to a public or private entity or office that is not part of the agency.

28 C.F.R § 115.51(b).

Polk County, and the Polk County Sheriff's Department that runs the Polk County Jail, is undoubtedly an "agency" under PREA and is mandated to follow the law. PREA is enforceable to the states by way of a failure to comply equates to a reduction in funding from the federal government. 42 U.S.C. § 1507(c). While it is true that there is no enforcement mechanism under PREA to local jails, this does not mean that the law does not apply in full force. None of the provisions outlined above are optional; each and every provision indicates that an agency **shall** complete an action. At the very minimum, PREA represents industry standards to protect inmates from sexual assault that Polk County has unquestionably not implemented. Polk County has failed to complete the mandates of PREA, not because of budgetary constraints, but because they have made a deliberate choice that PREA compliance is not necessary.  PREA undoubtedly creates national standards for the protection of inmates from sexual assault. Polk County has made zero meaningful attempts to comply with PREA.

D. *Despite the Remainder of the United States Recognizing PREA as an Epidemic, the Polk County deliberately chose not to implement PREA and had the audacity to trivialize the law within their jail.*

1. **Jail inspector Hompe provided resources to the Polk County Jail on how to comply with PREA**

Although Brad Hompe does not consider himself a PREA expert, he has provided numerous resources to the jails that he inspects, including Polk County, on how to comply with the law. (PPFF ¶ 51.) In fact, he has told everyone in his jail administrative group "not to ignore PREA." (PPFF ¶ 52.) Mr. Hompe indicated that as PREA was created, there have been "a lot of questions and frustration about it as it rolled out. When it first came out people didn't necessarily understand what to do, where to go." (PPFF ¶ 53.) However, in his role as a detention facility

specialist, he provided those administrators with resources that they could use. (PPFF ¶ 54.) Mr. Hompe was employed through the Wisconsin Department of Corrections ("DOC"). (PPFF ¶ 50.) The DOC provides resources regarding PREA to local jails, but they have no means of enforcing compliance. (PPFF ¶ 55.) When asked what resources he provides or makes available to jails regarding PREA, Hompe indicated:

> …we gave the jails, if they wanted them… posters that they could post in their jails, zero tolerance for sexual abuse. We developed a training PowerPoint for PREA, and I don't recall all of the components, but one of the components was staff training that they could utilize if they choose to do so.

(Hompe Depo. 18:8-19.) Mr. Hompe testified that the National Institute of Corrections ("NIC") also provides PREA resources to county jails. (PPFF ¶ 57.)

When asked whether Polk County requested the training materials, Mr. Hompe indicated that, "I don't know the answer to that, if they asked for it. They were all made aware of it, that it was available and … from WILENET training website… a website administered by the Department of Justice. They have a portal for jails and jail training. So they put it in there so anybody who wants to access it can access it." (PPFF ¶ 58.) In addition, the Department of Corrections has sent several emails on the topic of PREA since it became an Act. (PPFF ¶ 59.) Additional resources that have been made available to local jails include a PREA investigator out of Chippewa County for training, as well as online PREA training through Edcor which walks through PREA 101 and includes a recorded test result upon completion. (PPFF ¶ 60.)

Mr. Hompe provided a plethora of resources to local jails to retrieve any and all PREA information that they would need. Polk County deliberately chose to ignore the PREA resources, information, and trainings that were offered to them.

**2.      Despite resources being available, Sheriff Johnson had and continues to have zero intimate knowledge of PREA**

Sheriff Johnson admitted that other than the basic concepts, he does not have any knowledge about PREA. When asked, "[t]ell me what you know about PREA" Sheriff Johnson indicated, "We've had it mentioned a few times at our sheriff's conference. Again, I'm sure, as you know, an hour or less discussing it at a conference you aren't touching the surface… PREA is a big subject and I don't claim to come anywhere near to be an expert on that." (PPFF ¶ 61.) He further clarified that "[m]y understanding is very limited to, I know there's a law and I know there's some requirements that the law requires or that PREA requires on federal agencies. I know those are best practices that we are aiming to try to get to… I know the things we can get to and that's where I'd like us to get." (PPFF ¶ 61.) When asked "what things would you like to get to" the response was "[a]nd again, I don't know the details. Certain things, I know you have to have an officer that is the PREA compliance officer that takes those complaints and forwards them where they need to go. You know, there's a policy that has to be in place." (PPFF ¶ 62.) When asked who he was working through these issues with, Sheriff Johnson indicated, "those are things that the captain is working on." (PPFF ¶ 63.) When asked if he has had any discussions about progress with Nargis, Sheriff Johnson indicates "I have not" but then later indicates that he has indicated to Nargis that they need to get as much as possible in compliance. (PPFF ¶ 63.)

When asked whether PREA policies were in place, the sheriff indicated, "I believe they are, my understanding is that they are." (PPFF ¶ 65.) When asked what policies he was specifically referring to he indicated, "I don't know specifically" but that Nargis would have put the policies in place. (PPFF ¶ 65.) When asked who the PREA officer is, he indicates he is not sure, but that he "assum[es]" it is Nargis. (PPFF ¶ 65.)

While Sheriff Johnson admitted that he does not know what information PREA requires to be provided to inmates, he believes that whatever information is required would currently be in their handbook. (PPFF ¶ 66.) Again, he indicated that Nargis would be responsible for that information. (PPFF ¶ 66.) When asked whether it was a budgetary constraint for why additional information is not given to inmates he indicated, "I don't know that, but I wouldn't think so." (PPFF ¶ 149.)

Sheriff Johnson indicated that after the allegations against Christensen came out, he met with DOC and Nargis. DOC gave them posters that they could put in the jail for inmates. (PPFF ¶ 145.) When asked whether or not he knew if the posters were up, Sheriff Johnson indicated, "[n]o, I don't." (PPFF ¶ 149.) Sheriff Johnson indicated that if the DOC recommended the posters, it would be a good idea if they were up. (PPFF ¶ 145-46, 149.) When asked whether it would surprise him if the posters were not up in the jail he indicated, "Surprise me? Nothing surprises me. Would it disappointment me? Probably… Because it's a cost effective way of getting the information out [to inmates]." (PPFF ¶ 149.)

It is abundantly clear that Sheriff Johnson is not aware of the intricacies of PREA and that, according to him, Nargis was responsible for implementing and complying with PREA.

### 3.   C.D. Moe had and continues to have zero intimate knowledge of PREA

When asked what PREA is, C.D. Moe indicated, "I know PREA is the acronym for Prison Rape Elimination Act. If that's not right it has to be nearly so. And that is an effort—I'm going to speculate to say it's a national effort, but certainly Wisconsin was involved in the effort to eliminate sexual assaults on inmates." (PPFF ¶ 67.) When asked if he had any special training on PREA, C.D. Moe indicated, "I don't believe so." (*Id*.) When asked whether PREA would apply to the Polk County Jail, C.D. Moe indicated "only generally, that it was—the subject

matter was to eliminate sexual assaults of inmates and that it was – it was relative to prisons and jails. Beyond that I can't tell you much." (*Id*.) He has never read PREA. (*Id*.) Other than the purpose of PREA, C.D. Moe has no additional knowledge of the law.

4.     **Despite being provided with a plethora of information on PREA, Nargis, the individual responsible for jail administration, training, and PREA, deliberately chose to ignore the mandates of PREA and even trivialized the law to staff.**

Nargis admitted that he would be the one responsible for implementing PREA and that "[t]he sheriff has, in my opinion, little more valuable time then to sit down and cover each point of PREA. As it impacts the jail, he relies on my opinion on it." (PPFF ¶ 180.)Nargis states that he has had zero training specific to PREA. (*Id*. at ¶ 181.) Even though Nargis indicates that PREA was discussed at his quarterly conferences "more frequently," when asked "what did you do as a response or preparation for its implementation," Nargis indicates "Nothing." (*Id*. at ¶ 178.)While indicating that PREA is prohibitive financially, he has never brought up budgetary issues to the Sheriff, the person in charge of the budget. (*Id*. at ¶ 179.)

Nargis is responsible for the inmate handbook and he has no knowledge whether or not PREA was consulted in making the grievance process within the handbook or whether it is PREA compliant. (PPFF ¶ 142-43.) The grievance process is supposedly the method that an inmate was to use to report sexual assault from a jailer. (PPFF ¶ 143.) The grievance process indicated in relevant parts:

Step One- Submit Initial Grievance
           An officer will attempt to resolve the matter personally. If unable to do so, the
           form will be forwarded to a supervisor.
Step Two- Initial Grievance Response
           A written response will be provided to the inmate within 5 days of the receipt of
           Grievance.

(PPFF ¶ 144; Bannink Aff. Ex. K) The only way for inmates to report sexual assault was to fold up a piece of paper and hand it to the jailer on duty. (PPFF 143-44.) As previously stated, PREA

requires at a minimum two internal procedures and one external procedure. 28 C.F.R §

115.51(a)-(b). In addition, according to PREA, the primary reporting procedure should not be

through the traditional grievance process and it **cannot** be the only method. National Standards

To Prevent, Detect, and Respond to Prison Rape, 77 FR 37106-01 *37109. Polk County is

clearly in violation of PREA. Polk County has given no reason as to their failed compliance. One

simple, low cost mechanism for internal compliance is to provide a lockbox within the housing

area for inmates where inmates could confidentially (if they chose) file a report that would not be

able to be opened by anyone other than the Captain or other identified PREA officer. (Case No.

15-c-433. ECF No. 77 at 74:7-11; Case No. 15-c-428, ECF No. 76 at 74:7-11.) In the face of

such information being readily available, Polk County made a deliberate choice not to provide

additional grievance procedures. The only method inmates had and continue to have available is

the century's old procedure of handing a folded up piece of paper to the jailer on duty.

The only information **ever** provided to inmates relating to PREA is provided in the

Inmate Handbook on page 10 of 12 in font that is, at a minimum, 2 points smaller than all other

font on the page and indicates, "Every inmate has the right to be safe from sexual abuse and

harassment. No one has the right to pressure you to engage in sexual acts. If you are being

pressured, threatened, or extorted for sex, you should report this to staff immediately." (Bannink

Aff. Ex. K; PPFF ¶ 131.) Polk County Jail inspector, Brad Hompe indicated that the language

quoted above is an abbreviated version of the complete PREA notice that would have been

provided from Hompe to Polk County Jail and that someone from Polk County must have chosen

to exclude certain information. (PPFF ¶ 130.) Polk County provides zero information to inmates

that they have a right to be free from retaliation if they report misconduct; zero information about

what constitutes abuse and harassment; zero information at the time of intake regarding PREA

(other than one sentence contained in the Inmate Handbook); zero additional written information; zero videos; and zero posters or fliers are within the facility to provide PREA information. (*See* PCPFF ¶ 142-144, PPFF ¶ 129-131.) Clearly in violation of PREA, with no attempted justifications, and plenty of resources offered by Brad Hompe, Polk County has made a deliberate choice not to provide inmates the information that PREA requires. PREA was created because most of the people in jail are not the most educated, and many have been victimized themselves. (Case No. 15-c-433. ECF No. 77 at 74:3-6; Case No. 15-c-428, ECF No. 76 at 74:3-6.) Inmates often do not know what sexual abuse is, and where the line is drawn due to victimization they have previously experienced. (Case No. 15-c-433. ECF No. 77 at 74:3-19; Case No. 15-c-428, ECF No. 76 at 74:3-19.) The psychology of the situation requires educating the inmates on what is abuse, how to confidentially report it, and that they will not be retaliated against for reporting the abuse. (Case No. 15-c-433. ECF No. 77 at 74:12-19; Case No. 15-c-428, ECF No. 76 at 74:12-19.)

The **one** so called PREA training that was given to jail staff on February 20, 2014, was oral, no materials were presented, and PREA requirements were not specifically read to the attendees.  (PPFF ¶ 115.) This was given after most of the abuse and harassment from Christensen was perpetrated on the Plaintiffs. (PCFOF ¶¶ 87-88.) Nargis does not know how long PREA was discussed, if it was more than five minutes, or if it consisted of only three bullet points, identified below, that may have simply been read to staff attendees word-for-word. (PPFF ¶ 116.) Taser recertification was also addressed at this so called PREA training. (PPFF ¶ 117.) The sign in sheet for the day stated that the training was "Taser Re-Cert" and made no mention of it being PREA training. (PPFF ¶ 118.) The following day, Nargis followed up the meeting with an email to all staff with the following content:

- o Seems to be that everyone is in a **tizzy** to train their staff on PREA. There is no requirement for us to be compliant with everything that the law calls for, but nevertheless it is federal law. So we'll hit the basics of PREA training.
- o Do not allow/condone inappropriate contact between inmates.
- o Do not allow/condone/engage in inappropriate contact between staff & inmates.
- o If someone (staff or inmate) presents a concern about inappropriate contact, report it to me.

(PPFF ¶119; Nargis Decl. Ex. G.) Nargis indicated that the content of this email was based on

conversations with Brad Hompe. (PPFF ¶ 120.)

Brad Hompe indicated that there are extensive materials available to Polk County Jail

regarding PREA, including PowerPoint presentations. (PPFF ¶ 57-56.) Nargis does not recall

being provided PREA material in writing from Hompe, does not recall taking notes from his

conversation with Hompe, and does not have any documents that would show the basic

requirements of PREA. (PPFF ¶ 122.) All information and resources relating to PREA provided

to Nargis went in one ear and out the other.

With regards to other jail administrators being in a "tizzy," Nargis indicated that many

administrators were considering hiring PREA consultants. (PPFF ¶ 123.) When asked whether

Nargis used a consultant or whether he explored the possibility of using a consultant he

indicated, "No." (PPFF ¶ 125.) Nargis indicated that if he did have PREA questions that one

resource would be to ask a PREA consultant. (PPFF ¶ 124.) When asked whether he found a

PREA consultant, Nargis indicated "I haven't felt the need to." (PPFF ¶ 125.) When asked, "[d]o

you feel the need to now" Nargis indicated, "No, sir." (PPFF ¶ 125.) Despite the known

instances of multiple women being assaulted in "his" jail, he still does not feel the need to take

the prevention of inmate assault seriously. In the face of a plethora of information being

available to the Polk County Jail for training on PREA, Nargis made a deliberate choice not to

train his jailers. Nargis went even further when he trivialized the subject. In the wake of all other

administrators being in a panic to determine how to comply with PREA, Nargis was deliberate in his choice to ignore PREA and its requirements.

After the allegations regarding Christensen surfaced, Nargis and Sheriff Johnson met with Kristi Dietz from the Head of the Office of Detention Facilities. Polk County was given copies of the posters to put up in the jail for inmates. (PPFF ¶ 145.) Nargis made the decision not to put the posters up because of his concern that inmates would attempt to tunnel out behind the poster or hide contraband behind a poster, as in the fictional movie, Shawshank Redemption. (PPFF ¶ 146.) He has never heard of a similar real-life incident happening, nor did he ask Ms. Dietz how to address those concerns. (PPFF ¶ 147.) When asked if the inmates were provided with copies of that information he indicated "No" because that information was provided in their handbook. (PPFF ¶ 148.) This information is clearly not provided in the inmate handbook. (*See* Bannink Aff. Ex. K) Sheriff Johnson indicated that he would be disappointed if the posters were not displayed as they are a cost effective means to educate. (PPFF ¶ 149.) Based on his reference to a fictional movie, Nargis made a deliberate choice to not comply with PREA and not display the posters. Not only was his concern illegitimate, but he did not attempt to work through that concern with Kristi Dietz, who recommended the posters to jails around the state. (PPFF ¶147.) He also made a deliberate choice to not provide that information in another format, such as a handout. (PPFF ¶ 148.)

Individuals from the Polk County Jail, as well as their counsel, keep hanging their hat on the fact that certain requirements of PREA are allegedly not best practices in the view of Polk County. (PCFPF ¶54.)The only example they continually provide is that PREA recommends that a jailer entering the housing area announce their presence prior to entrance for safety purposes. Polk County believes that this is not good practice for safety concerns. (PCFPF ¶ 54.)  Mr.

Hompe testified that his department has provided additional ways to ensure a jail will meet this standard such as notifying inmates in the handbook or at the beginning of each shift that they will be supervised by both male and female inmates. (PPFF ¶ 150.) There is no such notice in Polk County's Inmate Handbook. (Bannink Aff. Ex. K.) Notwithstanding, this **one** provision in PREA does not get to the purpose of PREA. The three basic tenets of PREA are 1) prevention of rape through inmate and officer training, 2) detection of prison rape through inmate and officer training, and 3) responding to rape and providing appropriate resources. (Eiser Decl. ¶ 27.) By hanging their hat on small objection, they are throwing up a smoke screen and ignoring what the thrust of the law requires and what its purpose is.

It is also alleged by Polk County that Plaintiffs are attempting to use PREA as a private cause of action. (PC Br. 19-20.) This is untrue. Plaintiffs reference PREA because it is a federal law that is mandated on the Polk County Jail and although there is no enforcement mechanism, it is one more element in support of Plaintiffs' claim that Polk County was deliberately indifferent to the rights of Plaintiffs to be free from sexual assault.

### E.      *Polk County was deliberately indifferent to the possibility of inmates being sexually assaulted when they deliberately chose not to train their officers in the face of prior allegations of sexual assault and the national epidemic of prison rape which led to the creation of PREA.*

#### 1.      General standard for failure to train employees.

A municipality can be liable for a failure to train its employees when the municipality's failure shows "a deliberate indifference to the rights of its inhabitants." *City of Canton*, 489 U.S. 378 at 389. The Supreme Court continued that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390; *id.* at n. 10. In addition, the

plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.,* 520 U.S. at 404. ("Plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.")

A municipality's failure to train must be a "deliberate choice" made by the municipality as to effectively make this choice a "policy" attributable to the municipality. *Id.* at 389. Failure of the City to provide adequate training in light of foreseeable consequences will meet the deliberate indifference standard. *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).

Typically, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train. *Connick*, 563 U.S. at 62. A pattern of violations puts municipal decision makers on notice that a new program is necessary, and "[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.,* 520 U.S. at 407. However, just because there have been no prior allegations does not mean that the County gets "one free sexual assault pass." *See Woodward v. Correctional Medical Services of Illinois*, 387 F. 3d 917, 929 (7th Cir. 2004) (A jail without prior instances of suicide does not get "one free suicide" pass).

The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a "highly predictable consequence" of the municipality's failure to act. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.,* 520 U.S. at 409. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding

that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right. *Id.* at 409-410. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.,* 520 U.S. at 409-410.

### 2.      Polk County had notice of prior allegations of sexual assault that occurred within their facility.

Contrary to Polk County's claim that "Plaintiffs fail to allege even a single incident" of sexual abuse/harassment in the Polk County jail, prior to the assaults of Plaintiffs by Christensen, there were two prior allegations of sexual relations within the Polk County Jail. (PC Br. pg. 9.) All of the information regarding these two prior sexual assault allegations was disclosed by Polk County in response to Plaintiffs' discovery requests. (Bannink Aff. Ex. B, D at pg. 3737-3768.)

The first allegation involved Christensen on May 4, 2004. (*Id.* at 3727.) An inmate at the jail indicated that Officer Christensen entered into the cell block while she was in the shower and he attempted to see her naked. *Id.* Christensen admitted that he entered the cell block alleged that he did not attempt to view the inmate in the shower. *Id.* In Nargis' write up of the situation, he indicated "I did say that Officer Christensen is a veteran officer and that I am not aware of any accusation such as this in the past, and that I have no reason to believe he would engage in that sort of behavior." *Id.* at 3728. When the inmate believed that Nargis was not listening to her concerns she indicated, "Well what about all the comments" indicating comments from Christensen about having a nice butt and "with someone as good-looking as you in here we have to look." *Id.* When approached on the incident, Christensen indicated he is not sure why the inmate would make false statements as he was nice to her. *Id.* Once he offered her a fresh cup of

coffee for helping clean up and when she indicated she did not like coffee Christensen purchased a soda and gave her a glass. *Id.* at 3728. Christensen also gave her a doughnut one morning when she was being transferred out of the jail before breakfast. *Id* at 3728-3729. Nargis "instructed Officer Christensen that it would be in his best interests to avoid entering B-pod unless he absolutely needed to." *Id.* at 3729. Nargis' report indicates he is waiting for more information from another officer, but there is nothing in the documentation provided that would show that additional follow up was completed. (*Id.*; PPFF ¶ 73.)

The other allegation of a jailer engaging in an improper sexual relationship with an inmate at the Polk County Jail was in January of 2012, against Jailer Alan Jorgensen which is unbelievably similar to the case at hand. (Bannink Aff. Ex. D at pg. 3739.) Two inmates made allegations against Jorgensen that, "would be unprofessional, in violation of Jail Policy, and potentially criminal" as indicated by Nargis. *Id*. Nargis indicated in his report that one of Jorgensen's fellow officers also indicated that she was, "sick of Allen spending unnecessary time in K-pod [female pod] and also standing outside K-pod 'leering' at the female inmates." *Id*. One inmate indicated Jorgensen was on the intercom with NS and he called the inmate a "bitch" and that "whatever Allen and [NS] have going on has been going on too long." *Id*. Another inmate said that Jorgensen made remarks when they would go into the shower like "nice bra" or "nice boobs." (Bannink Aff. Ex. D at pg. 3741.) The same inmate saw Jorgensen pat NS's butt. She also stated that Jorgensen looks to the camera to know when it is pointed at him prior to doing things, that he often comes into the cell to hang out and talk with inmates, and that Jorgensen treated NS differently and that he is "more friendly." (*Id*. at 3741.) Another inmate, PL, indicated that Jorgensen "touched her crotch and tits." (*Id*.) Jorgensen also asked PL to "show him my boobs, undress for him in the shower," touched her hand at meal pass/medical pass, asked her to

"shake her titties" for him, "told [her] to lift my shirt and show my tits," would run his hands up
her leg when he placed shackles, "touched her ass," put his arms around her, and made
comments about the color of her underwear. (*Id.* at 3741-3742.) Inmate SC indicated that
Jorgensen engaged in inappropriate behavior such as "hand touching" at med pass. (*Id.* at 3743.)
SC indicated that Jorgensen was also inappropriate with other inmates, KE, and NS. (*Id.*) When
inmates would want something they would ask NS to ask Jorgensen because they knew
Jorgensen would do things for her. (*Id.*) BB, another inmate, identified Jorgensen as
unprofessional. (*Id.*) Numerous other inmates recalled Jorgensen calling NS a "loudmouth
bitch." (*Id.*) Another inmate, KE, indicated that Jorgensen would touch NS's hand, would engage
in flirting and sexual comments, and that Jorgensen would tell NS that he wanted to "take her on
his boat" or say that he would "invite her to his place." (*Id.* at 3744.) When initially interviewed,
NS claimed that there was no inappropriate conduct. (*Id.*)

    As a result of its investigation, C.D. Moe and Nargis met with Officer Jorgensen. (*Id.* at
3745.) Nargis informed Jorgensen that "there were two things that consistently came up [from
the investigation]: there is a perception by the other inmates of the K-pod that there is some kind
of relationship between him & [NS] and that he gives her undue and/or preferential treatment,
and that he spends an inordinate amount of time in contact with her when compared with other
inmates." (*Id.* at 3746.) Nargis also indicated in his notes that one or more female inmates
indicated that there was inappropriate sexual remarks and physical contact. (*Id.*) Nargis wrote:
"[Jorgensen] did not offer an explanation as to why multiple inmates would say that. However, it
should also be noted that our investigation did not reveal anything that could substantiate those
claims." (*Id.*) Jorgensen explained that NS has an infatuation with him and denied any
inappropriate relationship. (*Id.*) "C.D. Moe informed Officer Jorgensen that there were some

potentially serious consequences involved with this situation, but that he "<u>did not feel that</u>

<u>Officer Jorgensen's job was in jeopardy</u>." (*Id*. at 3746-3747) (emphasis added). Nargis

continued:

> We informed him that we believed we established a few things…[NS] is not a
> very credible source of information. Another thing we believed we established
> was that Officer Jorgensen flirts with some of the female inmates. We also
> believed that Officer Jorgensen, at best, allowed some kind of arrangement or
> relationship to grow between him and [NS]; at worst, he fostered and encouraged
> it.

(*Id*. at 3747.) He further stated:

> We advised him [Jorgensen] that we **valued his contribution to the department**,
> that we know he is a "go to" guy when we need help with something. He was
> informed that we had considered his work history and the fact that there was no
> prior discipline history. C.D. Moe then advised him that I would be preparing a
> letter of reprimand this week We tried to assure Officer Jorgensen that a letter in
> his file **is not a major deal**, that it should be a learning experience. **We thanked
> Officer Jorgensen for taking the time to meet with us**, shook hands, and
> concluded our meeting. In accordance with our decision, I will be preparing a
> letter of reprimand for Officer Jorgensen's file.

(*Id*.) (emphasis added).

Subsequent to the discussions, above, NS wrote a letter to jail administration indicating

that, "I would like to tell the truth about the allegations made against Allen Jorgensen…there are

many things he has said & done that have been inappropriate in a sexual manner towards me."

(*Id*. at 3748.) NS indicated that Jorgensen would make comments when females go into the

shower, he told NS he wants to "ride her topless in his boat," and he brought items into the jail

for her as payment for her doing certain acts. (*Id*.) He would also touch her hand during meal

pass and medical pass, grabbed her around the waist, and slapped her butt. (*Id*.) When NS asked

Jorgensen if there were corrupt jailers, Jorgensen indicated that he was a corrupt jailer and that

there are many things he has done that he could have been fired for. (*Id*.) After Jorgensen was

told of this letter by administration, Nargis engaged in the following text exchange with

Jorgensen:

- AJ:     Hey, u got a sec?
- Me:     What's up?
- AJ:     I can't turn my head off about this stuff, U said I really shouldn't worry about this new letter but should I be?
- Me:     I guess I can't really answer that. But it's nothing new. We just need clarification on a few things.
- AJ:     Ok, I'm really sorry u have to deal with this.
- Me:     Appreciate that. But don't worry about it.

(*Id*. at 3749.)

Additionally, a letter was intercepted by Polk County that was written by NS to a former

inmate stating:

> Well, you're gonna [sic] be shocked. I told about Allen. Had to. It wasn't sitting well with me for some reason. I only told about my incidences. My mom said to do it… he seemed so worried… "[w]ell he should stop shopping in the jail for women who he can treat like pieces of meat." *Id*. She indicated that "the thing that sucks" which helped her decide not to lie anymore was that "it was interfering w/my meds. When he was out there, 75% of the time I'd deny my meds.

*Id*. Nargis did see that she refused her meds a large number of times and, when she did, a high

number of refusals contained the initials "AJ." (*Id*.) Upon being approached with the new

information, Jorgensen continued to deny the allegations and continued to explain the situation

away indicating that NS was infatuated with him. (*Id*. at 3750.) Nargis wrote in his report:

> [Allen] was being warned that any other allegations of a similar nature involving inmates would probably result in some suspension time while it was investigated. I informed him I believed that he was being less than honest with us, and that was based on by training & experience as an interrogator. I informed him that the information was too similar to be coincidental, and that there were some things that the inmate could *not* have known unless he told her. [Referencing Jorgensen trying to have a threesome with a girl from Peru]…
>
> Even if there was no touching, his behavior was inappropriate and unprofessional. C.D. Moe did mention that what he was wanting to hear from Officer Jorgensen was some kind of statement indicating that he knew what behavior was proper and what was not. Sheriff Johnson also spoke of keeping the line between

personal and professional life, and not crossing it. Officer Jorgensen **never did
provide acknowledgement of an inappropriate relationship, or a statement
that he understood what was proper and what was not.**

**I advised officer Jorgensen that the letter of reprimand he received last week
was the end of the issue at this point.** … I feel compelled to note that, based on
my training & experience, and based on knowing Officer Jorgensen for 9-plus
years, it is my opinion that he was not only less than honest about this**, but he
was outright lying to us at times**. No further information at this time.

(*Id*. at 3751) (bold emphasis added, italics from report).

Co-existent with the investigation into Jorgensen's inappropriate conduct with inmates,

there was a parallel investigation into Jorgensen's sexual harassment of female officers.  (PCJ

3762-3767.) Five female jailers indicated that Jorgensen targeted inappropriate sexual comments

towards them. (*Id*.) As a result of the investigations, Nargis wrote:

Officer Jorgensen was advised that any further complaints by co-workers would
be closely scrutinized. He was reminded to keep his conversation professional. He
was told that the Department would **not be taking any action on the allegations
at this time**, other than reporting it to E.R. [presumably employee relations] and
that they would be following up.

I feel compelled to note that based on my training & experience, and having
known Officer Jorgensen for 9-plus years, **it is my opinion that he was less than
honest with us, and at times was outright lying to us.**

(*Id*.) (emphasis added.)

There were no additional documents provided from discovery with regards to this matter.

(Bannink Aff. Ex. B, D at pg. 3737-3768.) It is believed that Polk County discontinued the

investigation once Jorgensen resigned. It is known that Jorgensen resigned shortly after being

prompted with the allegations. (PPFF ¶85.) It is also known that, when Christensen resigned Polk

County Jail terminated their investigation because Christensen was no longer an employee. (*Id*.)

With regards to Jorgensen, Sheriff Johnson does know if they "had come to a final discipline or

if he resigned prior to that." (*Id*.)

Polk County indicates in their brief that "there is no evidence here of any prior instances of sexual misconduct by Christensen or other jail staff over the last several decades. (PC Br. pg. 16.) The documents relating to prior allegations against Jorgensen and Christensen were provided by Polk County in Plaintiffs' discovery requests and their statement is patently contrary to the records they provided. Polk County Jail was faced with two incidences of remarkably similar conduct as that described in Plaintiffs' complaints and still failed to act to the assault of Plaintiffs. In addition, in Nargis' write up of both of the incidents, he explicitly mentioned the tenure of the jailer involved and, despite the serious allegations, both individuals were told their jobs were not in jeopardy. Neither of the incidents involved any punishment other than a letter in the file which was severely downplayed by administration, and **neither of the incidences involved additional training of the officers**.

### 3. Polk County knew that Christensen and other male jailers were uncomfortable supervising female inmates

Christensen admitted in his deposition that he felt uncomfortable supervising female inmates. (PPFF ¶ 86.) He also indicated that this concern was, "voiced by several of us throughout my career that we felt that it should be separated." (PPFF ¶ 87.) Although Christensen did not personally tell them why he was uncomfortable, he knew that others voiced their opinion that, "because of this fact that you can see—when they don't put towels over there, you can see into the showers. They come out of the shower and go into their rooms, and they've got to get dressed. You're looking directly into the cell blocks. You can see everything." (PPFF ¶ 88.) Christensen indicated that he could not handle the pressure. (PPFF ¶ 89.) This was the exact training that could have been offered through PREA on how to deal with this pressure. This training was never given or offered by Polk County, but is certainly training that PREA

encompasses. Polk County was deliberately indifferent to the rights of jailers when they had notice that males were uncomfortable supervising females and they did **nothing** about it.

> **4.** **In the face of the prior allegations and knowledge that male jailers were uncomfortable supervising female inmates, Polk County deliberately chose not to train jailers on PREA.**

One of the ways from PREA to prevent sexual assaults upon inmates is to educate jailers. PREA training to jailers targets key topics related to preventing, detecting, and responding to sexual abuse. National Standards To Prevent, Detect, and Respond to Prison Rape, 77 FR at *37108.   Specific things trained on would include: what constitutes sexual harassment/assault; on the policy of zero tolerance; how to fulfill their responsibilities regarding sexual abuse/harassment prevention, detection, reporting, and response; who the PREA coordinator or point person is; how to avoid creating inappropriate relationships with inmates; the dynamics of sexual abuse/harassment in confinement, how to detect and respond to signs of threatened and actual sexual abuse, and the right of inmates to be free from retaliation for reporting. 28 C.F.R § 115 Sec. 31.  Mr. Hompe had numerous resources on jailer training and also was able to give presentations himself on the topic of inmate manipulation and professionalism that "focuses around avoiding any type of in appropriate or too close of conversations with inmates that would lead to relationships." (PPFF ¶ 126.) Polk County never availed Mr. Hompe of his offers to provide training.  (PPFF ¶ 127.)

**Never once**, in the scope of all of Christensen's employment, was he provided with PREA training. When Polk County indicates that Christensen was trained by Polk County about sexual assault, this is wrong. The only "training" that he received was not from Polk County, but was an outside agency in **1996** when Christensen first became a law enforcement officer. (PPFF ¶ 106.) Christensen cannot remember the content of the training, specifically. (PPFF ¶ 107.) The training certainly could not have been based on the decade of research that went into PREA,

because PREA was not yet created. Christensen did not even know that an inmate was unable to consent to sexual acts. (PPFF ¶ 109.)

It appears that Polk County is attempting to argue that Christensen and other jailers were trained on PREA through "daily trainings." However, despite asking for a list and documentation of all PREA training in Plaintiffs' discovery requests, no additional proof of PREA training was provided from Polk County. Interrogatory Number 13 from Plaintiffs to Polk County specifically requested to describe in detail any and all training on the issue of fraternization with inmates, including sexual conduct. (PPFF ¶ 113.) Request for Production of Documents Number 3 requests all documents generated as a result of training received by Defendant Christensen, including but not limited to PREA. (*Id.*) No documents were provided that any training from Polk County (other than January 2014) included PREA. (*Id.*) Nargis indicated that 90 topics are covered in the daily training and that jailers use an honor system to indicate they have complied with the training by signing their name. (*Id.*) The topical list has never been provided in discovery and neither has a list of Christensen's acknowledgments that he allegedly reviewed the policies. (*Id.*)

The two pieces of PREA information that were given to Christensen were 1) the three bullet points in an email and 2) the language in the policy handbook. (Nargis Decl. Ex. B.) The PREA policy in the jail handbook only targets what to do once a matter is reported, which is the same thing that has been done for a century while the epidemic continues to proliferate. (*Id.*) The PREA notice given to the jailers through the manual does not mention target the thrust of PREA which is to prevent and detect sexual assault. (Case No. 15-c-433, ECF No. 77 at 97:2-6; Case No. 15-c-428, ECF No. 76 at 97:2-6.) With no justification for failing to do so, Polk County provided no training on PREA other than a written policy and no proof has been submitted that

Christensen ever read the policy. This is clearly in violation of PREA the best practices within the industry.

> ### 5. A reasonable jury could determine that based on the prior allegations of sexual assault within the Polk County Jail, mere proscriptions were not enough to satisfy Polk County's duty to protect inmates from sexual assault

In addition, a reasonable jury could conclude that prior complaints from Jorgensen and Christensen would have alerted Polk County that the mere proscriptions on sexual contact between guards and prisoners [such as the policy manual and the bulleted points from Nargis] had proved an insufficient deterrent to sexual exploitation. A jury could easily conclude that these two investigative determinations should have alerted defendants that they could not rely simply on guards' awareness of a no-tolerance policy to deter sexual misconduct. *See Walker v. City of New York*, 974 F.2d at 297 (observing that even where the need for a different policy "would not be obvious to a stranger in the situation, a particular context might make the need for training or supervision so obvious that a failure to do so would constitute deliberate indifference"); *see also Gonzales v. Martinez*, 403 F.3d 1179, 1187 (10th Cir. 2005) (holding that evidence of prior non-sexual physical assaults, lapses in jail security, and sexual harassment and intimidation by guards was sufficient to support a reasonable inference that the sheriff was aware of the risk of sexual assault to female inmates to sustain an Eighth Amendment deliberate indifference claim); *see also Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.,* 520 U.S. at 407 (citing *City of Canton*, 489 U.S. at 387 (holding that "if a [training] program does not prevent constitutional violations, municipal decisionmakers [sic] may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard

for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.").

In the context of such an absolute proscription and a duty to protect inmates from sexual abuse, knowledge that an established practice has proved insufficient to deter lesser misconduct can be found to serve notice that the practice is also insufficient to deter more egregious misconduct. *Cf. Amnesty Am.*, 361 F.3d at 128 (observing that "evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious" (internal quotation marks omitted)).

It was undoubtedly foreseeable that the failure to provide PREA training would result in sexual assaults to inmates, as has occurred and proliferated nationally for the last century. While every jailer that was deposed, Sheriff Johnson, C.D. Moe, Nargis, Manning, Pittman, and Christensen, were able to pay lip service to the general idea of PREA and understood that the goal is to reduce prison rape, **<u>no one</u>** at Polk County made any efforts to try to reduce prison rape at Polk County. The fact that all of the jailers knew about PREA proves that they knew PREA was an epidemic. PREA was created to respond to the national epidemic of prison rape and undoubtedly gave notice to Polk County of the possibility of inmates being sexually abused and/or harassed. *See Brown v. Blanchard*, 31 F.Supp.3d 1003 (E.D. WI 2014) (a chapter of text in "Crisis Management Guidelines" on how law enforcement officers should handle suicidal persons supports the conclusion that law enforcement officers need at least *some* training on what to do when responding to a suicidal call supported the denial of summary judgment). All of the local jail administrators were "in a tizzy" about PREA while Polk County did not feel the need to take the law seriously.

PREA, citing *Farmer v. Brennan*, stated that states that choose not to take steps to eradicate prison rape are **deliberately indifferent** to the risks involved. 42 U.S.C. § 15601(13) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). There is no reason that the same is not true for local jails. The Polk County Jail had two prior allegations of sexual contact between jailers and inmates in their jail and knew that male jailers were uncomfortable supervising female inmates. Polk County deliberately made a choice to brush the possibility and seriousness of prison rape aside, to brush the mandates of PREA aside, to brush all of the resources provided to them on PREA aside, and take **zero action to protect their inmates from sexual assault** which could have been accomplished by additional training**.** They continued to do what they did for the past century, which, industry wide, obviously was not preventing prison rape. It was a highly predictable and foreseeable consequence of Polk County's failure to train jailers on PREA that inmates were sexually assaulted. (Eiser Decl. ¶ 37.) Undoubtedly, this constitutes deliberate indifference.

At the very least, there is a factual issue as to whether or not Polk County was deliberately indifferent to the rights of inmates by failing to train Christensen. It is not the job of a judge on a summary judgment motion to weigh the facts. As stated by *Cameron v. City of Milwaukee*, even if the basic facts are undisputed, competing inferences may often be drawn from those facts. 102 Wis.2d at 460. A reasonable jury could determine that the Polk County Jail was deliberately indifferent to the possibility of sexual assault from their jailer when Polk County ignored the federal epidemic, ignored the federal legislation, and ignored prior allegations of sexual assault within their jail and failed to provide additional training regarding PREA to its staff.

6.      **Polk County's deliberate indifference to the likelihood that inmates would be sexually assaulted by failing to train jailers caused the harms suffered by Plaintiffs.**

The causation inquiry focuses on whether "the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Canton,* 489 U.S. at 391. Causation is a requirement for failure-to-train liability that is separate from deliberate indifference; however, "[t]he high degree of predictability [in a single-incident case] may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan Cnty.,* 520 U.S. at 409–10, 117 S.Ct. 1382. The causation inquiry—"[p]redicting how a hypothetically well-trained officer would have acted under the circumstances"—"may not be an easy task for the factfinder, particularly since matters of judgment may be involved." *Canton,* 489 U.S. at 391, 109 S.Ct. 1197.

The failure to offer PREA training to jailers caused the assaults upon Plaintiffs; Polk County's deliberate indifference led directly to the very consequence that was so predictable. Had Polk County treated the epidemic of prison rape seriously by establishing a strict zero tolerance policy and making an example of Jorgensen, providing training about how to avoid inappropriate relationships, about proper supervision and monitoring of inmates, and limiting cross gendering viewing of inmates for sensitive matters, Polk County could have prevented all of the assaults committed by Christensen. Jorgensen was engaging in inappropriate relationships prior to Christensen beginning to do so. (PPFF ¶ 105.)

The likelihood of constitutional injury was so obvious given the national epidemic and the prior allegations within the Polk County Jail, that a reasonably jury could easily determine that Polk County's deliberate choice of failing to train jailers caused the sexual assaults. In addition, Jeff Eiser, who worked extensively in creating PREA training standards for jails, indicates that based on his training, experiences, and education combined with the facts of this

case, that it was a highly predictable and foreseeable consequence of Polk County's failure to train jailers on PREA that inmates at the Polk County Jail would be sexually assaulted. (Eiser Decl. ¶ 37.) Opinion evidence offered on the subject of causation is sufficient to preclude summary judgment. *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 582–83 (3d Cir. 2004).

This case is dissimilar to *Connick* as the risk of sexual assault in this matter was "patently obvious" and "predictable." *Connick* dealt with whether a municipality could be held liable for a professionally trained and licensed attorney. 563 U.S. at 66-68. *Connick* specifically held that the nuance of applying law to a particular set of facts cannot support a finding of deliberate indifference. *Id*. That same nuance is present which makes this case more similar to *Canton,* where the court grappled with the question of whether a municipality could be held liable for an untrained officer failing to provide medical assistance; the court held that a municipality could be liable in those situations. 489 U.S. at 392.  For all intents and purposes, Polk County provided zero training regarding PREA to jail staff. This case is analogous to *Canton* and summary judgment must be denied.

> ### F.     Plaintiffs have established a claim for liability under Monell based on a failure to train inmates.

The law applicable to this section is the same as applicable in the aforementioned section on failure to train staff. Polk County acted with deliberate indifference when, in the face of the national epidemic of prison rape, PREA, the prior allegations of sexual assault, and the neglected training staff,  and Polk County failed to train their inmates on what constituted sexual abuse/harassment and how to report that conduct. Plaintiffs, once again, do not allege a direct action under PREA. PREA is used as one of the multitude of factors in establishing deliberate indifference.

Again, inmate education is important because a lot of inmates do not know what sexual abuse is and they do not know what is prohibited by law. (Case No. 15-c-433, ECF No. 77 at 74:12-19, 78:19-79:1; Case No. 15-c-428, ECF No. 76 at 74:12-19, 78:19-79:1.) The most common route that leads women into the criminal justice system is their exposure to physical and sexual abuse, poverty, and substance abuse. (Eiser Decl. ¶ 15.) This factor shapes program needs while in custody.  (*Id*.) Jail administrators and staff must be aware of the significant pattern of emotional, physical, and sexual abuse that many of these women have experienced, and every precaution must be taken to ensure that the jail setting does not "re-create" those types of earlier life experiences. (*Id*. at ¶ 17.) It is important for jail administration to consider the implications of the physical, emotional, sexual, intellectual, and relational differences between men and women when they make staffing, programming and operational decisions. (*Id*.)  Many female inmates have lived in situations in which they do not feel safe, and they bring this experience with them to jail. (Eiser Decl. ¶ 16.)

Inmate training on PREA consists of educating inmates on what constitutes sexual abuse and sexual harassment, that zero tolerance of abuse is accepted within the facility, who the PREA coordinator or point person might be, making sure that they have a method that they are comfortable with reporting abuse which includes providing multiple channels, making sure inmates of all abilities are able to receive this information and, finally, making sure that inmates know that they cannot be retaliated against for reporting abuse. 28 C.F.R § 115.33. Because female inmates have often been victimized in the past, inmate education and making individuals comfortable with reporting is an extremely important part of what PREA requires. (Eiser Decl. ¶¶ 15, 17, 34, 38.)

A good step in complying with the education portion can be as easy as providing one hour of training during the intake process as well as references in the jail handbook. (Case No. 15-c-433, ECF No. 77 at 78:19-7; Case No. 15-c-428, ECF No. 76 at 78:19-7.) Larger jails will have a video, verbal presentation, and written materials for inmates. (*Id.* at 79:11-14.) A jail is not required to go to those lengths, but they cannot bury their heads in the sand. (*Id.* at  (97:22-98:6.)

Polk County failed to comply with PREA's requirements for training inmates. As discussed previously, the only information on PREA that was provided to inmates was one sentence on page 10 of 12 in the inmate handbook that was in a font smaller than any other font on the same page. (PPFF ¶ 129 ). This is far from being compliant with the inmate educational components of PREA. As to the grievance procedure, the only method available was handing a folded up piece of paper to the jailer on duty. (PPFF ¶ 143 ). Again, this is what has been done for over a century and is far from being PREA compliant.  While there some information that was similar to PREA's requirements in the jail policy manual, this information was never given to inmates. (PPFF ¶ 131 )

The failure to train inmates on the mandates of PREA caused the sexual assaults upon Plaintiffs. Plaintiffs state that they have not received PREA training from Polk County. (MJJ Decl. July 27, 2016, ¶ 4; JKJ Decl. July 27, 2016, ¶ 4.) Plaintiffs came into the Polk County Jail with histories of violence and victimization in their lives. (MJJ Decl. ¶ 3; JKJ Decl. ¶ 3) Plaintiffs also indicate that, had they been trained on what sexual abuse/harassment actually consists of, that there was a zero tolerance policy of being subject to any abuse/harassment within the jail, that there was a person at the jail who would be in charge of sexual assault allegations, that they had a confidential means of reporting, that they had been told they could

40

not be retaliated against, and that they would not be judged, they would have recognized Christensen's comments as harassment prior to it turning into physical abuse and they would have been more likely to report both the harassment and the abuse. (MJJ Decl. ¶¶ 3-12; JKJ Decl. ¶¶ 3-12.) This is consistent with what Eiser's experiences, education, and training has taught him as well as the basic premises of PREA; inmates who are given all of the tools and knowledge relating to their right to be free from sexual abuse are more likely to be free from sexual abuse. (Eiser Decl. ¶ 30.) In addition, based on Jeff Eiser's training, experiences, and education combined with the facts of this case, it is his opinion that a highly predictable and foreseeable consequence of Polk County's failure to train inmates on PREA was that inmates would be sexually assaulted. (*Id*. at ¶ 38.) Failure to train inmates created an unreasonable and undeniable risk to inmates of sexual assault. Summary judgment must be denied.

### G.    Plaintiffs have established a claim for liability under Monell when Polk County's policies and customs created a culture that fostered, encouraged, and caused Christensen to engage in sexual acts with inmates

Polk County created a culture within the jail that fostered, encouraged, and caused Christensen to engage in sexual acts with inmates. This culture was created from the aforementioned items: the lack of any inmate training on what constitutes sexual assault/harassment; the lack of inmate training on how to report assault/harassment; the lack of training that reporting will not cause retaliation; the lack of jailer training on what sexual assault consists of, how to avoid it, and how to detect it; the lack of any reporting mechanism other than giving a folded note to the perpetrator (or co-worker of the perpetrator) of the sexual assault;  the deliberate choice to not train officers on sexual assault even after it was clear that at least one jailer participated in/fostered a relationship with an inmate and there was a sexual assault allegation against Christensen; and the complete lack of knowledge of PREA despite resources being available. In addition to the aforementioned, Polk County had a custom that jailers do not

tell on other jailers for rule violations, had a custom that rule violations were not taken seriously, and created and fostered an inappropriate, sexually charged atmosphere within the jail. Finally, Polk County also had policies in place that fostered and caused the constitutional deprivations. These policies included treating male and female inmates the same despite the contemporary jail standards saying otherwise and the policy of allowing a lone male jailer to supervise female inmates. In creating this culture, Polk County was deliberately indifferent to Plaintiffs' rights to be free from sexual assault. This culture created an environment that allowed and caused Christensen to commit sexual assaults against Plaintiffs.

The law applicable to this section is the same as previously outlined.

### 1. Polk County had a custom that rule violations were not taken seriously

When information was circulating about Jorgensen engaging in a sexual relationship with inmates, had Polk County implemented changes from it, Polk County would have established a policy that any inappropriate relationships with inmates are treated seriously. Did they do that? No. Rule violations were not taken seriously. This indifference to rule violations can also be seen in from Christensen's personnel file records received from Polk County. Christensen received numerous "write ups" from Nargis due to delinquent behavior. The commonality between the write ups is that Polk County does not take violations seriously. In the write ups, Christensen's status as a "veteran officer" is frequently mentioned, that he has never engaged in a similar incident is often mentioned, formal punishment is almost never received, and additional training is either never received or, if it was received, clearly ineffective. Polk County had a custom of not treating rule violations seriously.

On September 29, 2014 a coworker made a complaint that she could smell a "strong odor of intoxicants" coming from Christensen and that he "appeared hungover and made references to

being hungover." (PCPFOF ¶ 90.) C.D. Moe expressed his concern to Nargis that this incident was "yet another 'negative' contact with Officer Christensen in a short period of time." (*Id*. at ¶ 91.) Nargis "echoed" C.D. Moe's concern and indicated that "it doesn't do any harm for him to know that he cannot behave in any way he chooses." (*Id*.) No formal punishment was issued, no training was offered as a re-direct.

On June 20, 2014 Nargis saw Darryl Christensen on his cell phone with his back to an inmate while the inmate was on a phone for inmates. (PCPFOF ¶ 92.) Once Christensen heard the booking room door close, Christensen hung up his phone. (*Id*.) A short time later Christensen was in the inmate property storage room, again on his phone. (*Id*.) Nargis, "expressed [his] exasperation and reminded [Christensen] that cell phones can be accessed in the break room, and that they do not belong in the jail. [He] stated that it is bad enough that [he has] caught people in Max and Master, but on the floor with an inmate out—and his back to the inmate—was not acceptable." (*Id*. at ¶ 93.) [Nargis] then indicated, "it was certainly not the type of example our most-senior officer should be making… I thanked him for his time and excused him to go off duty." (*Id*.) No punishment was implemented, his experience was referenced, and Christensen was even "thanked" for his time.

On July 27, 2010, Nargis found that officer Christensen was solely in charge of the maximum area, did not delegate his duties back to master, and left the post to go meet his wife and pick up his lunch. (*Id*. at ¶ 94.) Nargis wrote that Christensen indicated that he just "popped out" and picked up his lunch "real quick." (*Id*.) Nargis indicated, "in the future, he should surrender control to Master Control. [he] pointed out the importance of this due to the fact that one of the inmates could have called in an emergency, and no one would have been able to respond to it. Officer Christensen indicated that he understood, and I returned to my duties." (*Id*.)

Nargis indicates that Christensen's actions were in violation of "Jail Policy C-900 Correction Officer Post Orders which requires a jailer to remain at their post unless they are relieved from that post. (*Id*.)Nargis pointed out that this incident was "particularly disturbing" as Christensen was the jail's Safety and Security Officer. (*Id*.) Christensen received no formal punishment for leaving the post and received no additional training as a result of the clear violation of the policy.

On April 22, 2010, there was an allegation that Christensen used unnecessary and excessive force against an inmate (MW). (*Id*. at ¶ 95.)  Nargis indicated that, "[g]iven all of the information… it is my opinion that the use of force in this incident was not necessary… nor was the amount of force reasonable... [g]iven that, I will be proceeding with the discipline process as the result of an excessive use of force." (*Id*. at ¶ 96.)  Nargis summarized his investigation as follows:

> I believed that this matter was best resolved by issuing a verbal reprimand to Officer Christensen, and providing re-training on the justification for use of force in the Jail, per our policy.

> I would like to note that officer Christensen has a lengthy history of service with our Department and has had no similar incidents in the past.

(*Id*. at ¶ 97.)  Nargis indicated that it appeared from the incident that Christensen had taken this matter seriously, that he was remorseful, and that he was sincere in changing his ways. (*Id*. at ¶ 98.)  However, when Christensen was asked in his October 6, 2011 Performance Review what was his "favorite incident/event in the past 12 months and why? What made it so special" Christensen indicated, "[MW] incident - felt good." (*Id*. at ¶ 99.) When asked "what was your biggest mistake/regret of the past 12 months and what did you learn from it? Christensen wrote "[MW] incident - got disciplined." (*Id*.) Nargis signed this performance review. (*Id*.) It is clear that over a year and a half later, the "training" that was allegedly provided to Christensen was not taken seriously.

On May 25, 2009, the Polk County Jail received a call from an angry inmate who indicated that Christensen attempted to pit a co-defendant against him by disclosing statements relating to his criminal case. (*Id*. at ¶ 100.) Nargis said to the inmate that he "had no reason to believe that officer (Darryl Christensen), who is a veteran officer with no issues such as this on his record, would engage in any inappropriate behavior." (*Id*.)  Christensen denied that he engaged in such conduct. (*Id*. at ¶ 101.) Based on this information alone, Nargis indicated, "that it appeared to be what I had suspected, a case of misinformation, and I wanted him to be aware of the situation just in case something should arise. I thanked him and continued with my duties." (*Id*.)  Again, no additional training was offered, and his status as a "veteran officer" was once again mentioned.

Polk County did not take rule violations seriously and the jail staff knew this. Christensen was able to take advantage of the failed enforcement and sexually assault Plaintiffs. Christensen consistently broke the rules and was not punished. This custom contributes to the deliberate indifference of Polk County.

### 2.   Polk County had a custom in their jail that jailers do not tell on other jailers for rule violations.

During the Jorgensen investigation, other Polk County Jailers, including Christensen, heard rumors that Jorgensen was having "inappropriate sexual relations" with female inmates. (*Id*. at ¶ 102.) Christensen did not feel the need to tell supervisors because "they're rumors… I'm not going to go and report to my captain that – if I didn't see it happen, there's nothing to report. (*Id*. at ¶ 103.) The only time he would tell a supervisor is "if [he] witnessed it." (*Id*. at ¶ 103.)

Jailer Scott Pittman worked with Christensen and indicated that Christensen was closer to JKJ than any other inmates and would pay her more attention. (*Id*. at ¶ 154.) Pittman stated that there were three times when he returned from lunch and Christensen was in the max pod where

he requested the door to be opened and there was a delay for Christensen to open the door. (*Id.* at ¶ 155.)) While not admitted to by Pittman, Christensen indicated that Pittman engaged in sexual conversations about inmates. (*Id.* at ¶ 156.)

Polk County had a culture where jailers did not tell on jailers. This went hand in hand with their culture that, even if the violations were witnessed and known to administration, the violations were not taken seriously. Fostering this culture contributed to the deliberate of Polk County.

### 3. The Polk County Jail has an unprofessional, inappropriate, and sexual atmosphere that was fostered by Nargis that contributed to the pervasive and unreasonable risk that inmates would be sexually abused.

In addition to the culture that rules were not taken seriously, and jailers did not tell on jailers, Polk County fostered an environment and atmosphere that was inappropriate and sexually charged. This atmosphere, along with all other factors previously mentioned, allowed and caused Christensen to engage in the sexual assaults against Plaintiffs.

Every correctional facility must create and establish a culture that promotes the fair treatment of all inmates. (Eiser Decl. ¶ 13.) This is especially important for the protection of female inmates in an environment that is historically dominated by males, such as a correctional facility. (*Id.*) Instead of creating a culture that "foster[s] the development of an agency and facility culture that prioritizes efforts to combat sexual abuse, Polk County did the opposite. *See* National Standards To Prevent, Detect, and Respond to Prison Rape, 77 FR at *37146. Christensen indicated that it was common to participate in sexual conversations with inmates. (PCPFOF ¶ 157.) Christensen said that other jailers including Scott Pittman, Tyler Briggs, Alan Jorgensen, and Michael Ottosen would also participate in sexual conversations with inmates. (*Id.*

at ¶ 158.) Christensen indicated that he would talk about his lack of sex life at home with the inmates. (*Id*. at ¶ 159.)

When Nargis was asked whether he saw Christensen make any sexual comments regarding females he stated "Yes." (*Id*. at ¶ 160.) When asked what kind of comments Nargis saw, he indicated, "I can't say specifics. I'm mainly answering yes because of the typical tier talk amongst the staff, that's something that would have come up." (*Id*.) When asked what tier talk means he indicated "just talking among the staff, bantering back and forth. Dark Humor." (*Id*.) When asked whether he personally, in his supervisory capacity, has made comments about female coworker's physical anatomy, Nargis indicated, "Sure." (*Id*. at ¶ 161.) When asked if they were derogatory, Nargis indicated, "Yes, there have been derogatory comments." (*Id*.) When asked if he has heard others make comments about coworker's anatomy, he indicated "yes." (*Id*.) When asked whether he has heard Christensen make comments about an inmate's breasts or their rear ends, Nargis indicates, "Again, I don't recall anything specific, but I'm sure there probably have been comments over the years." (*Id*. at ¶ 162.) According to Nargis these comments are, "just part of the typical banter." (*Id*.) Nargis continued:

> Do I participate in and allow them to discuss amongst each other that here's a mug shot of an inmate who has two black eyes. Damn, that's messed up or that person fell off the tree or that person fell out of the ugly tree and hit every branch on the way down in that condition, yeah. Do I participate and allow the staff to make comments about each other? Yes. Again, generally speaking, that is more tier talk, dark humor, generally more insulting one another than anything else.

(*Id*. at ¶ 163.) Nargis allowed and participated in "dark humor" or "tier talk" that created an unprofessional and sexually charged atmosphere.

An example of the sexual atmosphere was one time when jailer Pittman entered into the K pod with female inmates, Christensen announced over the loud speaker that it was Pittman's birthday and the inmates should give him his birthday spankings. (PCPFOF ¶ 164.) He did not

report the conduct because he "didn't think it was something that was illegal or something." (*Id.* at ¶ 165.) Again, this goes to both the sexual atmosphere and the lack of training within the Polk County Jail that was deliberately indifferent to the possibility of sexual assault of inmates.

Polk County's sexually charged atmosphere that was fostered by the administration, contributed to the deliberate indifference of Polk County to the sexual assaults of Plaintiffs.

>  **4.      The policy of treating male and female inmates the same, in combination with custom of acceptance of the use of cross-gendered supervision by a lone officer contributed to a pervasive and substantial risk inmates would be subject to sexual assault**

Contemporary corrections industry standards and practices such as the American Correctional Association ("ACA"), which is recognized nationwide as an industry standard, recognize that differences exist between male and female populations and require jail administrators to pay special attention to the implications of these differences when making staffing and other operational decisions. 28 C.F.R. § 115.13. (Eiser Decl. ¶ 14.)

Polk County Jail policy Section 21 C-200 states that that "Male and female officers will supervise and manage all inmates regardless of gender, with the exception of pat-down searches and strip searches." (PCPFOF ¶ 30.)

Again, contemporary jail standards require that male and female inmates be treated differently to provide the same level of care and protection. Females often enter the criminal justice system because of abuse, poverty, manipulation, and substance abuse. (Eiser Decl. ¶ 15.) This factor shapes program needs and behavior while in custody. (*Id.*) Jail administrators and staff must be aware of the significant pattern of emotional, physical, and sexual abuse that many of these women have experienced, and every precaution must be taken to ensure that the jail setting does not "re-create" those types of earlier life experiences. (*Id.* at ¶ 17.) It is important for jail administration to consider the implications of the physical, emotional, sexual, intellectual,

and relational differences between men and women when they make staffing, programming and operational decisions to insure that inmate rights are complied with. (Eiser Decl. ¶¶ 15, 17, 20, 21.)

In addition, PREA requires that agencies **shall** "implement policies and procedures that enable inmates to shower, perform bodily functions, and to change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks." 28 C.F.R § 115.15. However, any jailer in the maximum control area of the jail at Polk County can easily and clearly see into the shower and toilet areas of an inmate's cell. (Case No. 15-c-433, ECF No. 77 at Ex. 84:7-19; Case No. 15-c-428, ECF No. 76 at Ex. 84:7-19.)

Contemporary jail standards also require that if a cross-gendered jailer is to enter the unit of living, they should always be accompanied with a similar gender jailer to protect both the inmates as well as the staff from false accusations against them. (Case No. 15-c-433, ECF No. 77 at Ex. 44:8-11, 46:23-47:3, 61:4-62:24; Case No. 15-c-428, ECF No. 76 at Ex. 44:8-11, 46:23-47:3, 61:4-62:24.) Polk County has no similar policies.

These policies, practices, and customs created the opportunity for male staff (specifically Christensen) to easily isolate female inmates in private areas and sexually assault them. This was made even easier by the custom of allowing a lone male jailer to supervise female inmates.

Defendant Christensen had unfettered authority over inmates which was caused by the aforementioned policies and customs of the jail. (PCPFOF ¶¶ 9-34; Eiser Decl. ¶ 21.) While Christensen was the lone person supervising female inmates he had complete control over whether or Plaintiffs were able to shower; whether or not Plaintiffs received food, whether or not Plaintiffs could receive a haircut; whether or not Plaintiffs had access to a razor; whether or not

Plaintiffs could have access to books and reading material; whether or not Plaintiffs would receive medications; whether or not Plaintiffs would receive clean sheets, towels, and a uniform; whether or not Plaintiffs could use the multipurpose or X-room; whether or not Plaintiffs could exercise according to the policies outlined in the inmate handbook; whether or not Plaintiffs could access legal research; whether or not Plaintiffs had access to materials on the supply cart; whether or not Plaintiffs would be placed in maximum security versus minimum security; whether or not Plaintiffs could access playing cards; whether or not Plaintiffs could hang personal items in her cell/bunk; whether or not Plaintiffs would have access to the television and, how many channels she would be allowed to view, whether or not Plaintiffs could have access to visiting family or friends, whether or not Plaintiffs could access their beds and/or blankets throughout the day, whether or not Plaintiffs would receive treats for "good behavior," and many other personal liberties that are often taken for granted while not incarcerated. (PCPFOF ¶¶ 9-34.)

In combination with the power and authority that Defendant Christensen had, inmates are instructed via the inmate manual that they are to follow all orders of a jailer. (*Id*. at ¶ 35.) Failure to follow a direct order is a "major rule violation." (*Id*.) The punishment for a major rule violation can include segregation for more than 24 hours and loss of privileges up to 30 days (T.V., visits, etc.). (*Id*. at ¶ 36.) It is possible that no one else in the jail, other than the inmate, would have knowledge of immediate restrictions on privileges, just as Nargis alleges that the administration did not have knowledge of Christensen's sexual conduct. (*Id*. at ¶ 37.) It was the policies and customs of Polk County that allowed Christensen to wield tremendous power over Plaintiffs.

Finally, in addition, a lone jailer could, without any additional authority, impose punishment on an inmate for an alleged violation of jail policy. (*Id*. at ¶¶ 32, 33, 34, 37.) This punishment could include random searches, lock down for 24 hours without a formal hearing, and a restriction of all of the privileges identified above. (*Id*.) The simple act of taking away television, playing cards, or access to the multipurpose room would have the ability of making an inmate's life miserable.  It is this dynamic that is particularly troubling -- a tremendous amount of power, very little oversight, and the potential for a tremendous loss of life and liberty if improperly used.

The culture, by way of the explicit policies and customs, allowed, encouraged, and caused the sexual assaults to happen to MJJ. The assault to MJJ started as sexual comments. (*Id*. at ¶ 166.) Christensen would call over the intercom and say that she looked sexy, requesting that she leave the towel down so he can see in the shower, ask to put her lotion on topless, etc. (*Id*..) He was taking advantage of Polk County's deliberate choice not to implement PREA regulations regarding privacy of inmates in the most sensitive areas -- toilet, changing, and showers. The comments turned into abuse when Christensen would call her out of the cell and direct her to perform various sexual acts. (*Id*. at ¶ 167-169.) He would call her out of the cell and, while still standing in the bubble, stick his penis through a mail slot to have MJJ touch it. (*Id*. at ¶ 167.) Christensen would call her when she was legitimately doing research in the X room and direct her to touch herself. (*Id*. at ¶ 168.) He would call her out of the pod, push her up against the glass and start touching or kissing her, which led to either oral or actual sex. (*Id*. at ¶ 169.)

The same is true with JKJ. Christensen would use his authority to call her over the intercom. (*Id*. at ¶ 170.) He then called her out once to engage in sexual intercourse and twice to engage in oral sex. (*Id*. at ¶ 171.)  Christensen took advantage of the policies and customs that

specifically allowed, encouraged, and caused his sexual assaults. Based on the culture that Polk County created through explicit policies, customs, and the deliberate indifference to PREA, it was foreseeable that inmates would be sexually assaulted.

Once again, at the very least this is a factual issue that is best left for a jury. This case is similar to that of *Minton v. Guyer,* where the court held on a summary judgment motion that a "reasonable jury could find that McFadden, recognizing that it was bad policy to fail to segregate male guards from female inmates in the Chester County Prison main housing unit, was aware of and deliberately indifferent to the need to segregate male correctional officers from female inmates in the Chester County Prison Work Release Center. I find that there remains a genuine issue of material fact as to McFadden's deliberate indifference to the need to segregate correctional officers from opposite-sex inmates." *Minton v. Guyer*, No. CIV.A. 12-6162, 2014 WL 1806844, at *10-11 (E.D. Pa. May 7, 2014). Summary judgment must be denied.

## III. State Law Claims Are Valid

### A. *Under the traditional scope of employment analysis Christensen was acting within his scope of authority.*

Defendant Polk County asks this Court to grant summary judgment on Plaintiffs' state law claims because they contend that, as a matter of law, Christensen was not acting within the scope of his employment. This request must fail as overwhelming case law in the Seventh Circuit and beyond demonstrates, whether Christensen was acting within the scope of his employment is a matter for the jury to determine. Defendants seem to believe that sexual assault by an on-duty police officer could never fall within the scope of the officer's employment. This conclusion ignores the wealth of case law addressing this very scenario, in which courts in this Circuit and beyond have endorsed the possibility and concluded that the question of the officer's scope of employment must be resolved by a jury. Defendants have provided no grounds for this Court to

depart from that well-settled precedent, and a review of the full record reveals ample evidence from which a jury could conclude that Christensen was acting within the scope of his employment.

Case law is clear that an employee's conduct is within the scope of employment if "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228 (1958); *Olson v. Connerly*, 156 Wis. 2d 488, 457 N.W.2d 479 (1990). Employees act within the scope of their employment as long as they are "at a minimum, 'partially actuated by a purpose to serve the employer.'" *Fischer v. United States*, 996 F. Supp. 2d 724, 729 (W.D. Wis. 2014); (quoting *Block,* 201 Wis.2d at 806, 549 N.W.2d 783). "Serving the employer need not be the sole purpose of the employee's conduct, nor need it be even the primary purpose." *Id.*

Jailers can be acting within the scope of their employment even if they acted intentionally or criminally, and even if they misused their authority. *See Javier v. City of Milwaukee*, 670 F.3d 823, 829-30 (7th Cir. 2012); *Johnston v. Chi., St. Paul, Minneapolis & Omaha Ry. Co.,* 130 Wis. 492, 110 N.W. 424, 426 (1907) ("A master is liable for the tortious act of the servant done in the scope of his employment, though the master did not sanction it, or even though he forbade it."); Restatement (Third) of Agency § 7.07 cmt. c (2006) ("[C]onduct is not outside the scope of employment merely because an employee disregards the employer's instructions."); Restatement (Second) of Agency § 230 (1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment."); Restatement (Second) of Agency § 231 (1958) ("An act may be within the scope of employment although consciously criminal or tortious.").

An employee may act within the scope of employment if some of his actions involved performance of his job duties, even if he used improper methods to carry out those duties. *Estate of Watts v. Heine*, 2008 WL 4058032 at *3. That rape is not a legitimate law enforcement goal does not prevent an officer's act of rape from falling within his scope of employment. *Bennett v. Pippin*, 74 F.3d 578, 586, 589 (5th Cir. 1996) (finding that the sheriff's actions were those of the county because he used his authority over an investigation to coerce sex with the victim, including saying that he could do what he wanted because he was the sheriff); *Kratz*, 2012 WL 5833185 at *5 (acknowledging that "[i]f the acts alleged are unclear or can be reasonably viewed as furthering a purpose other than the employee's own sexual desires, summary judgment would be inappropriate").

Finally, because the scope of employment issue involves a question of intent and purpose, generally it presents a question of fact. *Destolle v. Continental Case Co.*, 136 Wis.2d 13, 26-28, 400 N.W.2d 524, 528-29 (Ct. App. 1986). Even when the basic facts are undisputed, competing inferences may often be drawn from the facts. *See Cameron v. City of Milwaukee*, 102 Wis.2d 448, 460, 307 N.W.2d 164, 170 (Ct. App. 1986). For judgment to be granted as a matter of law, the act must be so wholly unconnected to the employee's duties that no intent to further the employer's purpose can be inferred. *See Linden v. City Car Co.*, 239 Wis. 236, 300 N.W. 925, 926 (1941).

Christensen admitted that he engaged in sexual conduct with Plaintiffs although he disputes the number of times and the type of conduct that he engaged in. (PCPFOF ¶172.) Christensen was employed as a jailer for Defendant Polk County at all times identified in Plaintiffs' Complaint. (*Id.* at ¶ 172.) It was normal procedure to have only one officer in the max pod, max control, which is where the sexual contact occurred. (*Id.* at ¶ 151.) Christensen

admitted that he would engage in the sexual contact when no other guards were present. (*Id*. at ¶ 152.)

Again, Christensen's power as a jailer was signified in his physical appearance and in his actions. Christensen wore a jail uniform, a badge, carried handcuffs, and wielded a taser to indicate, physically, that he was in a position of authority. (*Id*. at ¶¶ 5-8.)  While Christensen was the lone person supervising the inmates, he had complete control over every single move that an inmate made including pulling them out of their cells and directing them to perform sexual acts. (*See id*. at ¶¶ 9-34.) Inmates could also be strictly and immediately punished for failing to abide by orders. (*Id*. at ¶¶ 32, 33, 34, 37.)  Polk County policies and customs created a tremendous amount of power, very little oversight, and the potential for a tremendous loss of life and liberty if improperly used.

Even under the traditional "scope of employment" framework, Christensen was acting within the scope of his employment. While Christensen was employed and during his work hours, he acted within his scope of employment to use the control that was so freely granted to him by Defendant Polk County to commit atrocious harms upon Plaintiffs. The harms were actuated, in part, by a purpose to serve the master and as an exercise of the control that was so freely given to Polk County Jailers. This is consistent with numerous federal courts.

> **B.     *Numerous federal courts have found that on-duty sexual assault under the color of law may be within the scope of employment .***

Numerous federal courts in the Seventh Circuit have found that on-duty sexual  assault under the color of law may fall within the scope of employment. *See, e.g., Lemons v. Howard*, No. 13-C-0331, 2016 WL 3746571 (E.D. Wis. July 8, 2016) (denying motion for summary judgment when officer sexually assaulted a 9-1-1 caller as it was an issue for the jury); *Rankins v. Howard,*   No. l l-CV-11 53-JPS, 2012 WL 5932029, at *3 (E.D. Wis. Nov. 27, 2012)

(denying motion for summary judgment on indemnification issue in case involving sexual assault by a correctional officer against a prisoner); *Estate of Watts v. Heine,* No. 07-CV-644, 2008 WL 4058032, at *4 (E.D. Wis. Aug. 26, 2008) ("A reasonable trier of fact could find that [the police officer's] sexual misconduct was not wholly disconnected from the scope of his employment."); *Carney v. White,* 843 F. Supp. 462, 480 (E.D. Wis. 1994) (finding a genuine issue of fact as to whether the police officer's conduct, including sexual assault and coerced sexual acts, was within the scope of his employment), *aff d sub nom., Carney v. Vill. Of Darien,* 60 F.3d 1273 (7th Cir. 1995); *Doe v. Clavijo,* 72 F. Supp. 3d 910, 915 (N.D. Ill. 2014) (finding a genuine issue of fact regarding scope of employment where on-duty police officer allegedly sexually assaulted plaintiff in his police car); *Doe v. Roe,* No. 12 C 9213, 2013 WL 2421771, at *4-5 (N.D. Ill. June 3, 2 0 1 3 ; *Doe v. Lee,* 943 F. Supp. 2d 870, 880 (N.D. Ill. 2013) (finding a genuine issue of fact regarding scope of employment where police officer allegedly sexually assaulted a police intern after taking her to a bar under the guise of performing an alcohol sting); *Arias v. Allegretti,* No. 05 C 5940, 2008 WL 191185, at *6 (N.D. 111. Jan. 22, 2008) (finding a genuine issue of fact regarding scope of employment where police officer allegedly coerced plaintiffs into performing sexual acts in exchange for not receiving a ticket).[1]

---

[1] A similar position has been taken by federal courts across the country. *See, e.g., St. John v. United States,* 240 F.3d 671 , 678 (8th Cir. 2001); *M.N.O. v. Magana* , No. CIV. 03-6393-TC, 2006 WL 559214, at *17 (D. Or. Mar. 6, 2006). So, too, by state courts addressing police sexual assault. *See, e.g., Doe v. State,* 76 A.3d 774, 777 (Del. 2013) (reversing trial court's determination on summary judgment that sexual assault by police officer was outside his scope of employment); *May M. v. City of Los Angeles,* 54 Cal. 3d 202, 221, 814 P.2d 1341, 1352 (1991l("(W)e reject the assertion that the appellate court should decide as a matter of law whether a law enforcement officer who commits a sexual assault is acting outside the scope of employment. The question of scope of employment is ordinarily one of fact for the jury to determine."); *Applewhite v. City of Baton Rouge,* 380 So. 2d 119, 121 (La. Ct. App. 1979) ("The City maintains that the actions of (defendant police officer) are far removed from the course and scope of his employment and that it should not be vicariously responsible for sexual abuses committed by its officers. Due to the particular facts of this case, that argument has no merit.").

A deeper examination of the facts in *Estate of Watts v. Heine, Lemons v. City of Milwaukee,* and *Nealy v. Nelson* is warranted. The defendant in *Heine,* a Deputy Sheriff at the Milwaukee County Jail, was alleged to have ordered a female prisoner to expose herself, then twice e n t e r e d   h e r  cell and sexually assaulted her. *Heine,* 2008 WL 4058032, at *1. He was ultimately tried and convicted of sexual assault. *Id.* The court declined to rule as a matter of law that the Deputy Sheriff had acted outside the scope of his employment, because: "a jury could conclude that his supervision of and interaction with inmates, both inside and outside of their cells, was part of his job and the sexual assault was only made possible by virtue of his status as a deputy sheriff." *Id.* at *4 (internal citations omitted).

In *Lemons v. Milwaukee* an officer responded to Lemon's home for a 9-1-1 call in a police uniform and marked squad car and sexually assaulted her forcing her to perform oral sex and penetrating her vagina digitally and with his penis. *Lemons*, 2016 WL 374651, at *10-11. At deposition, Cates stated that his motivation for engaging in sex acts was his desire to have sex with her as well as his desire to seek out and obtain personal physical pleasure. *Lemons*, 2016 WL 374651, at *14. The court held that whether or not Cates acted within his scope of employment was a factual issue for trial by indicating, "at the summary judgment stage, the court does not weigh the evidence, and sufficient evidence exists for a reasonable jury to find to the contrary, i.e. that Cates was acting within the scope of employment at the time of the rape." *Lemons*, 2016 WL 374651, at *24. The court continued,

> a reasonable trier of fact could find that Cates's sexual assault of Lemons was not wholly disconnected from his job. Cates's interaction with crime victims and his investigation of crimes while responding to 9-1-1 calls was part of his job, and the sexual assault **was made possible by Cates's role in the investigation.** In sum, whether Cates stepped aside from serving his employer for a sexual frolic or instead raped Lemons as part of the continuum of the investigation is a question for trial.

*Lemons*, 2016 WL 374651, at *25 (emphasis added).

57

*Nealy v. Nelson* involved sexual misconduct by a social worker. No. 11-C-541 (E.D. Wis. Jan. 6, 2014). The defendant social worker, acting under the color of law, had been assigned as part of his legitimate work responsibilities to investigate an allegation of child abuse against *Nealy*. *Id*. at 11. While he found the allegations unsubstantiated, the defendant asserted his power and authority over plaintiff to gain unwanted access to her home, and used the control he had over the custody and placement of her children to coerce her into sexual activity. *Id*. at 11-13. Rejecting the State of Wisconsin's position that the sexual misconduct was, as a matter of law, outside the scope of employment, the court stated:

> [T]he problem with your argument is you conclude it was only after Mr. Nelson's work as a social worker was completed that he engaged in the sexual misconduct. [Plaintiff's counsel] is asserting- and certainly the Second Amended Complaint alleges- that it was more- *what happened was more of a continuum*. And that it cannot- and as a consequence it cannot be determined as a matter of law what occurred between Mr. Nelson and Ms. Nealy was outside the scope of his employment.

*Id*. at 12 (emphasis added).

As in *Heine* and *Lemons*, "the sexual assault was only made possible by virtue of his [employment] status, *Heine at *4, Lemons* at *10, and as in *Nealy* and *Lemons*, the sexual conduct was part of a "continuum" of conduct that spanned both legitimate official duties and the sexual misconduct, *Nealy* at 12, *Lemons* at *10. Christensen was in full control of the Plaintiffs when he pulled them out of their pods to engage in sexual activity. (PCPFOF ¶ 10.) Christensen knew that no one else was around when he would call them out of their cells. (PCPFOF ¶ 152.) CITE For all the Plaintiffs knew, they were being called to go to a legitimate appointment such as a visitor, a doctor, probation agent, etc. With the power that Christensen wielded over the Plaintiffs, he sexually assaulted them.

Granting summary judgment for Polk County on the scope of employment would depart from the Seventh Circuit precedent holding that this issue is properly left as a matter for the jury

– particularly in cases involving sexual assaults by a police officer, where the issue of municipal liability is a "difficult one" which should be not be resolved "before the actual facts bearing on the issue [are] determined. *Doe v. City of Chicago*, 360 F. 3d 667, 673 (7th Cir. 2004). Moreover, Polk County's motion essentially asks this Court to rule, as a matter of law, that sexual assault committed by an on-duty police officer acting under the color of law can *never* be within the scope of employment. They have not cited a single case that would support this position, and this court should decline their invitation. Therefore, Polk County's motion should be denied.

### C. Furthermore, the "wave of the future" is that "scope of employment" should be interpreted more broadly when an employee is a police officer.

Furthermore, the "wave of the future" is that "scope of employment" should be interpreted more broadly when an employee is law enforcement. *Doe,* 671 F.3d  at 671 (7th Cir. 2004); (citing *Mary M. v. City of Los Angeles,* 54 Cal.3d 202, 285 Cal.Rptr. 99, 814 P.2d 1341, 1347–52 (1991) (since law enforcement officers are entrusted with enforcing the law they act with state authority, "inherent in this formidable power is the potential for abuse"… "the cost resulting from misuse of that power should be borne by the community, because of the substantial benefits that the community derives from the lawful exercise of police power")); *West v. Waymire,* 114 F.3d 646, 649 (7th Cir.1997) ("But when the employee is a male police officer whose employer has invested him with intimidating authority to deal in private with troubled teenaged girls, his taking advantage of the opportunity that authority and proximity and privacy give him to extract sexual favors from these girls should be sufficiently within the orbit of his employer-conferred powers to bring the doctrine of respondeat superior into play, even though he is not acting to further the employer's goals but instead on a frolic of his own" (internal citations omitted)); *St. John v. United States,* 240 F.3d 671, 676–78 (8th Cir.2001); *Primeaux v. United States,* 102 F.3d 1458 (8th Cir.1996); *Red Elk v. United States,* 62 F.3d 1102, 1104–07

(8th Cir.1995); *Ingram v. City of Indianapolis,* 759 N.E.2d 1144, 1146–48 (Ind.App.2001);

*Applewhite v. City of Baton Rouge,* 380 So.2d 119, 121–22 (La.App.1979); cf. *Stropes v.*

*Heritage House Childrens Ctr. of Shelbyville, Inc.,* 547 N.E.2d 244, 245, 249–50 (Ind.1989);

*Gutierrez v. Thorne,* 13 Conn.App. 493, 537 A.2d 527 (1988); see generally 1 J.D. Lee & Barry

A. Lindahl, *Modern Tort Law: Liability & Litigation* § 7:12 (rev. ed. 1994 & Supp.2001);

Rochelle Rubin Weber, Note, "'Scope of Employment' Redefined: Holding Employers

Vicariously Liable for Sexual Assaults Committed by Their Employees," 76 *Minn. L.Rev.* 1513

(1992).)

> As the Seventh Circuit so aptly stated in *Doe v. City of Chicago*,

> It is not that being a police officer creates access that facilitates the commission of intentional torts. That is true of many employments. A meter reader gains access to homes by virtue of his employment by the electric company, but if he steals something from the home the theft is not deemed to be within the scope of his employment. See *Hendley v. Springhill Memorial Hospital,* 575 So.2d 547 (Ala.1990); *Grimes v. B.F. Saul Co.,* 47 F.2d 409 (D.C.Cir.1931). The difference between him and other intentional tortfeasors is slight. The situation of a police officer, however, is significantly different from that of a meter reader. The officer is armed, has authority to arrest that is considerably broader than the authority of a private person to make a "citizen's arrest," has access to all sorts of personal information, is an authority figure trained to develop and project an intimidating aura, and may seem to be above the law ("I am 911").

> Indispensable to law and order, he is also and inescapably a dangerous instrumentality. A person who keeps a tiger in his backyard is strictly liable for the injuries caused by it, *G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d 379, 386 (7th Cir.1995), and when an independent contractor is hired to conduct an abnormally dangerous activity the principal is strictly liable for injuries caused by the activity. *Anderson v. Marathon Petroleum Co.,* 801 F.2d 936, 938–39 (7th Cir.1986); *Crane v. Conoco, Inc.,* 41 F.3d 547, 549–50 (9th Cir.1994); *Restatement (Second) of Torts* § 427A (1965). Maybe by analogy a police department should be held strictly liable for torts of police officers who use their official powers to commit the torts. As in the ultrahazardous-activity cases, the power of a rogue police officer to do harm is so great that more than ordinary care on the part of his employer may be required in order to provide adequate protection to the public.

*Doe v. City of Chicago*, 360 F.3d at 671.

Christensen, often working alone, had complete control over every single move that an inmate made including providing for all basic needs. (PPFF ¶¶ 9-34.) The authority that he was granted had nearly no oversight and allowed him to make immediate decisions that no other person would have knowledge of. (*Id*. at ¶ 32, 33, 34, 37.) Christensen was akin to a tiger in a person's back yard -- if you have an animal that is capable of immense power and inflicting immense harm, you should be strictly liable for any acts committed by that animal. *Doe v. City of Chicago*, 360 F.3d at 671. It was this power that was granted to Christensen with no oversight that allowed him to engage in sexual contact with Plaintiffs. Christensen was acting within his scope of employment when he engaged in sexual contact with Plaintiffs. As such, Polk County's motion should be denied. At the very least, this remains a factual issue that must be decided by the trier of fact.

### D.     The cases cited by Polk County are not persuasive.

One of the cases cited, *S.J.A.J. v. First Things First, Ltd.*, is cited in violation of Wisconsin Statute § 809.23(3). *S.J.A.J. v. First Things First, Ltd.,* 2000 WI App 233, 239 Wis. 2d 233, 619 N.W.2d 307). This case was unpublished, issued prior to 2009, and does not fall into any specifically enumerated exception. While it is distinguishable, this will not be explored as further citation is not appropriate.

None of the additional cases cited by Defendant Polk County support the request they are making of this Court; to the contrary, they further demonstrate that the scope of employment is a jury question. In *Olson v. Connerly*, the **jury** determined that the physician was not acting within the scope of his employment when he ate lunch with a patient at local parks, engaged in an exercise program with the patient, and eventually went to the patient's house where sexual intercourse occurred. *Olson v. Connerly*, 156 Wis. 2d 488, 494, 457 N.W.2d 479, 481 (1990). This case is further distinguishable because there is no captor/captive dynamic present in *Olson*

like there is in the matter at hand. The conduct by Christensen happened in a penal institution where Christensen called Plaintiffs out of their cell and engaged in unconsented sexual contact. (PPFF No. 11.) The Polk County inmate handbook indicates that all inmates must comply with all orders of officials. (*Id*. at Nos. 13, 43.) As previously stated, Christensen, as a jailer, was solely responsible for providing food, allowing Plaintiffs to shower, providing clean clothes to Plaintiffs, etc. (*Id*. at Nos. 13-32.) With the great power given to Christensen, comes great risk. These basic liberties could be taken away at a whim. (*Id*. at Nos. 21, 30, 33, 34, 35, 36, 39.) This power, combined with the fact that inmates were required to comply with orders easily makes *Olson* distinguishable. It is easy to find that Christensen was acting within his scope of employment as a jailer when he used the power granted to him by Polk County to engage in unconsented sexual contact with Plaintiffs.

*Block v. Gomez* involved a doctor/patient relationship that started as counseling and resulted in a sexual relationship that lasted eight months. 201 Wis. 2d 795, 799-800, 549 N.W.2d 783, 785 (Ct. App. 1996). The doctor took the patient and her daughter on a fishing trip and eventually moved into and lived in the patient's apartment where sexual relations would occur. *Id*. at 800. The district court held that, as a matter of law, the doctor was acting outside his scope of employment. *Id.* at 804. Again, there was no captor/captive relationship -- the doctor <u>moved into the patient's apartment</u>. It is, once again, easy to see how this was deemed outside the scope of employment and how this case is distinguishable.

*Doe v. Time Warner Cable of SE Wisconsin, L.P.* held that, as a matter of law, a woman who was sexually assaulted by a co-worker who was walking her to her car after a work meeting. No. 07-C-781, 2007 WL 4143226 (E.D. Wis. Nov. 19, 2007). They were outside of work hours, not engaging in work and, other than being co-employees, had no other ties to being in the

"scope of employment." *Id*. Along similar lines of both *Olson* and *Block,* this case is distinguishable. Christensen was a captor over Plaintiffs, the captives. Christensen was at work, using the scope of power that he was granted by the Defendant Sheriff to engage in unconsented sexual contact with Plaintiffs.

Christensen was acting within his scope of employment. At the very least, the determination involves the question of intent and purposes, such that there is a factual dispute which renders summary judgment inappropriate. As stated by *Cameron v. City of Milwaukee,* even if the basic facts are undisputed, competing inferences may often be drawn from those facts. 102 Wis.2d at 460. A reasonable jury could determine that Christensen was acting within the scope of employment based on the undisputed facts and the immense power held by Christensen. (PPFF Nos. 13-44.) As such, summary judgment is not appropriate.

**IV.**   **Polk County is not entitled to immunity.**

Polk County is not entitled to immunity as both the ministerial duty exception as well as the known and compelling danger exception apply. At the very least, whether these exceptions apply are factual questions that need to be decided by a jury and not via summary judgment.

**A.**   ***The ministerial duty exception applies such that immunity is not appropriate.***

"A ministerial duty is one that 'is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.'*Lodl v. Progressive N. Ins. Co.,* 2002 WI 71, ¶ 25, 253 Wis.2d 323, 646 N.W.2d 314. It is a duty that has been "positively imposed by law, and its performance required at a time and in a manner, or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion." *Id*., ¶ 26. "The first step in the ministerial duty analysis is to identify a source of law or policy that imposes

the alleged duty." American Family Mut. Ins. Co. v. Outagamie Cnty., 2012 WI App 60, ¶ 13, 341 Wis.2d 413, 816 N.W.2d 340. Even if a municipality has different methods of complying with a law, that does not make the compliance itself discretionary. *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee,* 2005 WI 8, 277 Wis.2d 635, 691 N.W.2d 658, *Bostco LLC v. Milwaukee Metro Sewerage Dist.*, 2013 WI 78, 350 Wis.2d 553, 835 N.W.2d 160 (a municipality has a ministerial duty to abate a known continuing nuisance, even though there may be different methods of abatement from which to choose).

The law that applies and imposes a duty is PREA. Compliance with PREA is a ministerial duty. PREA mandates that all agencies **SHALL** complete certain tasks. While there is flexibility within PREA and how a jail chooses to comply with certain tasks, whether or not to comply is not discretionary, but ministerial. Ministerial duties resulting from PREA include but are not limited to training inmates and training jailers. Polk County did nothing. They cannot claim that they were discretionarily acting to abide by PREA when they failed to do anything. Polk County did nothing by way of inmate education of what sexual assault/harassment is, did nothing by the way of inmate education that their complaints could be confidential, and did nothing by the way of informing them that they could not be retaliated against. Polk County also did nothing by the way of training their jailers of what sexual assault is and how to detect/prevent it from happening. When it comes to detection of prison abuse, Polk County also did nothing. They did not follow the requirements of having more than one grievance procedure; they did not have an outside source to report sexual assault.  While there could be an argument that the decisions made in an attempt to comply with PREA are discretionary, the mandate that PREA is complied with is not. Summary judgement regarding immunity is inappropriate as the

ministerial exception to immunity applies. Again, at the very least, this is a factual question left to the jury.

**B.      *The compelling danger exception applies such that immunity is not appropriate.***

The known and compelling danger exception to governmental immunity was first established in *Cords v. Anderson*. 80 Wis. 2d 525, 259 N.W.2d 672 (1977). There, the plaintiffs were seriously injured when they fell into a deep gorge while hiking at night on a hazardous portion of a trail at a state-owned nature preserve. *Id*. at 531–32, 534–36. The manager of the preserve knew that the drop-off from which the plaintiffs fell was dangerous, particularly at night, but did nothing to advise the public or his supervisors of the hazard. *Id*. at 536–37. The court concluded that "the duty to either place warning signs or advise superiors of the conditions is, on the facts here, a duty so clear and so absolute that it falls within the definition of a ministerial duty." Id. at 542 (emphasis added). The "facts here" on which the court relied were: "[The manager] knew the terrain at the glen was dangerous particularly at night; he was in a position as park manager to do something about it; he failed to do anything about it." Id. at 541. The governmental entity was held liable because it was aware of a compelling danger but nonetheless failed to act.

The known and compelling danger exception arises when "there exists a known present danger of such force that the time, mode and occasion for performance [are] evident with such certainty that nothing remains for the exercise of judgment and discretion." *Lodl,* 253 Wis.2d 323, ¶ 38 (quoted source omitted). The ministerial duty arises "by virtue of particularly hazardous circumstances—circumstances that are both known to the municipality or its officers and sufficiently dangerous to require an explicit, non-discretionary municipal response." *Id.,* ¶ 39. "The theory of this exception is that when a danger known to a public officer or employee is of such a compelling force, it strips that person of discretion or judgment and creates an absolute,

certain and imperative duty to act." *Heuser ex rel. Jacobs v. Community Ins. Corp.,* 2009 WI 151, ¶ 23, 321 Wis.2d 729, 774 N.W.2d 653; *see also Kimps,* 200 Wis.2d at 15–16 (when an officer is faced with a compelling and known danger, the officer has a clear and absolute duty to act); *C.L.,* 143 Wis.2d at 715 ("circumstances may give rise to such a certain duty where ... the nature of the danger is compelling and known to the officer and is of such force that the public officer has no discretion not to act"). The application of the known and compelling danger exception to governmental immunity is by nature "case-by-case." *Lodl,* 253 Wis.2d 323, ¶ 38.

As has been shown time and time again, Polk County was deliberately indifferent when they knew the risk of sexual assault to inmates within their jail and they failed to act to prevent and detect the abuse. Polk County knew of the particularly hazardous circumstance, a compelling and known danger of sexual assault, and failed to act. As such, the compelling danger exception applies such that summary judgment is inappropriate. At the very least, this is a factual question that is not appropriate for summary judgment, but for a jury.

## V.     Plaintiffs are entitled to be indemnified by Polk County pursuant to Wis. Stat. § 895.46.

Defendant Polk County asks this Court to grant summary judgment on Plaintiffs' indemnification claim because they contend that, as a matter of law, Christensen was not acting within the scope of his employment. This fails for two reasons 1) Seventh Circuit case law clearly states that indemnification should not be decided before the factual issues related to scope and liability are resolved and 2) it has already been shown that Christensen was acting within the scope of his employment—at the very least, whether or not Christensen was acting within his scope of employment is a factual matter for the jury to decide.

A.    *Seventh Circuit precedent holds that indemnification should not be decided before the jury has resolved liability.*

It is well-settled law in the Seventh Circuit that indemnification claims should not be resolved before the jury has decided the factual issues related to liability – even in cases involving a sexual assault by a police officer. In *Doe v. City of Chicago,* a factually analogous case involving a police officer's sexual assault of a civilian, the Seventh Circuit reversed the district court's grant of summary judgment in favor of the defendant city. 360 F.3d 667 (7th Cir. 2004). Stating that "(we have warned repeatedly against trying to resolve indemnity before liability," the court held that the district judge erred by ruling on the city's responsibility for the tortious conduct of its police officer "before the actual facts bearing on the issue were determined." *Id.* at 672-73 (citing *Lear Corp. v. Johnson Electric Holdings Ltd.,* 353 F.3d 580, 583 (7th Cir. 2003); *Nationwide Ins. v. Zavalis,* 52 F.3d 689, 693 (7th Cir. 1995); *Grinnell Mutual Reinsurance Co. v. Reinke,* 43 F.3d 1152, 1154 (7th Cir. 1995); *Travelers Ins. Cos. v. Penda Corp.,* 974 F.2d 823, 833-34 (7th Cir. 1992)).

Following this clear precedent, a litany of district courts in this Circuit - including those applying Wisconsin state law - have declined to decide the indemnification issue before resolving liability. *See, e.g., Lemons*, 2016 WL 374651, at *24-25 (denying motion for summary judgment on indemnification in a case where an officer sexually assaulted a citizen even though the City claimed that the officer only had sexual relations to gratify his own needs); *Rankins v. Howard,* No. 11-CV-1153-JPS, 2012 WL 5932029, at *3 (E.D. Wis. Nov. 27, 2012) (denying defendant municipality's motion for summary judgment, ruling that "the issue of indemnification will be reserved for further consideration at trial"); *Estate of Watts,* 2008 WL 4058032, at *3-4 (declining to make a "preemptory finding" on the indemnification issue); *Carney v. White,* 843 Supp. at 480 (declining to decide in

67

municipality's favor on the indemnification issue "at this stage of the proceedings"), *aff'd sub nom., Carney v. Vill. Of Darien*, 60 F.3d at 1273; *Doe v. Clavijo*, 72 F. Supp. 3d at 915 ("In accordance with the Seventh Circuit's warning, the Court declines to resolve the issues of *respondeat superior* liability and indemnification at this stage of the proceedings."); *Doe v. Lee*, 943 F. Supp. 2d at 880 ("heed[ing] the Seventh Circuit's warning" and leaving for trial the issue of municipal liability); *Doe v. Roe,* 2013 WL 2421771, at *4-5 ("The court concludes that a judgment regarding indemnification at this stage of the proceedings would be premature."); *Doe v. Lee*, 943 F. Supp. 2d at 880 ("The Court will heed the Seventh Circuit's warning and leave the issue of the Village's liability for Lee's alleged torts for trial."); *Arias,* 2008 WL 191185, at *6 (denying motion for summary judgment on indemnification issue "because it is premature"). As such, Polk County's motion for Summary Judgment on the immunity claim must be denied.

## CONCLUSION

Based upon the foregoing facts and law, Defendant WCMIC is not entitled to summary judgment as a matter of law. They have failed in their burden of proof to establish a right to summary judgment. Their motion should be denied and this matter allowed to proceed to trial.

**ECKBERG LAMMERS, P.C.**

Dated:   July 29, 2016                    By:   s/Lida M. Bannink
                                                Thomas J. Weidner (1082013)
                                                Lida M. Bannink (1088518)
                                                Attorneys for Plaintiffs
                                                430 Second Street
                                                (715) 386-3733
                                                tweidner@eckberglammers.com
                                                lbannink@eckberglammers.com