Allen Jorgenson, allegations of fraternization with an inmate.

1.    Did the employee know that the prohibited conduct was wrong?  And, are the violated rules reasonable and fair?

Yes, the Jail policy against Fraternization with Inmate (C-202) has been in place since 11/8/07.

2.    Was the investigation fair and objective?  Did the investigator conduct a thorough investigation, affording the accused an opportunity to be heard and defend himself?

Yes.  The investigation included statements from current inmates that may have witnessed the alleged activities.  Additionally, Officer Jorgenson was given the opportunity by Capt Nargis & C.D. Moe to give his side of the story and provide a defense.

3.    Is there adequate proof of a violation?  Does it meet the level of "preponderance of the evidence" or "clean and convincing" in cases of moral turpitude?

Yes.  The evidence suggests that Officer Jorgenson gave undue, and preferential, attention to the inmate.

4.    Does the administration apply rules, orders, and penalties to all employees uniformly and without favoritism?

Yes.

5.    Has the Sheriff considered the employee's work history, level of performance, and prior discipline or lack thereof?

Yes.  Officer Jorgenson's work history and lack of any prior discipline was considered.

6.    Does the employee wish to be heard on the subject of discipline and have an opportunity to petition for a lesser penalty?

Officer Jorgenson waived his right to representation and did give his side of events.  He was also allowed a chance to defend the allegations.  He was advised that he could appeal the decision for a letter of reprimand, but that he could attach a letter to it if he wished.



EXHIBIT

D

PCJ0003737

7.  Is the degree of discipline consistent with the offense?  Does the punishment
    fit the "crime"?

    Yes it does.  The potential negative effects of fraternization – or the
    perception of fraternization – could be extremely detrimental to the security of
    the facility, and the integrity of the staff.  A letter of reprimand is appropriate.

SN/810
1/18/12

PCJ0003738

17 January 2012

***Investigation ~ Allegations of Fraternization/Misconduct by Allen Jorgenson***

On Sunday, 15 January 2012 I, Scott A. Nargis, was off duty at my residence when I received an email from Sgt Steve Schaefer on my cell phone. The email was sent at 1757hrs. I noted that there was a document attached to the email. Upon opening the document I learned that it was some documentation, by Officer Kathleen Fjorden, of an incident that occurred in K-pod on 14 January (see attached copy). Of note was that, at the end of the document, Officer Fjorden indicates that one of the female inmates in K-pod informed her that Officer Allen Jorgenson does special favors for Inmate Nicole Schlageter. She also indicates that Officer Jorgenson wanted to know about the incident in K-pod. She writes "He then told me Inmate Nicole Schlageter was accusing him of grabbing her."

At 1808hrs I then received another email from Sgt Schaefer, with another document attached (see attached copy). This document details discussions that he had with Officer Fjorden, Inmate Christine Otis-Munoz, and Inmate Jamijo Schmidt. Of note was that Officer Fjorden appeared to be upset about the issues that arose on 14 January, and reported that she was "sick of Allen spending unnecessary time in K-pod and also standing outside K-pod 'leering' at the female inmates". Additionally, both inmates make allegations of actions by Officer Jorgenson that would be unprofessional, in violation of Jail Policy, and potentially criminal.

At 1938hrs I then received another email from Sgt Schaefer, with another document attached (see attached copy). This document details a discussion that he had with Officer Jorgenson. Of note is that Officer Jorgenson initiated the discussion, and that according to Officer Jorgenson he heard that Inmate Schlageter was spreading rumors to the other females that he was "grabbing her ass" and touching or hugging her. Officer Jorgenson went on to indicate that he felt a need to "nip it in the bud" and had told Inmate Schlageter that "she was a loudmouth liar", or something to that effect.

This document also detailed a discussion with Inmate Schlageter. He reports that Inmate Schlageter informed him that the other female inmates perceive that Officer Jorgenson gives her special attention and is nice to her. She denied anything inappropriate between her and Officer Jorgenson.

Upon my return to duty as Jail Captain on 16 January, I reviewed the documents again and left a voice message for Chief Deputy Steve Moe indicating that I had a personnel situation that needed to be looked into, and I requested his assistance.

In the meantime, I had the opportunity to review the surveillance video from the K-pod incident on 14 January. It should be noted that Officer Jorgenson was assigned as the B-

shift Master Control Officer, and the incident occurred during his shift. As the Master Control Officer, Officer Jorgenson had control of the Minimum Housing camera. I did view video from the incident, as well as video of the period immediately before and after the incident. Additionally, I scanned the video feed for the duration of the B-shift on that date. I noted that the camera was trained on K-pod for an inordinate amount of time, as compared to the other cells. I also noted that, as Officer Fjorden was handling the incident, the video feed would seem to indicate that the operator had an unusual interest for a situation that was only a verbal altercation.

Considering the allegations that had been made, I decided to check the surveillance video from the last time that Officer Jorgenson had been assigned to Master Control (1/6/12). I noted a similar situation, with an inordinate amount of time being focused on K-pod. I also noted that Inmate Schlageter picked up the intercom handset at 7:02:56pm and remained on the intercom until 7:11:20pm. The intercom connects to the station that controls the Minimum Housing area, which 90-95% of the time is Master Control. It is not normal for a jailer to speak to an inmate on the intercom for that length of time.

I then checked the video from the two times that Officer Jorgenson was assigned to Master Control prior to 1/6/12. The video again showed that the camera was trained on K-pod for an inordinate amount of time.

At approximately 1000hrs on the 16th, C.D. Moe met with me in my office. I explained the situation to him, and the allegations that had been made. I also advised him of what I had observed with the surveillance video. It was decided that we would interview the female inmates that were in K-pod at the time of the incident on 14 January, not only for their take on the incident, but for any other information that they might have. C.D. Moe then left the jail to handle some other business.

At approximately 1115hrs C.D. Moe and I began to interview each of the inmates, individually, in multi-purpose room X4. When each interview was complete, the inmate was then placed in X3 so they could not discuss the interview with others in the cell. Each inmate was advised that we were looking into the incident from 14 January and attempting to determine a cause of it. Unless they offered the information without prompting, the inmates were told that there were allegations of an inappropriate relationship between one of the females, and one of the jailers, without mentioning names. A summary of the information learned from each inmate is as follows:

**Jamijo Schmidt, 2/21/73:**
- Stated Nicole had been on the phone (intercom) with Allen. He called her a bitch and she came into the bunk area and threatened the whole cell. Threatened to stab someone in the eye with a pencil.
- Stated "whatever Allen and Nicole have going has been going on too long", but indicated that she did not believe there was a physical relationship.
- Stated "I've told Allen to quit pissing her off because we have to deal with it".
- Stated Allen "comes into the cell for no reason", that he just hangs out to "chit chat".

PCJ0003740

- Stated that Shelly (Campeau) was going to "let Allen have it because we are tired of it".
- Stated that a released inmate, Dar (Swanson), would flirt with Allen when she was here.

**Savannah Scheel, 7/4/87:**
- Stated that the incident happened because Nicole was disrespectful to Allen, and he was rude back to her.
- Stated that whatever is going on between those two, she "wouldn't call it a relationship".
- Stated that when she was in X4 with Nicole after the incident on 14 January, Allen apologized over the intercom.  Stated that Nicole asked her to apologize to Allen on her behalf.

**Christine Otis-Munoz, 7/21/75:**
- About the incident on 14 January, stated that Nicole told her that Allen called her a "big mouth bitch".
- Stated that when she was incarcerated here for 4 ½ months last year, there were three other girls "fighting over Allen" besides Nicole (named Tyne Lowe, Kristina Erlitz, and Dar Swanson).  Stated Allen gave the "the same kind of attention".
- Stated that Allen calls Nicole on the intercom frequently.
- Stated that Allen makes remarks when we go into the shower, such as "nice bra" or "nice boobs".
- Stated that she saw Allen pat Nicole on the butt when she was here last year.  Stated that Nicole was outside of the cell for med delivery and that she (Christine) was looking out of the cell window and observed Allen open the door to let Nicole back into the cell and then patted her on the butt.
- Stated that Allen looks at the camera to make sure it's not pointed at him prior to doing things.
- Stated that Allen comes into the cell to hang out and talk to Nicole.
- Stated that Allen will "treat Nicole differently" and that he is "more friendly" with her.

**Patricia Leveen, 8/26/86:**
- Stated that Nicole had stated that Allen "touched her crotch and tits".
- Stated that Allen has asked her to "show him my boobs, undress for him in the shower".  She stated that he makes comments about the color of her underwear.  Stated that he touches her hand at meal pass and/or med pass.
- Stated that when she first came in (prior to Oct. 2011 she had not been here since she was 17 years old) Allen asked her if she remembered him.  She

stated that she did remember him, that she remembered his "baby face" and how he would look at her with his eyes "glaring" at her.

- Stated that during a med-pass when she was in A-pod Allen asked her about remembering him, then made a comment that he could see her in the shower and that "I should shake my titties" for him.
- Stated that she was moved to upper-A, Allen was up there and "told me to lift my shirt and show my tits".
- Stated that Allen "smacked my ass", has put his hand in the small of her back. She stated that these things did not happen until she had been moved to Minimum.
- Stated that Nicole has told her about Allen touching her.
- Stated that when Allen was putting shackles on her he would run his hand up her leg.
- Stated that Allen is "always there" and she finds it "creepy".
- Stated that, while she has been in Minimum, Allen has "touched my ass" twice and put his arm around her.
- Stated that she observed Allen rub Dar Swanson's hand sexually; indicated when Allen rubs her hand that way, she takes it to be a sexual gesture.
- Stated she came out at 1600 meds on 14 January and told Allen that "he's fucking disgusting for hitting on Nicole". Stated that she had just heard that "he touched Nicole's crotch and spanked her ass".
- Stated she heard Nicole say there were going to "fuck in the broom closet".
- Stated that, on 14 January, Allen got Nicole on the intercom and told her to keep her mouth shut. Nicole "got pissed", slammed down the intercom and threatened to stab someone in the eye. Stated Nicole said "Allen just said 'fuck off bitch'".
- Stated that she heard that Allen apologized over the intercom when Nicole and Savannah were in X4.
- Stated that Allen will get Nicole extra things, such as toothpaste, toothbrushes, hot packs.

**Laura Ytzen, 10/10/60:**
- Stated that the incident on 14 January was a result of too many women in a small area.
- Stated that the incident happened after Nicole had been "back and forth" on the intercom with Allen. Seemed to be a case of "you said something about me, so I said something about you".
- Stated that Nicole is flirty, but that she wouldn't say she's seen any favoritism.

**Shelly Campeau, 6/14/77:**

- Stated that, on 14 January, she was sleeping. Nicole came into the bunk area saying that "whoever was talking shit about me, I'm going to stab them in the eye with a pencil."
- Stated Nicole said Allen called her "a loudmouth bitch".
- Stated that Allen called her on the phone and said, about the last time she was incarcerated here, "Thanks for the show". Stated that he was referring to a time when she was in A-pod and did not put a towel up to cover the window in the shower.
- Stated that there is inappropriate behavior, such as "hand touching" at med pass.
- Stated that there have been other inmates he has been inappropriate with, and named Kristina Erlitz.
- Stated that Allen saw her at a store in September and stated that he made a comment that he "was going to pick me up and take me for a ride, or maybe you would take me for a ride."
- Stated Allen called her on the intercom after the 14 January incident, that she got on the intercom he asked he what was going on. Stated that she told him "You know what the fuck this is about" and hung up on him.
- Stated that Allen treats Nicole differently. "We never get hot packs."
- Stated that the other girls, when they want something, will say "Nicole, you ask. He'll do it for you."
- Stated that Nicole thrives on attention.
- Stated that Nicole commented to Allen about him calling on the intercom all the time, and don't the other jailers know? Stated his reply was that he "knows when to do it."

**Barbara Branville, 1/2/68:**
- Stated that there is "a jailer here who is unprofessional". Named Allen.
- Stated that the incident on 14 January was a jealousy issue, and that it is grade school stuff.

**Sherry Youngmark, 4/7/72:**
- Stated that prior to the incident on 14 January Nicole had been on the intercom, Allen was "being an asshole to her" and he "called her a fucking bitch".

**Suzette Henley, 8/15/72:**
- Stated Nicole threatened everyone after being called a bitch on the intercom "by Allen I think".
- Stated that Nicole said she was called a "loudmouth bitch" by Allen "in the bubble".

- Stated that the talk the rest of the day was that Nicole brought it on herself and she should have known better.

C.D. Moe and I met with Inmate Schlageter to speak with her. Inmate Schlageter was adamant that there was nothing inappropriate going on between her and Officer Jorgenson, and stated "You're not going to get me to say that there is." She did state that Officer Jorgenson treats her nicely, but had nothing further to contribute.

Given the fact that former inmate Dar Swanson's name came up as one who could corroborate some of the information provided by Inmate Leveen, a message was left for her requesting that she call me. I did receive a call from her at approximately 1645hrs while on my way home. I explained to Ms. Swanson what the situation was, and that there was an allegation of inappropriate conduct. I explained that her name came up as someone who would have personal knowledge of some of the allegations. I asked Ms. Swanson if she had ever experienced any of the jail staff being unprofessional with her, such as inappropriate comments, or if there had been any touching of her other than what would be considered normal in the course of a jailer's duties. She stated that she did not experience anything like that. She did state that Kari Ebert talked about having her hand touched at med or meal pass, but she felt that was just incidental. I again asked if she had experienced any jailer touching her or making inappropriate comments. She stated that she did not. I thanked her for her time and terminated the call.

Upon my return to duty on 17 January 2012, I had a chance to speak with C.D. Moe and advise him of what I had learned from the previous evening's call. We then reviewed notes from the interviews of the day before. Considering that Kristina Erlitz's name came up twice, with the allegation that she was one "fighting for" Officer Jorgenson's attention, we decided to try to contact her. I was aware that she was serving a prison sentence, and used the DOC Locator website to locate her at Robert Ellsworth Correctional Center. I made contact with her social worker, Anthony Billman, and requested to be able to speak with Ms. Erlitz about a situation she may have knowledge about.

At 1015hrs I did make contact with Ms. Erlitz. I explained that her name came up while we were investigating allegations of inappropriate actions by a jailer. I asked if she had any knowledge of anything like that, and she replied "No, not really." I went on to state that the allegation involved preferential treatment to a female inmate, possibly some improper contact, and asked if she was aware of anything like that. She stated that she was not, but that she knew who I was talking about. I asked her who that was, and she replied "Allen". She then stated "Allen and Nicole have a close relationship". She clarified that "Nicole" is Nicole Schlageter. I asked her what she meant by "close relationship". She stated "flirting, sexual comments". She stated that there was some touching, just like pushing the other person as a joke was make, touching her arm when he was in the cell visiting. She stated that she did witness that a number of times. She stated that Allen would "tell her he'd want to take her on his boat", or say that he should "invite her to his place". She also stated that Nicole would spend long periods of time on

the intercom talking to Allen, or that she'd exit the cell to talk to him. She stated that they would talk about things that she did not want the rest of the females in the cell to know, that they were "secretive, but you could tell". I asked her twice if she had been on the receiving end of any touching or comments like she was referring to, and she stated that she was not. I asked her if there was anything else that I needed to know about the situation, and she could not think of anything. I thanked her for her time and concluded the call.

At approximately 1145hrs I contacted Officer Jorgenson via text message and asked if he would be able to stop by the office around 1400hrs, as I was aware from a previous contact that he would be in the area around that time. He indicated that he could do that.

At approximately 1400hrs C.D. Moe and I met with Officer Jorgenson in the media room of the Sheriff's Department. C.D. Moe gave Officer Jorgenson a brief overview of the allegations that we had been investigating, and informed Officer Jorgenson that there was a potential for discipline as a result of what we discovered. Officer Jorgenson was advised of his right to stop our discussion and seek representation in the matter, but that he was compelled to comply with our investigation. Officer Jorgenson took a few minutes to think about the situation, and did make comments such as "I have some questions." C.D. Moe and I both advised Officer Jorgenson that we also had some questions, and that we would very much like to get his side of the story, but that he had to make a decision to move forward or seek representation. Officer Jorgenson did indicate that he was willing to answer our questions without representation.

C.D. Moe asked Officer Jorgenson to describe what had happened on 14 January. Officer Jorgenson indicated that he was working in Master Control (for the B-shift), and that he got an intercom call from Inmate Schlageter. He then stated that he should back up to Friday, 13 January. He stated that he was doing meds and Inmate Patricia Leveen came out and "said I was dirty" and that I was "falling for a dirty girl". He stated that Inmate Leveen informed him that Inmate Schlageter had been telling people that he has been touching her. He stated that he did not want to confront Inmate Schlageter about it that night, as he believed that she would figure out who had told him and possibly retaliate against that person. He stated that he did want to talk to a sergeant about it, but when he came in on 14 January he did not realize that Sgt Schaefer had worked an A-shift, and he did not have contact with him.

Officer Jorgenson then returned to the intercom call of 14 January. He stated that Inmate Schlageter had asked to go to an X-cell, which both were occupied at the time, and that she was very demanding about it. He indicated that he had a reaction like "you don't run this place". He stated that he reacted by telling her that she needs to "keep her mouth shut and stop talking about shit that isn't true". He stated that it was very soon after this that Officer Fjorden asked for access to K-pod, and ended up dealing with the incident. He stated at one point that he spoke with Officer Pete Dueholm, who was in the area while the incident was being handled, and asked him what was going on. He stated that Officer Dueholm stated that it was about him (Jorgenson).

PCJ0003745

C.D. Moe asked Officer Jorgenson about his contacts with Inmate Schlageter. Specifically, he asked how many times he had spoken with Inmate Schlageter on the intercom on 14 January. He stated that it was just the one time. Officer Jorgenson was asked about the frequency and length of contacts with Inmate Schlageter, and he indicated that he doesn't talk to her more frequently, or for longer periods, than he does with any other inmate. He did indicate one time when he spoke with her a little longer than usual, as she was upset about a situation with her daughter. He indicated, correctly, that he believes that is part of his job. About Inmate Schlageter, he indicated that his "relationship is the same with her as any other inmate".

I informed Officer Jorgenson of what was revealed by our investigation, specifically that there were two things that consistently came up: that there is a perception by the other inmates of K-pod that there is some kind of relationship between him & Inmate Schlageter and that he gives her undue and/or preferential treatment, and that he spends an inordinate amount of time in contacts with her when compared with other inmates. I mentioned that the statements from the other inmates in K-pod – including someone that is no longer in custody here - consistently mentioned "something going on" or "relationship". I also mentioned that the video footage from the last four times he was in Master Control shows far too much attention being paid to K-pod in general, and specifically the time on 1/6/12 where he spoke with Inmate Schlageter on the intercom for over 8 minutes.

Officer Jorgenson was also advised that there were statements made about inappropriate physical contact with one or more of the female inmates, as well as inappropriate, sexual remarks to one or more of the female inmates. He did not offer an explanation as to why multiple inmates would say that. However, it should also be noted that our investigation did not reveal anything that could substantiate those claims.

Officer Jorgenson's take on the situation was that Inmate Schlageter must have some kind of infatuation with him. He stated that he believe that Inmate Otis-Munoz has come out of the cell and told him that Inmate Schlageter was saying things about him. He stated that former inmate Dar Swanson had done so also. He continued to deny that there was an inappropriate relationship between him and Inmate Schlageter.

C.D. Moe did inform Officer Jorgenson that our concerns about the situation were based on a couple of issues. One issue being that fraternization with an inmate threatens, or has the potential to threaten, the security of the facility. A tangential issue would be that undue attention given to one inmate or one cell means that the rest of the inmates an officer is charged with caring for are not being supervised properly. Further, even rumor of an inappropriate relationship will place doubt in the minds of co-workers. It was clearly established that the belief among the female inmates is that Officer Jorgenson would provide preferential treatment, and give undue attention, to Inmate Schlageter. Additionally, there is at lest one of his co-workers that had that same belief.

C.D. Moe informed Officer Jorgenson that there were some potentially serious consequences involved with this situation, but that he did not feel that Officer

Jorgenson's job was in jeopardy. He informed him that we believed we had established a few things. One thing we knew was that Inmate Schlageter is not a very credible source of information. Another thing we believed we established was that Officer Jorgenson flirts with some of the female inmates. We also believed that Officer Jorgenson, at best, allowed some kind of arrangement or relationship to grow between him and Inmate Schlageter; at worst, he fostered and encouraged it. We asked Officer Jorgenson to step out and give us a few minutes to discuss things.

When Officer Jorgenson was gone we made contact with Sheriff Pete Johnson, who had previously been briefed on the situation. We summarized our discussion with Officer Jorgenson, and advised him of the things we believed we had established. C.D. Moe and I had previously discussed the fact that Officer Jorgenson has a very good work history, with no indication that I could find of any previous disciplinary issues. With that in mind, we informed the Sheriff that we believed the situation was serious enough to merit discipline, and that we believed a letter of reprimand was appropriate. Sheriff Johnson agreed with us.

We brought Officer Jorgenson back into the room. C.D. Moe did advise him that we valued his contribution to the department, that we know he is a "go to" guy when we need help with something. He was informed that we had considered his work history, and the fact that there was no prior discipline history. C.D. Moe then advised him that I would be preparing a letter of reprimand this week. We tried to assure Officer Jorgenson that a letter in his file is not a major deal, and that it should be a learning experience. We thanked Officer Jorgenson for taking the time to meet with us, shook hands, and concluded our meeting.

In accordance with our decision, I will be preparing a letter of reprimand for Officer Jorgenson's file.

No further information at this time.


1/20/12

At approximately 1600hrs on 1/19/12, while I was on duty in the Polk County Jail as the Jail Captain, Sgt Schaefer informed me that Inmate Schlageter had asked to speak with him. He stated that she had provided him with two pages of handwritten letter, front and back, and had spoken to him about the content of the letter. He informed me that she stated that she had lied about there not being anything going on with her and Officer Jorgenson. She had told him that she did not want to get Officer Jorgenson in trouble, but that she had spoken with her mother about it and she had been advised to report what was going on. He then provided me with the letter, which he and Sgt LaVenture had read. I then met with Sheriff Johnson and C.D. Moe and read them the contents of the letter.

PCJ0003747

The letter alleges that Officer Jorgenson had engaged in the behaviors that had been alleged by the other female inmates. Specifically, she indicates "I would like to tell the truth about the allegations made against Allen Jorgenson". She goes on to write "there are many things he has said & done that have been inappropriate in a sexual manner towards me." Further, "I've seen it & heard of it with other girls that have been here & gone & some that are still here". She goes on to mention that Officer Jorgenson will make comments when the females go into the shower, that he has told her that he wants her to ride topless in his boat, that he had brought items into the jail for her as payment for acts (such as lifting her shirt for him), and that he has touched her. She indicates that he would touch her hand during med pass or at meal pass, and that he has grabbed her around the wait and slapped her butt. She indicates that he would do things that he was not supposed to, such as bring her hot packs. She indicated that she once asked him if there were any corrupt jailers, and he replied that he was and that he'd done many things he could have been fired for. She indicates that the day Sgt Schaefer spoke with her (1/15/12) Officer Jorgenson spoke to her thru to trap and said he was sorry, that he "didn't mean for it to go down like this", that "he owed me his life" and that she made him give her 4 or 5 Ibuprofen.

Sheriff Johnson, C.D. Moe and I discussed the situation. It was decided that we would need to address the issue with Officer Jorgenson again. I had plans to be out of county for a meeting with the Jail Inspector on 1/20/12, so we decided that we would address the issue again on 1/23/12. It was further decided that Officer Jorgenson's post assignments should be modified so that he is not responsible for supervising Inmate Schlageter. Additionally, Sgt LaVenture's shift on 1/20 was adjusted so that there would be a supervisor present for each of Officer Jorgenson's shifts until 1/23. Further, I did speak with Officer Jorgenson by phone and told him that I had received a letter from Inmate Schlageter that contained similar information as we had received from the other female inmates, and that he would need to meet with C.D. Moe and me again on 1/23 for some clarification on some issues. He indicated that he understood. I also instructed him that he was not to have contact with Inmate Schlageter. He also indicated that he understood that. This conversation occurred at approximately 1740hrs on 1/19.

I did return the letter to Inmate Schlageter after making a copy of it. I thanked her for the information, and asked her what changed her mind. She stated that her mother told her she had to tell. She did state that she did not want him to get into any trouble. I stated to her that if there were two issues. One, if these things were happening then she is not getting anyone into trouble, he is getting himself in trouble. And two, if these things are occurring we cannot allow them to happen. I again thanked her and exited the cell.

I then asked Sgt Schaefer to document the conversation he had with Inmate Schlageter when she provided him with the letter. I also asked him if he would check the inmate phone system for any telephone calls that she may have made to her mother.

A short time later I received a text message from Officer Jorgenson asking if there was any way that we could have our conversation on 1/20, as he just wanted to get the issue

over with and put it behind him.  I informed him that I was scheduled to be out of county at a meeting, so that would not work.

At 1902hrs I did receive an email from Sgt Schaefer indicating "Schlageter did make a call to her mother shortly after she was placed in Max pod 1/15/12. I listened to the entire call, the only reference to this incident is she tells her mom "this guard has been flirting with me" to which Mom replies "file a sexual harassment against him".  Sgt Schaefer later emailed me that he had copied the telephone call to compact disc and left it in my office.

At 1950hrs, while I was off duty at my residence, I received another text message from Officer Jorgenson.  The following is the content of our exchange:
- AJ:  Hey, u got a sec?
- Me:  What's up?
- AJ:  I can't turn my head off about this stuff.  U said I really shouldn't worry about this new letter but should I be?
- Me:  I guess I can't really answer that.  But it's nothing new.  We just need clarification on some things.
- AJ:  Ok, I'm really sorry u have to deal with this.
- Me:  Appreciate that.  But don't worry about it.

This concluded the conversation at 2005hrs.

On 20 January 2012 I returned to duty in the Jail.  I printed off an email from Sgt Schaefer that documented his discussion with Inmate Schlageter.  I also had an opportunity to listen to the call that Inmate Schlageter had made to her mother.  The call was made on 1/15/12 after she had been moved from K-pod to A-pod.  The call was made to 715-497-5474, to her mother Joni Haller.  During the call Inmate Schlageter states that she had been moved because some "stupid guard that flirts with me".  Her mother then states "Charge him with sexual harassment".  The remainder of the call contains no more pertinent information.

On 23 January 2012 I returned to duty in the Jail.  I found a letter that had been left for me by the jail staff.  The letter was from Inmate Schlageter to former inmate Amy Reimenschneider.  In the letter Inmate Schlageter writes "Well, you're gonna be shocked. I told about Allen.  Had to.  I wasn't sitting well with me for some reason.  I only told about my incidences.  My mom said to do it."  She further writes that she had decided to lie for him because "he seemed so worried."  She then writes "Well he should stop shopping in the jail for women who he can treat like pieces of meat."  Inmate Schlageter indicated that one "thing that sucks" which helped her decide not to lie anymore is that "it was interfering w/my meds.  When he was out there, 75% of the time I'd deny my meds."

I did have an opportunity to check Inmate Schlageter's medical records in the nurse's office.  I did notice that the med sheets indicated that she did refuse her meds fairly often. I did also note that a high number of the refusals contained the initials "AJ".

PCJ0003749

At approximately 1400hrs Officer Jorgenson was available to meet, as previously requested by my phone call on 1/19. He met with me, C.D. Moe and Sheriff Johnson in the Sheriff's media room. Officer Jorgenson was advised that there was some additional information that has come up, in large part generated by Inmate Schlageter. He was advised that he was being accused of touching female inmates, having inappropriate conversations with female inmates, and doing favors for female inmates.

Officer Jorgenson recapped the events leading up to the incident on 1/14. He then made mention of the letter that I had received from Inmate Schlageter and stated that he felt it was probably retribution for him not giving her utilities in her cell (for failing to clean) on the morning she wrote me that letter. He indicated that the allegations of him touching her were what he had called her on prior to the incident on 1/14. He continued to claim that the inmate was infatuated with him. When directly asked by Sheriff Johnson, Officer Jorgenson stated that he has never touched Inmate Schlageter in a sexual manner.

I explained to Officer Jorgenson that retribution is a possible explanation for the inmate writing that letter, but there were a couple of issues that didn't sit well with that explanation. My first concern was the number of behaviors mentioned in the inmate's 4-page letter. Additionally, the things she was alleging are the same things that the other females from K-pod were telling us independently. Officer Jorgenson stated that it was probably because Inmate Schlageter was telling them all about the things she is thinking of or would like to do, based on her infatuation. I pointed out that someone outside of the facility, with no access to communication from Inmate Schlageter, told me that she had heard Officer Jorgenson say things to Inmate Schlageter, and what she told me was identical to some of the claims Inmate Schlageter made. Officer Jorgenson offered no explanation for that.

I then pointed out that retaliation also didn't explain why, the day she was moved to A-pod, Inmate Schlageter told her mother on the phone that the reason she was moved was because of a guard that flirts with her. Officer Jorgenson denied flirting with Inmate Schlageter.

I reminded Officer Jorgenson that the allegations were quite serious, including touching of an inmate, which could be considered a crime, and bringing in items from outside of the facility, which could be considered a crime. When I mentioned bringing in something from outside the facility for Inmate Schlageter, his only response was "That's what it said? Huh." Officer Jorgenson offered no explanation or denial of that activity. Officer Jorgenson was asked to exit the room while we discussed the situation.

Upon his return I informed Officer Jorgenson that he was being warned that any other allegations of a similar nature involving inmates would probably result in some suspension time while it was investigated. I informed him I believed that he was being less than honest with us, and that was based on my training & experience as an interrogator. I informed him that the information was too similar to be coincidental, and that there were some things that the inmate could *not* have known unless he told her. I informed him that the letter mentioned him telling the inmate about him and his brother

trying to have a threesome with a girl from Peru (I knew this information to be accurate, as Officer Jorgenson had mentioned it to me while off duty). Officer Jorgenson's answer for that was that he had discussed it with Inmate Shelly Campeau when he was booking her in.

At this point Sheriff Johnson pointed out that the behavior he just admitted was exactly the issue we were talking about. Even if there was no touching, his behavior was inappropriate and unprofessional. C.D. Moe did mention that what he was wanting to hear from Officer Jorgenson was some kind of statement indicating that he knew what behavior was proper and what was not. Sheriff Johnson also spoke of keeping the line between personal and professional life, and not crossing it. Officer Jorgenson never did provide acknowledgement of an inappropriate relationship, or a statement that he understood what was proper and what was not.

I advised Officer Jorgenson that the letter of reprimand he received last week was the end of the issue at this point. He was advised that if there are any further complaints, they will be very closely scrutinized. We concluded our meeting and Officer Jorgenson reported to the jail for his duty shift.

At 1853hrs Officer Jorgenson sent an email to Sheriff Johnson, C.D. Moe and me titled "Couple things". Officer Jorgenson indicates that he wants to apologize for his behavior that has blemished the reputation of the Department. He indicates that his "down fall as an officer in all this is that I have become too comfortable with how I conduct myself around inmates", male and female, and that he has allowed himself to "talk to inmates about things that are personal in nature". Officer Jorgenson indicates that this "incident has been a slap in the face and a wake up call", and that he is taking steps to not allow himself to become too comfortable again.

I feel compelled to note that, based on my training & experience, and based on knowing Officer Jorgenson for 9-plus years, it is my opinion that he was not only less than honest about things, he was outright lying to us at times.

No further information at this time.

PCJ0003751

# OFFICE OF THE SHERIFF
## Polk County Sheriff's Department
### *"Integrity, Honor, and Courage"*
#### JAIL DIVISION
## 1005 West Main, Suite 900 – Balsam Lake, WI  54810

Peter M. Johnson, Sheriff                                   Steven B. Moe, Chief Deputy

**Scott A. Nargis, Captain**
**Jail Business Telephone: 715-485-8370**
**Jail Business Fax: 715-485-9124**


January 18, 2012


To:     Jail Officer Allen Jorgenson

From:  Captain Scott Nargis

Re:     Documentation of Discipline


Officer Jorgenson,

This memo is intended to document a disciplinary procedure, which occurred on Tuesday, January 17, 2012, regarding the following incident.


Synopsis of Event

On January 14, 2012, Officer Jorgenson was assigned as the Master Control Officer for the B-shift (1400-2230hrs) in the Polk County Jail.  During the course of his shift an incident occurred in K-pod (minimum security female housing).  During the investigation of the incident an inmate reported to another jailer that Officer Jorgenson provides an inmate with "favors", and gives her undue attention in person and via the intercom phone.

Subsequently, a supervisor was advised of that information and had a discussion with the reporting officer, the inmate, and an additional inmate.  The supervisor was advised of allegations of inappropriate physical contact and sexual comments by Officer Jorgenson and reported them to the Jail Captain.

Subsequently, the Jail Captain and Chief Deputy conducted an investigation into the allegations.


Investigation

The Jail Captain and Chief Deputy conducted interviews with the female inmates that had been in the cell at the time of the incident, and who would have been in there long enough to be familiar with the "norms" of the cell.  Additionally, Captain Nargis spoke by telephone with two former inmates who had been mentioned as having first-hand knowledge of the allegations,

PCJ0003752

specifically the physical contact allegations.  Further, surveillance video footage was viewed in an effort to substantiate or reject allegations.

The investigation revealed numerous independent reports of Officer Jorgenson doing "favors" for one particular inmate.  Additionally, there were numerous independent reports of Officer Jorgenson giving undue time/attention to this same inmate.  Video footage of times that Officer Jorgenson was assigned to Master Control did support the allegations of undue time/attention given to the inmate that did not appear to be normal in the course of his duties.

Relative Disciplinary History

Officer Jorgenson has no disciplinary history with the Department.

Disciplinary Meeting

On Tuesday, January 17, 2012, at approximately 2:00pm, I met with Officer Jorgenson and Chief Deputy Steve Moe in the Media Room of the Sheriff's Department.  During the course of the discussion of situation in question, Chief Deputy Moe notified Officer Jorgenson that he was entitle to representation, as there was a possibility of discipline (specifically for violation of Jail Policy C-202, Fraternization with Inmates).  Officer Jorgenson waived representation.

Officer Jorgenson was given an opportunity to speak about the incident that occurred on January 14th, as well as an opportunity to give a defense to the allegations against him.  Officer Jorgenson was advised that there was nothing to substantiate the allegations of either inappropriate physical contact or making sexual comments.  He was also advised that there was a preponderance of the evidence to suggest that he did give undue time/attention to one inmate, and that he allowed an improper relationship to build with this inmate.

Summary and Conclusion

Chief Deputy Moe and I were in agreement that this matter was best resolved by issuing a letter of reprimand to Officer Jorgenson.  Officer Jorgenson did not dispute that prohibiting fraternization between staff and inmates is reasonable and necessary for security of the facility and integrity of the staff.

I would like to note that Officer Jorgenson demonstrated a professional demeanor during this process, and was cooperative.


CC:    Officer Jorgenson Personnel File

### *Follow up to Jorgenson Harassment Complaints*

On 24 January 2012 I, Scott A. Nargis, was on duty in the Polk County Jail as the Jail Captain. At approximately 1400hrs Officer Allen Jorgenson and I met with Employee Relations Director Andrea Jerrick in her office. We were meeting in accordance with the county Sexual Harassment Policy to facilitate the E.R. Director's investigation of allegations against Officer Jorgenson.

Officer Jorgenson was advised by Andrea that he was compelled to cooperate with the investigation, and to answer questions truthfully. He was further advised of his right to representation, which he waived. Andrea asked him several questions, but one was noteworthy. Officer Jorgenson was asked if he had ever made comments or asked questions of his female co-workers that could be considered inappropriate or offensive, and he replied that he had. This was noteworthy because, on 23 January, when meeting with Sheriff Johnson, Chief Deputy Moe and me he denied making any such statements.

During the course of the discussion Officer Jorgenson indicated that he had taken steps to make the situation better. When asked to clarify, he indicated that he had called Sgt Sarah LaVenture on the evening of the 23rd, and that she indicated she had no complaints. He further stated that he spoke with Officer Becky Roberts at shift change on the 23rd, and that she had no complaints either. He also indicated that he had spoken, on the 23rd, with Officer Kathleen "Dolly" Fjorden, and that he spoke with Officer Lorraine Beyl prior to our arrival at the E.R. office.

Upon conclusion of the discussion, Andrea indicated that this was the first part of her investigation, and that there would be follow-up conducted with the people he had spoken with. We then returned to the jail.

At approximately 1425hrs I did have an opportunity to meet with Officer Beyl in my office. I did inform her that, as part of County policy, E.R. was conducting an investigation into allegations of sexual harassment by Officer Jorgenson. I stated that he had mentioned that he spoke with her, and I wanted to get her general impressions of that conversation.

Officer Beyl indicated that Officer Jorgenson had sent her an email from home this morning. She stated that the email said something along the lines of "I'm sorry, I didn't realize I was doing anything wrong". Officer Beyl indicated that she did not reply to the email, and she was somewhat frustrated, because he "didn't accept any responsibility". She stated that the email made her feel like he was saying "Sorry you felt the way you did", and that "he didn't realize that what he was doing was wrong, in a nutshell". She stated that when he came in this afternoon he asked to speak with her. She stated that he again indicated that he did not realize he was doing anything wrong. She stated that he said "Maybe I went a little overboard". She stated that she replied to that by telling him "No, you were harassing."

PCJ0003754

Officer Beyl indicated that Officer Jorgenson was persistent with his actions. She gave the example of the song "Are You Gonna Kiss Me or Not?" She informed me that, while working, Officer Jorgenson would call her from his post to let her know that song was on. She stated that he would text her while off duty to tell her it was on. She stated that she would not answer the text, but then he would text something like "So you're not answering me now?"

I brought her attention again to his statement that he did not realize what he was doing was wrong. I asked her if she felt as if she had made it clear to him that his actions were unwanted/inappropriate. She stated that she had never "told him to stop A, B and C", but that she tried to find the "nicest" way to let him know, such as ignoring the texts, hoping that he would get the hint.

Officer Beyl indicated that she asked him if he thought he needed sexual harassment training, but he did not answer. She stated that she felt he was scared.

I asked her what her overall impression of the conversation/apology was, if she felt he was being sincere or if he was attempting to cover himself. She stated that she felt she was remorseful.

Officer Beyl then stated that she was not sure what the situation was with the female pod last week, but that she recalled a couple of weeks ago where she was "Looking at him, and asked what's going on with you two". She further explained that she observed what she described as "strange body language" between Officer Jorgenson and Inmate Nicole Schlageter. She stated that Officer Jorgenson did not answer her, so she asked him again. She stated that he replied "nothing", and walked away. She then stated that she asked him about that again today, and he denied that she had ever asked him that. She then went on to state that he denied some other things. She stated that she mentioned recently, when doing Taser recert, he commented to her about there not being any cameras on the range. She stated that he asked her, "You said that to me?" When she stated that he had said that to her, he denied that he ever had.

Officer Beyl stated that she didn't want to see him lose his job. I assured her that nobody wanted that as an outcome, but there was that possibility, given the nature/seriousness of the allegations.

I concluded the discussion by reiterating that she should feel free to make me aware if any issues arise in the future.

At approximately 1550hrs Officer Fjorden stopped by my office and asked if she could speak with me. She came in and closed the door, and asked me what was going on with Allen. I advised her that I'm glad she asked, as I needed to speak with her. I did inform her that, as part of County policy, E.R. was conducting an investigation into allegations of sexual harassment by Officer Jorgenson. I stated that he had mentioned that he spoke with, and I wanted to get her general impressions of that conversation.

PCJ0003755

Officer Fjorden did state that he came to apologize to her a couple of times. I asked her what her impression of his apology was. She indicated that she felt that he was "trying to cover his behind" but that there was also some sincerity to it. She stated that she felt that he was saying he was sorry that he hurt her, but was not apologizing for what he had done; that he did not realize what he had done. She stated that he "pretty much said he was sorry he hurt me – but he had no remorse".

Officer Fjorden stated that she just felt like she did not want to let the issue rest, and she did not want to see it just get swept away. She stated that it was only one comment to her when she first started but that it has stuck with her this whole time. However, the other girls have had this going on for a long time. She stated that, in fact, she informed Officer Jorgenson that "it's been a long time coming". I assured her that the issue is being addressed. She thanked me for my time, and I concluded by reiterating that if there are any further incidents she should feel free to notify me immediately.

While I will be following up with other staff members, I have no further information at this time.

25 January 2012

Upon my return to duty in the Jail on 1/25, I had an opportunity to communicate with Officer Becky Roberts via text message. Officer Roberts had informed me, when I initially interviewed her, that there was nothing of concern as far as Officer Jorgenson being inappropriate with her. However, it would appear that Officer Roberts had/has some concerns that are more related to Officer Jorgenson's conduct while off duty. I advised her that it was my understanding that she had a conversation with Officer Jorgenson the other night, and that I needed to ask if she was satisfied with the outcome of that discussion. She did reply that they had a good talk, and that she was very blunt with Officer Jorgenson. She indicated that she thinks he is aware of what needs to change and is willing to change. She indicated that she was very satisfied with the outcome of their discussion.

Some time later, while out in the jail, I had an opportunity to speak with Officer Lori Flandrena at the Minimum Control station. I asked if Officer Jorgenson had contacted her at all in an effort to speak with her and/or apologize, as I was aware that she knew Officer Beyl had been contacted. She stated that she had received a text message the afternoon before from Officer Jorgenson asking if she'd be able to speak with him by phone. She stated that she replied that she was unable to until later in the evening, but that she never heard back from him.

At approximately 0930hrs I had an opportunity to meet with Sgt Sarah LaVenture, in private, in the sergeant's office. I did advise her of the situation with Officer Jorgenson, specifically that E.R. had started an investigation. I informed her that she was mentioned

PCJ0003756

as one of the people that he had spoken with in an effort to make amends, although Sgt LaVenture reported that he had never made inappropriate marks to her directly. She stated that he did call her the other night and spoke with her as a friend, telling her some of the things that are going on. She stated that he maintained that he did nothing wrong with the inmate situation. I informed her that some of the other female staff got the impression that he maintained that same position as far as the harassment allegations, and that the conversations were mutual. She stated that she "could see that". When I asked her to explain what she meant, she stated that Officer Jorgenson doesn't usually think he does anything wrong. She stated that she hated being in the middle, knowing what she does due to her position, as well as being friends with Officer Jorgenson. She reiterated that her call to him was made as a friend. I advised Sgt LaVenture that this is a prime example of the difficulty in maintaining friendships with staff once you accept a supervisory position. I told her that I understood that she did not wish to betray his confidence, but at the same time she would be compelled to comply with any investigation. She did then state to me that Officer Jorgenson is looking for another job. She stated that he was asking her questions about the work her husband does, and if she thought he could be a reference. I asked her if this has just come up since these allegations, and she replied that it had.

During our discussion I mentioned that while Officer Jorgenson denied any knowledge of inappropriate behavior towards staff when he met with Department Administration, he did answer "yes" when the E.R. Director asked him if he had ever said anything to female staff that could be inappropriate. I stated that his stance with Department Administration had been that there is a lot of inappropriate/unprofessional things said in the jail, and that other people do it as well. She stated that she believed I was correct, and that he is already "preparing his defense". She stated that he mentioned to her that he was already sending emails home to his personal email address. I reminded her that while there may be some truth to his "defense", the difference lies in the fact that nobody else has issued a complaint with Administration. I reiterated the difficulty in maintaining a friendship while in a supervisory position, and pointed out to her that, if she doesn't want to betray his confidence, it might be in her best interest to inform him that she did not wish to speak about the issue on a personal basis. She agreed that perhaps that would be the smart thing to do. We discussed other jail-related topics and then returned to our duties.

At approximately 1415hrs I had an opportunity to meet, alone, with Officer Kelly Krautkramer at her post in Max Control. This was Officer Krautkramer's first day back after her scheduled days off. I explained to her that, during the course of a situation I was investigating, her name came up as someone who had been the recipient of some inappropriate or unwanted comments or questions from a co-worker, specifically sexual in nature. As I was saying this she was nodding her head as if to say "yes". I asked her, "That's true?" She replied, "No, not really." She then stated, "Well…Allen, and with everything going on, he hasn't for a really long time." She stated that when she first started here (approximately 2 years ago) he would say things, although she couldn't remember what he said. She stated that she thought he hasn't said anything since because of the way she handled it, because "of my bitchiness towards him". She did go on to state that it was to the point that, if he was alone such as in Max Control, she wouldn't go

and sit alone with him. She did indicate that she had *not* experienced anything inappropriate from anyone else. She then stated that he would "tell me about his sex life with his wife", and that he would "ask about me and Ty" (her fiancée). I asked her if this was done recently. She replied that it had been around the time they first started dating, a little over a year ago. She reiterated that he doesn't say anything anymore, and she believed that it was due to the way she handled it. She could not think of anything else that I should be made aware of. I did inform her that if she is subject to anything inappropriate or unwelcome from Allen or anyone else, she should let me know. I thanked her for her time, left her to her duties and exited the control station.

At approximately 1435hrs I had a chance to meet with Officer Joanell Bibeau, alone, at her post in the booking room. I explained to her that, during the course of a situation I was investigating, her name came up as someone who had been the recipient of some inappropriate or unwanted comments or questions from a co-worker, specifically sexual in nature. She immediately stated, "Allen has never been inappropriate to me." She then stated that "It's all around", meaning that word is spreading among the staff about the situation. She went on to state that he has made some tasteless comments, but that they were no different than things others say, and they did not offend her. She stated that she does not work with Allen that much, but that she thinks he probably views her more as a mother figure. She also state that if he were to ever say anything she thought was inappropriate she would tell him to "knock it off", and if he continued she would bring it to a supervisor. I did inform her that if she is subject to anything inappropriate or unwelcome from Allen or anyone else, she should let me know. I thanked her for her time, left her to her duties and exited the booking room.

At approximately 1515hrs Sgt LaVenture approached me in my office and asked if I had gotten a text message from Officer Jorgenson. I replied that I had not, at which point she showed me her Department-issued phone. I noted a text message from Officer Jorgenson that read "L.B. just unfriended me on FB. WTF?" (To clarify, "L.B." is how Officer Lorraine Beyl is frequently referred to by jail staff, "FB" is shorthand for Facebook, and "WTF" is shorthand for "what the fuck".) She did not indicate if she had, or was going to, reply to the text message.

On 26 January 2012, upon my return to duty, I had an opportunity to meet with Officer Stacey Ptacek, at approximately 0625hrs, alone in my office. I should note that Officer Ptacek has only been on staff since 11/14/11. I explained to her that, during the course of a situation I was investigating, her name came up as someone who had been the recipient of some inappropriate or unwanted comments or questions from a co-worker, specifically sexual in nature. I asked Officer Ptacek if that was true. She stated "No, not sexual in nature." She went on to explain that Officer Jorgenson asked her some things that made her uncomfortable. She stated that it was not the content of what he was asking, but just the vibe she got from him. She stated that it was like he was "just wanting to know too much personal information", and that it didn't make her feel right. She reiterated that it wasn't anything sexual, that it was information "if you were asking me about I wouldn't have a problem with it, and it wouldn't make me feel uncomfortable". She stated that she

PCJ0003758

felt as if Officer Jorgenson was invading her personal space. I asked her if she had experienced similar feelings in regard to any other staff member, and she replied that she had not. She could not think of anything further that I should be aware of. I did inform her that if she is subject to anything inappropriate or unwelcome from Allen or anyone else, she should let me know. I thanked her for her time, and she exited my office to go off duty.

At this point (1/26/12, 0710hrs), I have spoken to and/or followed up with each female staff member whose name was brought to my attention. Unless/until Officer Jorgenson has follow-up contacts with additional staff members, or other information is brought to my attention, I do not believe there is any further follow-up that I can perform.

No further information at this time.


At approximately 0830hrs on the 26th, Officer Lori Flandrena asked me to speak with her at her post in Master Control. Officer Flandrena advised me that she spoke with Officer Jorgenson the previous evening by telephone. She stated that he wanted to apologize to her, and that they spoke about the issue in general. She stated that she felt that Officer Jorgenson was remorseful, but she got the impression that he didn't really realize what he had done that was wrong. She stated that he brought up an incident where he commented about "extra real estate" on her backside, but that he could not think of other incidents when he might have offended her. She stated that ended up giving him several examples, and told him that his actions continued even after she had told him that she "wasn't going there" or wasn't discussing something with him. She stated that he made a comment that he just figured it was OK. She stated that she told reminded him that they had a similar conversation after he did not get promoted, telling him that he need to stop with the comments/questions, but that he has continued. She stated that she pointed out to him that it got to the point that she did not want to go into a room alone with him because she did not know if it was going to be "the good Allen that I like, or the sex Allen". She stated that she felt like she was doing more apologizing than he was. She stated that he said he was sorry and "I sincerely apologize if I did anything to offend you". She stated the "if" part of that is what left her feeling odd about it. I asked her if she felt like he was apologizing for his behavior, or if she felt more like he was saying "I'm sorry you felt that way". She said "Yes! Thank you!" She stated that was how she felt but that she couldn't find a way to describe it. She also stated that Officer Jorgenson asked her what the rumor was around the jail about him. She stated that the rumor was that he pinched an inmate's butt. She stated that he maintained that it was false. She stated that he also mentioned to her that "personnel is doing an internal investigation" and that she would probably be asked about things. She stated that she told him "I'm not going to lie". When she was finished recapping her conversation I thanked her for speaking with me and returned to duties.

A short time later I did speak with the E.R. Director, who did request that I follow up with the I.T. Director in order to get copies of the emails that Officer Jorgenson had forwarded to his personal email address. At 1137hrs I did send an email request to I.T.

Director Todd Demers requesting any emails from Officer Jorgenson's Polk County account to any outside email addresses, specifically his personal one of amjorgy@yahoo.com, since 16 January.

On 1/27/12 I did receive an email from Todd with the requested information. There were not emails that I felt were of any consequence.

On 1/30/12, upon my return to duty in the Jail, I met with Sheriff Johnson, C.D. Moe, and Andrea Jerrick in her office. Andrea had been receiving updates from me as I conducted my follow up. We concluded that there was nothing further that we needed to do as far as the investigation goes. We concluded that there was a basis for the claims of sexual harassment. We also considered Officer Jorgenson's work history and lack of disciplinary issues (prior to the incident that led to the sexual harassment allegations). It was decided that the situation would be resolved with a written letter of reprimand and warning being issued to Officer Jorgenson.

No further information at this time.

PCJ0003760

# OFFICE OF THE SHERIFF
## Polk County Sheriff's Department
### *"Integrity, Honor, and Courage"*
#### JAIL DIVISION
### 1005 West Main, Suite 900 – Balsam Lake, WI  54810

Peter M. Johnson, Sheriff                                             Steven B. Moe, Chief Deputy

**Scott A. Nargis, Captain**
**Jail Business Telephone: 715-485-8370**
**Jail Business Fax: 715-485-9124**


30 January 2012

To:     Officer Allen Jorgenson

Re:     Written reprimand & warning


Officer Jorgenson,

On 19 January 2012, pursuant to a discussion that was had between you and another jailer in my office, I began an investigation into allegations of inappropriate sexual comments/discussions, by you, directed towards your female co-workers.  I have concluded my investigation and determined that there was a basis for those claims.

After consultation with the Sheriff and the Employee Relations Director it was determined that we would best resolve this issue with this written reprimand.  The Department & County are supportive of County Policy 703 (Sexual Harassment) and you are hereby warned that any further allegations of harassment will be investigated and, if substantiated, will be subject to discipline, including possible termination.

PCJ0003761

19 January 2012

### *Allen Jorgenson ~ Allegations of sexual harassment of staff*

On 19 January 2012 I, Scott A. Nargis, was on duty in the Polk County Jail as the Jail Captain. At approximately 1000hrs Officer Kathleen "Dolly" Fjorden approached me in my office and asked if she could speak with me. I invited her to sit down and asked what was on her mind.

Officer Fjorden stated that she did not know if something had been done about the incident that occurred in K-pod on 14 January, but something needed to be done (it should be noted that this was Officer Fjorden's first day back from her days off). She was referring to an incident that resulted in an investigation into allegations of fraternization between Officer Allen Jorgenson and a female inmate. I advised Officer Fjorden that I could tell her that the issue was addressed, but that I could not tell her how. I could tell by her demeanor that she was still upset about the incident, as had been noted by Sgt Steve Schaefer on 15 January. Officer Fjorden stated that the issue was "Allen's fault", and that his inappropriate behavior with the female staff has to stop. I asked her to elaborate on what she meant by "inappropriate behavior".

Officer Fjorden stated that it has been going on since she first started here 9 years ago. She stated that she recalled Officer Jorgenson asking her about her sex life, about how they get along, and about "how you like to do it". She went on to state that "it" usually happens with the new girls also. She stated that I should ask Melissa (Officer Amundson), as she had heard that Officers Jorgenson and Amundson had ridden to work together one time and Officer Jorgenson asked her, in the car, if she "would like to suck his dick". She stated I could ask any of the female staff and they'd probably tell me similar things.

Officer Fjorden stated that she had some things she needed to say to Officer Jorgenson, and that she would like it if she could do it with me present. I informed her that I could do that. I commented that I could tell she was clearly still upset, and she stated that she was so upset she could not put into words what she was feeling. She stated that she had typed up what she wanted to say to him, and provided me with a copy of it (see attached). She had a copy of the County Sexual Harassment Policy attached and stated, "I wanted him to know I'm serious about this." She stated that everyone says it's just "Allen being Allen", but that has gone on for too long. I informed her that I was aware that Officer Jorgenson may, from time to time, make an off-color remark or joke, but that I was not aware of anything such as she was describing. She stated that I would not be, as it occurs when I'm not around. She stated that she doesn't want anyone to lose their job or anything, but something needs to be done. She again indicated that the entire incident in K-pod was his fault, because of his inappropriate behavior with one or more of the female inmates.

PCJ0003762

Officer Fjorden went on to state that Officer Jorgenson goes into the female cell for no reason, and just seems to "hang out" there. She stated that he will stand outside of the female cell and "just stare at them".

I stated to Officer Fjorden that there appeared to me to be two issues that she was raising. The first would be inappropriate conduct that resulted in an issue with the inmates. I reiterated that that had been addressed. The second would be inappropriate conduct with staff that causes issues or feelings of awkwardness. That behavior could undermine the integrity and cohesion of the staff. Officer Fjorden stated, "That is exactly what I'm trying to say, I just couldn't put it into words."

I informed her that it is now my issue to deal with, but that I would be happy to meet with her and Officer Jorgenson. We agreed to attempt to meet that day at shift change, approximately 1415hrs, as both were currently on duty.

I did inform Chief Deputy Moe of the situation, and he advised me to meet with both officers and see where to go from there. He suggested that I reiterate the County Policy and make sure Officer Jorgenson understands it. It should be noted that, on 12/11/02, Officer Jorgenson signed a document acknowledging that he had received a copy of the Polk County Sexual Harassment Policy and that he had been instructed by his supervisor to read it.

At approximately 1245hrs I did meet in private with Sgt Sarah LaVenture. I asked Sgt LaVenture to keep me informed if she hears any comments about Officer Jorgenson making inappropriate remarks to the staff, particularly female staff. She informed me that she believes that he probably has, and pretty recently. I asked what she meant, and she stated that he reportedly made a comment to Lori (Officer Flandrena) in the recent past about "just calling up Rick because she misses it". Officer Flandrena and her husband are currently separated, and missing "it" was taken as missing sex.

At approximately 1420hrs I did meet, in my office, with Officers Fjorden and Jorgenson. Officer Fjorden indicated that she had some things to say to Officer Jorgenson and she felt that it was important that she did so, and that she did it with me present. She then read the letter that she had typed to Officer Jorgenson. As she was reading this I was observing Officer Jorgenson. He did display behaviors that are commonly associated with nervousness: he kept directing his eyes down from Officer Fjorden, he swallowed repeatedly, and he appeared somewhat shaky.

When Officer Fjorden finished reading her letter, Officer Jorgenson apologized for anything he did that made Officer Fjorden feel that way. He indicated that he respected her as a co-worker and as a friend. Officer Fjorden accepted his apology, and she exited. I did ask Officer Jorgenson to remain behind.

I explained to Officer Jorgenson that the Sexual Harassment Policy is pretty clear. He indicated that he agreed. He did state that he could not recall making any statements to Officer Fjorden that would make her feel that way. I informed him that she indicated it

was early on during her employment here. Officer Jorgenson stated that he thinks he was, as a younger officer, perhaps a little out of line but that he's turned that around. He stated that there are some people who don't seem to mind. I indicated that perhaps they mind a little bit more than they let on, but do not want to say anything because it is uncomfortable for them. I did tell him that he cannot act in a way that is going to make people feel as uncomfortable as Officer Fjorden did. He indicated that he understood. He then exited the office.

At approximately 1445hrs I did meet with Sgt Steve Schaefer. He wanted to discuss the incident from the weekend that led to all of this. We did discuss it, and I did advise him that Officer Fjorden and Officer Jorgenson had a discussion in my office about some things that were bothering Officer Fjorden. Sgt Schaefer stated that he had been thinking about it for the past four days while he was off duty. I did inform him of the things that Officer Fjorden wanted to tell Officer Jorgenson, and he stated that a number of female staff members have spoken with him about inappropriate conduct/comments by Officer Jorgenson towards them. He stated that each time he asked if they wanted him to follow up on the information and they indicated that they did not, so he did not address the issue with me. I informed him that he needs to do that in the future, and I asked him and Sgt LaVenture to provide me with names of staff members that have spoken to them about this issue.

I did meet with Sheriff Pete Johnson and C.D. Moe to advise them of the situation. We discussed it, along with some potential follow up. It was decided that we would explore requiring Officer Jorgenson to attend sexual harassment training, and that I would follow up with each staff member identified by the sergeants.

On 20 January 2012 I arrived at the Jail at approximately 0600hrs. I had received an email from Sgt Schaefer that contained a list of employees that he had personally spoken with about this issue:
- Dolly Fjorden
- Joanell Bibeau
- Lori Flandrena
- Lorraine Beyl
- Melissa Amundson-Alexander
- Becky Roberts

Officers Roberts and Amundson were on duty, finishing the C-shift. I asked each of them to stop by my office before they left.

At approximately 0615hrs Officer Roberts did come to my office. I asked her to close the door and have a seat. I informed her that during the course of something I was investigating her name was given to me by one of the sergeants as someone they had spoken with about being the subject of some unwanted attention from a co-worker, specifically regarding sexual comments/questions. Officer Roberts appeared to be genuinely confused and asked if I was referring to "the tripping thing". I told her that I did not know what she was talking about, and she said that it was an incident with Allen

PCJ0003764

but that it was "nothing" and that it happened a long time ago and nothing has happened since. I did note that Officer Jorgenson was the first person that came to her mind. She stated that she did not recall speaking to a sergeant about anything like I was describing. She did go on to state that "Allen is Allen", and that she needed to have a talk with him. I should note that I received a text message from Officer Roberts on 1/18 indicating that she needed to "have a talk with Allen" about his behavior. She was referring to conduct while off duty the night before at the venison feed. Officer Jorgenson was apparently making some rude/inappropriate comments, and Officer Roberts stated that three different females were telling him "to knock it off". Officer Roberts did state to me that she could not think of anything other than the tripping incident, which she did not feel needed to be discussed. I did inform her that if she is ever the target of unwelcome attention in that fashion, she should feel free to bring it to my attention. She stated that if that happened she would put him in his place at the time of the incident. I thanked her for her time and she went off duty.

I then met with Officer Amundson. I explained to her the same thing as I had with Officer Roberts. Officer Amundson indicated that one time she was riding into work with Officer Jorgenson. She stated that he asked her what his payment would be for driving her, "road head" or something like that. She stated that she could not recall any other incident. I also informed her that if she is the target of unwelcome attention that she should feel free to bring it to my attention. I thanked her for her time and she, too, went off duty.

At approximately 0930hrs I met with Officer Beyl in my office. Once again I explained the reason for speaking with her. She indicated that Allen has, and does, make inappropriate comments to her. She stated that it's constant, but that he hasn't done anything in a long time. She then stated that "Well, a long time for Allen is about a week." She stated that he will send her text messages. She also indicated that his comments and behavior happen while at work, as well. She stated that he "hasn't tried anything, but he's very suggestive." She stated that recently, during Taser recertification, he commented to her that there are no cameras in the range. She stated that another time they were going to the laundry room and he made a comment that if they went to the storage area behind the washer and dryer, nobody would know where they were. She stated that she has just tried to ignore it, hoping he would get the hint that she is not interested, and that it would just stop. She did indicate that it bothers her that he continues to do it. She also stated that she has spoken about the situation with Lori Flandrena, and that she was aware that he has asked Lori about her sex life. She stated that she thinks it could be a huge liability for the county. She further indicated that she would like for it to stop. I informed her that the issue is, and will be, being addressed, and that she should feel free to speak to me if there are any further incidents with Officer Jorgenson or any other staff member.

On 23 January 2012 I returned to duty in the Jail. I discovered a sealed envelope addressed to me waiting in my mail box. Upon opening the letter I noted that it was from Officer Beyl, and was dated 1/21/12. In her letter she thanks me speaking with her about Allen. She states "I guess I never really knew how it was affecting me at work, and the

amount of stress I felt when would say things to me." She stated that after speaking with me "it felt like a weight had been lifted off of my shoulders". She concluded her letter with "I have let this harassment go on way way to long and I am relieved that it is finally going to end. I will never let him talk to me that way again."

A short time later I had an opportunity to meet privately with Officer Lori Flandrena. As she entered my office and closed the door, she stated "Let's get this over with." I indicated that, by her comment, I assume she knew what I wanted to talk to her about. She did indicate that it was about Allen. She stated the following regarding Officer Jorgenson:

- He has asked her, since she has been separated from her husband, about "missing sex";
- He has asked her about sleeping in the same bed with a friend that she was going to visit, and asked if she would take pictures for him;
- He has asked her how many orgasms she normally has;
- He tells her things about his sex life without her inquiring, that sometimes "It's the first thing out of his mouth in the morning";
- He has asked about her & her husband having someone else in their bed;
- He has made comments about there not being any cameras down a particular hallway;
- She tells him that she's not talking about these things with him, but he continues to ask;
- "If he's in a room alone, I don't go in there";
- If her daughter calls the jail for her and he answers the phone, she hangs up because he keeps her on the line asking questions;
- Sometimes his behavior has caused her so much stress that she could not wait for the shift to be over so she could leave.

Officer Flandrena stated that this behavior has been going on since she first went to the night shift, which was approximately 9 years ago. She stated that she knew it was not just her that he behaves this way with, as she has spoken about it with Officer Beyl. She stated that our newest hire, Officer Stacey Ptacek, has told her that she is uncomfortable around him, that she feels as if he is undressing her with his eyes. Officer Flandrena further stated that "a while ago" – she could not recall when – Officer Jorgenson asked her if she had ever done anything that she could get fired for. She stated that he told her that one time, while he was in Max Control, there were some female inmates in A-pod and they were asking for something. He asked them what was in it for him, and reportedly the inmates lifted their uniform shirts to expose themselves to him. I informed her that the issue is, and will be, being addressed, and that she should feel free to speak to me if there are any further incidents with Officer Jorgenson or any other staff member.

At approximately 1345hrs C.D. Moe did have contact with Darlene Kusmirek of Employee Relations, as the Director of E.R., Andrea Jerrick, was out of the office. He informed her of what was happening. A short time later she called back and indicated that she had spoken with Andrea, who asked that we inform Officer Jorgenson that E.R. would be conducting a follow up investigation.

PCJ0003766

At approximately 1400hrs, Officer Jorgenson was available to meet with Sheriff Johnson, C.D. Moe and me, as he was already present for another matter. Officer Jorgenson was advised that there were allegations by female staff members accusing him of harassment. Officer Jorgenson was advised of his right to have representation, but he did not request any.

Officer Jorgenson was advised of accusations of unwelcome sexual comments and discussions that made them feel uncomfortable. C.D. Moe indicated that he was aware that he had already met with/been confronted by Officer Fjorden in my office. He further stated that, since then, additional staff members have provided similar statements to me. Officer Jorgenson was asked to speak to the issue.

Officer Jorgenson indicated that apparently a couple of female staff members have claimed that he has been harassing them. He indicated that he did have that meeting with Officer Fjorden in my office. He then indicated that, as far as other co-workers, "nobody's really said anything". He stated that Officer Flandrena, specifically, has told him that she would let him know if he "crosses the line". He further stated that some of his co-workers have said things that have "made my jaw drop". Officer Jorgenson did state that he has "tapered off".

I asked him specifically if he could remember being told things along the lines of "I'm not talking about that with you" or "that's not appropriate" or similar statements. He stated that he could not recall anything like that.

Officer Jorgenson went on to state that he feels that he has made changes over the last 3 to 4 years so that he doesn't "go down that road". He stated that after the first round of sergeant promotions years ago he realized he "needed to change". He stated that he spoke with a female co-worker, soliciting advice on what she thought he could do to improve his promotion chances. He indicated that he was told he needed to watch some of the things he said at times. He further stated that he never put someone in a situation to make them feel uncomfortable.

Sheriff Johnson drew his attention to the statement that he has "tapered off". He was asked what level he was at before. Officer Jorgenson did not understand the question, and it was explained that if he has "tapered off", then there must have been a behavior level that he recognized that he had to taper off from. He continued to reiterate that things he had said before about making some comments, but nothing that anyone told him was inappropriate. He continued to state that the conversations were mutual.

I informed him that the statements from several of his co-workers, both male and female, indicated that the conversations were not mutual, and that they were inappropriate and unwanted. I advised him that more than one person indicated that his comments are often suggestive, such as "You know, there are no cameras there". He showed a more animated reaction to that statement than anything else, but did not outright deny the

allegation. Officer Jorgenson was asked to step out of the room so that we could discuss the situation.

Upon his return, Officer Jorgenson was given a chance to tell us what changes he thinks he will make to avoid similar accusations in the future. Officer Jorgenson stated that he respects his female co-workers, as well as the males, and that he doesn't want to make anyone uncomfortable. He stated that he wanted to "make it right" with his female co-workers, although he wasn't sure how to do that.

Officer Jorgenson was advised that any further complaints by co-workers would be closely scrutinized. He was reminded to keep his conversations professional. He was told that the Department would not be taking any action on the allegations at this time, other than meeting the requirement of reporting it to E.R., and that they would be following up. Our meeting concluded and Officer Jorgenson reported to the jail for his duty shift.

I feel compelled to note that based on my training & experience, and having known Officer Jorgenson for 9-plus years, it is my opinion that he was less than honest with us, and at times was outright lying to us.

At 1853hrs Officer Jorgenson sent an email to Sheriff Johnson, C.D. Moe and me titled "Couple things". In his email Officer Jorgenson apologizes for his behavior that "has blemished the excellent reputation" of our Department. He indicates that this is not something he is taking lightly or blowing off. He indicates that "nothing makes me sadder than to know I have made some of my co-workers uncomfortable, that they have felt a burden because of me, and that they have had an unpleasant working environment". He goes on to restate his "deepest regrets and sincerest apologies".

On 24 January 2012, at approximately 0920hrs, I spoke by phone with Andrea Jerrick. I advised her of the situation, and briefly discussed the inmate fraternization allegations that led to the harassment allegations. I advised her that I would bring her the documentation that I have regarding the allegations. I further advised her that our Department was not taking any action on the harassment allegations, but that Officer Jorgenson was advised that E.R. would be looking into it. Plans were then made with Sheriff Johnson and C.D. Moe to meet later with the E.R. director later in the morning.

No further information at this time.