29 September 2014

### *Christensen ~ complaint about being intoxicated at work*

On 27 September 2014 I, Scott A. Nargis, was off duty and staying at a cabin in Gordon, WI. At approximately 0810hrs I checked my cell phone and noted a text message from Officer Stacey Ptacek. The message showed a sent time of 0725hrs on that date. The message read:

"Hi Scott. I know this is not a great time but I have a concern I need to share with you. This morning a coworker had what I would consider a strong odor of intoxicants coming off of them. There was reference made about possibly being hungover. I do not know if the smell was lingering affects from last night or if they could still have intoxicants in there system. My first concern is officer safety. I also worry about liability and then the concern of judgment. Again I don't know if this person is still under the influence but I felt like I needed to say something because if something happened and I did nothing I couldn't forgive myself. I don't want to cause problems and I hate that I was put in this position on what I should do or how I should handle the situation. I do not know if anyone else noticed or if it is just me. But I felt I needed to let you know. Please contact me if you have any questions or would like to discuss this. Again I don't want to make false accusations and I don't know for sure I just know my observations. I would like to keep this confidential if possible. Thank you."

I then sent her a text back asking who we were talking about. Her reply was "Darryl", indicating that he was her replacement at 0600hrs shift change. The only "Darryl" on staff is Officer Darryl Christensen. We exchanged a couple more text messages, with her indicating that she "smelled the odor" and that "he appeared hungover and made reference to being hungover". She also expressed concern that, even if he was not under the influence, "it doesn't look good if I can smell it cause what if inmates do too". Officer Ptacek has been with the Jail for almost three years and has primarily worked nights, where she is exposed to and has a great deal of experience dealing with intoxicated individuals.

I then attempted to contact Chief Deputy Steve Moe as I could not address the situation where I was. Due to poor cell service I could not leave a complete voice message. I did send him a text message with the information I had. C.D. Moe indicated that he would report to the office and check it out. At 0955hrs I received a text message from him that read:

"Talked to Darryl PBTed 00. Relieved! So was he. Little chat, all OK at least for now."

On 29 September 2014 I returned to duty in the Polk County Jail as the Jail Captain. I did have an opportunity to speak with C.D. Moe about the incident. He indicated that he had come to the office and met with Officer Christensen in his office. He stated that he had issued him used his PBT and got a reading of .00 g/210L of breath, but that his had not been used in several years. He stated that he got another device from the squad room



EXHIBIT 6

PCJ0003718

and obtained another sample, with the same results. He stated that Officer Christensen was appropriate during the entire situation, but also expressed some concern that this was yet another "negative" contact with Officer Christensen in a short period of time (having had some issues with an inappropriate conversation in open court recently). I echoed his concern and indicated that it doesn't do any harm for him to know that he cannot behave in any way he chooses.

At this point I have no further information.

PCJ0003719

### *Darryl Christensen ~ Unauthorized cell phone use in the jail*

On 20 June 2014 I, Scott A. Nargis, was on duty in the Polk County Jail as the Jail Captain. At approximately 1117hrs I was entering the booking room to drop off some paperwork. Officer Darryl Christensen was assigned as the Booking Officer. As I entered the booking room I observed that Inmate Blake Reber was talking on the inmate phone located on the west wall just north of the pre-booking slider. I also noted that Inmate Reber was still in his street clothes.

As I came around the counter to approach the officer's area I noticed that Officer Christensen had a cell phone up to his ear. Additionally, I noted that Officer Christensen was seated at the eastern computer and was facing to the east, with his back to the inmate. Officer Christensen hung ended the call as he heard the booking room door closing and me approaching. I provided him the paperwork that I was delivering, but did not confront him about the phone due to the presence of an inmate.

A short time later I observed Officer Christensen escorting Inmate Reber to his housing unit. After that was completed and Officer Christensen returned to the booking room, I also entered the booking room. I did not observe Officer Christensen, but as I was turning to leave I heard his voice coming from the inmate property storage room. There was then a pause, and then I heard his voice again, as if I was hearing one side of a conversation. At that point I knew the location of the other jail officers on duty and believed that Officer Christensen was on his cell phone again. I then left the booking area and a few minutes later relieved the Master Control Officer for a break. Officer Christensen remained in the property room until Burnett County transport arrived at 1137hrs.

At approximately 1415hrs I had an opportunity to meet in private with Officer Christensen in my office. I informed Officer Christensen that I have given people a great deal of leeway in regards to personal calls and such while on duty (specific to him I mentioned conducting business as the Amery Fire Chief). I then advised him that I walked into the booking room to find him on his cell phone with his back to an inmate. I expressed my exasperation and reminded him that cell phones can be accessed in the break room, and that they do not belong in the jail. I stated that it is bad enough that I have caught people on them in Max and Master, but on the floor with an inmate out – and his back to the inmate – was not acceptable. He nodded his head in understanding. I informed him that I did not wish to restrict cell phones from the facility completely, as people like to check up on things while taking a short break. He agreed, and indicated that this incident was what that entailed, and was related to a fund-raiser at the Fire Hall. He then stated that it was no excuse. I reiterated that the reason we do not want them out in the jail is because we don't want people getting distracted. He again nodded his head in understanding. I then indicated that it was certainly not the type of example our most-senior officer should be making. He again nodded his head in understanding. I thanked him for his time and excused him to go off duty.

No further information at this time.

25 May 2009

### Notes ~ complaint against Darryl Christensen

On 25 May 2009 I was on duty in the Polk County Jail as a Jail Sergeant. During the course of my duties I received an e-mail from Sgt Dan Casey indicating that I should listen to a voice-message that he had saved. I did access the voice messaging system and played the lone saved message. The message was from Sheriff Tim Moore, who indicated that, "This is a jail issue, so I'm giving it to you, but I'll give the guy a call back." Attached to his message was a forwarded message from Clerk of Courts Lois Hoff, indicating that the message she had appeared to be something that should be brought to the Sheriff's attention. The message was then played and I heard a male identify himself as Ted Wistrom. I missed the date/time stamp on the message but was aware that Mr. Wistrom had been incarcerated 5/20 – 5/21/09. Mr. Wistrom indicated that he was upset over one of the jailers, "Darryl", discussing what was going on with his case with another inmate. Mr. Wistrom did leave a call-back number.

At approximately 1230hrs I did contact Mr. Wistrom to get the details of the incident from him. He indicated that he had gone to court and received a bond, and then when another inmate came back into the cell from court he told him that "Darryl" had told him things about what had happened. I explained to Mr. Wistrom that what happened in court was an open hearing and a matter of public record, and that we frequently have people asking what another inmate received for bond. Mr. Wistrom indicated that it was not like that. I asked if he recalled who the inmate was that told him this. Mr. Wistrom replied that it was Paul, meaning Paul Appel, a co-defendant and an admitted friend. Mr. Wistrom indicated that Paul told him "Darryl" had said that he (Wistrom) was trying to blame everything that happened on Paul. I asked Mr. Wistrom if he thought it was possible that Paul had misunderstood the content or context of "Darryl's" statements, or that "Darryl" might have been joking around with Paul. Mr. Wistrom did not think that was the case. I did inform Mr. Wistrom that Appel does would not be considered the most credible source of information given his known history. Mr. Wistrom then said he was not that worried about it, that it was not a big deal, and that he was just "hot" at the time. I did inform him that I would look into the situation. I stated that I had no reason to believe that the officer (Darryl Christensen), who is a veteran officer with no issues such as this on his record, would engage in any inappropriate behavior, but that I would look into the issue. He thanked me for my time and stated that he appreciated being called back about the issue.

I then spoke with Officer Christensen in private in the hallway of the Secure Housing Area. I explained my conversation with Mr. Wistrom to Officer Christensen, who replied by stating that he was just discussing the situation with Officer Steve Hilleshiem. He stated that while he was taking Inmate Paul Appel to court he kept stating that he did not tell the police the identity of Mr. Wistrom because they are friends and Mr. Wistrom saved his life earlier that day. Officer Christensen stated that Appel received a bond with

a condition of no-contact with Ted Wistrom, and that Appel replied that he was glad because all he does is get into trouble by hanging around with Wistrom. Officer Christensen stated that he replied to Appel that that was not what had come out in Wistrom's appearance. He stated that what came out then was that Appel had brought beer over to Wistrom's, and that was the start of their troubles. He stated that he did not disclose anything that was not part of the public record, nor did he try to play one of defendants against the other.

I informed Officer Christensen that it appeared to be what I had suspected, a case of misinformation, and that I wanted him to be aware of the situation just in case something should arise. I thanked him and continued my duties.

I did inform Sheriff Moore of the results of my investigation.

No further information at this time.

26 September 2014

### *Discussion notes ~ Darryl Christensen, comments in court*

On 24 September 2014 I, Scott A. Nargis, was on duty in the Polk County Jail as the Jail Captain. Sheriff Pete Johnson contacted me and informed me that he had a meeting with Judge Jeffrey Anderson regarding a couple of incidents that had occurred with Officer Darryl Christensen.

At a meeting on 9/11/14 Judge Anderson and I, along with other members of the Justice Procedures Committee, were discussing court schedules as they relate to having inmates brought to the courtroom. At that time Judge Anderson indicated that other counties have the inmates in the courtroom at the time that their hearings are scheduled. I informed the judge that we have a hard time with that, as the court dockets are often behind schedule. At that time Judge Anderson asked me if I was suggesting that his pre-lims do not go on time. I informed him that I was not suggesting anything or singling either court out, but that it was a fact that the calendars run behind scheduled for a multitude of reasons, to which Judge Molly GaleWyrick intervened and agreed with me.

Sheriff Johnson, on 9/24, indicated that apparently Officer Christensen had heard about the content of the meeting, probably from his wife in the District Attorney's Office, and had mentioned it in open court on 9/15/14 while he had an inmate over there. It was reported that the content of his comments was related to the duties of the jail staff and that it was not the staff that was making him fall behind schedule. Sheriff Johnson further indicated that one 9/16 Officer Christensen apparently called to apologize, but then basically reiterated what he had said in open court. He then stated that on 9/17, while in court on multiple different occasions, Officer Christensen asked the judge if he was going to be on time with a particular case. Sheriff Johnson further stated that, apparently, more than one person approached Judge Anderson and made pleas on Officer Christensen's behalf in an effort to ameliorate the situation, including statements that he had not been on his meds properly as of late. Sheriff Johnson instructed me to have a talk with Officer Christensen regarding the situation, how it reflects on the Department, him, and myself, and that it is not Officer Christensen's place (particularly in open court) to be making such comments.

On 9/26, at approximately 1140hrs, I did meet with Officer Christensen, alone, in my office. I informed him that the Sheriff had a discussion the other day with Judge Anderson regarding something that happened in court last week, and I asked him what happened. He recounted the story and it matched what Sheriff Johnson had relayed. Officer Christensen also indicated that it was around the same time that he noticed that he was getting short with his family at home. He stated that he had stopped taking the medications that he has been on since he has been seeing a counselor in relation to his father's death, thinking that he can deal with it on his own. He stated that he realized that he cannot and has since started taking his meds again. He also stated that he did apologize to the court. I pointed out to him that under different circumstances he may

have been found in contempt of court, which could result in the loss of his job. I also reaffirmed how his actions reflect upon me, the Sheriff, and the Department, not to mention on him. We concluded the discussion with an understanding that it was not his place to be making such comments.

No further information at this time.

PCJ0003724

# OFFICE OF THE SHERIFF
## Polk County Sheriff's Department
*"Integrity, Honor, and Courage"*
### JAIL DIVISION
### 1005 West Main, Suite 900 – Balsam Lake, WI 54810

Peter M. Johnson, Sheriff                              Steven B. Moe, Chief Deputy

**Scott A. Nargis, Captain**
**Jail Business Telephone: 715-485-8370**
**Jail Business Fax: 715-485-9124**

22 April 2011

To:     Jail Officer Darryl Christensen

From:   Captain Scott Nargis

Re:     Documentation of discipline

Officer Christensen,

This memo is intended to document a disciplinary procedure, which occurred on Friday, April 22, 2011, regarding the following incident.

Synopsis of Event

On April 21, 2011, Officer Christensen was assigned as the Booking Officer for the A-shift (0600-1430hrs) in the Polk County Jail. During the course of his shift there was a call for assistance in the Secure (Max) Pod of the jail, regarding an inmate throwing chairs in a multi-purpose room. This inmate had been placed in the multi-purpose room for being disruptive in his cell block earlier.

Subsequently, officers responded to the area and moved the inmate out of the cell to the booking room for placement into a receiving cell. The inmate, while obstinate regarding officers' instructions, was cooperative and did move on his own.

Subsequently, Officer Christensen entered the booking room ahead of the inmate to remove the mattress from the receiving cell. The inmate made a comment to one of the accompanying officers, which resulted in Officer Christensen grabbing the inmate and propelling him up against the wall.

As part of the investigation the video of the booking room, at the time of the incident, was viewed. In the video the inmate can be seen walking under his own power towards receiving cell R-1. The inmate then turns toward one of the accompanying officers and makes what is reported as a snide/rude comment. Officer Christensen can be seen

exiting R-1, throwing the mattress away from the cell, reaching out to grab the inmate by uniform, then propelling him towards the wall.

Officer Christensen's written and oral accounts of the incident mirror what was observed on the video, and were absent any indication that the inmate was making any threatening actions or statements to the officers.

Relative Disciplinary History

Officer Christensen has received a one-day suspension in the past for unrelated behavior.

Disciplinary Meeting

On Friday, April 22, 2011, at approximately 1330hrs, Chief Deputy Steve Moe and I met with Officer Christensen, privately, in my office. We had a discussion of the incident and indicated to Officer Christensen that he was entitled to union representation, as there was a possibility of discipline as the result of a violation of Jail Policy C-300 (Use of Force and Restraints), resulting in force being used against an inmate when it was not necessary. Officer Christensen waived his right to union representation.

Officer Christensen indicated that the facts surrounding the event were not in dispute. He did acknowledge that the inmate was a difficult inmate, and that the inmate got the best of him. Officer Christensen acknowledged that his actions were wrong and indicated that he would take steps to prevent a similar situation from occurring in the future.

Summary and Conclusion

I believed that this matter was best resolved by issuing a verbal reprimand to Officer Christensen, and providing re-training on the justification for use of force in the Jail, per our policy.

I would like to note that Officer Christensen has a lengthy history of service with our Department and has had no similar incidents in the past. Officer Christensen demonstrated a professional demeanor during this process, and was cooperative.


CC:   Officer Christensen personnel file.

4 May 2004

<u><i>Incident notes ~ Inmate Lindsey Neuman<br>
Possible Sexual Harassment Complaint Against Darryl Christensen</i></u>

On 3 May 2004, I was on duty in the Polk County Jail as a Jail Sergeant. At approximately 0900hrs, Officer Steve Schaefer informed me that Inmate Lindsey Neuman wished to speak with me. He further stated that he had already spoken with her about the issue, and that it had to do with an officer entering the cell block to remove cleaning supplies while she was in the shower. He stated that she was very upset and had been crying. I learned from Officer Schaefer that Officer Darryl Christensen was the officer that had removed the cleaning supplies while Inmate Neuman was in the shower. I also learned that Inmate Neuman apparently makes a habit of showering downstairs, then going to her room upstairs wearing only a jail uniform top and her underwear.

I spoke with Officer Christensen and asked him if had gone into the cell while a female inmate was in the shower. Officer Christensen indicated that he did go into B-pod to remove the cleaning supplies. He further stated that he did inspect the cell. He stated that he knew an inmate was in the shower, because there was a uniform shirt covering the observation window of the shower door. He stated that he proceeded to the mezzanine level to inspect those cells. He stated that he then went downstairs and inspected the cells, starting with B-3 (which is farthest away from the shower). He then inspected cell B-2, and stated that he did not go any further towards the shower or B-1 because there was a female in the shower.

I then went to speak with Inmate Neuman outside of B-pod. Inmate Neuman asked me why a male officer was removing the cleaning supplies while she was in the shower. I explained to Inmate Neuman that a female being in the shower was not enough reason to prevent officers from performing their duties. I went on to explain that I had been informed by Officer Christensen that he did not even approach the area of the shower. I further pointed out that she had placed her uniform shirt over the observation window. She replied to this by stating that the shirt didn't cover all of the window, and that Officer Christensen would have been able to see her while walking up the stairs. I tried to assure Inmate Neuman that Officer Christensen was not intentionally trying to look at her in the shower. I further explained to Inmate Neuman that there is a markedly lower expectation of privacy while in jail. I further stated that officers occasionally see inmates in compromising situations, but that they do not intentionally try to do that, nor do they let their gazes linger but rather look away. I further pointed out that I had received information that she routinely walks up that stairs in only a uniform shirt and underwear. To this she replied that goes to her cell (upstairs, next to the upper shower) to put lotion on. I did inform her that it is a violation of the jail rules to not be wearing all of the jail uniform when out of bed. Inmate Neuman was upset during the entire conversation, and was crying. Inmate Neuman accused me of "taking his side". I informed Inmate Neuman that I was not taking sides and that she was saying Officer Christensen did

something that he says he did not do. I did say that Officer Christensen is a veteran officer and that I am not aware of any accusation such as this in the past, and that I have no reason to believe he would engage in that sort of behavior. Inmate Neuman asked if I was accusing her of making the story up. I informed Inmate Neuman that I was not, and that I believed that what she told me actually happened; Officer Christensen entered the cell and did an inspection while she was in the shower. I did state that I did not believe that Officer Christensen, if he saw anything, intentionally tried to look at her in the shower. At this point, Inmate Neuman asked, "Well what about all the comments?" I asked her what comments she was referring to. She stated, "Comments about having a nice butt, and 'with someone as good-looking as you in here we have to look'". I asked her who had made these comments and she replied, "The same one that came in here this morning." I informed Inmate Neuman that administration would look into that issue, and returned her to her cell (it should be noted that Inmate Neuman never identified Officer Christensen by name, only referring to "he" or "him").

On 4 May 2004, I met with Officer Christensen as his post (Secure Control). I informed him that Inmate Neuman was not too pleased about what had happened on the 3rd. I relayed the information to him that she had given me, particularly that she had accused him of making inappropriate comments to/about her. Officer Christensen appeared dumb-founded, and was shaking his head as I told him this. Officer Christensen asked me if Officer Dan Casey had told me what Inmate Jean Bloom had told him (Casey). I indicated that I had not received any information from Officer Casey. Officer Christensen stated that, at 0600hrs shift-change this morning, Officer Casey told him that Inmate Jean Bloom (also in B-pod) had spoken with him, either at lock-down on the 3rd or sometime during the night. Inmate Bloom apparently warned Officer Casey that Inmate Neuman and a couple of the other inmates in B-pod were conspiring to catch Officer Christensen in a bad situation, such as setting up a situation where Inmate Neuman would step out of the shower in only a towel when Officer Christensen entered the cell, so as to get him in trouble. (I have directed Officer Casey to provide what information he has to me) In the past, Inmate Bloom has provided reliable information about her cell mates, particularly when they conspire to "gang up" on an individual in there. I asked Officer Christensen if he knew of any reason why Inmate Neuman might want to get him in trouble, other than being upset about the incident on the 3rd. Officer Christensen stated that he did not.

Officer Christensen went on to give examples of him treating Inmate Neuman well. He stated that, on one occasion, she had volunteered to assist staff by bagging dirty uniforms/linens after an exchange. Afterwards, he offered her a cup of fresh coffee for her effort, to which she replied that she did not like coffee. He stated that he had purchased a soda, and gave her a cup-full of that instead. Officer Christensen also stated that he was working the night shift on April 29th, and escorted her to the booking room on the morning of the 30th when Cpt Terry Nesvold arrived to transport her to Burnett County for court. Officer Christensen stated that he bought a box of donuts from Cpt Nesvold that morning. Officer Christensen pointed out to Cpt Nesvold that breakfast had not yet been served in our facility, to which Cpt Nesvold replied that it would be done at

Burnett County Jail by the time they got there. Officer Christensen stated that he then offered a donut to Inmate Neuman, which she accepted.

Officer Christensen went on to state that on the morning of the 3rd, prior to the incident that upset Inmate Neuman, he had spoken with her and there were no apparent problems. He stated that he had spoken with her about what had happened during her court appearance. He then stated that it was a short time later when Inmate Neuman asked him to open the "skylights". He stated that she got upset when he told her that they do not open, which they do not. Inmate Neuman then stated that someone else had told her they do, and named Officer Dave Dettmering as the one. Officer Christensen stated that she made a comment about it being stuffy in the cell, and that we were trying to suffocate the inmates. The next contact was the shower incident.

I instructed Officer Christensen that it would be in his best interests to avoid entering B-pod unless he absolutely needed to. He concurred.

I am waiting for the information from Officer Casey, which I anticipate having tomorrow.

No further information at this time.

27 July 2010

### *Darryl Christensen leaving post unattended, 7/26/10*

On 26 July 2010 I, Scott A. Nargis, was on duty in the Polk County Jail as a Jail Sergeant. At approximately 1220hrs I was relieving Officer Milo White in Master Control so that he could retrieve his lunch. While in Control I noted that the Integrator system was configured so that I had control of the Minimum area, but that the Secure Control Officer had control of that housing area.

A minute or two after relieving Officer White I received a door violation alarm from the main entry door from the public lobby to the jail hallway. I noted on the camera that it was Cheryl Christensen from the District Attorney's office leaving the jail. Cheryl is the wife of Officer Darryl Christensen, who was assigned as the Secure Control Officer at that time. It is common for Cheryl to bring Officer Christensen's lunch to him. However, I found her leaving to be unusual, Master Control had not announced that she was coming to the service window. I also found it odd, as all of the other jail staff were in the break room and nobody could have met Cheryl, and I doubted she would have left the food there. I began to suspect that Officer Christensen may have left his post to get his lunch, but found that unusual since Master Control did not have control of the Secure Housing Area.

I checked the Integrator log for door activity at "SEC1", which is the door to the Secure Control station. I noted that the door was unlocked at 1218hrs. Again, I found this odd as the rest of the jail staff was in the break room (and Officer White at his post). I then got called away to a meeting with the Sheriff and did not have a chance to ask Officer Christensen about the incident before he went off duty.

When I returned from my meeting I accessed the Genetec Omnicast Archive player and accessed the video recorded from the camera that covers the public-contact window, where Cheryl normally drops off lunch. I did find video footage of Officer Christensen approaching the public-contact window, with Cheryl in view on the public side. I did save/print a snapshot of a frame from this footage, which had a date/time stamp of 7/26/10 at 1219hrs.

On 7/27/10, at approximately 1115hrs, I met with Officer Christensen at his assigned post (again, Secure Control). I informed him that I had not had a chance to speak with him prior to him leaving on 7/26, but in the future he should have Master Control take control of his station prior to retrieving his lunch. He stated that Officer White had called and said that Cheryl was coming down with his lunch, so he just popped out and picked it up real quick. I stated that, in the future, he should surrender control to Master Control. I pointed out the importance of this due to the fact that one of the inmate's could have called in an emergency, and nobody would have been able to respond to it. Officer Christensen indicated that he understood, and I returned to my duties.

This is particularly disturbing due to the fact that Officer Christensen has the extra duty of being the jail's Safety & Security Officer. Additionally, his actions were in violation of Jail Policy C-900, "Correction Officer Post Orders", which indicates "Each officer assigned to a post position shall remain on their post until relieved by the Shift Supervisor or the officer assigned to the post" and "Each officer shall remain at the post position at all times, unless there is an emergency at another area with the facility, or their duties require assisting other positions".

No further information at this time.

PCJ0003731

22 April 2011

*Unnecessary use of force ~ Darryl Christensen*

On 21 April 2011 I, Scott A. Nargis, was on duty in the Polk County Jail as the Jail Captain. At approximately 0710hrs I heard a call on the radio from Secure Control Officer Milo White stating "He's throwing chairs around in there". I proceeded to respond to the area and met up with Officer Darryl Christensen in front of Master Control. Officer Christensen was assigned as the Booking Officer and was responding to the radio traffic. As we were responding he informed me that Inmate Matthew Wright had been causing a disturbance in D-pod earlier in the morning, and Floor Officer Joanell Bibeau had moved him to a multi-purpose room until she could complete her morning duties.

As Officer Christensen and I arrived in the area, Officer Bibeau and Officer Lori Flandrena were already present. As the inmate had been throwing chairs around the room Officer Flandrena did secure a Taser. As we all approached multi-purpose room X-2, Inmate Wright was placing all of the chairs onto the tables. The door to the room was opened and Inmate Wright did comply with orders to exit the cell. Officer Bibeau informed him that he would be moved to a receiving cell, and gave him verbal instructions of which direction to walk. Despite her instructions, which she combined with hand/arm gestures, Inmate Wright did not move as he was told and had to be physically pointed in the correct direction by Officer Bibeau. During the entire movement to the booking room, Inmate Wright was cooperative, but was also speaking in a nonsensical fashion. Inmate Wright repeatedly slowed down his pace and was instructed several times to pick up his pace. At one point he replied that he had a hard time moving any faster when he didn't know where he was going. He was informed that he was walking straight ahead down the hall, so it should not be a problem.

Once we arrived at the door to the booking room I decided that my presence was no longer required, as Inmate Wright was not being resistive/combative, just "pokey". I did hear Officer Christensen call on the radio to have the door to receiving cell R-1 opened as I was returning to my office.

A short time later I was in my office when Officer Christensen came in and asked me if he needed to do a report, as he had driven Inmate Wright into the wall and had to give him a knee strike as he was directing him to the bunk. I stated yes, he needed to do a report. He went on to tell me that as he was removing the mattress from R-1 he heard Officer Flandrena tell Inmate Wright to walk faster. He stated that Inmate Wright turned towards Officer Flandrena and replied, "What are you going to do about it old lady?" He stated that he then grabbed Inmate Wright and put him up against the wall and had to deliver a knee strike to get him onto the bunk. He also stated that he informed Inmate Wright that he will apologize to Officer Flandrena, which he did. Officer Christensen then made a comment about it being time to retire, as "these guys" are really pushing his

buttons. I did not think much of the comment at the time, as we have recently had an unusually high number of difficult inmates lately.

A short time later in the morning I did receive Officer Christensen's report of the incident (2011-104), which mirrored his conversation with me. Sgt Sarah LaVenture was on duty, and informed me that she would do the use of force review for the incident.

Later in the day, approximately 1530hrs, Sgt LaVenture asked if I had viewed the video of the incident from the booking room camera, which I had not. She told me she had spoken with Officer Christensen and that what he had indicated in his report appears to be exactly what happened. She then proceeded to show me the video of the incident. In it you can see the point at which Inmate Wright must have made his comment to Officer Flandrena, as Officer Christensen can be seen exiting R-1, throwing the mattress off to the side, and then reaching out to grab Inmate Wright. He then propels Inmate Wright towards the wall next to the door of R-1, and then moves him into R-1. What happens after that cannot be seen. In the video, there is no clear movement by Inmate Wright to turn towards/move at Officer Flandrena. Based on the information in Officer Christensen's oral and written reports and the video, there is no indication that Inmate Wright was being combative/resistive. He had, in fact, moved willingly to the booking room, despite being somewhat obstinate and having to be physically pointed in the right direction. Based on the reports and the video, there is not reason to believe that Inmate Wright could not have been controlled with a much lower-level force alternative, such as a come-along or even an escort hold.

More information will follow upon the conclusion of Sgt LaVenture's use of force review.   SN/810, 4/22/11, 1030hrs.


4/22/11, 1117hrs
The following information is a result of having received Sgt LaVenture's use of force review for the incident in question. Having reviewed the incident report, viewed the video footage from the booking room, and speaking with at least one officer (other than Officer Christensen) that was involved, her opinion was that the force was not necessary under the circumstances, nor was the amount/level of force reasonable given the circumstances. I did speak privately with Sgt LaVenture about her review.

Sgt LaVenture indicated that there was nothing in any of the written, visual or oral accounts of the incident that indicated any threat by Inmate Wright. In fact, the evidence all pointed to the contrary: Inmate Wright was willingly moving as ordered, without threatening harm to the officers either verbally or by his actions. She did note the video clearly shows Officer Flandrena carrying the Taser while in the booking room, and wondered why officers felt the need to have the Taser, yet they did not handcuff Inmate Wright or use any escort holds.

At approximately 1125hrs I did speak with Officer Flandrean, in private, in my office. I asked her at what point during the incident on 4/21 she pulled the Taser out of her cargo pocket, where I saw her putting it as we arrived at X-2 (note: given that the inmate was throwing chairs, securing the Taser was a legitimate and wise decision). Officer Flandrena stated that she had the Taser in her hand the entire time, as she was unable to get it into her cargo pocket due to having other equipment in there. She stated that she did her best to keep the Taser out of the inmate's sight. I then asked her for her impression of the entire situation. She stated that it happened very quickly, and that Inmate Wright had been kind of goading the officers. She stated that Officer Christensen was in a bit of a foul mood to begin with, which may have resulted in the incident turning out like it did. As she recalled the incident I asked her if Inmate Wright had turned to her in a threatening manner. She stated that he did not, but that he kind of looked over his shoulder at her when he asked, "What are you going to do about it old lady". She stated that she was just in the process of putting her hand up to help escort Inmate Wright, who had slowed down again, but before she could Officer Christensen had grabbed him. She stated that he did not drive him into the wall, but did spin him up against it.

Given all of the information, viewing the incident as a POSC instructor it is my opinion that the use of force in this incident was not necessary (inmate was willingly moving, albeit slowly; inmate did not threaten officers by words or actions), nor was the amount of force reasonable. The circumstances do not reflect any justification for the use of an active countermeasure. Given that, I will be proceeding with the discipline process as the result of an excessive use of force.

No further information at this time.

The following is in relation to an incident on 4/21/11 involving Officer Darryl Christensen and the possible unnecessary use of force:

1. Did the employee know that the prohibited conduct was wrong? And, are the violated rules reasonable and fair?

   Yes. The employee receives regular in-service training on use of force, including the daily training program. This provides him, at least four (4) times a year, the guidelines for non-deadly force within the jail, directly from the jail policy manual. The rules are very reasonable and fair.

2. Was the investigation fair and objective? Did the investigator conduct a thorough investigation, affording the accused an opportunity to be heard and defend himself?

   The investigation was fair, and the accused had many opportunities to be heard and to defend his actions. These opportunities included an oral recitation to me prior to his written report; his written report; oral report to Sgt LaVenture; oral report to Chief Deputy Moe and me.

3. Is there adequate proof of a violation? Does it meet the level of "preponderance of the evidence" or "clear and convincing" in cases of moral turpitude?

   There is adequate proof, including video of the incident from the booking room camera.

4. Does the administration apply rules, orders, and penalties to all employees uniformly and without favoritism?

   Yes.

5. Has the Sheriff considered the employee's work history, level of performance, and prior discipline or lack thereof?

   The employee's history of more than 15 years without any such incident was considered.

6. Does the employee wish to be heard on the subject of discipline and have an opportunity to petition for a lesser penalty?

   The employee was informed of his options and chose to waive his right to have union representation.

PCJ0003735

7. Is the degree of discipline consistent with the offense? Does the punishment fit the "crime"?

I believe that a verbal reprimand (with documentation to follow) and retraining on the guidelines for use of force within the jail does fit the offense.

PCJ0003736