UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

M.J.J.,

      Plaintiff,

    v.

POLK COUNTY, DARRYL L.
CHRISTENSEN,

      Defendants,               Case No. 15-CV-433

    and

WISCONSIN COUNTY MUTUAL
INSURANCE CORPORATION,

      Intervenor.

J.K.J.,

         Plaintiff,

    vs.

POLK COUNTY,
and DARRYL L. CHRISTENSEN,

      Defendants,             Case No. 15-CV-428

    and

WISCONSIN COUNTY MUTUAL
INSURANCE CORPORATION,

      Intervenor.

**POLK COUNTY'S RESPONSE TO
PLAINTIFF'S PROPOSED FINDINGS OF FACT**

      Defendant Polk County ("Polk County"), by its undersigned counsel, submits, pursuant to

Federal Rule of Civil Procedure 56, the following Response to Plaintiff's Proposed Findings of

Fact in Support of its Motion for Summary Judgment in both Case No. 15-CV-428 and Case No. 15-CV-433.

### A.   Jail Administration

1.      Christensen was employed as a jailer for Defendant Polk County at all times identified in Plaintiffs' Complaint. (Case No. 15-c-433, ECF No. 46 at 6:17-22; Case No. 15-c-428, ECF No. 47 at 6:17-22.)

**Polk County's Response:**      No dispute.

2.      Captain Scott A. Nargis ("Nargis") has been Polk County Jail Captain since 2010. From April 2008 to November 2010 Nargis was acting as Jail Administrator (Case No. 15-c-433, ECF No. 49 at 5:7-20; Case No. 15-c-428, ECF No. 48 at 5:7-20.)

**Polk County's Response:**      No dispute.

3.      Sheriff Peter Johnson ("Johnson") is the current Polk County Sheriff and has been since 2011. (Case No. 15-c-433, ECF No. 53 at 5:5-9; Case No. 15-c-428, ECF No. 52 at 5:5-9.)

**Polk County's Response:**      No dispute.

4.      Steven Moe ("Moe") was the Polk County Chief Deputy from 1991 until he retired in March 2016. (Case No. 15-c-433, ECF No. 59 at 8:12-14; Case No. 15-c-428, ECF No. 58 at 8:12-14.)

**Polk County's Response:**      No dispute.

5.      Defendant Christensen wore a uniform while employed as a jailer at the Polk County Jail. (Affidavit of Linda Bannink July 29, 2016 ("Bannink Aff.") Exs. K, N, O, P, Q, R, S.)

**Polk County's Response:**      No dispute.

6.      Defendant Christensen carried handcuffs while employed as a jailer at the Polk County Jail. (*Id.*)

**Polk County's Response:**      No dispute.

7.      Defendant Christensen wore a badge while employed as a jailer at the Polk County Jail. (Bannink Aff. Ex. K.)

**Polk County's Response:**      No dispute.

8.      Defendant Christensen was trained in, and carried a taser while employed as a jailer at the Polk County Jail. (Bannink Aff. Ex. T.)

**Polk County's Response:**      Dispute.  While Christensen was trained in its use, jail staff do not carry Tasers at the Polk County Jail.  (8/16/16 Declaration of Scott Nargis ("8/16/16 Nargis Decl.") ¶ 7.)

9.      Defendant Christensen would use the intercom to call Plaintiff out of the pod to engage in sexual contact. (Case No. 15-c-433 ECF No. 48 at 64:1-15, 84:23-25 and 86:5-10; Case No. 15-c-428 ECF No. 46 at 57:21-23 and 58:20-59:8.)

**Polk County's Response:**      No dispute, based on his admissions.

10.      Defendant Christensen, often working alone, had complete control over every single move that in inmate made including providing for all basic needs. (Bannink Aff. Exs. J, K, L, M.)

**Polk County's Response:**      Disputed.  In support of this hyperbolic statement, plaintiffs' cite the Inmate handbook and various provisions of the Jail Policy Manual, none of which state that jailers have "complete control over every single move that and inmate made." (*See* Affidavit of Linda Bannink ("Bannink Aff.") Exs. J, K, L, M, filed in Case No. 15-CV-428, ECF No. 86 and Case No. 15-CV-433, ECF No. 87.)  To the contrary, rather than stating jailers

have "complete control" over inmates, Policy I-100, Inmate Rights,  lists numerous rights

retained by inmates, effectively restricting the degree of control jail officers may exert.  (Bannink

Aff. Ex. J.)  For example, Policy No. I-100 states that "[i]nmates are permitted freedom in

personal grooming . . . ."  (Bannink Aff. Ex. J.)  Further, Policy I-100 states that inmates have a

right to access the courts, contact their attorney, access the grievance process, access media,

programs and services, and receive medical care, to name just a few.  (*Id*.)  While the very nature

of a jail requires that officers facilitate the movement of inmates into and out of their cells, the

Jail Policy Manual and Inmate Handbook make clear that inmates have rights that cannot be

denied at the whim of a jail officer, as suggested by plaintiffs.  (*See* Bannink Aff. Exs. J – M.)

11.     The Polk County inmate handbook indicates that all inmates must comply with all

orders of jailers. (*Id*. at Ex. K pg. 4.)

**Polk County's Response:**     No dispute.

12.     Inmates that are not given Huber privileges are not allowed under the sheets or

blankets of their bed during the day. (*Id*. at pg. 2.)

**Polk County's Response:**     No dispute.

13.     Inmates are informed that they are to shower daily from 0700 to 1000 hrs. (*Id*.)

**Polk County's Response:**     No dispute.

14.     If inmates are to request a razor for shaving they must do so during 0700 meds

and they must be requested personally. (*Id*.)

**Polk County's Response:**     No dispute.

15.     Medications are administered four times daily by jailers whereby the inmate must

come to the door for their medications. (*Id*. at pg. 3.)

**Polk County's Response:**     No dispute.

4

16.     Uniforms and towels are exchanged twice weekly, sheets are exchanged weekly, and blankets are exchanged monthly. (*Id.*)

**Polk County's Response:**     No dispute.

17.     Inmates can receive items from the supply cart only if not otherwise available through commissary and only on Monday and Thursday. (*Id.*)

**Polk County's Response:**     No dispute.

18.     Inmates are allowed to exercise without their shirt for 60 consecutive minutes per day. (*Id.*)

**Polk County's Response:**     No dispute.

19.     Recreation privileges, such as exercising, may be denied to inmates by staff. (*Id.* at Ex. M.)

**Polk County's Response:**     No dispute.

20.     Playing cards are available through commissary. (*Id.*)

**Polk County's Response:**     No dispute.

21.     Polk County Jail staff are solely responsible for providing meal trays to inmates. Inmates failing to come to the pass through during meal pass may miss the meal. (Bannink Aff. Ex. K at pg. 4.)

**Polk County's Response:**     Disputed.  While inmates "may" miss a meal if they do not come to the pass through during meal pass, inmates frequently "miss" meal pass (such as if they are in the bathroom) but get their meals after notifying staff; an inmate can only refuse their meal personally, not thru another inmate.  (Bannink Aff. Ex. K at 4.)

22.     In order to get a haircut, an inmate must request use of jail owned clippers which are available one time per month. Jailers have the authority to stop use privileges indefinitely. (*Id.* at pg. 9.)

**Polk County's Response:**     No dispute.

23.     Inmates are charged a $5.00 co-pay to see the jail nurse. (*Id.* at pg. 3.)

**Polk County's Response:**     No dispute.

24.     Inmates cannot change bunks or move to another cell without an officer's approval in medium and maximum pods. (*Id.* at pg. 2.)

**Polk County's Response:**     No dispute.

25.     Inmates cannot hang any personal items in the inmate's cell or on their bunk (*Id.*)

**Polk County's Response:**     No dispute.

26.     In order to receive new books and reading materials, an inmate must request them from Jail officers through the jail library or submit a request through jail staff for books from an outside agency. (Bannink Aff. Ex. L.)

**Polk County's Response:**     No dispute.

27.     In order to do legal research, other than through an attorney, an inmate must fill out an Inmate Request Form and submit it to an officer in order to receive those materials. (*Id.*)

**Polk County's Response:**     No dispute.

28.     Televisions can be restricted for disciplinary reasons. (*Id.* at Ex. M.)

**Polk County's Response:**     No dispute.

29.     According to Polk County Jail Policy, the multipurpose room, or X room, was only available for inmates for use upon requesting permission from the jailer on duty (*Id.*)

**Polk County's Response:**     No dispute.

30.     The multipurpose, or X-room could be used for walking, calisthenics, aerobic exercise, shadow boxing, etc. (*Id.*)

**Polk County's Response:**     No dispute.

31.     The captain of the Polk County Jail allowed inmates to be given treats for good behavior. (Case No. 15-c-433, ECF No. 46 at 121:16-122:9; Case No. 15-c-428, ECF No. 47 at 121:16-122:9.)

**Polk County's Response:**     Disputed.   Good behavior is expected.   (*See, generally*, Bannink Decl. Ex. K, Inmate Handbook.)  Items such as fresh coffee or extra meal items may be provided to inmates for voluntarily working in the jail (assisting with uniform/linen pickup, cleaning, etc.) or as a reward for exemplary behavior (such as having a bunk made in a fashion that exceeds expectations).  (Deposition of Scott Nargis ("Nargis Dep.") 110-11, filed in Case No. 15-CV-428, ECF No. 48 and Case No. 15-CV-433, ECF No. 49.)

32.     An inmate's person, property, and cell/pod could be searched at random and an inmate has no right to be present during the search. (Bannink Aff. Ex. K, pg. 4.)

**Polk County's Response:**     No dispute.

33.     Officers could restrict privileges and/or lock down an inmate for up to 24 hours without a formal hearing for violations of the jail rules. (*Id.*)

**Polk County's Response:**     No dispute.

34.     Jailers could determine that a major rule violation be punished with a sanction normally reserved for a minor rule offense. (*Id.*)

**Polk County's Response:**     No dispute.

35.     Disobeying a direct order is considered a "major rule violation." (*Id.* at pg. 6.)

**Polk County's Response:**     No dispute.

36.     Penalties for a major rule violation can include:

i.      Disciplinary segregation for a period greater than 24 hours.
ii.     Loss of one or more privileges for up to 30 days (T.V. visits etc)
iii.    Loss of Canteen- except hygiene and writing materials
iv.     Restitution for damages
v.      Criminal Charges
vi.     Re-classification
vii.    Loss of good time
viii.   Request to court for revocation of Huber Privileges
ix.     Any combination of the above (*Id.*)

**Polk County's Response:**     No dispute.

37.     Penalties for a minor rule violation are as follows: "An officer witnessing or gaining knowledge of an incident involving violations of minor jail rules may **immediately** discipline the offending inmates by: verbal warning, temporarily restricting that inmate's privileges (T.V., canteen, etc.), placing the inmate on Disciplinary Segregation for 24 hours, Restitution for damages, and write up for re-classification. (*Id.* at pg. 7) (emphasis added.)

**Polk County's Response:**     Disputed.  The complete procedure for administering discipline for minor violations is set forth in section I-400 of the Jail Manual, and includes providing the inmate an opportunity to make a verbal statement about the alleged violation to the staff member.  (8/16/16 Nargis Decl. ¶ 8, Ex. A; *see also* Wis. Admin. Code § DOC 350.24(2)(c).)

38.     Minimum Security inmates "will be given some additional privileges not afforded medium or maximum inmates. These include the ability to have 2 visits per week and full access to current and future jail programs. 2 late nights will be offered per week. Additional TV channels are also provided." (*Id.* at pg. 11.)

**Polk County's Response:**     No dispute.

39.     Medium Security Inmates "will also be allowed 2 visits per week and somewhat limited access to jail programs. One late night per week based on inmate behavior and officer

discretion. Housing will be in a separate part of the jail from minimum inmates. Limited TV channels are provided." (*Id.*)

**Polk County's Response:**        No dispute.

40.      Maximum Security Inmates "will also be offered one visit per week. You will not be allowed to attend group programs, only the Friday morning One on One. 5 TV channels are provided. Maximum Security inmates will be housed separately from all other inmates." (*Id.*)

**Polk County's Response:**        No dispute.

41.      Inmates are informed that, "[t]hose [inmates] who cannot follow the rules will find their privileges and housing options restricted. You are responsible for your own behavior and you are ultimately responsible for the conditions of your stay at the Polk County Jail." (*Id.*)

**Polk County's Response:**        No dispute.

**B.      Polk County's policy makers for training and jail policy**

42.      Prior to becoming a Sheriff, Sheriff Johnson did not have training in jail operations, since becoming sheriff his training has been "very limited." (Case No. 15-c-433, ECF No. 53 at 7:4-20; Case No. 15-c-428, ECF No. 52 at 7:4-20.)

**Polk County's Response:**        No dispute.

43.      Sheriff Johnson does not handle the "minutia" of running a jail which includes training unless issues are brought to his attention. (*Id*. at 8:11-9:3; *Id*. at 8:11-9:3.)

**Polk County's Response:**        No dispute.

44.      Nargis would only discuss the content of the training with Sheriff Johnson if the issued involved a budgetary change. (*Id*. at 16:16-22, 17:16-21; *Id.* at 16:16-22, 17:16-21.)

**Polk County's Response:**      Disputed; the cited testimony does not support the proposed finding of fact.  Sheriff Johnson was asked whether, when Captain Nargis returns from a jail

conference, the two of them "meet and talk about issues related to jail operations." (Deposition of Peter Johnson ("Sheriff Johnson Dep.") 16, filed in Case No. 15-CV-428, ECF 52 and Case No. 15-CV-433, ECF No. 53.) Sheriff Johnson replied: "Only if there's something specific—if he wanted to make some major change in something or if there was a major new change in state law or something that would require a budgetary change." (*Id*.) This statement has nothing to do with training provided in the Polk County Jail, but instead concerns "jail operations" that might have been covered at jail conventions attended by Captain Nargis; even in that limited instance, the issues are not confined to "budgetary change," but might involve "something specific" Captain Nargis chose to discuss, such as a major change Captain Nargis wanted to make, or a change in state law, or something that would require a budgetary change. (*Id*.) With regard to training provided to staff within the Polk County Jail, Captain Nargis frequently advises the Sheriff and the Chief Deputy of what training topics are being covered as they come up. (8/16/16 Nargis Decl. ¶¶ 4, 9.)

45.     Sheriff Johnson indicated that Captain Nargis reported directly to Chief Deputy Steve Moe ("C.D. Moe"), who was Chief Deputy for all relevant time periods until March of 2016, when he retired. ( *Id*. at 11:1-10; *Id*. at 11:1-10.)

**Polk County's Response:**     No dispute.

46.     C.D. Moe indicated that the jail administrator/jail captain was responsible for training jail staff. (Case No. 15-c-433, ECF No. 59 at 14:20-23, 15:4-9; Case No. 15-c-428, ECF No. 58 at 14:20-23, 15:4-9.)

**Polk County's Response:**     No dispute.

47.     If there were discussions regarding the context or quality of training between C.D. Moe and the jail administrator/captain was done in passing. (*Id*. at 26:6-16; *Id*. at 26:6-16.)

**Polk County's Response:**   Disputed.  Chief Detective Moe testified that he probably discussed training with Captain Nargis "like in passing in the hall kind of conversations, as opposed to a meeting that may have been established for that purpose."  (Deposition of Steve Moe ("Moe Dep.") 26, filed in Case No. 15-CV-428, ECF No. 58 and Case No. 15-CV-433, ECF No. 59.)  In addition, Moe and Nargis had meetings "regularly and weekly and . . . [i]f subjects needed attention we would discuss them."  (*Id.* at 32.)   Further, Captain Nargis frequently advised Chief Deputy Moe of what training topics were being covered as they came up.  (8/16/16 Nargis Decl. ¶ 4-6, 9.)

48.   Nargis created the training program for all time periods relevant to Plaintiffs' complaints (Case No. 15-c-433, ECF No. 49 at 18:3-9; Case No. 15-c-428, ECF No. 48 at 18:3-9.)

**Polk County's Response:**   No dispute.

49.   Inspector Brad Hompe has never had any conversations regarding policy decisions or sent his inspection reports to any of the County Commissioners, these conversations and documents are always sent to Sheriff Johnson and Captain Nargis. (Case No. 15-c-433, ECF No. 73 at 49:11-18; Case No. 15-c-428, ECF No. 72 at 49:11-18.)

**Polk County's Response:**   No dispute.

**C.   Polk County's knowledge of PREA**

50.   Mr. Hompe was employed through the Wisconsin Department of Corrections ("DOC"). (Case No. 15-c-433, ECF No. 73 at 4:23-5:4, 10:2-2; Case No. 15-c-428, ECF No. 72 at 4:23-5:4, 10:2-2.)

**Polk County's Response:**   No dispute.

51.     Although Brad Hompe does not consider himself a PREA expert he has provided numerous resources to the jails that he inspects, including Polk County, on how to comply with the law. (*Id*. at 41:17-22; *Id*. at 41:17-22.)

**Polk County's Response:**     No dispute that Mr. Hompe does not consider himself to be a PREA expert (Deposition of Brad Hompe ("Hompe Dep.") at 41, filed in Case No. 15-CV-428, ECF No. 72 and Case No. 15-CV-433, ECF No. 73.), but dispute that Hompe "provided numerous resources" regarding PREA.  Hompe testified that the Department of Corrections made available to jails posters about "zero tolerance for sexual abuse," and "a training PowerPoint for PREA."  (Hompe Dep. 18.)

52.     In fact, he has told everyone in his jail administrative group "not to ignore PREA." (*Id*. at 43:14-15; *Id*. at 43:14-15.)

**Polk County's Response:**     No dispute.

53.     As PREA was created, there were "a lot of questions and frustration about [PREA] as it rolled out. When it first came out people didn't necessarily understand what to do, where to go." (*Id*. at 41:23-42:6; *Id*. at 41:23-42:6.)

**Polk County's Response:**     No dispute that Hompe testified that he held this opinion, but his testimony is inadmissible for the purposes of establishing what Polk County or other county jails understood or believed about PREA.

54.     In Brad Hompe's role as a detention facility specialist, he provided those administrators with resources that they could use. (*Id*. at 42:7-16; *Id*. at 42:7-16.)

**Polk County's Response:**     No dispute.

55.     The DOC provides resources regarding PREA to local jails, but they have no means of enforcing compliance. (*Id*. at 16:1-4, 17:2-18:7; *Id*. at 16:1-4, 17:2-18:7.)

**Polk County's Response:**      Disputed.  Hompe testified "PREA compliance does not fall under our jurisdiction."  (Hompe Dep. 16.)  PREA is a federal act, and as Hompe testified, "it's not mandatory for . . . county jails."  (*Id*. at 15).  With regard to county jails, "their compliance at this time is voluntary or on their own decision."  (*Id*. at 16.)  Indeed, "It's completely up to them at this point.  Again, some jails have done nothing at all, they haven't even acknowledged it.  Some have done the basics and some are full-fledged trying to implement every single standard."  (*Id.* at 42-43.)  However, not a single jail in Hompe's region has gone to the point of having an audit to be certified as PREA compliant.  (*Id*. at 43.)

56.      Hompe provides the following resources to jails that he administers: Those resources were made available to us. I believe it was a technical assistance grant the state got. And we gave the jails, if they wanted them, there were posters that they could post in their jails, zero tolerance for sexual abuse. We developed a training PowerPoint for PREA, and I don't recall all of the components, but one of the components was staff training that they could utilize if they choose to do so. (*Id*. at 18:8-19; *Id*. at 18:8-19.)

**Polk County's Response:**      No dispute.

57.      The National Institute of Corrections ("NIC") also provides PREA resources to county jails. (*Id*. at 13:3-9, 13:7-14:4; *Id*. at 13:3-9, 13:7-14:4.)

**Polk County's Response:**      Disputed.  Hompe testified the NIC has "resource materials, training materials," and that some of those were regarding PREA; however, while his testimony implies those materials were available and could be requested, he did not testify that NIC actually "provided" the materials county jails.  (Hompe Dep. 13-14.)

58.      If Polk County had requested resources, they were made well aware of the fact that resources could be found online. (*Id*. at 19:5-15; *Id*. at 19:5-15.)

**Polk County's Response:**     Disputed.  Hompe testified he did not know if Polk County requested "the training PowerPoint for PRA," and to the extent Hompe's testimony can be construed as stating what Polk County was "well aware of," it is inadmissible speculation. (Hompe Dep. 19.)

59.     The DOC has sent several emails on the topic of PREA to jail administrators since it became an act. (*Id.* at 29:24-30:22; *Id.* at 29:24-30:22.)

**Polk County's Response:**     No dispute.

60.     Additional resources that have been made available to local jails include a PREA investigator training in Chippewa County, as well as online PREA training through Edcor, an online training that walks through PREA 101 with a recorded quiz upon completion. (*Id.* at 39:19-40:7, 41:2-7; *Id.* at 39:19-40:7, 41:2-7.)

**Polk County's Response:**     Disputed.  Hompe testified that in a conversation among the regional jail administrator group is was mentioned that a PREA investigator training was conducted in Chippewa County and that "there's a private contractor called Educor, that does online PREA training;" he did not testify these "additional resources" were "made available" to county jails.  (Hompe Dep. 39-40.)

61.     Sheriff Johnson admitted that other than the basic concepts, he does not have any knowledge about PREA. (Case No. 15-c-433, ECF No. 53 at 17:23-18:7, 19:10-19; Case No. 15-c-428, ECF No. 52 at 17:23-18:7, 19:10-19.)

**Polk County's Response:**     Disputed.  Sheriff Johnson testified:  "I know there's some requirements that that law requires or that PREA requires on federal agencies.  I know those are best practices that we are aiming to try to get to, but based on some of what they have as best practice, I don't believe fiscally we'll ever be able to fully comply."  (Sheriff Johnson Dep. 19.)

Further, among other things, he testified: "Certainly I understand that any contact between guards and inmates, inmates and inmates, any of that has to be reported and acted on, investigated as soon as possible." (*Id*. at 18.)

62.     When asked "what things would you like to get to" the response was "[a]nd again, I don't know the details. Certain things, I know you have to have an officer that is the PREA compliance officer that takes those complaints and forwards them where they need to go. You know, there's a policy that has to be in place." (*Id*. at 19:20-20:1; *Id*. at 19:20-20:1.)

**Polk County's Response:**     Disputed.  The proposed finding of fact does not include all of Sheriff Johnson's response to that question, nor does it include all of his testimony that is relevant to the issue.  (*See, e.g*., Sheriff Johnson Dep. 19-20.)

63.     Sheriff Johnson believes that Captain Nargis is working on PREA compliance although they have not had discussions other than that Polk County needs to get as much in compliance as possible. (*Id*. at 20:11-13, 20:14-20; *Id*. at 20:11-13, 20:14-20.)

**Polk County's Response:**     Disputed.  The proposed finding of fact mischaracterizes Sheriff Johnson's testimony, does not include all of Sheriff Johnson's response to that question, and does it include all of his testimony that is relevant to the issue.  (*See, e.g*., Sheriff Johnson Dep. 20-21.)  Sheriff Johnson testified Captain Nargis is working on PREA compliance and he has not had discussions with Captain Nargis regarding his progress on that issue.  (Sheriff Johnson Dep. 20.)

64.     Sheriff Johnson assumes that Captain Nargis is the PREA compliance officer. (*Id*. at 21:22-23; *Id*. at 21:22-23.)

**Polk County's Response:**     No dispute.

15

65.     The sheriff believes that PREA policies are currently in place although he does not know what the policies are and that Nargis would know. When asked whether PREA policies were in place, the sheriff indicated, "I believe they are, my understanding is that they are." (*Id*. at 21:1-11, 21:8-16, 21:22-23; *Id*. at 21:1-11, 21:8-16, 21:22-23.)

**Polk County's Response:**     No dispute.

66.     Sheriff Johnson does not know what is required by PREA to be provided to inmates, Captain Nargis would know that information, but he believes that Polk County is compliant. (*Id*. at 22:16-23:14; *Id*. at 22:16-23:7.)

**Polk County's Response:**     Disputed.  First, county jails are not required to provide anything contained in PREA to inmates, since they are not required to comply with PREA. (Hompe Dep. 15-16, 42-43; Deposition of Jeffrey Eiser ("Eiser Dep.") 100-101, filed in Case No. 15-CV-428, ECF No. 76 and Case No. 15-CV-433, ECF No. 77), and any PREA recommended information they provide to inmates is entirely voluntary.  (Hompe Dep. 66; Eiser Dep. 100-101.) Second, the proposed finding of fact mischaracterizes Sheriff Johnson's testimony, does not include all of Sheriff Johnson's response to that question, and does it include all of his testimony that is relevant to the issue.  (*See, e.g*., Sheriff Johnson Dep. 22-23.)

67.     C. D. Moe does not have any special training on PREA and beyond the purpose of eliminating assaults from prisons, he does not have additional information and has never read PREA. When asked if he had any special training on PREA, C.D. Moe indicated, "I don't believe so." (Case No. 15-c-433, ECF No. 59 at 34:16-35:1, 35:20-24, 36:13-18, 36:19-20; Case No. 15-c-428, ECF No. 58 at 34:16-35:1, 35:20-24, 36:13-18, 36:19-20.)

**Polk County's Response:**     No dispute.

**D.      Prior allegations of sexual assault at Polk County Jail**

68.      An inmate at the jail indicated that Officer Christensen entered the cell block to remove cleaning supplies while she was in the shower alleging that he attempted to look at her naked; Christensen admitted he entered the cell block but did not get close to the shower. (Bannink Aff. Ex. G, PCJ 3727.)

**Polk County's Response:**      Disputed.  Christensen did state that he entered the cell block to retrieve cleaning supplies and that he did not approach the shower because he knew an inmate was in the shower.  The investigation documented by Captain Nargis establishes that the inmate was in the shower with her uniform top at least partially covering the window in the shower door.  She did not state that Christensen "attempted to look at her naked."  Rather, she stated that, despite her shirt covering the window, "Christensen would have been able to see her while walking up the stairs."  (Bannink Aff. Ex. G at PCJ0003727-3728.)

69.      Captain Nargis informed the inmate that "I did say that Officer Christensen is a veteran officer and that I am not aware of any accusation such as this in the past, and that I have no reason to believe he would engage in that sort of behavior." (*Id*. at 3728.)

**Polk County's Response:**      No dispute.

70.      The inmate further alleged that Christensen made comments about her "having a nice butt" and also "with someone as good-looking as you in here we have to look." (*Id*. at 3728.)

**Polk County's Response:**      No dispute.

71.      When approached on the incident, Christensen indicated he is not sure why the inmate would make false statements as he was nice to her, offered her fresh cups of coffee at time and once gave her a doughnut. (*Id*. at 3728-3729.)

**Polk County's Response:**    Disputed.  Christensen informed Captain Nargis that Officer Casey had been informed by another inmate, who was noted to be reliable, that Inmate N. (who made the complaint about the shower) had been heard that day conspiring with another inmate to get Christensen in trouble.  (Bannink Aff. Ex. G at PCJ0003728.)  Christensen said he did not know why Inmate N. would want to get him in trouble.  (*Id*.)  He also recounted one incident when he had offered N. fresh coffee as a reward for volunteering to assist staff with laundry.  (*Id*.)  On another occasion, when Inmate N. was to be transported to another facility before breakfast had been served—and would presumably then miss the meal—Christensen gave her a donut.  (*Id*.)

72.    Captain Nargis "instructed Officer Christensen that it would be in his best interests to avoid entering B-pod unless he absolutely needed to." (*Id*. at 3729.)

**Polk County's Response:**    No dispute that the report includes the quoted statement and the Captain Nargis determined, based on the nature of the inmates allegation, the lack of corroboratory evidence, and Christensen's lengthy work history without any similar incidents that no discipline beyond that admonishment was warranted. (Bannink Aff., Ex. 3 at 3729.)

73.    Captain Nargis' report indicates he is waiting for more information from another officer, but there is nothing in the documentation provided that would show that additional follow up was completed. (Bannink Aff., Ex. G, PCJ 3729; Case No. 15-c-433, ECF No. 49 at 57:14-58:9; Case No. 15-c-428, ECF No. 48 at 57:14-58:9.)

**Polk County's Response:**    No dispute.

74.    Jailer Alan Jorgensen was accused of having sexual contact/language with an inmate at the Polk County Jail in January of 2012. (Bannink Aff. Ex. D, PCJ 3739, 3741-3746.)

**Polk County's Response:**     Disputed.  On January 15, 2012, Jail Officer Kathleen Fjorden reported that one of the female inmates told her that another female inmate in K-pod, N.S., received special favors from Jorgensen and that Jorgensen himself had told Officer Fjorden that "inmate [N.S.] was accusing him of grabbing her."  (Bannink Aff. Ex. D at PCJ0003739.) The same day, Sgt. Schaefer reported that Officer Fjorden had reported to him that she was "sick of Allen spending unnecessary time in K-pod and also standing outside K-pod 'leering' at the female inmates."  (*Id.*)  Sgt. Schaefer also reported that day that he had investigated these reports by speaking to both Jorgensen, who stated Inmate S. was spreading rumors about him, and Inmate S., who "denied anything inappropriate between her and Officer Jorgensen."  (*Id.*) Captain Nargis, along with Deputy Sheriff Moe, then undertook and extensive investigation in which they documented interviews conducted with Jorgensen, Inmate S., and nine other female inmates.  (*Id.* at PCJ0003739-3751.)  The investigation yielded conflicting information, but included allegations of inappropriate contact between Jorgensen and some female inmates and inappropriate comments by Jorgensen, some of which were of a sexual nature.  (*Id.*)

75.     In addition, multiple of the female officers made sexual harassment claims and one coworker indicated that Jorgensen spent time "leering" at female inmates. (*Id.* at 3739, 3762-3767.)

**Polk County's Response:**     Disputed.  One female officer, Officer Fjorden, reported to Captain Nargis that Officer Jorgenson had engaged in "inappropriate behavior with female staff."  (Bannink Aff. Ex. D at PCJ0003762.)  Captain Nargis, along with Deputy Sheriff Moe, initiated and completed an extensive investigation in which they documented interviews with numerous female officers.  As a result of that investigation, it was discovered that Jorgenson had made offensive comments to a number of female officers that had not previously been reported

19

to the County or jail management.  It was determined that Jorgensen's comments may have violated the County's sexual harassment policy.  (Bannink Aff. Ex. D at PCJ0003754-3768.)

76.     C.D. Moe and Nargis met with Officer Jorgensen. (*Id*. at 3745.)

**Polk County's Response:**     No dispute.

77.     Captain Nargis informed Jorgensen that "there were two things that consistently came up [from the investigation]: there is a perception by the other inmates of the K-pod that there is some kind of relationship between him & [NS] and that he gives her undue and/or preferential treatment, and that he spends an inordinate amount of time in contact with her when compared with other inmates." (*Id*. at 3746.)

**Polk County's Response:**     No dispute.

78.     Jorgensen did not offer an explanation as to why multiple inmates would make these allegations other than that one of the inmates had an infatuation with him, he denied any inappropriate relationship (*Id*.)

**Polk County's Response:**     No dispute.

79.     C.D. Moe informed Officer Jorgensen that there were some potentially serious consequences involved with this situation, but that he "did not feel that Officer Jorgensen's job was in jeopardy." (*Id*. at 3746-3748.)

**Polk County's Response:**     No dispute that the investigation report indicates the statement quoted was made on January 17, 2012, at which time Inmate Schlageter "denied anything inappropriate between her and Officer Jorgensen."  (Bannink Aff. Ex. D at PCJ0003739.)  However, on January 20, 2012, Inmate Schlageter changed her story, further investigation was undertaken, and further conversations took place between Chief Deputy Moe, Captain Nargis and Jorgensen.  (*Id*. at PCJ0003747- 3751.)

80.     Captain Nargis believed that, at best, Jorgensen allowed some kind of relationship to grow between Jorgensen and the inmate (*Id*. at 3747.)

**Polk County's Response:**     No dispute that the investigation report indicates the statement quoted was made on January 17, 2012, at which time Inmate Schlageter "denied anything inappropriate between her and Officer Jorgensen." (Bannink Aff. Ex. D at PCJ0003739.)  However, on January 20, 2012, Inmate Schlageter changed her story, further investigation was undertaken, and further conversations took place between Chief Deputy Moe, Captain Nargis and Jorgensen. (*Id*. at PCJ0003747- 3751.)

81.     Captain Nargis "advised him [Jorgensen] that we valued his contribution to the department, that we know he is a "go to" guy when we need help with something. He was informed that we had considered his work history and the fact that there was no prior discipline history. C.D. Moe then advised him that I would be preparing a letter of reprimand this week We tried to assure Officer Jorgensen that a letter in his file is not a major deal, that it should be a learning experience. We thanked Officer Jorgensen for taking the time to meet with us, shook hands, and concluded our meeting. In accordance with our decision, I will be preparing a letter of reprimand for Officer Jorgensen's file." (*Id*.)

**Polk County's Response:**     No dispute that the investigation report indicates the statement quoted was made on January 17, 2012, at which time Inmate Schlageter "denied anything inappropriate between her and Officer Jorgensen." (Bannink Aff. Ex. D at PCJ0003739.)  However, on January 20, 2012, Inmate Schlageter changed her story, further investigation was undertaken, and further conversations took place between Chief Deputy Moe, Captain Nargis and Jorgensen. (*Id*. at PCJ0003747- 3751.).

82.     After a letter was received from the alleged victim of sexual assault and another letter intercepted from the same alleged victim to a prior inmate, Polk County completed more investigation and determined

> [Allen] was being warned that any other allegations of a similar nature involving inmates would probably result in some suspension time while it was investigated. I informed him I believed that he was being less than honest with us, and that was based on by training & experience as an interrogator. I informed him that the information was too similar to be coincidental, and that there were some things that the inmate could *not* have known unless he told her. [Referencing Jorgensen trying to have a threesome with a girl from Peru]...
> Even if there was no touching, his behavior was inappropriate and unprofessional. C.D. Moe did mention that what he was wanting to hear from Officer Jorgensen was some kind of statement indicating that he knew what behavior was proper and what was not. Sheriff Johnson also spoke of keeping the line between personal and professional life, and not crossing it. Officer Jorgensen **never did provide acknowledgement of an inappropriate relationship, or a statement that he understood what was proper and what was not.**
>
> **I advised officer Jorgensen that the letter of reprimand he received last week was the end of the issue at this** point. ... I feel compelled to note that, based on my training & experience, and based on knowing Officer Jorgensen for 9-plus years, it is my opinion that he was not only less than honest about this**, but he was outright lying to us at times**. No further information at this time.

(*Id*. at 3751.)

**Polk County's Response:**     No dispute that the investigation report includes the quoted statement quoted was made on January 17, 2012, at which time Inmate Schlageter "denied anything inappropriate between her and Officer Jorgensen."  (Bannink Aff. Ex. D at PCJ0003739.)  However, following that discussion, Jorgenson sent an email which included the statement that his "down fall as an officer in all this is that I have become too comfortable with how I conduct myself around inmates", male and female, and that he has allowed himself to "talk to inmates about things that are personal in nature".  (*Id*. at PCJ0003751.)

83.     After five female jailers indicated that Jorgensen targeted inappropriate sexual comments towards them. Nargis wrote:

Officer Jorgensen was advised that any further complaints by co-workers would be closely scrutinized. He was reminded to keep his conversation professional. He was told that the Department would **not be taking any action on the allegations at this time**, other than reporting it to E.R. [presumably employee relations] and that they would be following up.

I feel compelled to note that based on my training & experience, and having known Officer Jorgensen for 9-plus years, **it is my opinion that he was less than honest with us, and at times was outright lying to us.**

(*Id*. at 3762-3767.)

**Polk County's Response:**     No dispute.

84.     There were no additional documents provided from discovery with regards to this matter despite the documents being requested. (*Id*. at 3737-3768; Bannink Aff. Ex. A-D.)

**Polk County's Response:**     No dispute Polk County produced all documents in its possession that were responsive to Plaintiff's discovery requests.

85.     Sheriff Johnson does know if they "had come to a final discipline or if he resigned prior to that." (Case No. 15-c-433, ECF No. 53 at 30:14-18; Case No. 15-c-428, ECF No. 52 at 30:14-18.) Although, it is known that when Christensen resigned Polk County terminated their investigation because he was no longer an employee (*Id*. at 25:24-25:4; *Id*. at 25:2425:4) and that Jorgensen resigned shortly after being prompted with the allegations. (*Id*. at 30:5-9; *Id*. at 30:5-9.)

**Polk County's Response:**     No dispute that Jorgensen resigned before a decision was made with regard to discipline.  (Sheriff Johnson Dep. 30.)  The incident that prompted the investigation occurred on January 14, 2012 and was reported to Captain Nargis on January 15, 2012.  (Bannink Aff. Ex. D at PCJ0003739.)  He undertook an immediate and comprehensive investigation that continued through January 30, 2012 (*Id.* at 3739-3768), at which time the allegations of coworker harassment were referred to the Employee Relations Department for further handling.  (Id. at 3768.)  Jorgensen resigned on February 3, 2012.  (8/16/16 Nargis Decl. ¶ 11, Ex. B.)  Dispute that Polk County terminated its investigation of Christensen because he

23

resigned, although he did so immediately upon being confronted with the allegations made by Inmate R.  (*See* Affidavit of Paul Cranley ("Cranley Aff.") ¶ 3, Ex. A, Polk County Sheriff's "Request for Outside Agency, Criminal Investigation," PCJ0004405-4410.)  Rather, Polk County referred the matter to the Wisconsin Department of Justice Division of Criminal Investigations ("DCI") to conduct a criminal investigation, which it did.  (*Id*.; *see also*, Sheriff Johnson Dep. at 25, stating ". . . I contacted DCI by phone . . . .  I told them what we had and I wanted them to come in as an outside agency to conduct a criminal investigation.")

### E. Notice that male guards were uncomfortable supervising female inmates

86.     Christensen was uncomfortable supervising female inmates. (Case No. 15-c-433, ECF No. 46 at 111:1-3; Case No. 15-c-428, ECF No. 47 at 111:1-3.)

**Polk County's Response:**     No Dispute that Christensen gave the referenced testimony; however there is no evidence to corroborate his testimony or to support any implication that the County or jail management was aware of Christensen's alleged discomfort.

87.     Christensen's concern was, "voiced by several of us throughout my career that we felt that it should be separated." (*Id*. at 111:4-8; *Id*. at 111:4-8.)

**Polk County's Response:**     Disputed.  Christensen's testimony regarding concerns "voiced" by others is inadmissible hearsay.

88.     Although Christensen did not personally tell them why he was uncomfortable, he knew that others voiced their opinion that, "because of this fact that you can see—when they don't put towels over there, you can see into the showers. They come out of the shower and go into their rooms, and they've got to get dressed. You're looking directly into the cell blocks. You can see everything." ( *Id*. at 111:14-22; *Id*. at 111:14-22.)

**Polk County's Response:**     Disputed.  Christensen's testimony regarding opinions "voiced" by others is inadmissible hearsay.

89.     Christensen indicated that he could not handle the pressure. ( *Id*.at 111:23-25; *Id.* at 111:23-25.)

**Polk County's Response:**     No dispute.

**F. Rule violations in Polk County**

90.     On September 29, 2014 a coworker made a complaint that she could smell a "strong odor of intoxicants" coming from Christensen and that he "appeared hungover and made references to being hungover." (Bannink Aff. Ex. G, PCJ 3718.)

**Polk County's Response:**     Disputed.  The quoted report was made to Captain Nargis on September 27, 2014, the matter was investigated, Chief Deputy Moe administered to Christensen two separate alcohol breath tests from two different devices, and the readings on both devices were negative for the presence of any alcohol (.00 g/210L of breath).  (Bannink Aff. Ex. G at PCJ0003718.)

91.     C.D. Moe expressed his concern to Captain Nargis that this incident was "yet another 'negative' contact with Officer Christensen in a short period of time" and Captain Nargis indicated that "it doesn't do any harm for him to know that he cannot behave in any way he chooses." No formal punishment or training was given. (*Id*. at 3719.)

**Polk County's Response:**     No dispute that the quoted language was included in Captain Nargis's report, but dispute that the selectively quoted language in the proposed finding of fact accurately and completely describes the incident.  (*See* Bannink Aff. Ex. G at PCJ0003718-3719.)

92.     On June 20, 2014 Captain Nargis saw Christensen on his cell phone with his back to an inmate while the inmate was on a phone for inmates. Once Christensen heard the booking room door close, Christensen hung up his phone. A short time later Christensen was then in the inmate property storage room, again on his phone. (*Id*. at 3720.)

**<u>Polk County's Response:</u>**     No dispute.

93.     Captain Nargis, "expressed [his] exasperation and reminded [Christensen] that cell phones can be accessed in the break room, and that they do not belong in the jail. [He] stated that it is bad enough that [he has] caught people in Max and Master, but on the floor with an inmate out—and his back to the inmate—was not acceptable" and this " was certainly not the type of example our most-senior officer should be making... [he] thanked him for his time and excused him to go off duty." No other punishment or training was issued as a result. (*Id*.)

**<u>Polk County's Response:</u>**     No dispute that the quoted language was included in Captain Nargis's report, but dispute that the selectively quoted language in the proposed finding of fact accurately and completely describes the incident.  (*See* Bannink Aff. Ex. G at PCJ0003720.)

94.     On July 27, 2010, Captain Nargis found that Christensen was solely in charge of the maximum area, did not delegate his duties back to master, and left the post to go meet his wife and pick up his lunch which was against policy and "particularly disturbing" as Christensen was their Safety and Security Officer. (*Id*. at 3730-3731.)

**<u>Polk County's Response:</u>**     Disputed.  The incident occurred on July 26, 2010; and further dispute that the few facts the plaintiffs have chosen from Captain Nargis's investigation report to include in the proposed finding of fact accurately and completely describe the incident. (*See* Bannink Aff. Ex. G at PCJ0003730-3731.)

26

95.     On April 22, 2011, there was an allegation that Christensen used unnecessary and excessive force against an inmate (MW). (Case No. 15-c-433, ECF No. 49 at 58:2159:12; Case No. 15-c-428, ECF No. 48 at 58:21-59:12; Bannink Aff., Ex. E, PCJ 37253726.)

**Polk County's Response:**     Disputed.  The incident occurred April 21, 2011.  (Bannink Aff. Ex. G at PCJ0003725.)  Further dispute that the investigation and subsequent discipline arose out of "an allegation that Christensen used unnecessary and excessive force."  The incident was reported by Christensen himself, who came to Captain Nargis's office immediately after it occurred, explained what happened, and asked if he needed to prepare a report, to which Nargis responded "yes."  (Bannink Aff. Ex. G at PCJ0003732.)  A thorough investigation was then conducted and documented by both Captain Nargis and Sgt. LaVenture, including a review of the video footage from the cell where the incident occurred.  (*Id*. at PCJ0003732-3736.)  As a result of the investigation, it was determined that Chrstensen used excessive force in dealing with an "obstinate" inmate, who was "goading the officers" and who made a "snide/rude comment" to Christensen that prompted the reaction from Christensen that Nargis ultimately concluded was excessive.  (*Id*. at PCJ0003725-3726, 3732-3736.)

96.     Captain Nargis concluded, "Given all of the information... it is my opinion that the use of force in this incident was not necessary... nor was the amount of force reasonable... [g]iven that, I will be proceeding with the discipline process as the result of an excessive use of force." (Bannink Aff., Ex. G., PCJ 3734.)

**Polk County's Response:**     No dispute.

97.     Captain Nargis summarized his investigation as follows:

> I believed that this matter was best resolved by issuing a verbal reprimand to Officer Christensen, and providing re-training on the justification for use of force in the Jail, per our policy.

I would like to note that officer Christensen has a lengthy history of service with our Department and has had no similar incidents in the past.

(*Id*. at 3726.)

**Polk County's Response:**      No dispute.

98.     Captain Nargis believed that Christensen had taken this matter seriously, that he was remorseful, and that he was sincere in changing his ways. (Case No. 15-c-433, ECF No. 49 at 61:1-62:3; Case No. 15-c-428, ECF No. 48 at 61:1-62:3.)

**Polk County's Response:**      No dispute.

99.     When Christensen was asked in his October 6, 2011 Performance Review what was his "favorite incident/event in the past 12 months and why? What made it so special" Christensen indicated, "[MW] incident- felt good." When asked "what was your biggest mistake/regret of the past 12 months and what did you learn from it? Christensen wrote "[MW] incident- got disciplined." Captain Nargis signed Christensen's, October 6, 2011, performance review. (Bannink Aff., Ex. F.)

**Polk County's Response:**      No dispute.

100.     On May 25, 2009, the Polk County Jail received a call from an angry inmate who indicated that Christensen attempted to pit a co-defendant against him by disclosing statements relating to his criminal case. Captain Nargis said to the inmate that he "had no reason to believe that officer (Darryl Christensen), who is a veteran officer with no issues such as this on his record, would engage in any inappropriate behavior." (*Id*.)

**Polk County's Response:**      Disputed.  The report of the incident indicates Sheriff Tim Moore received a phone message from a former inmate, T. W., and the message was forwarded to Captain Nargis.  (Bannink Aff. Ex. G at PCJ0003721.)  Mr. W. indicated that a codefendant and friend of Mr. W., named P.A., told W. that Christensen had told P.A. that W. was trying to

28

"blame everything that happened on P." (*Id*.) Although W. was noted to have sounded "upset" in his voice message, when he talked to Captain Nargis he "said he was not that worried about it, that it was not a big deal." (*Id*.) Captain Nargis told W., as quoted above, that he "had no reason to believe that officer (Darryl Christensen) . . . would engage in any inappropriate behavior," but also told W. that he would "look into the issue," which he then did, as documented in his report. (*Id*.)

101.    Christensen denied that he engaged in such conduct and Captain Nargis indicated, "that it appeared to be what I had suspected, a case of misinformation, and I wanted him to be aware of the situation just in case something should arise. I thanked him and continued with my duties." (Bannink Aff., Ex. G, PCJ 3721.)

**Polk County's Response:**     Disputed. The report does not indicate Christensen "denied that he engaged in such conduct," but rather indicates that Christensen gave a detailed account of the conversation he had with Appel, which differed from the account W. reported to Captain Nargis that he had heard from P.A. (Bannink Aff. Ex. G at 3721-3722.) As noted above, Captain Nargis concluded, after his investigation, that it appeared to be "a case of misinformation." (*Id*. at 3722.)

102.    During the Jorgensen investigation, other Polk County jailers, including Christensen, heard rumors that Jorgensen was having "inappropriate sexual relations" with female inmates. (Case No. 15-c-433, ECF No. 46 at 137:5-15; Case No. 15-c-428, ECF No. 47 at 137:5-15.)

**Polk County's Response:**     Disputed. Christensen's testimony regarding rumors he or other jailers heard is inadmissible hearsay. Fed. R. Evid. 801, 802.

103.    Christensen did not feel the need to tell supervisors because "they're rumors... I'm not going to go and report to my captain that – if I didn't see it happen, there's nothing to report." (*Id*. at 137:21-138:12; *Id*. at 137:21-138:12.)

**Polk County's Response:**    Dispute that the quoted testimony fully or accurately characterizes Christensen's testimony, as he also testified "I'm not going to report on a rumor if I have no factual basis."  (Deposition of Darryl Christensen ("Christensen Dep.") 138, filed in Case No. 15-CV-426, ECF No. 37 and Case No. 15-CV-433, ECF No. 38.)

104.    The only time Christensen would tell a supervisor is "if [he] witnessed it." ( *Id*. at 138:522; *Id*. at 138:5-22.)

**Polk County's Response:**    No dispute that Christensen gave the quoted testimony.

### G. Polk County's failure to train officers on PREA

105.    Jorgensen was engaging in inappropriate relationships prior to Christensen beginning to do so. (*Id*. at 138:2-4; *Id*. at 138:2-4.)

**Polk County's Response:**    Disputed.  The incident that led to the investigation that revealed Jorgensen's alleged inappropriate behavior occurred on January 14, 2012, and prior to that time the County and jail management had no knowledge of any such behavior by Jorgensen. (*See* Bannink Aff. Ex. D at PCJ0003739.)  The allegations against Christensen involve conduct dating back to November 3, 2011 (JKJ Complaint, Case No. 15-CV-428, ECF No. 1 at 12), but were not discovered until the Department of Criminal Investigations undertook an investigation of Christensen following an October 29, 2014 report by another inmate, Inmate R.  (*See* Cranley Aff., ¶ 3, Ex. A, Polk County Sheriff's "Request for Outside Agency, Criminal Investigation," at PCJ0004405-4410.)  With regard to the plaintiffs specifically, the allegations against Christensen made by J.K.J were not discovered until she was interviewed Wisconsin Department of Justice

Division of Criminal Investigations ("DCI") on November 19, 2014 (Cranley Aff., ¶ 4, Ex. B, DCI summary of Nov. 19, 2014 interview of JKJ), and the allegations made by M.J.J. were not discovered until she was interviewed by DCI on December 8, 2014.  (Cranley Aff., ¶ 5, Ex. C, DCI summary of Dec. 8, 2014 interview with MJJ.)

106.    The only training Defendant Christensen had regarding the concept of correctional officers having sexual contact with inmates consisted of a four-week program given in 1996 when he was first certified as a jail officer. (*Id*. at 11:17-14:2, 81:21-25; *Id*. at 11:17-14:2, 81:21-25.) This was the only training Defendant Christensen had outside the jail. (*Id.* at 82:1-6.)

**Polk County's Response:**     Disputed.  Jail officers receive frequent training on jail policies and other matters, including fraternization with inmates, including sexual conduct.  (See Bannink Aff. Ex. B, responses to Interrogatory No. 13; 7/1/16 Declaration of Scott Nargis ("7/1/16 Nargis Decl.") ¶¶ 30-35, filed in Case No. 15-CV-428, ECF No. 55 and Case No. 15-CV-433, ECF No. 56; *see also*, 7/1/16 Nargis Decl. ¶ 23, Ex. B, Jail Policy C-202, "Fraternization with Inmates," *and* 7/1/16 Nargis Decl. ¶ 26, Ex. D, Jail Policy No. I-100, "Inmate Rights," stating that "[u]nder no circumstances shall an inmate be the object of verbal, physical, emotional, psychological or sexual harassment by facility staff.  Any officer engaged in such actions is subject to disciplinary charges and/or termination.")

107.    Christensen cannot remember the content of the 1996 training, specifically. (*Id*. at 12:4:414; *Id*. at. 12:4:4-14.)

**Polk County's Response:**     No dispute.

108.    Defendant Christensen does not recall Polk County offering or providing any in-house training to its correctional officers on the topic of sexual contact with inmates or PREA (*Id*. at 12:21-13:11; 20:19-25).

**Polk County's Response:**     No dispute Christensen gave the referenced testimony, but dispute any implication that no such training was given. (*See* 7/1/16 Nargis Decl. ¶¶ 23, 30-35.)

109.    Christensen did not know that an inmate was unable to consent to sexual acts. (*Id*. at 140:12-141:9,141:21-142:12; *Id*. at 140:12-141:9, 141:21-142:12.)

**Polk County's Response:**     Disputed.  Christensen did not state that he did not know an inmate was unable to consent to sexual acts; rather, he testified he never "received any training from Polk County . . . that says that an inmate could not consent to sex with a jailer." (Christensen Dep. 142.)  Further, Christensen testified he knew it was "criminal, unlawful" and "illegal" for a jailer to engage in sexual activity with inmates.  (*Id*. at 140-41.)

110.    Interrogatory Number 13 from Plaintiffs to Polk County specifically requested to describe in detail any and all training on the issue of fraternization with inmates, including sexual conduct. (Bannink Aff. Ex. A.)

**Polk County's Response:**     No dispute.

111.    Request for Production of Documents Number 3 requests all documents generated as a result of training received by Defendant Christensen, including but not limited to PREA. (*Id*.)

**Polk County's Response:**     No dispute.

112.    No documents were provided from Polk County pursuant to discovery requests that any training from Polk County (other than January 2014) included PREA. (Bannink Aff. Exs. B, C.)

**Polk County's Response:**     Disputed.  Polk County produced a copy of its Jail Policy Manual, which includes Jail Policy No. C-202, Fraternization with Inmates/PREA.  (7/1/16 Nargis Decl. ¶ 23, Ex. B.)

113.    Captain Nargis indicated that 90 topics are covered in the daily training and that jailers use an honor system to indicate they have complied with the training by signing their name. The topical list has never been provided in discovery and neither has a list of Christensen's acknowledgments that he allegedly reviewed the policies. (Case No. 15-c433, ECF No. 49 at 25:25-26:18; Case No. 15-c-428, ECF No. 48 at 25:25-26:18; Bannink Aff. Exs. A, B, C.

**Polk County's Response:**    Disputed.  Captain Nargis testified the topics for the Daily Training Program are drawn from the Policy Manual, which has been produced to plaintiffs. (Nargis Dep. 25-26).

114.    The PREA policy in the jail handbook only targets what to do once a matter is reported. (Nargis Decl. Ex. B.)

**Polk County's Response:**    Disputed.  The referenced document is Policy No. C-202 of the Jail Policy Manual, not the "jail handbook," and the policy is not limited to "what to do once a matter is reported."  (*See* 7/1/16 Nargis Decl. ¶ 23, Ex. B.)  For example, the policy discusses "supporting victims so reporting misconduct is not deterred;" admonishes jail officials that "[i]n addition to Department policies against sexual misconduct, Wisconsin State Statutes make it a criminal offence for correctional staff members to have sexual intercourse or contact with an individual confined in a correctional institution;" and the policy advises jail officials that assistance is available through the County's Employee Assistance Program to provide "[h]elp and guidance if an employee believes they are blurring professional boundaries and need help in maintaining those boundaries."  (*See id.*)  Further, the Jail Handbook advises inmates they have "the right to be safe from sexual abuse and harassment" and if they are "being pressured,

threatened, or extorted for sex" they "should report this to staff immediately." (*Id.* at ¶¶ 28-29, Ex. F at 10.)

115.    The one alleged PREA training that was given to jail staff on February 20, 2014, was oral, no materials were presented, and PREA requirements were not specifically read to the attendees. (Case No. 15-c-433, ECF No. 49 at 41:11-42:22; Case No. 15-c-428, ECF No. 48 at 41:11-42:22.)

**Polk County's Response:**     Disputed.  In addition to the February 20, 2014 session, jail officers received continual training on jail policies, including the Daily Training Program, and the Jail Manual includes a policy entitled C-202, Fraternization with Inmates/PREA, and another policy entitled I-100, Inmate Rights, which states that "Under no circumstances will any inmate be the object of verbal, physical, emotion, psychological, or sexual harassment by facility staff. An officer engaged in such actions is subject to disciplinary charges and/or termination." (7/1/16 Nargis Decl. ¶ 23, Ex. B and ¶ 32.)

116.    Captain Nargis does not know how long PREA was discussed, if it was more than 5 minutes, or if it consisted of only three bullet points (Nargis Decl. Ex. G.) that may have simply been read to staff attendees word-for-word. (Case No. 15-c-433, ECF No. 49 at 43:1-5; 47:20-48:3; Case No. 15-c-428, ECF No. 48 at 43:1-5; 47:20-48:3.)

**Polk County's Response:**     Disputed.  Captain Nargis did not recall the details or the length of the training, but testified:  "At our training session I discussed it with the staff.  I told them what PREA was, what it means for us and what the prohibitions are."  (Nargis Dep. 42.) Captain Nargis also stated:  "At a meeting with Polk County jailers on February 20, 2014, I discussed the basics of PREA.  In particular, I discussed that the Jail and PREA do not allow or condone inappropriate contact between inmates, or between staff and inmates.  In addition, I

34

stated that if someone, either an inmate or staff member, presents a concern about inappropriate contact, it should be reported to me." (7/1/16 Nargis Decl. ¶ 35.) The next day, Captain Nargis provided the staff with an email that reiterated "the meeting minutes and spelled out what the prohibitions were and what the expectation for their behavior was." (Nargis Dep. 42.) Plaintiffs blatantly mischaracterize Nargis's testimony by stating that the PREA training may have "consisted of only three bullet points that were read to staff word-for-word." Nargis gave no such testimony. To the contrary, in addition to the testimony quoted above, Nargis specifically denied the training was confined to the specific words contained in the email, stating "I believe I spoke more about it than that. This is just bullet points of an outline for me to present." (Nargis Dep. 47.)

117.    Taser recertification was also addressed at the alleged PREA meeting. (Bannink Aff. Ex. C, PCJ 3778.)

**Polk County's Response:**    No dispute.

118.    The sign in sheet for the day did not mention PREA training, but only that the type of training was "Taser Re-Cert." (*Id.* 3818.)

**Polk County's Response:**    No dispute.

119.    The following day, Captain Nargis followed up the meeting with an email to all staff with the following content:

> o    Seems to be that everyone is in a tizzy to train their staff on PREA. There is no requirement for us to be compliant with everything that the law calls for, but nevertheless it is federal law. So we'll hit the basics of PREA training.
>
> o    Do not allow/condone inappropriate contact between inmates.
>
> o    Do not allow/condone/engage in inappropriate contact between staff & inmate

o    If someone (staff or inmate) presents a concern about inappropriate contact, report it to me.

(Nargis Decl. Ex. G.)

**Polk County's Response:**    No dispute.

120.   Captain Nargis indicates that this brief summary of PREA was provided based on conversations with Brad Hompe. (Case No. 15-c-433, ECF No. 49 at 44:14-45:4; Case No. 15-c-428, ECF No. 48 at 44:14-45:4.)

**Polk County's Response:**    Disputed.  The cited testimony did not directly concern the content of the email; rather, Captain Nargis testified that, as there is no requirement that the County "be compliant with everything that the law called for," his plan with regard to PREA was to instruct on the basics, as discussed with Brad Hompe, the jail inspector.  (Nargis Dep. 44.) Hompe testified he recommended jails in his region to implement what he considers to be the basics of PREA.  (Hompe Dep. at 35).  He instructed jail administrators to:

> at least inform the inmates that they have the ability to—they have the right not to be sexually abused and have a reporting mechanism, one.  Two, train your staff so they know how to handle it, as far as reporting it.  And three, make sure you have an investigative process to clearly vet those complaints.

(*Id*.)  Hompe agreed Polk County implemented these recommendations.  (Hompe Dep. at 60-64.) Further, although Hompe testified he recommends jails in his region implement certain PREA principles (Hompe Dep. at 35), compliance with PREA is "voluntary" for county jails and "on their own decision." (Hompe Dep. at 15-16).  Similarity, Plaintiffs' expert, Jeffrey Eiser, testified that PREA compliance is "voluntary."  (Eiser Dep. at 100-101).

121.   Brad Hompe provided extensive materials available to Polk County Jail regarding PREA, including PowerPoint presentations (Case No. 15-c-433, ECF No. 73 at 13:7-14:4. 18:8-19; Case No. 15-c-428, ECF No. 72 at 13:7-14:4. 18:8-19.)

**Polk County's Response:**     Dispute that Hompe "provided extensive materials" regarding PREA.  Hompe testified that the Department of Corrections made available to jails posters about "zero tolerance for sexual abuse," and "a training PowerPoint for PREA."  (Hompe Dep. 18.)

122.     Captain Nargis does not recall being provided PREA material in writing from Hompe, does not recall taking notes from his conversation with Hompe, and does not have any documents that would show the basic requirements of PREA. (Case No. 15-c-433, ECF No. 49 at 44:20-45:15; Case No. 15-c-428, ECF No. 48 at 44:20-45:15.)

**Polk County's Response:**     No dispute.

123.     Many jail administrators were considering hiring PREA consultants. (*Id*. at 44:3-8, 45:1625; *Id*. at 44:3-8, 45:16-25.)

**Polk County's Response:**     Disputed.  The statement mischaracterizes Captain Nargis's testimony, which did not concern what "many" jail administrators were considering.  Captain Nargis was asked if "other jail administrators were considering hiring consultants to make this presentation."  He responded: "[t]hey were considering hiring consultants to at least do some training.  I don't know about a presentation."  (Nargis Dep. 45.)

124.     If Captain Nargis had a question regarding PREA one resource he would use would be a PREA consultant. (*Id*. at 90:20-91:9; *Id*. at 90:20-91:9.)

**Polk County's Response:**     No dispute.

125.     Nargis has not consulted a PREA consultant and does not feel the need to now. (*Id*. at 44:9-12, 91:6-9; *Id*. at 44:9-12, 91:6-9.)

**Polk County's Response:**     No dispute.

126.     Hompe had numerous resources on jailer training and also was able to give presentations himself on the topic of inmate manipulation and professionalism that "focuses around avoiding any type of in appropriate or too close of conversations with inmates that would lead to relationships." (Case No. 15-c-433, ECF No. 73 at 27:22-28:12; Case No. 15-c428, ECF No. 72 at 27:22-28:12.)

**Polk County's Response:**     Disputed.  Hompe did not testify he had "numerous resources on jailer training," and he testified he has given training on inmate manipulation. (Hompe Dep. 27-28.)

127.     Polk County never availed Mr. Hompe of his offers to provide training. (*Id.* at 27:2-8; *Id.* at 27:2-8.)

**Polk County's Response:**     Disputed.  Hompe testified he never provided any training for the Polk County corrections officers and that he had never been requested by Captain Nargis to do so; however, Hompe did not testify he ever offered to give such training.  (Hompe Dep. 26-27.)

**H. Polk County's failure to train inmates on PREA**

128.     Inmate education is important as a lot of inmates do not know what sexual abuse is and they do not know what is prohibited by law. (Case No. 15-c-433, ECF No. 77 at 74:1219, 78:19-79:1; Case No. 15-c-428, ECF No. 76 at 74:12-19, 78:19-79:1.)

**Polk County's Response:**     Disputed.  The proposed finding of fact is the opinion of plaintiffs' paid expert, and neither the expert nor the plaintiffs provide any legal or constitutional basis to establish that a county jail has any obligation to educate inmates on what sexual abuse is or what is prohibited by law.  (Eiser Dep. 74.)

129.    The only PREA information that was provided to inmates from Polk County was one sentence on page 10 of 12 in the inmate handbook written in font smaller than any other text on the same page. (Bannink Aff. Ex. K, p. 10.)

**Polk County's Response:**    Disputed.  The information referenced by plaintiffs on page 10 of the Inmate Handbook is three sentences in English, and is repeated in Spanish.  (Bannink Aff. Ex. K at 10.)

130.    The language provided to inmates in the Inmate Handbook is an abbreviated version of the complete PREA notice that would have been provided from Hompe to Polk County Jail and that someone from Polk County must have chosen to exclude certain information. (Case No. 15-c-433, ECF No. 73 at 23:11-26:12; Case No. 15-c-428, ECF No. 72 at 23:11-26:12.)

**Polk County's Response:**    Disputed.  Plaintiffs do not identify, and Hompe was not asked, what constitutes the "complete PREA notice" referenced by plaintiffs, and Hompe was unable to specify what was given to Polk County (Hompe Dep. 26); further, he testified that Polk County was not required to provide any such "PREA notice" to inmates, and their decision to do so was voluntary.  (*Id*. at 66.)

131.    Information regarding PREA reporting was never provided to inmates. (Case No. 15-c433, ECF No. 52 at 19:20-20:10; Case No. 15-c-428, ECF No. 51 at 19:20-20:10; Case No. 15-c-433, ECF 46 at 85:17-86:1, Case No. 15-c-428, ECF No. 47 at 85:17-86:1.)

**Polk County's Response:**    Disputed.  The Inmate Handbook includes a five step grievance procedure and specifically advised inmates that "[i]f you are being pressured, threatened, or extorted for sex, you should report this to staff immediately."  (7/1/16 Nargis Decl. ¶ 29, Ex. F at 10; *see also* Hompe Dep. 61-64, stating that the grievance procedure in the Inmate

Handbook satisfies the recommendation in PREA for a "reporting mechanism" for inmates who are victims of sexual abuse.)

132.    Plaintiffs have not received PREA training from Polk County. (Decl. of MJJ July 27, 2016 ("MJJ Decl.") ¶4; Decl. of JKJ July 27, 2016 ("JKK Decl.") ¶4.)

**Polk County's Response:**    Disputed.  While plaintiffs do not define what they mean by "PREA training," both plaintiffs were provided—in the case of one plaintiff, multiple times— a five step grievance procedure and information advising that "If you are being pressured threatened, or extorted for sex, you should report this to staff immediately." (7/1/16 Nargis Decl. ¶ 29, Ex. F at 10.)

133.    Plaintiffs came into the Polk County Jail with histories of violence and victimization in their lives. (*Id*. at ¶3; *Id*. at ¶3.)

**Polk County's Response:**    No dispute.

134.    Plaintiffs were never trained by Polk County as to what sexual harassment and abuse consists of. (*Id*. at ¶5; *Id*. at ¶5.)

**Polk County's Response:**    Disputed.  Plaintiffs received information that "Every inmate has the right to be safe from sexual abuse and harassment.  No one has the right to pressure you to engage in sexual acts.  If you are being pressured threatened, or extorted for sex, you should report this to staff immediately."  (7/1/16 Nargis Decl. ¶ 29, Ex. F at 10.)

135.    Plaintiffs were never trained by Polk County that they have a zero tolerance policy towards inmate abuse and/or harassment. (*Id*. at ¶6; *Id*. at ¶6.)

**Polk County's Response:**    Disputed.  Plaintiffs received information that "Every inmate has the right to be safe from sexual abuse and harassment.  No one has the right to

pressure you to engage in sexual acts.  If you are being pressured threatened, or extorted for sex, you should report this to staff immediately."  (7/1/16 Nargis Decl. ¶ 29, Ex. F at 10.)

136.    Plaintiffs were never trained by Polk County that there was a specific person at Polk County Jail that they could report assault/abuse to that would handle all of the allegations for the jail. (*Id*. at ¶7; *Id*. at ¶7.)

**Polk County's Response:**    Plaintiffs received information that "Every inmate has the right to be safe from sexual abuse and harassment.  No one has the right to pressure you to engage in sexual acts.  If you are being pressured threatened, or extorted for sex, you should report this to staff immediately."  (7/1/16 Nargis Decl. ¶ 29, Ex. F at 10.)  Further, the grievance process provides that a complaint made to a staff officer, if unresolved, may be appealed to the Jail Administrator first, and then to the Sheriff. (*Id*.)

137.    Plaintiffs were never trained by Polk County that they had the ability to report the abuse and harassment in confidence. (*Id*. at ¶8; *Id*. at ¶8.)

**Polk County's Response:**    No dispute plaintiffs provided the referenced testimony; however, Jail Policy No. I-100 states that "In the event an inmate believe his/her rights have been violated, they may seek legal redress without threat, retaliation or sanction.  (7/1/16 Nargis Decl. ¶ 26, Ex. D.)

138.    Plaintiffs were never trained by Polk County that if they reported abuse and/or harassment, they could not be retaliated against. (*Id*. at ¶9; *Id*. at ¶9.)

**Polk County's Response:**    No dispute plaintiffs provided the referenced testimony; however, Jail Policy No. I-100 states that "In the event an inmate believe his/her rights have been violated, they may seek legal redress without threat, retaliation or sanction.  (7/1/16 Nargis Decl. ¶ 26, Ex. D.)

139.    Plaintiffs were never trained by Polk County that if they reported the abuse and harassment that they would not be judged. ( *Id.* at ¶10; *Id.* at ¶10.)

**Polk County's Response:**    No dispute plaintiffs provided the referenced testimony; however, Jail Policy No. I-100 states that "In the event an inmate believe his/her rights have been violated, they may seek legal redress without threat, retaliation or sanction.  (7/1/16 Nargis Decl. ¶ 26, Ex. D.)

140.    Had Plaintiffs been provided the training regarding reporting, they would have recognized Christensen's comments as harassment prior to abuse turning physical. (*Id.* at ¶11; *Id.* at ¶11.)

**Polk County's Response:**    Disputed.  The plaintiffs' testimony is speculative and not credible.  With respect to JKJ in particular, the evidence establishes that even when she was not incarcerated at Polk County Jail she sought out Christensen, drove to meet him several times, uninvited, at the fire station where he worked when he was not working at the Polk County Jail, and engaged in sex with him.  (Deposition of J.K.J. ("JKJ Dep.") 67-76, filed in Case No. 15-CV-428, ECF No. 46 and Case No. 15-CV-433, ECF No. 47; Christensen Dep. 60-63.)

141.    Had Plaintiffs been provided the training and had a comfortable atmosphere of which to report the abuse and harassment, they would have been more likely to report the abuse and harassment prior to it turning physical. (*Id.* at ¶12; *Id.* at ¶12.)

**Polk County's Response:**    Disputed.  The plaintiffs' testimony is speculative and not credible.  With respect to JKJ in particular, the evidence establishes that even when she was not incarcerated at Polk County Jail she sought out Christensen, drove to meet him at the fire station where he worked when he was not working at the Polk County Jail, and engaged in sex with him. (JKJ Dep. 67-76; Christensen Dep. 60-63.)

142.     Captain Nargis is responsible for the Inmate Handbook and he has no knowledge whether or not PREA was consulted in making the grievance process within the handbook or whether it is PREA compliant. (Case No. 15-c-433, ECF No. 49 at 88:19-24, 102:22-25; Case No. 15-c-428, ECF No. 48 at 88:19-24, 102:22-25.)

**Polk County's Response:**     Disputed, as the Inmate Handbook predates PREA, and while Captain Nargis testified he has not consulted PREA to determine whether the grievance process meets the PREA recommendations (Nargis Dep. 48), Hompe testified the grievance procedure in the Inmate Handbook satisfies the recommendation in PREA for a "reporting mechanism" for inmates who are victims of sexual abuse.  (Hompe Dep. 61-64.)

143.     As to the grievance procedure, the only method available to report assault was handing a piece of paper to the jailer on duty. (*Id*. at 102:22-103:7, 107:12-17; *Id*. at 102:22-103:7, 107:12-17; Bannink Aff. Ex. K.)

**Polk County's Response:**     Disputed.  Although the grievance procedure outlined in the Inmate Handbook involves written documentation given to a jail officer, Inmates could verbally report assault, or any other complaint, to any staff member.

144.     The grievance process indicated in relevant parts:

Step One- Submit Initial Grievance An officer will attempt to resolve the matter personally. If unable to do so, the form will be forwarded to a supervisor.

Step Two- Initial Grievance Response

A written response will be provided to the inmate within 5 days of the receipt of Grievance. (Bannink Aff. Ex. K.)

**Polk County's Response:**     No dispute the grievance procedures includes the steps quoted above, but dispute that those are the "relevant parts."  (*See* 7/1/16 Nargis Decl. ¶ 29, Ex. F at 10.)

145.    After the allegations regarding Christensen surfaced, Captain Nargis and Sheriff Johnson met with Kristi Dietz from the Head of the Office of Detention Facilities. Polk County was given copies of the posters to put up in the jail for inmates. (Case No. 15-c-433, ECF No. 53 at 27:10-14; Case No. 15-c-428, ECF No. 52 at 27:10-14.)

**Polk County's Response:**    Disputed.  Sheriff Johnson and Captain Nargis met with Ms. Dietz, at which time she provided copies of the referenced posters, but that meeting occurred on March 30, 2016, and was not prompted by or specifically in relation to the incidents involved Darryl Christensen.  (Nargis Dep. 48; 8/16/16 Nargis Decl. ¶ 12.)

146.    Captain Nargis made the decision not to put the posters up because of his concern that inmates would attempt to tunnel out behind the poster or hide contraband behind a poster, as in the fictional movie, Shawshank Redemption. (Case No. 15-c-433, ECF No. 49 at 48:4-8; 107:21-109:1; Case No. 15-c-428, ECF No. 48 at 48:4-8; 107:21-109:1.)

**Polk County's Response:**    Disputed.  Captain Nargis testified there were safety reasons for not displaying posters in the jail, and when asked what those safety reasons were he testified: "One safety reason is, those posters could hide attempts to chisel our or tunnel through a section and/or provide a space where contraband could be hidden."  (Nargis Dep. 107-08.)

147.    He has never heard of a similar real-life incident happening, nor did he ask Ms. Dietz how to address those concerns. (*Id*. at 108:5-109:1; *Id*. at 108:5-109:1.)

**Polk County's Response:**    Disputed.  Captain Nargis testified he did not know if anyone had tunneled out of a jail behind a PREA poster; he was not asked whether he was aware of any cases in which a poster or wall hanging had been used to hide contraband.  (Nargis Dep. 108.)

148.    When asked if the inmates were provided with copies of that information he indicated "No" because that information was provided in their handbook. (*Id*. at 49:9-14; *Id*. at 49:9-14.)

**Polk County's Response:**    No dispute.

149.    Sheriff Johnson does not know if the posters are up but would be disappointed if they were not displayed as they are a cost effective means to educate and does not believe there would be a budgetary constraint in providing this information. (Case No. 15-c-433, ECF No. 53 at 28:19-23, 23:16-24:5, 28:8-11, 30:19-23; Case No. 15-c-428, ECF No. 52 at 28:19-23, 23:16-24:5, 28:8-11, 30:19-23.)

**Polk County's Response:**    Disputed.  Sheriff Johnson stated he would "probably" be disappointed if the posters were not up.  (Sheriff Johnson Dep. 28.)

150.    Hompe has provided ways for Polk County to comply with the PREA recommendation that officer's announce their presence prior to entering a housing area, such as notifying inmates in the handbook or at the beginning of each shift that they will be supervised by both male and female inmates. (Case No. 15-c-433, ECF No. 73 at 59.20-60:6; Case No. 15-c-428, ECF No. 72 at 59.20-60:6.)

**Polk County's Response:**    Disputed.  Hompe testified that the PREA recommendation that an officer announce his presence before entering an inmates' cell "creates some security problems" and "contradicts" the Wisconsin Administrative Code, Wis. Admin Code § DOC 350.18, which requires "staggered" checks on inmates to prevent inmates from predicting when they may be inspected or searched.  (Hompe Dep. 58-59.)  Hompe testified he told jails (though not Polk County in particular) that "there are other ways to ensure that they could try to meet that standard," including notifying inmates, "either in the handbook or possible at the beginning of

the shift, that they will be supervised by both male and female staff and conduct themselves accordingly." (Hompe Dep. 59-60.) Dispute that such notice would meet the recommendation in PREA, since, on its face, it would not, and further note that inmates are informed in the Jail Manual that they "may be searched at random," and there is no dispute that inmates knew they were supervised by jail officers of the opposite sex. (7/1/16 Nargis Decl. ¶ 29, Ex. F at 4.)

### I. Polk County's culture

151.    It was normal procedure to have only one officer in the max pod, max control, which is where the sexual contact occurred. (Case No. 15-c-433, ECF No. 46 at 138:25-239:6, 102:12-24, 104:18-23; Case No. 15-c-428, ECF No. 47 at 138:25-239:6, 102:12-24, 104:18-23.)

**Polk County's Response:**     No dispute.

152.    Christensen admitted that he would engage in the sexual contact when no other guards were present. (*Id*. at 58:15-22; *Id*. at 58:15-22.)

**Polk County's Response:**     No dispute.

153.    A jailer in the maximum control area of the jail at Polk County can easily and clearly see into the shower and toilet areas of an inmate's cell. (Case No. 15-c-433, ECF No. 77 at 84:7-19; Case No. 15-c-428, ECF No. 76 at 84:7-19.)

**Polk County's Response:**     Disputed.   A jail officer, or anyone else, cannot easily and clearly see into the inmates' showers.  There is a small open area through the shower door at foot-to-calf level, and a window at shoulder/head level, which inmates frequently cover while in the shower.  These openings are maintained for suicide prevention and inmate safety.  (8/16/16 Nargis Decl. ¶ 13; *see also* Deposition of Scott Pittman ("Pittman Dep.") 38, filed in Case No. 15-CV-428, ECF No. 50 and Case No. 15-CV-433, ECF No. 51, "unless they'd be extremely tall you couldn't really see anything but their head.")

46

154.    Christensen was closer to J.K.J. than any other inmates and would pay her more attention. (Case No. 15-c-433, ECF No. 51 at 21:23-7; Case No. 15-c-428, ECF No. 50 at 21:23-7.)

**Polk County's Response:**    Disputed.  Pittman's testimony lacks foundation and is inadmissible speculation.

155.    There were three times when Jailer Pitman returned from lunch and Christensen was in the max pod where he requested the door to be opened and there was a delay for Christensen to open the door. (*Id*. at 31:2-10; *Id*. at 31:2-10.)

**Polk County's Response:**    Disputed.  Pittman testified that circumstance occurred "two or three times."  (Pittman Dep. 31.)

156.    Pittman engaged in sexual conversations about inmates (Case No. 15-c-433, ECF No. 46 at 133:7-134:3; Case No. 15-c-428, ECF No. 47 at 133:7-134:3.)

**Polk County's Response:**    No dispute Christensen provided the referenced testimony, but dispute that the County or jail management had any knowledge of such conduct.

157.    It was common for jailers to participate in sexual conversations with inmates. (*Id*. at 133:4-11; *Id*. at 133:4-11.)

**Polk County's Response:**    Disputed.  Christensen did not testify that it was "common" for jailers to participate in sexual conversations with inmates.  (Christensen Dep. 134.)  He testified that "a few" jailers engaged in such conversations, and the only testimony he gave with respect to the frequency of such conversations was to say that Officer Ottosen "occasionally" participated in "those types of conversations."   (*Id.* at 133-34.)

158.    Jailers including Scott Pittman, Tyler Briggs, Alan Jorgensen, and Michael Ottosen would participate in sexual conversations with inmates. (*Id*. at 134:7-135:17; *Id*. at 134:7135:17.)

**Polk County's Response:**     No Dispute.

159.   Christensen indicated that he would talk about his lack of sex life at home with the inmates. (*Id*. at 134: 25-1; *Id*. at 134: 25-1.)

**Polk County's Response:**     No dispute.

160.   Captain Nargis saw Christensen make sexual comments regarding females and that it was part of "typical tier" talk amongst the staff, which means banter. (Case No. 15-c-433, ECF No. 49 at 83:6-84:8; Case No. 15-c-428, ECF No. 48 at 83:6-84:8.)

**Polk County's Response:**     Disputed.  Nargis testified he heard Christensen make "inappropriate or sexual comments," as part of  "tier talk amongst the staff," which he defined as "bantering back and forth.  Dark humor."  (Nargis Dep. 83-84.)

161.   Captain Nargis, in his supervisory capacity, has made comments about female coworkers' physical anatomy that have been derogatory and has heard other coworkers make comments about coworker's physical anatomy (*Id*. at 84:21-85:10; *Id*. at 84:2185:10.)

**Polk County's Response:**     No dispute Captain Nargis testified he has made comments about coworkers' anatomy, but dispute that he stated he had made derogatory comments of that nature.  (Nargis Dep. 84-85.)  He testified he has heard others make derogatory comments about a coworker's anatomy.  (*Id*. at 85.)

162.   Nargis has "probably" heard comments from staff regarding inmates' rear ends or breasts as those kinds of comments are "part of the typical banter." (*Id*. at 85:15-24; *Id*. at 85:15-24.)

**Polk County's Response:**     Disputed.  Nargis's testimony concerned Christensen, and he stated he was "sure there probably have been some comments over the years."  (Nargis Dep. 85.)

163.    Captain Nargis stated:

> Do I participate in and allow them to discuss amongst each other
> that here's a mug shot of an inmate who has two black eyes. Damn,
> that's messed up or that person fell off the tree or that person fell
> out of the ugly tree and hit every branch on the way down in that
> condition, yeah. Do I participate and allow the staff to make
> comments about each other? Yes. Again, generally speaking, that
> is more tier talk, dark humor, generally more insulting one another
> than anything else.

(*Id*. at 87:17-88:8; *Id*. at 87:17-88:8.)

**Polk County's Response:**     No dispute that Captain Nargis gave the quoted testimony,

but dispute that it accurately or completely characterizes his testimony, as he also stated:

> have I been present or part of conversations of, that an inmate has a
> nice butt or that inmate has a nice body, no.  I would not be part of
> that.  I wouldn't tolerate the staff talking about it.

(Nargis Dep. 87.)

164.    One time jailer Pittman entered into the K pod with female inmates, Christensen

announced over the loud speaker that it was Pittman's birthday and the inmates should give him

his birthday spankings. (Case No. 15-c-433, ECF No. 51 at 18:6-19:13; Case No. 15-c-428, ECF

No. 50 at 18:6-19:13.)

**Polk County's Response:**     No dispute.

165.    Jailer Pittman did not report the conduct because he "didn't think it was

something that was illegal or something." (*Id*. at 18:6-19:13; *Id*. at 18:6-19:13.)

**Polk County's Response:**     No dispute.

**J. Assaults to Plaintiffs**

166.    Christensen would call over the intercom and say that M.J.J. looked sexy,

requesting that she leave the towel down so he can see in the shower, ask to put her lotion on

49

topless, etc. (Case No. 15-c-433, ECF No. 48 at 64:20-65:2; Case No. 15-c-428, ECF No. 45 at 64:2065:2.)

      **Polk County's Response:**     No dispute.

167.    Christensen would call M.J.J out of the cell and, while still standing in the bubble, stick his penis through a mail slot to have M.J.J. touch it. ( *Id*. at 90:17-23; *Id*. at 90:17-23.)

      **Polk County's Response:**     No dispute.

168.    Christensen would call M.J.J when she was legitimately doing research in the X room and direct her to touch herself. (*Id*. at 86:23-87:10; *Id*. at 86:23-87:10.)

      **Polk County's Response:**     No dispute.

169.    Christensen would call M.J.J. out of the pod, push her up against the glass and start touching or kissing her, which led to either oral or actual sex. (*Id*. at 90:22-21:3:10; *Id*. at 90:22-21:3.)

      **Polk County's Response:**     No dispute.

170.    Christensen would use his authority to call J.K.J. her over the intercom. (Case No. 15-cv-433, ECF No. 47 at 57:21-22; Case No. 15-c-428, ECF No. 46 at 57:21-22.)

      **Polk County's Response:**     No dispute.

171.    Christensen called J.K.K out once to engage in sexual intercourse and twice to engage in oral sex. (*Id*. at 78:10-79:19; *Id*. at 78:10-79:19.)

      **Polk County's Response:**     No dispute.

172.    Christensen admitted that he engaged in sexual conduct with Plaintiff although he disputes the number of times and the type of conduct that he engaged in. (Case No. 15-c433, ECF No. 46 at 32:20-24, 33:2-4, 33:8-10, 33:11-16, 37:23-38:2, 38:14-20, 33:17 - 24:6; Case No. 15-c-428, ECF No. 47 at 32:20-24, 33:2-4, 33:8-10, 33:11-16, 37:23-38:2, 38:14-20, 33:17-24:6.)

**Polk County's Response:**     No dispute.

173.     Christensen does not recall the topic of PREA being provided or offered at any of the in-house training done by Polk County. (Case No. 15-c-433, ECF No. 46 at 20:19-25, Case No. 15-c-428, ECF No. 47 at 20:19-25.)

**Polk County's Response:**     No dispute.

174.     Hompe stated that one of the issues jails were having with some of the PREA standards dealt with staffing; some jail administrators were simply not going to acknowledge the issues. Nargis never discussed any difficulties he was having with PREA compliance. However, in several of Hompe inspection reports noted that Polk County needed to increase supervision of their jail and that it was an ongoing issue. (Case No. 15-c-433, ECF No. 73 at 43:20-45:15, Case No. 15-c-428, ECF No. 72 at 43:20-45:15.)

**Polk County's Response:**     No dispute that Hompe testified some jail administrators told him they were not going to acknowledge PREA and that Nargis never discussed any difficulties he was having with PREA compliance.  Dispute that the supervision issue noted in Hompe's reports had anything to do with PREA;  it did not.  (Hompe Dep. 44-45.)  Hompe testified DOC recommends as a "best correctional practice" that jails have a supervisor on duty at all times."

175.     PREA has not been a priority for Sheriff Johnson. (Case No. 15-c-433, ECF No. 53 at 22:1-9, Case No. 15-c-428, ECF No. 52 at 22:1-9.)

**Polk County's Response:**     Disputed.  Sheriff Johnson testified he "can't say it's been a priority because I know we can't meet it completely."  (Sheriff Johnson Dep. 22.)

176.     Manning had a sexual relationship with Christensen from approximately August into September 2014. Their relationship included inappropriate physical contact while they were

working together at Polk County Jail. (Case No. 15-c-433, ECF No. 52 at 24:7-25:14, 26:24-28:17, Case No. 15-c-428, ECF No. 51 at 24:7-25:14, 26:24-28:17; Case No. 15-c433, ECF No. 46 at 92:12-93:23, Case No. 15-c-428, ECF No. 47 at 92:12-93:23.)

**Polk County's Response:**     No dispute that Manning, a fellow corrections officer, had a relationship with Christensen from August through the first week of September, 2014 and that "no one knew about it until after the accusations by the inmates."  (Deposition of Lynelle Manning ("Manning Dep.") 24-25, filed in Case No. 15-CV-428, ECF No. 51 and Case No. 15-CV-433, ECF No. 52.)  The physical contact that occurred at work "was usually like he'd give me a back rub or just really kind of touchy-feely and that was it.  There was nothing else during work hours."  (*Id*. at 25.)

177.     There are no cameras in the maximum/minimum pod area, which is where the bulk of assaults against Plaintiffs occurred. (Case No. 15-c-433, ECF No. 59 at 55:16-56:10; Case No. 15-c-428, ECF No. 58 at 55:16-56:10.)

**Polk County's Response:**     No dispute.

178.     Captain Nargis did nothing to prepare for PREA implementation even though the subject came up frequently with other jail administrators. (Case No. 15-c-433, ECF No. 49 at 37:25-38:9; Case No. 15-c-428, ECF No. 48 at 37:25-38:9.)

**Polk County's Response:**     Disputed.  On the same page cited by plaintiffs, but conspicuously omitted from their proposed finding of fact, Captain Nargis clarified his testimony, stating:  "I shouldn't say I did nothing.  We've altered some things we provided inmates to give them notification that they have the right to be free from any sort of sexual harassment from staff or other inmates."  (Nargis Dep. 38.)

179.    While indicating that PREA is prohibitive financially, Nargis has never brought up his budgetary concerns to the Sheriff who is responsible for the budget. (*Id*. at 38:10-39:16; *Id*. at 38:10-39:16.)

**Polk County's Response:**    Disputed.  The cited pages of Captain Nargis's deposition simply do not say what plaintiffs claim.  Captain Nargis testified that "[i]t is very prohibitive to a small county jail to incorporate PREA, certainly to the fullest extent."  (Nargis Dep. 39.)  He agreed it is "financially prohibitive," but also stated it is prohibitive because "some of the guidelines within PREA itself are . . . against good correctional practices."  (*Id*. at 39.)  Captain Nargis did not state he never raised budgetary concerns with the Sheriff; rather, he testified he did not recall specifically what he discussed with the Sheriff, but stated that "[w]e had discussed the requirements [of PREA]."  (*Id*.)

180.    Nargis believes that the Sheriff has better things to do that sit down and cover each point of PREA. (*Id*. at 40:1-10; *Id*. at 40:1-10.)

**Polk County's Response:**    No dispute.

181.    Nargis has had zero training specific to PREA. (*Id*. at 36:25-37:1.)

**Polk County's Response:**    Disputed.  Captain Nargis testified he has not had "specific PREA training," but "may have had a presentation at one of the Jail Administrator Conferences on it;" it has been discussed at a regional jail administrator's meeting, and it has "come up a number of times at our meetings."  (Nargis Dep. 37-38.)  Nargis has also read PREA; has discussed the requirements with the Sheriff; has changed the Polk County Jail Policy Manual to incorporate PREA language and has changed the Inmate Handbook to include notification to inmates that they have the right to be free from sexual assault or harassment and are advised to report any such conduct, as recommended by PREA.  (*Id*. at 37-40.)

Dated this 16th day of August, 2016.

s/ *Paul D. Cranley*
Charles H. Bohl
Paul D. Cranley
Kurt M. Simatic

HUSCH BLACKWELL LLP
555 East Wells Street, Suite 1900
Milwaukee, Wisconsin 53202-3819
Telephone:  414-273-2100
Fax:  414-223-5000
Email: Charles.Bohl@huschblackwell.com

33 East Main Street, Suite 300
Madison, WI 53701-1379
Telephone: 608-255-4440
Fax: 608-258-7138
Email: paul.cranley@huschblackwell.com

20800 Swenson Drive, Suite 300
Waukesha, Wisconsin 53186
Telephone: 262-956-6200
Fax: 262-956-6210
Email: kurt.simatic@huschblackwell.com

Attorneys for Polk County

12967406.2