## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

J.K.J.,

          Plaintiff,                              Civil Action No. 15-cv-428-wmc

v.

POLK COUNTY AND
DARRYL L. CHRISTENSEN,

          Defendants,

and

WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

          Intervenor.

---

M.J.J.,

          Plaintiff,                              Civil Action No. 15-cv-433-wmc

v.

POLK COUNTY AND
DARRYL L. CHRISTENSEN,

          Defendants,

and

WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

          Intervenor.

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR NOTICE OF MOTION AND MOTION *IN LIMINE*- GENERAL MOTIONS

A motion *in limine* is a request for the court's guidance concerning an evidentiary

question. *Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999). The Court may give such guidance by issuing a preliminary ruling regarding admissibility. *Id*. Trial judges are authorized to rule on motions *in limine* pursuant to their authority to manage trials, even though such rulings are not explicitly authorized by the Federal Rules of Evidence. *Luce v.U.S.*, 469 U.S. 38, 41 n.4 (1984). Judges have broad discretion when ruling on motions *in limine*. *Jenkins v. Chrysler Motor Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). A ruling on a motion *in limine* is not necessarily final. *Townsend v. Benya*, 287 F.Supp.2d, 868, 872 (N.D. Ill. 2003).Trial judges may alter prior "*in limine* rulings, within the bounds of sound judicial discretion." *Id.*

**1)  Exclusion of all testimony prohibited by Federal Rules of Evidence 412**

Federal Rule of Evidence 412 was designed precisely to safeguard alleged victims from "sexual stereotyping and… the infusion of sexual innuendo into the factfinding process." Fed. R. Evid. 412, Advisory Committee Notes (1994).

Accordingly, if the Defendants wish to elicit any testimony relating to the sexual history, sexual partners, or alleged sexual predisposition of Plaintiffs or any third-party witnesses identified as an alleged victim of sexual assault-- specifically, (i) their sexual behavior, (ii) the nature of their past sexual relationship; (iii) their manner of dress, speech, or bodily appearance; (iv) their lifestyle; (v) tattoos or other markings that Defendants would argue evidence alleged sexual predispositions; (vi) any jobs or professions that Defendants would argue evidence alleged sexual predispositions-- Defendants must overcome an extremely high hurdle: they must provide in an evidentiary hearing that the probative value of these facts substantially outweighs the clear prejudice to the party, or harm to the witnesses. Defendants cannot meet that burden here. Plaintiffs respectfully seek an order barring any Defendant from introducing evidence or argument about these matters.

Federal Rule of Evidence 412, popularly known as the "Rape Shield Law," prohibits introduction of evidence regarding a sexual assault victim's sexual behavior or predisposition in a case regarding sexual misconduct. Fed. R. Evid. 412. The purpose of Rule 412 is to shield victims of sexual assault from the invasion of privacy, potential embarrassment, and sexual stereotyping inherent in public disclosure of intimate details. Fed. R. Evid. 4l2, Advisory Committee Notes (1994). The Rule was enacted to encourage victims of sexual misconduct to confront alleged offenders rather than be silenced by shame. *Id.*

The party offering Rule 412 evidence must be in strict compliance with the Rule's procedural requirements, by filing a motion under seal at least 14 days prior to trial requesting the admission of such evidence, serving the motion on all parties, and notifying the victims.[1] *Id.* The Rule applies to parties and non-parties alike and extends to "pattern" witnesses whose testimony about the offenders' misconduct is otherwise admissible. Advisory Committee Notes (1994).

In civil cases, Rule 412 motions require a special balancing test that differs from the standard Rule 403 analysis. Under Rule 412, the party offering the evidence (rather than the opponent) must show that the evidence is admissible because its probative value "substantially outweighs the danger of harm to any victim and of unfair prejudice to any party" Fed. R. Evid. 412 (b) (2). Significantly, probative value versus prejudice for the parties is not the only concern under Rule 412; the "harm to the victim"-- including non-party victims--must also be overcome before such evidence may be introduced. *Id.*

The Court then "must conduct an *in camera* hearing and give the victim and parties a right to attend and be heard." *Id.* The Advisory Committee made clear that courts must take an

---

[1] All alleged victims are treated as victims under the language of the rule. Fed. R. Evid. 412.

expansive view of evidence which falls within the ambit of Rule 412. Advisory Committee

Notes (1994). The Committee explained that "[The Rule] is designed to exclude evidence that

does not directly refer to sexual activities or thoughts but that the proponent believes may have a

sexual connotation for the factfinder..." including "the alleged victim's mode of dress, speech, or

life-style." *Id.*; See also, *United States v. Maksimenko,* at 2007 WL 522708 *2 (E.D. Mich. Feb.

14, 2007) (a sexual assault victim's prior work as an exotic dancer was inadmissible under Rule

412); *United States v. Shamsud-Din,* 2011 WL 5118840 at *3 (N.D. Ill. Oct. 27, 2011) (a sexual

assault victim's prior work as a prostitute was inadmissible under Rule 412); *Wolak v. Spucci*,

217 F.3d. 157, 160 (2d. Cir.2000) (sexual harassment victim's viewing of pornography outside of

work was inadmissible under Rule 412); *Socks-Brunot v. Hirschvogel, Inc.*, 184 F.R.D. 113,

123 (S.D. Ohio) (erroneous admission of a sexual harassment victim's discussion of sexual

matters with co-workers warranted a new trial); *United States v. Galloway*, 937 F.2d 542 (10th

Cir. 1991), *cert. denied*, 113 S.Ct. 418 (1992) (use of contraceptives inadmissible since use

implies sexual activity); *United States v. One Feather*, 702 F.2d 736 (8th Cir. 1983) (birth of an

illegitimate child inadmissible); *State v. Carmichael*, 727 P.2d 918, 925 (Kan. 1986) (evidence of

venereal disease inadmissible). In addition, the word "behavior" should be construed to include

activities of the mind, such as fantasies of dreams. *See* 23 C. Wright and K. Graham, Jr., *Federal

Practice and Procedure*, § 5384 at p. 548 (1980) ("While there may be some doubt under

statutes that require 'conduct,' it would seem that the language of Rule 412 is broad enough to

encompass the behavior of the mind.").

All sexual assault victims who may testify at trial are entitled to the fulsome notice,

motion, and hearing requirements imposed by Rule 412.[2] To be clear, Plaintiffs do not seek to

---

[2] Plaintiffs themselves are governed by Rule 412 and may not provide specific
examples of such evidence in a public filing. To the extent that Defendants

bar evidence or argument about the specific allegations of sexual conduct that occurred while Plaintiffs were incarcerated at the Polk County Jail and gave rise to the allegations made by Plaintiffs M.J.J. (WD WI 15-cv-433) and J.K.J (WD WI 15-cv-428-wmc), as well as other individuals assaulted by Defendant Christensen in the Polk County Jail: S.E.R. (WD WI 16-CV-632), S.A.L.M. (WD WI 16 CV 631), and S.L.C. (WD WI 16 CV 630) against Defendant Christensen. The Rule and supporting caselaw are clear: a victim's alleged sexual history and sexual predisposition are not proper subjects at trial, unless the probative value of each piece of evidence "substantially outweighs" the danger of harm to the victim.

As such, Plaintiffs move to bar any evidence or argument about the sexual history or alleged sexual predisposition of Plaintiffs or any third-party witnesses identified as an alleged victim of sexual assault including but not limited to, (i) their sexual behavior, (ii) the nature of their past sexual relationship; (iii) their manner of dress, speech, or bodily appearance; (iv) their lifestyle; (v) tattoos or other markings that Defendants would argue evidence alleged sexual predispositions; and (vi) any jobs or professions that Defendants would argue evidence alleged sexual predispositions.

**2) Motion to take Judicial Notice of the National Prison Rape Elimination Act of 2003 including the Congressional Findings and the National Prison Rape Elimination Commission Report of June 2009 in 45 USC 15601 (FRE 201).**

The Plaintiffs move this court to take judicial notice of the National Prison Rape Elimination Act, 42 USC § 15601 et. sec. and the U.S. Department of Justice's Prison Rape Elimination Act National Standards and related commentary dated June 20, 2012 and codified under 28 C.F.R § 115.

---

wish to introduce such evidence, they must specifically enumerate this evidence in a filing under seal pursuant to the rule.

In his deposition, Polk County's jail expert, Eugene Atherton, admitted that the standards that apply to cross gendered supervision include PREA.

Q:      What are the professional -- what national standards would you say there are for cross-gender supervision?

A:      The only national standard is that -- particularly that neither ACA nor PREA prohibits cross-gender supervision and also requires professional conduct among correctional officers.

Q:      All right. So PREA and ACA are the national standards with regard to cross-gender supervision; is that correct?

A:      No. What I said was they don't have a standard and they don't prohibit cross-gender supervision.

Q:      But you look to ACA and PREA for national standards, correct?

A:      Sure. Of course.

Q:      And you believe that ACA and PREA are the national standards, correct?

A:      Correct.

(Atherton, Eugene Deposition "Atherton Depo.," 15-cv-428, ECF No. 115 at 63:14-64:7.) He later testified that PREA is "absolutely" a best practice in prisons and jails which is "absolutely" to protect both correctional officers and inmates. (*Id.* at 86:19-87:10.) In addition, numerous times in Atherton's expert report he referenced whether Polk County complied with various PREA requirements. For instance, his expert report states, "[i]t is the opinion of the expert that the practices by which Polk County Jails [sic] supervises female inmates using male staff are consistent with national standards(3)…[footnote 3] Cross Gender Viewing, PREA standard 115.15 through 115.315." (*Id.* at  ECF No.

115(1).) He also states that "the placement of male staff working in female housing units is a reasonable corrections practice and not prohibited by PREA standards" among other things. (*Id.*)

The Prison Rape Elimination Act of 2003 ("PREA") was signed into law by President George Bush on September 4, 2003. 42 U.S.C. § 15601. The purpose of the law, amongst others, is to:

1) Establish a zero-tolerance standard for the incident of prison (<u>by definition includes local jails</u>) rape in the United States
2) Make the prevention of prison rape a top priority in each prison system
3) Develop and implement national standards for the detection, prevention, and reduction of prison rape
4) Increase the accountability of those who fail to detect, prevent, and reduce prison rape,
5) Protect the Eighth Amendment rights of local prisoners

42 U.S.C. § 15601.  In creating the law, Congress recognized the epidemic of prison rape and made the following findings, among others:

1. Experts conservatively estimated that at least 13% of inmates have been sexually assaulted while incarcerated. This equated to nearly 200,000 inmates that where then incarcerated that had been or would be victims of prison rape. The total number in the 20 years prior was estimated to exceed 1,000,000 individuals.

2. Most prison (by definition includes local jails) staff are not adequately training to prevent or report inmate sexual assaults.

3. Prison rape often "goes unreported, and inmate victims often receive inadequate treatment for the severe physical and psychological effects of sexual assault."

4. Victims of prison rape "suffer severe physical and psychological effects that hinder their ability to integrate into the community and maintain stable employment upon their release from prison."

5. Members of the "public and government officials are largely unaware of the epidemic character of prison rape and the day-to-day horror experienced by victimized inmates."

6. The "high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution." In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court ruled that deliberate indifference to the substantial risk of sexual

assault violates prisoners' rights under the Cruel and Unusual Punishments Clause of the Eighth Amendment and the Due Process clause of the Fourteenth Amendment. "Pursuant to the power of Congress under Section Five of the Fourteenth Amendment, Congress may take action to enforce those rights in States where officials have demonstrated such indifference. States that do not take basic steps to abate prison rape by adopting standards that do not generate significant additional expenditures demonstrate such indifference."

42 U.S.C. § 15601.

The final rule created as a result of PREA mandated "agencies" to employ standards to prevent, eliminate, respond to, and punish prison rape.  28 C.F.R § 115. An "agency" is defined as "the unit of …local… authority… with direct responsibility for the operation of any facility that confines inmates." 28 C.F.R § 115.5 (emphasis added.) Amongst other things, "agencies":

1) Shall have written policies mandating zero tolerance toward all forms of sexual abuse and harassment <u>and</u> outline the agency's approach to preventing such conduct. 28 C.F.R § 115.11(a).

2) Shall employ or designate an upper-level agency-wide PREA coordinator with sufficient time and authority to develop, implement, and oversee agency efforts to comply with the PREA standards. 28 C.F.R § 115.11(b).

3) Shall ensure that each facility "shall develop, document, and make its best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing and, where applicable, video monitoring, to protect inmates against sexual abuse." 28 C.F.R § 115.13.

4) Shall "implement policies and procedures that enable inmates to shower, perform bodily functions, and to change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks." 28 C.F.R § 115.15.

5) Shall train all employees who may have contact with inmates on:
    a. Its zero tolerance policy for sexual abuse and harassment;
    b. How to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention and detection;
    c. The right of inmates to be free from retaliation for reporting sexual abuse and harassment;
    d. The dynamics of sexual abuse and harassment in confinement;
    e. The common reactions of sexual abuse and harassment victims;
    f. How to detect and respond to signs of threatened and actual sexual abuse
    g. How to avoid inappropriate relationships with inmates;

      h.  How to communicate effectively and professionally with inmates.

28 C.F.R § 115.31.

6)  During intake the inmates:
      a.   "[S]hall receive information explaining the agency's zero tolerance policy regarding sexual abuse and sexual harassment and how to report incidents";
      b.  Within 30 days of intake, the agency shall provide comprehensive education in person or through video of their right to be free from sexual abuse and harassment and to be free from retaliation for reporting such incidents;
      c.  Shall be provided inmate education in formats accessible including those who have limited reading skills;
      d.  Shall be continuously and readily provided with key information of their rights through posters, inmate handbooks, or other written formats.

28 C.F.R § 115.33.

7)  Shall provide multiple internal ways for inmates to privately report sexual abuse and harassment. 28 C.F.R § 115.51(a).

8)  Shall also provide at least one way for inmates to report abuse or harassment to a public or private entity or office that is not part of the agency.

28 C.F.R § 115.51(b).

Polk County, and the Polk County Sheriff's Department that runs the Polk County Jail, is undoubtedly an "agency" under PREA and is mandated to follow the law. PREA is enforceable to the states by way of a failure to comply equates to a reduction in funding from the federal government. 42 U.S.C. § 1507(c). While it is true that there is no enforcement mechanism under PREA to local jails, this does not mean that the law does not apply in full force. None of the provisions outlined above are optional; each and every provision indicates that an agency **shall** complete an action. At the very minimum, PREA represents industry standards to protect inmates from sexual assault that Polk County has unquestionably not implemented. As such, Plaintiffs ask that the Court take Judicial Notice of 42 U.S.C. § 15601 *et. sec.* and 28 C.F.R § 115 *et. sec.*

**3)  Captain Nargis is a policymaker as it relates to jail operations in a § 1983 claim.**

Polk County attempts to argue in their Summary Judgment Reply that Captain Nargis is not a "policymaker" for the purposes of a § 1983 and *Monell* claim. (PC SJ Reply, 15-cv-428, ECF No. 91, p. 6-8).[3] Polk County argues that, ultimately, Captain Nargis does not have final decision making authority because conceivably the Chief Deputy or the Sheriff could override Captain Nargis' decisions.  Polk County's argument ignores all of the testimony from the Chief Deputy and Sheriff wherein they indicated that they have no formal training in jail administration and that any conversations about jail administration or new and upcoming training topics were only discussed in passing. Captain Nargis is a policymaker for Polk County as it relates to jail operations and training as he has the final decision making authority without oversight.

The U.S. Supreme Court has grappled with the question of where the policymaking authority lies for purposes of a §1983 claim. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S. Ct. 2702, 2723-24, 105 L. Ed. 2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S. Ct. 915, 99 L.Ed.2d 107 (1988), (plurality opinion). In *Praprotnik,* the plurality reaffirmed the teachings of prior cases to the effect that "whether a particular official has 'final policymaking authority' is a question of *state law.*" *Id.,* at 123, (emphasis in original), quoting *Pembaur,* 475 U.S. 469, 483, 106 S. Ct. 1292, 1300, 89 L. Ed. 2d 452 (1986) (plurality opinion). The trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. at 737.

The inquiry "is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker 'in a particular area, or on a particular issue'."

---

[3] Documents cited to in this brief reference 15-cv-428. Identical documents were filed in 15-cv-433 but are not cited in this brief.

*Congine v. Vill. of Crivitz*, 947 F. Supp. 2d 963, 975 (E.D. Wis. 2013); *Valentino v. Vill. of S. Chicago Heights,* 575 F.3d 664, 676 (7th Cir. 2009) (quoting *Kujawski v. Bd. of Comm'rs of Bartholomew County, Ind.,* 183 F.3d 734, 738 (7th Cir. 1999)). In determining whether an official is a final decision maker, it is also helpful to determine "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Congine*, 947 F. Supp. 2d at 975 (internal quotations omitted); *Vodak,* 639 F.3d 738, 748 (7th Cir. 2011). A key question is whether the decision maker "was at the apex of authority for the action in question." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1,* 274 F.3d 464, 468–69 (7th Cir. 2001).

Once the officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, see *Monell,* 436 U.S. at 661, n. 2, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. at 737; *see Pembaur,* 475 U.S. at 485–487 (WHITE, J, concurring).

Sheriff Johnson clearly delegated all duties of jail operations to Captain Nargis. Sheriff Johnson was never involved in jail operations prior to becoming sheriff and his only training since becoming sheriff has been "very limited." (Johnson, Peter Depo., 15-cv-428, ECF No. 52 at 7:4-20.) Johnson stated that, "I don't get down into a lot of the minutia of running the jail." (*Id*. at 8:11-9:3.) When asked whether the "minutia involve[s] training" Sheriff Johnson stated "[y]es, I would say training is definitely the captain's area" and that he does not get involved with such issues unless they are brought to his attention. (*Id*.) When Captain Nargis would go to

external continuing education regarding jail administration or training, he would only come to Sheriff Johnson to discuss the content of the training if the issue involved a budgetary change. (*Id.* at 16:16-22, 17:16-21.)

Sheriff Johnson indicated that Captain Nargis reported directly to Chief Deputy Steve Moe ("C.D. Moe"), who was Chief Deputy for all relevant time periods until March of 2016, when he retired. (*Id.* at 11:1-10.) C.D. Moe indicated that the jail administrator/jail captain was primarily responsible for training jail staff. (Moe, Steve Depo., 15-cv-428, ECF No. 58 at 14:20-23, 15:4-9.) When asked whether C.D. Moe was responsible for making sure that the training was adequate, he responded: "Ultimately, yes. Realistically, I didn't become involved in the hands-on training of the jail. That was the function that would typically be done by the jail captain."  (*Id.*) If there were discussions regarding the context or quality of training between C.D. Moe and Captain Nargis, "it was done kind of like in passing in the hall kind of conversations, as opposed to a meeting that may have been established for that purpose." (*Id.* at 26:6-16.)

Captain Nargis created the training program for all time periods relevant to Plaintiffs' complaints (Nargis, Scott Depo, 15-cv-428, ECF No. 48 at 18:3-9.), no one conducted a meaningful review of Captain Nargis' training program, and everyone agrees that creating a training program is within the realm of Captain Nargis' duties. Captain Nargis' job description indicates as a summary that: "The Jail Captain has general management responsibility for the jail operations and facilities. This includes but is not limited to the supervision of subordinate employees, fiscal management, policy development, public relations and administration of jail operations and inmate population." Bannink Decl. in Support of Plaintiff's Motions *in Limine*, "Bannink Decl. 12/19/2016," Ex. A. "Essential duties and responsibilities" include:

12

- Develop, recommend and implement policies and procedures relating to the Polk County Jail.

- Oversee the training of new employees in areas such as policy, department procedures, laws and regulations.

- Assure compliance with stator and administrative requirements of the Polk County Jail.

- Investigate reports of employee misconduct or disciplinary matters involving jail personnel.

- Monitor work-load and jail population and make modifications to staff levels.

- Attend and participate in mandatory training and conduct staff meeting as necessary.

- Evaluate the performance of subordinate employees in accordance with department and county policy.

*Id.*

Finally, the jail inspector, Brad Hompe ("Hompe"), has never had any conversations regarding policy decisions or sent his inspection reports to any of the County Commissioners; these conversations and documents are always directed to Sheriff Johnson and Captain Nargis. (Hompe, Brad Depo., 15-cv-428, ECF No. 72 at 49:11-18.) It would be absurd to make the argument that the County Board, the County Administrator, Sheriff Johnson, or even Chief Deputy Moe had policymaking authority over the administration and training in the Polk County jail. Captain Nargis is the policy maker for Polk County Jail administration and training and Plaintiffs ask, *in limine*, that an Order be issued as such.

**4) To admit that Polk County has insurance and preclude the argument that if the jury finds for Plaintiffs, the verdict will create a burden on Polk County's tax base.**

Pursuant to FRE 402, unless prohibited by the US Constitution, a federal statute, another FRE, or Supreme Court, all relevant evidence is admissible. Pursuant to FRE 401, Evidence is relevant if 1) it has any tendency to make a fact more or less probably than it would be without the evidence; and 2) the fact is of consequence in determining the action. The fact that Polk County has insurance is relevant to rebut the argument from Polk County that a verdict for the Plaintiffs would place a heavy burden upon local tax payers. The evidence of insurance is not being offered to prove that Polk County acted negligently or wrongfully, as is precluded by FRE 411. Liability insurance information that is being offered for purposes other than showing Polk County acted negligently or wrongfully is admissible. *See Tatum v. Clark*, No. 11-C-1131, 2015 WL 6392609, at *12 (E.D. Wis. Oct. 22, 2015). As such, Plaintiffs ask for a ruling, *in limine*, to allow testimony that Polk County is insured.

**5)  To exclude a letter sent from Officer Schaefer to the Judge in Christensen's criminal sentencing**

It is believed that Defendant Polk County may attempt to introduce into evidence a letter from Officer Schaefer that was sent to Judge Harrington, the Judge who presided over Defendant Christensen's criminal sentencing hearing based on the incident alleged in Plaintiffs' complaints. (Bannink Decl. 12/19/2016, Ex. B.) This letter should be precluded as it is not relevant pursuant to FRE 401 as it makes no fact of consequence more or less probable. In addition, the introduction of the letter, without additional testimony would be inadmissible hearsay pursuant to FRE 801. As such, Plaintiffs ask for a ruling, *in limine*, to preclude the aforementioned letter from Officer Schaefer.

**6)  Exclude all testimony or evidence that Plaintiff J.K.J. had sexual relations with Defendant Christensen at the Fire Department in Amery, Wisconsin.**

Plaintiff J.K.J. engaged in sexual relations with Defendant Christensen at the Amery Fire Department, where Christensen was the Fire Chief. (J.K.J. Depo, 15-cv-428, ECF No. 46; 67:8-76:19.) This testimony should not be admitted pursuant to FRE 412, as outlined above, which prohibits evidence regarding a sexual assault victim's sexual behavior or predisposition in a case regarding sexual misconduct. Again, the purpose of FRE 412 is to shield victims of sexual assault from the invasion of privacy, potential embarrassment, and sexual stereotyping inherent in public disclosure of intimate details. Plaintiff is clearly a victim that is protected by FRE 412 and this evidence would cause the Plaintiff embarrassment, an attempt to show propensity, stereotyping, be used as an attempt to silence Plaintiff from appropriately bringing her claims. This is exactly the kind of evidence FRE 412 was created to preclude from admission. In addition to FRE 412, this testimony and all evidence relating should not be admitted as references create a danger of unfair prejudice toward Plaintiff and is unrelated to whether or not the defendants were deliberately indifferent to Plaintiff's constitutional rights and harm that was caused when Plaintiff was incarcerated at the Polk County Jail.

This testimony should also be excluded on the grounds that it is improper character evidence in violation of FRE 404(a)(1) and FRE 404(b). It is believed that Polk County or Defendant Christensen may attempt to argue that J.K.J. was consenting to the sexual acts at the firehouse and therefore attempt to improperly argue that J.K.J. acted in conformity with behavior outside of the jail to argue that J.K.J. consented to sexual relations within the jail as an inmate. This would be an improper use of character evidence that is highly prejudicial.  In addition, and for all of the aforementioned reasons, pursuant to FRE 403, the introduction of this evidence would greatly prejudice Plaintiff far more than its probative value. Plaintiff J.K.J. therefore moves, *in*

*limine*, to exclude any reference to relationships with Defendant Christensen at the fire department.

**7)  Exclude evidence of M.J.J. Receiving State benefits**

Plaintiff M.J.J. is currently receiving benefits through the State of Wisconsin. Plaintiff believes that defense may seek to introduce evidence of this for improper reasons such as to imply that Plaintiff is a burden on society. In addition, the receipt of state benefits is often seen by members of the public negatively. Defendants may attempt to argue that Plaintiff is a burden on society from receiving such benefits and that her lawsuit is another burden on society, which would be an improper use pursuant to FRE 404(a)(1). Even if Defendants do not attempt to make such arguments, the introduction of this information would create the inference of these arguments such that the introduction of state benefits is much more prejudicial than probative pursuant to FRE 403. Such references to these benefits are irrelevant, create a danger of unfair prejudice toward Plaintiff, and are unrelated to whether the defendants were deliberately indifferent to Plaintiff's constitutional rights and the harm that caused Plaintiff. Plaintiff therefore moves to exclude any reference to Plaintiff receiving any state benefits pursuant to FRE 402, 402, 404, and 405. As such, Plaintiff M.J.J. asks for a ruling, *in limine*, to preclude testimony regarding her receipt of state benefits.

**8)  Exclusion of evidence or testimony that the Plaintiff M.J.J. has been the recipient of social services for her children.**

Plaintiff M.J.J. does not currently have custody of her children. It is believed that Defendants may argue that she either abandoned her children or that she is a bad mother. This is an improper attack on character completely unrelated to whether the defendants were deliberately indifferent to constitutional rights and the harm that caused. In addition, Defendants may attempt to make

similar arguments as those explored, above, that Plaintiff is a burden on society. Again, this is improper character evidence, is extremely prejudicial, has no relevance as to whether or not Defendant were deliberately indifferent to Plaintiffs' rights and the harm caused to Plaintiff, and should be excluded under FRE 402, 403, 404, and 405. As such, Plaintiff M.J.J. asks for a ruling, *in limine*, to preclude testimony regarding her receipt of social services.

**9) Include evidence of Defendant Christensen's untruthful character.**

On September 27, 2007 Jailer Christensen received a one day suspension without pay due to being less than truthful and misleading to a supervising officer. (Bannink Decl. 12/19/2016, Ex. C.) During the investigation into Christensen's conduct it was learned that Sgt. Casey sent an email to Christensen and it was determined that Christensen may have forwarded that email onto other staff members which would be extremely disrespectful to Sgt. Casey, his superior. (*Id.* at PCJ 327.) Christensen was asked, point blank, on three separate occasions whether or not he forwarded the email and Christensen indicated clearly that he had not forwarded it. (*Id.*) Through investigation of the IT server, it was found that Christensen did in fact forward the email. (*Id.* at PCJ 3285.) In the four occasions that Christensen met with superiors regarding this incident, "at no time did he even attempt to offer an explanation." (*Id.* at PCJ 329.) In negotiating appropriate punishment, CD Moe indicated that a 1-3 day suspension is considerably less than would be expected for a violation such as this but consideration was given to Christensen's work history and given the fact that he admitted his wrong doing and admits that he has to earn back the trust level damaged and the want of the county to "salvage" this employee. (*Id.* at PCJ 326.)

Pursuant to FRE 401 and 608, this evidence is relevant as it calls into question Defendant Christensen's credibility and reputation for truthfulness. The evidence is not being used to prove the truth of the matter asserted, that he lied to his superiors, but instead to attack his credibility

and character for truthfulness. Thus, Plaintiffs request a ruling, *in limine*, that the above mentioned testimony be allowed regarding Defendant Christensen's character for untruthfulness.

**10) Include testimony regarding Christensen's sexual relationship with coworker Lynelle Manning**

Defendant Christensen as well as jailer Lynelle Manning both admitted that they had sexual relations with one another while they were employed at the Polk County jail. (Christensen, Darryl Depo., 15-cv-428, ECF No. 47 at 92:12-94:2; Manning, Lynelle Depo., 15-cv-420, ECF No. 51 at 24:7-24.) Defendant Christensen was married at the time this affair occurred and Lynelle Manning was a coworker of jailer Christensen. (*Id.*) Lynelle indicated that there was physical contact between the two of them at the jail including kissing, touching, but not sexual intercourse. (*Id.* at 24:20-25:2.) This piece of evidence is needed to show, along with other evidence, that Polk County created a culture that was sexually charged and was deliberately indifferent to the possibility of Plaintiffs being sexually assaulted. This evidence is relevant pursuant to FRE 401 and 402 and is not unduly prejudicial under FRE 403. Thus, Plaintiffs request a ruling, *in limine*, that testimony be admitted regarding Defendant Christensen's sexual relationship with jailer Manning.

**11) Preclude Dr. Michael Spierer as an Expert Witness for Defendants.**

It is believed that Defendant Polk County may attempt to include as an expert witness, Dr. Michael Spierer. Because Polk County's hired expert, Dr. Robbins, was unable to review the raw data produced by Mr. Raderstorf due to qualifications, Polk County hired Dr. Michael Spierer to interpret Mr. Raderstorf's data. Pursuant to Rule 26 of the Federal Rules, Defendants have failed to disclose Dr. Michael Spierer as an expert witness in this case. Rule 26(a)(2) of the Federal Rules of Civil Procedure requires "the proponent of expert testimony to disclose the

witness's identify, along with a written report that contains, among other things, a 'complete statement of all opinions the witness will express and the basis and reasons for them.'" *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825 (7th Cir. 2010); quoting Rule 26(a)(2) Fed. R. Civ. P. Further, "a party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Non-compliance with rule 26(a) results in "automatic and mandatory exclusion from trial of the non-disclosed evidence, 'unless non-disclosure was justified or harmless.'" *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005); quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004); See also *Finley v. Maraton Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996).

Here, Defendants have not disclosed Dr. Spierer as an expert in accordance with this Court's scheduling Order, which lists the expert disclosure cutoff date as June 1, 2016. In addition, Plaintiffs' have not been provided with any indication as to the witnesses qualifications, publications authored in last 10 years, cases in previous 4 years, or any statement of compensation as is required by 26(a)(2)(B). Finally, Plaintiffs have not had the opportunity to depose Dr. Spierer or otherwise prepare for his proffered expert testimony at trial. Their failure to disclose Dr. Spierer as an expert results in a violation of Rule 26(a)(2)(D) of the Federal Rules of Civil Procedure and the non-disclosure is neither harmless nor justified.  Accordingly, Defendants should be "automatically" precluded from offering Dr. Spierer as an expert witness at trial. See *Finley*, 75 F.3d at 1230 ("The sanction of exclusion is thus automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.").

**12) For a finding that Defendant Christensen was acting under the color of law, as a matter of law.**

The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941). Accord, *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961) (adopting *Classic* standard for purposes of § 1983) (overruled in part on other grounds, *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 695-701, 98 S.Ct. 2018, 2038-2041, 56 L.Ed.2d 611 (1978)); *Polk County v. Dodson,* 454 U.S. 312, 317-318, 102 S.Ct. 445, 449, 70 L.Ed.2d 509 (1981); *id.,* at 329, 102 S.Ct., at 455-456 (dissenting opinion). In *Lugar v. Edmondson Oil Co., supra,* the Court made clear that if a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, "that conduct [is] also action under color of state law and will support a suit under § 1983." *Id.,* 457 U.S., at 935, 102 S.Ct., at 2752. Accord, *Rendell-Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982); *United States v. Price,* 383 U.S., at 794, n. 7, 86 S.Ct., at 1157, n. 7. In such circumstances, the defendant's alleged infringement of the plaintiff's federal rights is "fairly attributable to the State." *Lugar,* 457 U.S., at 937, 102 S.Ct., at 2753.

To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Ibid.* "[S]tate employment is generally sufficient to render the defendant a state actor." *Id.,* at 936, n. 18, 102 S.Ct., at 2753, n. 18; see *id.,* at 937, 102 S.Ct., at 2754. It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. See *Monroe v. Pape,* 365 U.S., at 172, 81 S.Ct., at 476. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while

20

exercising his responsibilities pursuant to state law. See, *e.g.,* **2256 *Parratt v. Taylor,* 451 U.S., at 535-536, 101 S.Ct., at 1913; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605-1606, 26 L.Ed.2d 142 (1970). See also *Flagg Bros., Inc. v. Brooks,* 436 U.S., at 157, n. 5, 98 S.Ct., at 1734, n. 5.

Finally, the Seventh Circuit Jury instruction 7.03 defines "Under Color of Law" as, "when I say that a person acts "under color of law," I mean that a person uses or misuses authority that he has because of his official position."

There can be no doubt that when Defendant Christensen sexually assaulted Plaintiffs he was a public employee and was using his authority as a jailer to sexually assault Plaintiff. Defendant Christensen's actions were made possible only because of his authority and position as a jailer to the Polk County jail. As such, Plaintiffs move, *in limine,* for a finding that Defendant Christensen was acting under color of law for purposes of Plaintiffs § 1983 claims.

**ECKBERG LAMMERS, P.C.**

Dated:   12/19/2016                          By:   /s Lida M. Bannink
                                                   Thomas J. Weidner (1082013)
                                                   Lida M. Bannink (1088518)
                                                   Attorneys for Plaintiffs
                                                   430 Second Street
                                                   Hudson, Wisconsin 54016
                                                   (715) 386-3733