## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

J.K.J.,

                Plaintiff,                                   Civil Action No. 15-cv-428-wmc

v.

POLK COUNTY AND
DARRYL L. CHRISTENSEN,

                Defendants,

and

WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

                Intervenor.

M.J.J.,

                  Plaintiff,                                   Civil Action No. 15-cv-433-wmc

v.

POLK COUNTY AND
DARRYL L. CHRISTENSEN,

                Defendants,

and

WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

                Intervenor.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR NOTICE OF MOTION AND MOTION *IN LIMINE*- PRIOR MISCONDUCT

A motion *in limine* is a request for the court's guidance concerning an evidentiary

question. *Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999). The Court may give such guidance by issuing a preliminary ruling regarding admissibility. *Id*. Trial judges are authorized to rule on motions *in limine* pursuant to their authority to manage trials, even though such rulings are not explicitly authorized by the Federal Rules of Evidence. *Luce v.U.S*., 469 U.S. 38, 41 n.4 (1984). Judges have broad discretion when ruling on motions *in limine*. *Jenkins v. Chrysler Motor Corp*., 316 F.3d 663, 664 (7th Cir. 2002). A ruling on a motion *in limine* is not necessarily final. *Townsend v. Benya*, 287 F.Supp.2d, 868, 872 (N.D. Ill. 2003).Trial judges may alter prior "*in limine* rulings, within the bounds of sound judicial discretion." *Id.*

Plaintiffs' federal claims against Defendant Polk County are as follows: 1) failure to protect Plaintiffs (deliberate indifference), 2) Failure to properly train Defendant Christensen, 2) Failure to properly train all jailers, 3) failure to train inmates, and 4) creating a custom of failing to train combined with turning a blind eye to rule violations and fostering a sexually charged work atmosphere which encouraged and caused the sexual assaults to occur. Multiple of Plaintiffs' counts have elements of whether or not Polk County had notice of prior instances of sexual conduct within the jail, whether there was a pattern of occurrences, and whether the sexual assault was a highly predictable consequence of Polk County's inaction. The legal analysis of notice and the requirement of a pattern of similar occurrences was explored in great detail in both Defendant Polk County and Plaintiffs' Summary Judgment pleadings. (PC SJ Brief, 15-cv-428, ECF Nos. 57, 81.)[1]

There are multiple pieces of evidence that should be admitted, *in limine*, that are directly relevant and central to Plaintiffs' federal claims which include evidence of Darryl Christensen's prior misconduct of a sexual nature and evidence of jailer Alan Jorgensen's prior misconduct of

---

[1] Documents cited to in this brief reference 15-cv-428. Identical documents were filed in 15-cv-433 but are not cited in this brief.

a sexual nature and Christensen's prior misconduct within the jail as an employee contained in his personnel file including Polk County's response to those violations. The prior instances of sexual misconduct and general misconduct come directly from Polk County's responses to Plaintiffs' requests for documents and were included in Defendant Christensen and Alan Jorgensen's personnel files. These prior instances gave Polk County notice of additional training needed, and show a pattern of similar occurrences within the jail making the sexual assaults a highly predictable consequence of Polk County's inaction. The prior instances also go to establishing the culture of deliberate indifference to rule violations. The admission of these prior instances of conduct are quintessential pieces of *Monell* evidence and are essential for Plaintiffs to show that Polk County was deliberately indifferent to Plaintiffs' rights. The prior instances of misconduct are directly relevant to the custom and culture in the jail as well as Polk County's deliberate indifference to the rights of Plaintiffs to be free from sexual assault. In addition, the claims are relevant under FRE 404 and not unduly prejudicial under FRE 403. As such, Plaintiffs ask that evidence of evidence of Darryl Christensen's prior misconduct of a sexual nature, evidence of jailer Alan Jorgensen's prior misconduct of a sexual nature, and Christensen's prior misconduct within the jail as an employee including Polk County's response to those violations be admitted, *in limine*.

## Facts

### I.  Darryl Christensen's misconduct in May, 2004 where Defendant Christensen was accused of misconduct of a sexual nature

The first allegation involved Defendant Christensen on May 4, 2004. (Bannink, Lida Affidavit, 7/29/2016 "Bannink Aff. 7/29/2016", 15-cv-428, ECF No. 86, Exs. B, G at PCJ 0003727.) An inmate at the jail indicated that Officer Christensen entered into the cell block while she was in the shower and he attempted to see her naked. (*Id*.) Christensen admitted that he

entered the cell block but alleged that he did not attempt to view the inmate in the shower. (*Id.*) In Captain Nargis' write up of the situation, he indicated "I did say that Officer Christensen is a veteran officer and that I am not aware of any accusation such as this in the past, and that I have no reason to believe he would engage in that sort of behavior." (*Id.* at PCJ 3728.) When the inmate believed that Captain Nargis was not listening to her concerns she indicated, "Well what about all the comments" indicating comments from Christensen about having a nice butt and "with someone as good-looking as you in here we have to look." (*Id.*) When approached on the incident, Christensen indicated he is not sure why the inmate would make false statements as he was nice to her. (*Id.*) Once he offered her a fresh cup of coffee for helping clean up and when she indicated she did not like coffee Christensen purchased a soda and gave her a glass. (*Id.* at PCJ 3728.) Christensen also gave her a doughnut one morning when she was being transferred out of the jail before breakfast. (*Id.* at PCJ 3728-3729.) Captain Nargis "instructed Officer Christensen that it would be in his best interests to avoid entering B-pod unless he absolutely needed to." (*Id.* at PCJ 3729.) Captain Nargis' report indicates he is waiting for more information from another officer, but there is nothing in the documentation provided that would show that additional follow up was completed. (*Id.*)

## II. Alan Jorgensen's misconduct of a sexual nature

The other allegation of a jailer engaging in an improper sexual relationship with an inmate at the Polk County Jail was in January of 2012, against Jailer Alan Jorgensen which is unbelievably similar to the case at hand. (Bannink Aff. 07/29/2016, 14-cv-428, ECF No. 87, Exs. B, D at PCJ0003739.) Two inmates made allegations against Jorgensen that, "would be unprofessional, in violation of Jail Policy, and potentially criminal" as indicated by Captain Nargis. *Id*. Captain Nargis indicated in his report that one of Jorgensen's fellow officers

indicated that she was, "sick of Allen spending unnecessary time in K-pod [female pod] and also standing outside K-pod 'leering' at the female inmates." *Id.* One inmate indicated Jorgensen was on the intercom with inmate NS and he called the inmate a "bitch" and said that "whatever Allen and [NS] have going on has been going on too long." *Id.* Another inmate said that Jorgensen made remarks when they would go into the shower like "nice bra" or "nice boobs." (*Id.* at PCJ 3741.) The same inmate saw Jorgensen pat NS's butt. She also stated that Jorgensen looks to the camera to know when it is pointed at him prior to doing things, that he often comes into the cell to hang out and talk with inmates, and that Jorgensen treated NS differently and that he is "more friendly." (*Id.* at PCJ 3741.) Another inmate, PL, indicated that Jorgensen "touched her crotch and tits." (*Id.*) Jorgensen also asked PL to "show him my boobs, undress for him in the shower," touched her hand at meal pass/medical pass, asked her to "shake her titties" for him, "told [her] to lift my shirt and show my tits," would run his hands up her leg when he placed shackles, "touched her ass," put his arms around her, and made comments about the color of her underwear. (*Id.* at PCJ 3741-3742.) Inmate SC indicated that Jorgensen engaged in inappropriate behavior such as "hand touching" at med pass. (*Id.* at PCJ 3743.) SC indicated that Jorgensen was also inappropriate with other inmates, KE, and NS. (*Id.*) When inmates would want something they would ask NS to ask Jorgensen because they knew Jorgensen would do things for her. (*Id.*) BB, another inmate, identified Jorgensen as unprofessional. (*Id.*) Numerous other inmates recalled Jorgensen calling NS a "loudmouth bitch." (*Id.*) Another inmate, KE, indicated that Jorgensen would touch NS's hand, would engage in flirting and sexual comments, and that Jorgensen would tell NS that he wanted to "take her on his boat" or say that he would "invite her to his place." (*Id.* at PCJ 3744.) When initially interviewed, NS claimed that there was no inappropriate conduct. (*Id.*) This matter was initially brought to light by Officer Dolly Fjorden.

(Bannink, Lida Declaration In Support of Plaintiffs' Motions *in Limine*, 12/19/2016 "Bannink Decl. 12/19/2016" Ex. D. at MJJ/JKJ 004675.) This document was only disclosed to Plaintiffs, upon their prompting, on November 18, 2016.

Also included in the November 18, 2016 disclosure from Polk County is an email from Steve Schaefer, a jailer who first reported Allen's misconduct to Captain Nargis. (*Id.* at MJJ/JKJ 004676.) In jailer Schaefer's email he indicates:

> Thought you should be made aware of this asap. I believe these allegations a [sic] serious and I know that Dolly is very upset about the issue and will not let it rest, and she shouldn't. **We all have heard complaints about inappropriate comments to both inmates and staff. I have also heard of staff scanning outgoing mail and seeing many references to Allen's behavior.** My opinion is that the inmates I spoke with were telling the truth. ... Sorry to buy you with this but I think it should be addressed.

*Id.* (emphasis added).

As a result of its investigation, C.D. Moe and Captain Nargis met with Officer Jorgensen. (Bannink Aff. 07/29/2016, 15-cv-428, ECF No. 87, Exs. B, D at PCJ0003745.) Captain Nargis informed Jorgensen that "there were two things that consistently came up [from the investigation]: there is a perception by the other inmates of the K-pod that there is some kind of relationship between him & [NS] and that he gives her undue and/or preferential treatment, and that he spends an inordinate amount of time in contact with her when compared with other inmates." (*Id.* at PCJ 3746.) Captain Nargis also indicated in his notes that one or more female inmates indicated that there was inappropriate sexual remarks and physical contact. (*Id.*) Captain Nargis wrote: "[Jorgensen] did not offer an explanation as to why multiple inmates would say that. However, it should also be noted that our investigation did not reveal anything that could substantiate those claims." (*Id.*) Jorgensen explained that NS has an infatuation with him and denied any inappropriate relationship. (*Id.*) "C.D. Moe informed Officer Jorgensen that there were some potentially serious consequences involved with this situation, but that he "<u>did not feel</u>

that Officer Jorgensen's job was in jeopardy." (*Id*. at PCJ 3746-3747.) (emphasis added). Captain

Nargis continued:

> We informed him that we believed we established a few things…[NS] is not a very credible source of information. Another thing we believed we established was that Officer Jorgensen flirts with some of the female inmates**. We also believed that Officer Jorgensen, at best, allowed some kind of arrangement or relationship to grow between him and [NS]; at worst, he fostered and encouraged it.**

(*Id*. at PCJ 3747 (emphasis added).) He further stated:

> We advised him [Jorgensen] that we **valued his contribution to the department**, that we know he is a "go to" guy when we need help with something. He was informed that we had considered his work history and the fact that there was no prior discipline history. C.D. Moe then advised him that I would be preparing a letter of reprimand this week We tried to assure Officer Jorgensen that a letter in his file **is not a major deal**, that it should be a learning experience. **We thanked Officer Jorgensen for taking the time to meet with us**, shook hands, and concluded our meeting. In accordance with our decision, I will be preparing a letter of reprimand for Officer Jorgensen's file.

(*Id*.) (emphasis added).

Subsequent to the discussions, above, NS wrote a letter to jail administration indicating

that, "I would like to tell the truth about the allegations made against Allen Jorgensen…there are

many things he has said & done that have been inappropriate in a sexual manner towards me."

(*Id*. at PCJ 3748.) NS indicated that Jorgensen would make comments when females go into the

shower, he told NS he wants to "ride her topless in his boat," and he brought items into the jail

for her as payment for her doing certain acts. (*Id*.) He would also touch her hand during meal

pass and medical pass, grabbed her around the waist, and slapped her butt. (*Id*.) When NS asked

Jorgensen if there were corrupt jailers, Jorgensen indicated that he was a corrupt jailer and that

there are many things he has done that he could have been fired for. (*Id*.) After Jorgensen was

told of this letter by administration, Captain Nargis engaged in the following text exchange with

Jorgensen:

- AJ:  Hey, u got a sec?
- Me:  What's up?
- AJ:  I can't turn my head off about this stuff, U said I really shouldn't worry about this new letter but should I be?
- Me:  I guess I can't really answer that. But it's nothing new. We just need clarification on a few things.
- AJ:  Ok, I'm really sorry u have to deal with this.
- Me:  Appreciate that. But don't worry about it.

(*Id*. at PCJ 3749.)

Additionally, a letter was intercepted by Polk County that was written by NS to a former

inmate stating:

> Well, you're gonna [sic] be shocked. I told about Allen. Had to. It wasn't sitting
> well with me for some reason. I only told about my incidences. My mom said to
> do it… he seemed so worried… "[w]ell he should stop shopping in the jail for
> women who he can treat like pieces of meat." *Id*. She indicated that "the thing that
> sucks" which helped her decide not to lie anymore was that "it was interfering
> w/my meds. When he was out there, 75% of the time I'd deny my meds."

(*Id*.) Captain Nargis did see that she refused her meds a large number of times and, when she did,

a high number of refusals contained the initials "AJ." (*Id*.) Upon being approached with the new

information, Jorgensen continued to deny the allegations and continued to explain the situation

away indicating that NS was infatuated with him. (*Id*. at PCJ 3750.) Captain Nargis wrote in his

report:

> [Allen] was being warned that any other allegations of a similar nature involving
> inmates would probably result in some suspension time while it was investigated.
> **I informed him I believed that he was being less than honest with us, and that
> was based on by training & experience as an interrogator. I informed him
> that the information was too similar to be coincidental, and that there were
> some things that the inmate could *not* have known unless he told her.**
> [Referencing Jorgensen trying to have a threesome with a girl from Peru]…
>
> Even if there was no touching, his behavior was inappropriate and unprofessional.
> C.D. Moe did mention that what he was wanting to hear from Officer Jorgensen
> was some kind of statement indicating that he knew what behavior was proper
> and what was not. Sheriff Johnson also spoke of keeping the line between
> personal and professional life, and not crossing it. Officer Jorgensen **never did**

**provide acknowledgement of an inappropriate relationship, or a statement that he understood what was proper and what was not.**

**I advised officer Jorgensen that the letter of reprimand he received last week was the end of the issue at this point**. … I feel compelled to note that, based on my training & experience, and based on knowing Officer Jorgensen for 9-plus years, it is my opinion that he was not only less than honest about this, **but he was outright lying to us at times**. No further information at this time.

(*Id*. at PCJ 3751) (bold emphasis added, italics from report).

Co-existent with the investigation into Jorgensen's inappropriate conduct with inmates, there was a parallel investigation into Jorgensen's sexual harassment of female officers. (*Id*. at PCJ 3762-3767.) Five female jailers indicated that Jorgensen targeted inappropriate sexual comments towards them. (*Id*.) As a result of the investigations, Captain Nargis wrote:

Officer Jorgensen was advised that any further complaints by co-workers would be closely scrutinized. He was reminded to keep his conversation professional. He was told that the Department would **not be taking any action on the allegations at this time**, other than reporting it to E.R. [presumably employee relations] and that they would be following up.

I feel compelled to note that based on my training & experience, and having known Officer Jorgensen for 9-plus years, **it is my opinion that he was less than honest with us, and at times was outright lying to us.**

(*Id*.) (emphasis added.)

Alan Jorgensen resigned on February 2, 2003 indicating:

I am submitting this letter to notify the Sheriff's Department of my resignation from the position of Corrections Officer. This letter will also serve as my two weeks' notice… This has not been an easy decision for me; I have very much enjoyed my time working with the Sheriff's Dept… **I have been thinking for some time that I needed to make a change in my life… I, personally, am leaving the Sheriff's Dept. on good terms with administration and with my co-workers**. I do not know completely where this road will take me, but I know that the Polk County Sheriff Dept. will always feel like home.

(Nargis, Scott Decl., 14-cv-428, ECF No. 92(2) (emphasis added)). There were no additional documents provided from discovery with regards to this matter. (Bannink Aff. 07/29/2016, 15 cv-428, ECF No. 86, Exs. B, D at PCJ 3737-3768.) It is believed that Polk County discontinued

the investigation once Jorgensen resigned. Sheriff Johnson does not know if they "had come to a final discipline or if he resigned prior to that." (Johnson, Peter Deposition "Johnson Depo.", 15-cv-428, ECF No. 52 at 30:14-18.)

A subsequent investigation with retired Polk County Jail officer, Kathleen Fjorden revealed that Fjorden had made numerous verbal complaints to Captain Nargis about Allen Jorgensen's inappropriate conduct and Captain Nargis' response was always, "Oh, that's just Allen," "don't worry about that." (Robert McDowell Declaration, December 19, 2016 "McDowell Decl.") It was Fjorden that brought the information from inmate NS, above, to the light of Captain Nargis and when she did she demanded that Captain Nargis do something about Jorgensen's inappropriate comments. *Id.* The issue with Jorgensen was never addressed until Fjorden quit making verbal reports and finally made a written report that Captain Nargis could not ignore. *Id.*

### III. Christensen's disciplinary records

All of the following disciplinary records below, were created by Polk County officials, contained in Defendant Christensen's personnel file, and were produced to Plaintiffs from Polk County as a result of discovery in this file.

On September 29, 2014 a coworker made a complaint that she could smell a "strong odor of intoxicants" coming from Christensen and that he "appeared hungover and made references to being hungover." (Bannink Aff 07/29/2016, 15-cv-428, ECF No. 86, Ex. G at PCJ 3718.) C.D. Moe expressed his concern to Captain Nargis that this incident was "yet another 'negative' contact with Officer Christensen in a short period of time." (*Id.* at PCJ 3719.) Captain Nargis "echoed" C.D. Moe's concern and indicated that "it doesn't do any harm for him to know that he

cannot behave in any way he chooses." (*Id*.) No formal punishment was issued, no training was offered as a re-direct.

On June 20, 2014 Captain Nargis saw Darryl Christensen on his cell phone with his back to an inmate while the inmate was on a phone for inmates. (*Id*. at PCJ 3720.) Once Christensen heard the booking room door close, Christensen hung up his phone. (*Id*.) A short time later Christensen was in the inmate property storage room, again on his phone. (*Id*.) Captain Nargis, "expressed [his] exasperation and reminded [Christensen] that cell phones can be accessed in the break room, and that they do not belong in the jail. [He] stated that it is bad enough that [he has] caught people in Max and Master, but on the floor with an inmate out—and his back to the inmate—was not acceptable." (*Id*.) [Captain Nargis] then indicated, "it was certainly not the type of example our most-senior officer should be making… I thanked him for his time and excused him to go off duty." (*Id*.) No punishment was implemented, his experience was referenced, and Christensen was even "thanked" for his time.

On July 27, 2010, Captain Nargis found that officer Christensen was **solely** in charge of the maximum area, did not delegate his duties back to master, and **left the post** to go meet his wife and pick up his lunch. (*Id*. at PCJ 730-3731.) Captain Nargis wrote that Christensen indicated that he just "popped out" and picked up his lunch "real quick." (*Id*.) Captain Nargis indicated, "in the future, he should surrender control to Master Control. [he] pointed out the importance of this due to the fact that one of the inmates could have called in an emergency, and no one would have been able to respond to it. Officer Christensen indicated that he understood, and I returned to my duties." (*Id*.) Captain Nargis indicates that Christensen's actions were in violation of "Jail Policy C-900 Correction Officer Post Orders which requires a jailer to remain at their post unless they are relieved from that post. (*Id*.)Captain Nargis pointed out that this

incident was "particularly disturbing" as Christensen was the jail's Safety and Security Officer. (*Id.*) Christensen received no formal punishment for leaving the post and received no additional training as a result of the clear violation of the policy.

On April 22, 2010, there was an allegation that Christensen used unnecessary and excessive force against an inmate (MW). (*Id.* at PCJ 3725-3726.) Captain Nargis indicated that, "[g]iven all of the information… it is my opinion that the use of force in this incident was not necessary… nor was the amount of force reasonable... [g]iven that, I will be proceeding with the discipline process as the result of an excessive use of force." (*Id.* at PCJ 3734.)  Captain Nargis summarized his investigation as follows:

> I believed that this matter was best resolved by issuing a verbal reprimand to Officer Christensen, and providing re-training on the justification for use of force in the Jail, per our policy.
>
> I would like to note that officer Christensen has a lengthy history of service with our Department and has had no similar incidents in the past.

(*Id.* at PCJ 3726.) Captain Nargis indicated that it appeared from the incident that Christensen had taken this matter seriously, that he was remorseful, and that he was sincere in changing his ways. (Nargis, Scott Depo., 15-cv-428, ECF No. 48 at 61:1-62:3.)  However, when Christensen was asked in his October 6, 2011 Performance Review what was his "favorite incident/event in the past 12 months and why? What made it so special" Christensen indicated, "**[MW] incident - felt good.**" (Bannink Aff. 07/29/2016, 15-cv-428, ECF No. 86, Ex. F.) When asked "what was your biggest mistake/regret of the past 12 months and what did you learn from it? Christensen wrote "**[MW] incident - got disciplined**." (*Id.*) Captain Nargis signed this performance review. (*Id.*) It is clear that over a year and a half later, the "training" that was allegedly provided to Christensen was not taken seriously when his biggest highlight of his year was his excessive use of force against an inmate because it "felt good."

On May 25, 2009, the Polk County Jail received a call from an angry inmate who indicated that Christensen attempted to pit a co-defendant against him by disclosing statements relating to his criminal case. (Bannink Aff. 07/29/2016, 15-cv-428, ECF No. 86, Ex. G at PCJ 3721.) Captain Nargis said to the inmate that he "had no reason to believe that officer (Darryl Christensen), who is a veteran officer with no issues such as this on his record, would engage in any inappropriate behavior." (*Id.*)  Christensen denied that he engaged in such conduct. (*Id.* at PCJ 3722.) Based on this information alone, Captain Nargis indicated, "that it appeared to be what I had suspected, a case of misinformation, and I wanted him to be aware of the situation just in case something should arise. I thanked him and continued with my duties." (*Id.*)  Again, no additional training was offered, and his status as a "veteran officer" was mentioned.

<u>Argument</u>

I.   **The two incidences of prior sexual misconduct are quintessential *Monell* evidence and establish Polk County's deliberate indifference in failing to protect Plaintiffs from sexual assault.**

Evidence of the two instances of alleged sexual misconduct are relevant to show notice to Polk County of the need for different policies and training on sexual assault against inmates as well as quintessentially admissible evidence to support Plaintiffs' *Monell* claims and Polk County's deliberate indifference in failing to protect Plaintiffs upon notice of prior instances of sexual misconduct within their jail. When offered for the purposes of the *Monell* claims, this evidence is not subject to Rule 404 because that rule only prohibits introduction of prior bad acts to prove "a person's character in order to show that on a particular occasion the person acted in accordance with the character" FRE 404(b)(1). In the context of Plaintiffs' *Monell* claims, Plaintiffs offer the evidence of prior similar complaints to show that Polk County had notice of

prior instances of jailer misconduct involving sexual conversations/interactions with inmates and yet did nothing to stop further similar conduct.

In order to proceed on their *Monell* claim, as well as the failure to protect, Plaintiffs intend to show, *inter alia*, that Polk County failed to train and supervise its jailers as well as created a custom of indifference within the jail and these failures were "moving force" behind Plaintiffs' constitutional violations. *See* Second Amended Complaint, 15-cv-428, ECF No. 41; *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978). In order to demonstrate that Polk County failed in these respects, Plaintiffs must be able to present evidence of how Polk County handled these prior misconduct allegations and how Polk County's failure to act constituted deliberate indifference. *See Lessley v. City of Madison, Ind*. 54 F.Supp.2d 877, 909 (S.D.Ind. 2009) (the record contained evidence that "the City of Madison's failure to take appropriate corrective action in response to repeated complaints of Royce's mistreatment of civilians, particularly women, could have amounted to an unconstitutional custom.") Put differently, Plaintiffs have alleged that Polk County's policymakers failed to take corrective action in the face of complaints; those complaints, therefore, are a necessary part of the case. *Sornberger v. City of Knoxville*, 434 F.3d 1006 at 1029-30; *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir.1997) (indicating that failure to act after learning a pattern of violations would be deliberately indifferent)).

In a related vein, Polk County's deliberate indifference may be established by its knowledge of deficient investigatory practices and its failure to take steps to remedy those practices. *See Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir.1995) ("The usual way in which an unconstitutional policy is inferred… is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed

what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of the subordinate officers."); *Thomas v. Cook Cty. Sheriff's Dept.* 604 F.3d 293, 303 (7th Cir. 2009) (policymakers "deliberately indifferent" when they were "aware of the risk created by the custom or practice" and "failed to take appropriate steps to protect the Plaintiff"). In the recently disclosed email which brought the Jorgensen matter to light, jailer Steve Shaefer indicates, "**we have all heard complaints about inappropriate comments to both inmates and staff.**" (Bannink Decl. 12/19/2016, Ex. D at MJJ/JKJ 004676.) Even though all of the jailers knew of the complaints against Jorgensen, **nothing was done.** There was no additional training, no discipline, no criminal investigation, no training of inmates on how to report sexual assault; nothing was done. Jorgensen resigned on what he claimed to be "good terms" and that was the end of the matter. In order to understand how Christensen could feel confident that he could sexually assault Plaintiffs with impunity, the jury must learn the myriad of ways that the previous investigations were incomplete and biased.

Defendants will likely argue that the prior alleged acts of sexual misconduct are not sufficiently similar to Plaintiffs' assault as to be admissible. That argument, however, does not square with this circuit's *Monell* case law. Courts in this and other circuits have explained that the scope of relevant past misconduct must not be defined too narrowly. *See e.g. Vetter v. Dozier*, 2010 WL 1333315, at *25 (N.D.Ill. Mar. 31, 2010) ("The character of the prior allegations were sufficiently similar, too: the Brandenburg complaint involved an officer abusing his police authority for personal aims, the Medej complaint involved a potentially serious constitutional violation while effecting a traffic top, and the McSweeney complaint involved misconduct in the course of sexual gratification."; *Donald v. City of Chicago*, 1992 WL 137190, at *1, *4 (N.D.Ill June 1, 1992) (racial harassment complaint sufficiently similar to a different

claim against subordinate); *Parrish v. Luckie*, 963 F.2d 201, 205-06 (8th Cir. 1992) (finding sexual assault to be, first and foremost, a crime of violence, and thus considering all proper violent allegations as "relevant past misconduct" for purposes of *Monell* analysis).

Polk County Jail was faced with two incidences of remarkably similar sexual conduct as that described in Plaintiffs' complaints and still failed to act to prevent the assaults of Plaintiffs. This evidence is quintessential *Monell* evidence and proof of Polk County's deliberate indifference that is relevant and its probative value clearly outweighs the prejudice that may be caused from introduction. Neither of the incidents involved any punishment other than a letter in the file which was severely downplayed by administration, and **neither of the incidences involved additional training of the officers or any acknowledgment to the remaining jail staff that the behavior was inappropriate.** Both of these incidences could have and should have served as teaching moments on the County's sexual harassment policy and PREA. Polk County buried their heads in the sand and did nothing.

Evidence of the prior sexual misconduct and Polk County's failure to adequately respond is not merely probative of the *Monell* claim, it goes to the heart of the *Monell* claim, because it establishes that the policymakers had notice of prior alleged sexual misconduct within their jail and they failed to respond which emboldened Defendant Christensen to sexually assault Plaintiffs.

The prior incidences of alleged sexual misconduct are also relevant because they show two instances where alleged sexual conduct was investigated very differently than the matter at hand. Even though, in Jorgensen, Captain Nargis clearly indicated in Jorgensen's personnel file that they **knew from investigation that Jorgensen allowed "some kind of arrangement or relationship grow between him and [NS]"** they never asked any external agency to investigate.

16

(Bannink Aff. 07/29/2016, 15-cv-428, ECF No. 86, Ex. D at pg. 3747.) Had it not been for the current litigation, the conduct of Jorgensen would have never been brought to the light of day. Dissimilarly, the conduct in Plaintiff's complaint was initially reported to an outside agency which prompted Polk County to act quickly and bring in an outside agency, The Department of Criminal Investigation, to conduct an investigation. It is peculiar that only when victim's claims were reported to an outside agency did Polk County act diligently in requesting a full thorough investigation. When conduct was only reported internally, they handled the matter themselves and simply terminated the investigation once Jorgensen resigned. The introduction of this evidence is quintessential for Plaintiffs to prove their claim against Polk County and any potential prejudice outweighs the extremely high probative value. The introduction of this evidence should be admitted, *in limine*.

## II.  The two prior instances of sexual misconduct and Christensen's prior "disciplinary records" should be admitted, *in limine*, to prove opportunity for Christensen to assault Plaintiff under 404(b).

In addition, and coexistent to the evidence being used to establishing liability under *Monell*, these allegations are also admissible to proving that Defendant Christensen had the opportunity to sexually assault Plaintiff. Details and facts regarding the allegations, above, are combined with all of the times that Christensen received alleged disciplinary action, however, no real punishment or additional training was ever received. The culmination of all of this evidence is relevant to Plaintiff's claim that Christensen had the opportunity to sexual assault Plaintiff which was provided by Polk County's failure to discipline and train.

Under Rule 404(b), "evidence of a crime, wrong, or other act is not admissible to prove the a person's character in order to show that on a particular occasion the person acted in

accordance with the character," but is admissible "for another purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." Fed. R. Evid. 404(b). The categories listed in the text of Rule 404(b) are not exclusive. *United States v. Robinson*, 161 F.3d 463,466-67 (7th Cir. 1998). "Indeed, Rule 404(b) does not require the party offering the evidence to force the evidence into a particular listed category, but simply to show any relevant purpose other than proving conduct by means of a general propensity inference." *Id.*

The Seventh Circuit has embraced an approach to Rule 404 (b) evidence that focuses on the principles behind the rule rather than a specific set of factors. *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir. 2014) abrogating the four-factor test of *United States v. Baker*, 655 F.3d 677, 681-82 (7th Cir. 20ll). In order to evaluate whether proffered evidence is forbidden propensity evidence, courts must consider the purpose for which the evidence is offered. *Gomez* at 856. Other-acts evidence need not be excluded whenever a propensity inference can be drawn; rather, such evidence may still be used "when its admission is supported by some propensity-free chain of reasoning." *Id.* Put another way, Rule 404(b) "excludes the evidence if its relevance to another purpose' is established only through the forbidden propensity evidence." *Id.* If the proponent of the evidence can make this initial showing, then the court must consider whether the probative value of the other-acts evidence is substantially outweighed by the risk of unfair prejudice under Rule 403. *Id.* The court should also consider whether the non-propensity purpose of the evidence is actually at issue in the case. *Id.*

Inclusion of prior instances of sexual misconduct within the jail while Defendant Christensen was employed and how neither resulted in discipline or additional training as well as how defendant Christensen was never appropriately disciplined for rule violations is admissible

to show that Christensen had the opportunity to assault Plaintiff. It has been indicated in depositions that Defendant Christensen would tell his victims that they should not tell anyone or he would get in trouble. (M.J.J. Depo., 14-cv-428, ECF No. 45 at 108:12-23; J.K.J. Depo., 15-cv-428, ECF No. 46 at 56:12-24.) In fact, Polk County and Wisconsin County Mutual Insurance have used these exact statements as an attempt to show that Christensen was acting rogue from his role as correctional officer and knew what he was doing was wrong. (*See* PC Br. And Reply for SJ, 15-cv-428, ECF Nos. 57, 91; *see* WCMIC Br. And Reply for SJ, 15-cv-428, ECF Nos. 33, 73.)  The admission of the conduct identified above is directly relevant to rebut these statements and show that, in actuality, Christensen was not afraid of getting caught or of punishment because he knew that rule violations were not taken seriously.  *See, e.g., Glenwood Halsted LLC v. Village of Glenwood*, 2014 WL 2862613, at *4 (N.D. Ill. June 24, 2014) (recognizing that evidence related to a defendant's "experience and expertise" would be admissible "state of mind" evidence under Rule 404(b)); *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993) (evidence that police officer committed similar acts of torture toward other arrestees was admissible as evidence of "intent, opportunity, preparation, and plan"). Defendant Christensen was not acting rogue and believing that he would actually be punished. He assaulted Plaintiffs because of the culture at the Polk County Jail and because he knew that officials did not take rule violations seriously. Christensen believed that he would never get caught- no one would suspect anything- he acted upon Polk County's deliberate indifference to the possibility of inmates being sexually assaulted.

  To be clear, Plaintiffs do not offer the prior misconduct of Christensen or the allegation against Jorgensen to prove that either of the actors actually committed the violations alleged or that Christensen actually assaulted Plaintiffs, but rather to demonstrate that he had the

opportunity to assault Plaintiffs based on his understanding of his power and authority as a jailer as well as the fact that rule violations were not treated seriously.

The Seventh Circuit has emphasized that courts must consider whether proffered 404(b) evidence is actually offered to prove an issue that is in controversy in the case. Gomez, 763 F.3d at 860. With regards to Christensen's actions, specifically, because Plaintiffs do not offer the prior bad acts to show that Christensen acted in conformity with his prior bad actions, but rather to show why he had the opportunity and felt that he could assault the Plaintiffs without consequences, this evidence should be admitted.

Even if evidence of prior bad acts is admissible under Rule 404(b), it still may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice. *See* Fed. R. Evid. 403; *Gomez*,763 F.3d at 860 (courts must apply the Rule 403 balancing test before admitting proposed 404(b) evidence). Although evidence of past misconduct may be prejudicial, its probative value is not substantially outweighed by any unfair prejudice. The Federal Rules of Evidence protect only against unfair prejudice.

Of course, "[a]lmost any bad act evidence simultaneously condemns by besmirching character." Id. at 855 (citing United States v. Beasley,809 F.2d 1273, 1279-80 (7th Cir. 1986)); *see also United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("all probative evidence is prejudicial to the party against whom it is offered"). It is therefore not enough to argue that Plaintiff s proposed 404(b) evidence will be prejudicial or cast the Defendants in a bad light.

Thus, evidence is unfairly prejudicial "only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Harris*, 536 F.3d 798, 809 (7th Cir. 2008) (quotation omitted). While Plaintiffs concede the evidence is prejudicial, there is little risk of unfair prejudice. See *United States v. Thompson*,

359 F.3d 470, 479 (7th Cir. 2004) ("[A]ll probative evidence is prejudicial to the party against whom it is offered.").

First, the evidence is not unfairly prejudicial because it is not inflammatory, and therefore, it will not result in a verdict that is based on emotion. *See United States v. Zahursky*, 580 F.3d 515, 525-26 (7th Cir. 2009) (admission of previous "sexually explicit and detailed" internet chats with minors to show knowledge and intent under Rule 404(b) were not unfairly prejudicial although likely appealed to the jury's emotions).

Second, there is no element of surprise or fabrication in these allegations which would pose an unfair prejudice. Each of these allegations predates this litigation and Plaintiffs' allegations against Defendants. In addition, each of the disciplinary records are documented by jail Captain Nargis himself and written in the jail captain's own words. In each case, there are strong indicia of reliability.

In sum, it is not unfairly prejudicial to Defendants that they are made to face allegations made against Christensen, Jorgensen, as well as Polk County regarding notice and the need for more/different training and supervision. Christensen was free to face evidence of these allegations long before this litigation was commenced and it is presumed that the personal records from Defendant Polk County were created by administration contemporaneous to all complaints seeking to be admitted. In addition, contemporaneous with the discipline records that Polk County jail created, they could have chosen a more appropriate course of disciplinary action and they neglected to do so. They must now face the consequences of their inaction.

Finally, any potential prejudice can be mitigated by an appropriate jury instruction. *Gomez*, 763 F.3d at 861 ("[W]e see no reason to keep the jury in the dark about the rationale for

the rule against propensity inferences. Lay people are capable of understanding the foundational principle in our system of justice that we try cases, rather than persons.") (internal quotation omitted). *See also*, *United States v. Denburg*, 212 F.3d 987, 994 (7th Cir. 2000); *United States v. Hernandez*, 84 F.3d 931, 935-36 (7th Cir. 1996); *United States v. Brooks*, l25 F.3d 484, 500 (7th Cir. 1997) (stating that "limiting instructions are sufficient to cure any potential prejudice resulting from the admission of 404(b) evidence"). The Seventh Circuit has made clear that courts are to presume that juries follow limiting instructions with respect to Rule 404(b) evidence. "Absent any showing that the jury could not follow the court's limiting instruction, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction." *Zahursky*, 580 F.3d at 525-26 (quoting *United States v. Lee*, 558 F.3d 638, 649 (7th Cir. 2009)). The Seventh Circuit assumes that the limiting "removed any unfair prejudice." *United States v. Chambers*, 642 F.3d 588, 596 (7th Cir. 2011).

For these reasons, the prior allegations of mistreatment of women, as well as Christensen's prior disciplinary records meet the 404 (b) test and should be admitted.

### III. The two prior instances of sexual misconduct and Christensen's prior "disciplinary records" should be admitted, *in limine*, to prove that Polk County was deliberately indifferent to Plaintiffs' rights to be free from sexual assault.

For the same arguments cited above, all prior misconduct is not only relevant and quintessential to Plaintiffs' *Monell* claims, but also to proving that Polk County was deliberately indifferent to the possibility that Plaintiffs would be sexually assaulted.

Plaintiffs must prove the County's actions evinced "deliberate indifference." *Palmer v. Marion Cty.*, 327 F.3d 588, 593 (7th Cir. 2003) ("[D]eliberate indifference is the recognized standard of protection afforded to both convicted prisoners and pretrial detainees.") (internal

quotation marks omitted). To prove the County acted with "deliberate indifference," Plaintiffs must 1) objectively demonstrate they were "incarcerated under conditions posing a 'substantial risk of serious harm'"; and 2) establish that County policymakers had knowledge of and disregarded the risk to their safety. *Id.*

For all of the aforementioned reasons, the misconduct cited above is directly relevant and essential for Plaintiff to be able to prove that Polk County created a substantial risk of serious harm to inmates, that Polk County had knowledge of a risk, and that Polk County disregarded that risk. As such, this information should be admitted, *in limine*.

## Conclusion

In conclusion testimony regarding the allegations of sexual misconduct against Alan Jorgensen and Darryl Christensen, as well as the non-sexual misconduct of Darryl Christensen should be admitted, *in limine* along with Polk County's response and non-response to these allegations. The admission of this evidence is essential for Plaintiffs to prove their claims against Polk County in showing that Polk County was deliberately indifferent to Plaintiffs' rights to be free from sexual assault.

**ECKBERG LAMMERS, P.C.**

Dated:  12/19/2016                               By:  /s Lida M. Bannink
                                                      Thomas J. Weidner (1082013)
                                                      Lida M. Bannink (1088518)
                                                      Attorneys for Plaintiffs
                                                      430 Second Street
                                                      Hudson, Wisconsin 54016
                                                      (715) 386-3733