IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

J.K.J.,

                              Plaintiff,                     OPINION AND ORDER

        v.
                                                            15-cv-428-wmc
POLK COUNTY and DARRYL L.
CHRISTENSEN,

                              Defendants.

and

M.J.J.,

                              Plaintiff,

        v.
                                                            15-cv-433-wmc
POLK COUNTY and DARRYL L.
CHRISTENSEN,

                              Defendants.

---

Former Polk County Jail correctional officer Darryl L. Christensen sexually assaulted plaintiffs, identified by their initials to protect their privacy, while they were imprisoned at the Polk County Jail.  Christensen was convicted of five counts of sexual assault -- these two plaintiffs were not his only victims -- and is currently serving a prison sentence of thirty years.  In this lawsuit, plaintiffs allege that Christensen violated their constitutional rights and also assert various claims under state law.  Material to this opinion, plaintiffs also allege that Polk County is liable under *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658 (1978), for failing to:  (1) train and supervise Christensen; and (2) adopt necessary procedures to prevent his sexual assaults.  Before

the court is the County's motion for summary judgment on plaintiffs' claims for federal Constitutional violations under 42 U.S.C. § 1983, as well as state claims for common law negligence under the court's supplemental jurisdiction. ('428 dkt. #54; '433 dkt. #55.)[1]

For the reasons that follow, the court concludes that plaintiffs have put forth sufficient evidence from which a reasonable jury could find that the County was deliberately indifferent to the risk of sexual assault by a correctional officer within its Jail. Accordingly, the court will deny the County's motion for summary judgment with respect to the § 1983 claim and plaintiffs' state law claim for negligent training and supervision. The court, however, will grant the motion and enter judgment in the County's favor on plaintiffs' claims of negligent infliction of emotional distress and duty to indemnify co-defendant Christensen, finding that a reasonable jury could not conclude that Christensen acted within the scope of his employment.

PRELIMINARY MATTER

Polk County recently provided plaintiffs with additional documents relating to an investigation into inappropriate sexual conduct by another of its correctional officers, Allen Jorgensen, in early 2012. These documents were produced long after requested, after summary judgment was fully briefed, and after the close of discovery. Moreover, the County provided these documents without any explanation for its failure to produce them earlier.[2] In particular, the County produced for the first time emails Sergeant Steve

---

[1] Unless otherwise noted, the citations to docket entries are to the 15-cv-428 docket.

[2] Even in opposition to the motion, Polk County Jail Captain Scott Nargis represents that he produced an electronic file of documents generated during the Jorgensen investigation in response

Schaefer sent to Jail Captain Scott Nargis on January 15, 2012, and attachments to those emails.  (Bannink Aff., Exs. F, H (dkt. ##120-6, 120-8).)

While the County's failure to previously disclose these documents or offer plaintiffs any explanation for its failure to do so is inexcusable, plaintiffs' request to re-open discovery, supplement summary judgment, investigate amending the pleadings and continue the trial date is also overblown.  (Pls.' Mot. (dkt. #118).)  Other than Sergeant Schaefer's admission in his cover letter that "[w]e all have heard complaints about inappropriate comments to both inmates and staff" (Bannink Aff., Ex. F (dkt. #120-6) 4), the content of his emails and attachments are similar to that previously produced by Captain Nargis in his investigation notes, which *were* timely produced by defendant.  Moreover, those timely-produced documents indicate that:  (1) Nargis received three emails from Schaefer prompting the investigation into inmate harassment by Jorgensen; and (2) Officer Kathleen Fjorden had in turn provided documentation to Schaefer.  (*See* Bannink Aff., Ex. D (dkt. #86-18) 3.)  Without excusing defendant's failure to produce the Schaefer emails, therefore, plaintiffs could have sought production of the referenced emails and attached documentation before the close of discovery and the deadline for filing an opposition to the County's motion for summary judgment.  Even more critical, these new documents neither change significantly (if at all) what plaintiffs knew before

---

to the plaintiffs' initial discovery requests, mistakenly believing that the file contained all of the documents relating to that investigation.  (Nargis Decl. (dkt. #125) ¶¶ 4-5.)  Even if the court were to find that Nargis's failure to search the physical documents was initially excusable based on his mistaken belief that the electronic file was complete, Nargis goes on to explain in his declaration that plaintiffs requested an inmate's letter referenced in one of the produced documents, which required him to search the physical file before locating the requested letter.  (*Id.* at ¶ 6.)  At that time, Nargis was on notice that the electronic file was incomplete, and still he failed to produce the physical file.  That action is inexcusable.

opposing summary judgment, nor the substantive evidence proffered to support their claim that the County had notice of sexual misconduct of another officer.

In addition to these emails, plaintiffs take issue with Jorgensen's resignation letter, which was submitted with the County's reply brief in support of its motion for summary judgment, but not previously produced by the County.  (Nargis Decl., Ex. B (dkt. #92-2).)  Here, the County's failure to produce this letter is understandable.  The letter does not fall into plaintiffs' request for "any and all documentation regarding any allegation and/or investigation, including but not limited to . . . PCJ staff having improper sexual contact with inmates and/or making improper sexual comments to inmates, including but not limited to Alan Jorgensen."  (Pls.' Br. (dkt. #119) 3.)  Indeed, much to plaintiffs' chagrin, the letter makes no reference to the allegations against him or any investigation.

Moreover, the letter was provided on August 16, 2016, before the close of discovery.  At that time, plaintiffs could have sought leave to file a sur-reply or open discovery regarding this letter, among other reactions.  They took none of those steps, perhaps because this letter also does not materially alter the evidence plaintiffs were provided before their filing an opposition to defendant's motion for summary judgment.  Indeed, plaintiffs knew Jorgensen had been issued two letters of reprimand and that he then resigned.  In his letter, plaintiffs take issue with Jorgensen's comment that he is "leaving the Sheriff's Dept. on good terms with administration and my co-workers."  (*Id.* at 2.)  The court is hard-pressed to understand how *Jorgensen's* mischaracterization of the circumstances of his departure is material to their claims that the County had notice of sexual misconduct by another officer and failed to deal with those claims appropriately.

4

Rather than grant the extreme relief plaintiffs seek, the court will craft a remedy commensurate with defendant's failure to produce Schaeffer's letters.  The court will re-open discovery for the limited purpose of allowing plaintiffs to depose Steve Schaeffer about his role in the Jorgensen investigation, including the content of his emails to Nargis on January 15, 2012.  The court will also order the County on or before January 9, 2017, to review its files -- both electronic and physical -- to ensure (again) that it has produced *all* documents responsive to plaintiffs' requests.  On or before January 10, 2017, the County will also be required to file a verification with the court that attests its review is complete and lists any additional documents produced to plaintiffs as a result.  Consistent with Rule 26(a)(3)(A)(iii), the court will also preclude the County from offering into evidence any late produced document.  Finally, the court will take up plaintiffs' motion for sanctions at the final pretrial conference.

UNDISPUTED FACTS[3]

**A.  The Parties**

Plaintiff J.K.J is an adult resident of the State of Wisconsin who was incarcerated from time to time from July 2012 to 2014 in Polk County Jail.  Like J.K.J., plaintiff M.J.J. is also an adult resident of the State of Wisconsin who was incarcerated from time to time from November 2011 to January 2014 in Polk County Jail.

Defendant Darryl L. Christensen is an adult resident of the State of Wisconsin, formerly employed as a correctional officer or "jailer" with Polk County.  Polk County

---

[3] The court finds the following facts, which are drawn from the parties' submissions, to be material and undisputed unless otherwise noted.

5

Sheriff's Department is a law enforcement agency of Polk County.[4]  Polk County is a municipal corporation organized under the laws of the State of Wisconsin.

Captain Scott A. Nargis has been the Polk County Jail Captain since 2000.  From April 2008 to November 2010, Nargis also acted as the Jail Administrator.  While the parties fail to explain the differences in these two positions, the court infers for purposes of summary judgment that, in either capacity, Nargis was the individual in charge of day-to-day jail administration.  Peter Johnson is the current Polk County Sheriff, a position he has held since 2011.  Finally, Steven Moe was the Polk County Chief Deputy from 1991 until his retirement in March 2016.

### B.  Overview of the Jail

#### i.  Physical orientation

The Polk County Jail is located in Balsam Lake, Wisconsin, and houses both convicted prisoners and pretrial detainees.  Within the jail, there are two separate housing areas or "pods":  a minimum security area and a maximum security area.  The latter, so-called "max pod" also contains a medium security section.  Constructed in 2003, cameras were not added to the max pod due to budgetary concerns, the difficulty in storing camera footage, and the fact that the max pod has a central area, referred to as

---

[4] Plaintiffs originally pursued claims against Polk County Sheriff's Department itself.  In its motion for summary judgment, defendant argued correctly that the proper suable entity is the County itself, not the Sheriff's Department.  *See Whiting v. Marathon Cty. Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004) (holding that county sheriff's department "is not a legal entity separable from the county government which it serves and is therefore, not subject to suit").  In response, the parties filed a stipulation removing the Sheriff's Department as a defendant and substituting the County.  (Dkt. #66.)  As such, the court need not reach defendant's argument about the proper party, and the clerk's office is directed to change the caption on the docket to reflect this change.

the "bubble," where a jailer is stationed all times to supervise inmates in that pod. The bubble is surrounded by a hallway, off of which are various rooms on the ground and lower level, some of which are cells that hold multiple inmates. The various cells within the max pod are segregated by sex.

The "X-Room" is one of the rooms located off of the hallway, and it is used by inmates for classes, exercising or other jail-sanctioned activities. The X-Room also has a locked bathroom connected directly to it, which is only accessible through that room. The X-Room was only available for inmates for use upon the permission of the jailer on duty.

There is one-way glass on the outside of the bubble and the various rooms, allowing jailers to see inside cells and other rooms, but limiting the ability of inmates to see into the hallway.[5]  The jailer staffed inside the bubble has the ability to remotely open the doors to allow access to the max pod. Unless these doors are left open, a jailer cannot enter the max pod without being let in by someone inside the bubble or by an officer in the master control room.

### ii. Jail administration

All jailers are under the supervision of Jail Captain Nargis, including Christensen during the course of his employment. From 2011 to 2014, the types of discipline that might be issued to a Polk County Jail employee included a written reprimand, an official reprimand, suspension without pay, demotion and termination. During that same

---

[5] Depending on lighting, inmates may be able to see into the bubble.

period, Polk County Jail employees were periodically evaluated and reviewed.  If a jail supervisor determined an employee violated a policy or procedure, that supervisor evaluated whether the violation warranted any discipline or retraining.  The employee would also have been informed of the violation and may have been retrained on the policy or formally disciplined.[6]

Before becoming sheriff, Sheriff Johnson had no training in jail operations.  Since becoming sheriff, his training has been very limited.  Moreover, Johnson testified that he does not handle the "minutia" of running a jail, which included training.  As Captain, Nargis reported directly to Chief Deputy Moe until Moe retired in March 2016.  During that time, Moe testified that Nargis was responsible for training jail staff, though Moe acknowledged that he may have discussed training with Nargis "like in passing in the hall kind of conversations."  (Def.'s Resp. to Pl.'s PFOFs (dkt. #94) ¶ 47 (citing Moe Depo. (dkt. #58) 26)).)  Regardless, it is undisputed that Nargis created the training program for all times relevant to plaintiffs' claims here.

### C.  Policies and Training Regarding Sexual Contact between Jailers and Inmates

#### i.    Policies and trainings directed at jailers

The Polk County Jail had multiple policies, rules and procedures in effect during plaintiffs' incarceration and Christensen's employment.  All jailers received a copy of Polk

---

[6] Plaintiffs propose a myriad of facts about inmate restrictions, control and disciplinary actions. (Pls.' PFOFs (dkt. #82) ¶¶ 11-41.)  While the County does not dispute these facts, plaintiffs fail to describe how these facts are material to their claims, much less to their opposition to the County's summary judgment motion.  As such, the court has opted not to describe them in this section.

County Jail's Policy and Procedures Manual upon commencing employment.  Jailers are expected to read and understand the Manual.  Jail Manual Section 21 C-200 provides that male and female officers will supervise and manage all inmates regardless of gender, with the exception of pat down searches and strip searches.  Polk County also provides training regarding inmate supervision techniques.

Section 21 C-202 prohibits jailers from engaging in sexual and/or other inappropriate contact with inmates under the Prisoner Rape Elimination Act ("PREA").  The policy also provides:  "In addition to Department policies against sexual misconduct, Wisconsin State Statutes make it a criminal offense for correctional staff members to have sexual intercourse or contact with an individual confined in a correctional institution."  (Nargis Decl., Ex. B (dkt. #55-2) 7.)  In addition to this policy, each jailer is required to be certified as a correction officer by the State of Wisconsin Department of Justice Law Enforcement Standard Board, which, in part requires training that sexual contact with inmates is unprofessional and violates the Wisconsin Statutes.

Despite the existence of Section 21 C-202 and other training, plaintiffs contend that Polk County failed to provide adequate training on the PREA and adopt recommended practices.  Inspector Brad Hompe, a detention facility specialist with the Wisconsin Department of Corrections, provided resources to jails, including posters and a PowerPoint training on the PREA.[7]  Hompe told jails not to ignore the PREA.  Because PREA is a federal statute, however, the DOC had no means of enforcing compliance;

---

[7] In addition, jails can also access materials from the National Institute of Corrections.  Moreover, county jail administrators can also attend a PREA investigator training in Chippewa County and access an online PREA training through Edcor.

instead, compliance is voluntary.  Still, the DOC has sent several emails on the PREA to jail administrators since its enactment.

Nargis testified at his deposition that he does not recall being provided PREA materials in writing from Hompe, does not recall taking notes from any conversations with Hompe, and does not have any documents that would show the basic requirements of the PREA.  Polk County also never took Hompe up on his offer to provide training, nor did the County consult with a PREA consultant.

Sheriff Johnson was generally aware of the PREA, but testified at his deposition that he did not "come anywhere to be[ing] an expert."  (Johnson Depo. (dkt. #52) 17.) He knew generally that "any contact between guards and inmates, inmates and inmates, any of that has to be reported and acted on, investigated as soon as possible."  (*Id.*) Johnson further testified that he did not think Polk County could reach full compliance with the law because of fiscal concerns.  Johnson testified that the PREA requires a compliance officer, and he assumed that Nargis fills that role.  Since Christensen's assaults came to light, Johnson has told Nargis that "we need to get as much as possible in compliance."  (*Id.* at 20.)  Johnson testified that, while he was not familiar with PREA policies, he assumed that the policies were in place.  As for information the PREA recommends jails provide to inmates, Johnson also testified that he does not know what is recommended, but assumes Nargis would know and that those policies are also in place.  Chief Deputy Moe similarly testified that he did not have any specific training on the PREA and does not know anything about it beyond its general purpose.

After the allegations regarding Christensen came to light, Nargis and Johnson met with Kristi Dietz from the Head of the Office of Detention Facilities, although the County contends that this meeting "was not prompted by or specifically in relation to the incidents" involving Christensen.  (Def.'s Resp. to Pls.' PFOFs (dkt. #94) ¶ 145.)  Dietz provided Polk County with copies of posters to put up in the jail to notify inmates of the protections of the PREA.  Nargis, however, made the decision not to put the posters up because of his concern that inmates would attempt to tunnel out behind the posters or hide contraband.[8]  Nargis also testified that he did not provide copies of the PREA information to inmates because it was already provided in the inmate handbook.  For his part, Sheriff Johnson testified that he would "probably be disappointed" if the posters were not displayed because they are a cost-effective means of educating inmates. (Johnson Depo. (dkt. #52) 28.)

Other than training on the jail policies described above, the only PREA specific training available for jail employees, including Christensen, occurred on February 20, 2014.  At his deposition, Nargis testified that he did not recall the details of the training, including the length of it, other than he told staff what the "PREA was, what it means for us and what the prohibitions are."  (Nargis Depo. (dkt. #48) 42.)  The training also addressed Taser recertification, and the sign-in sheet for the day only mentioned "Taser Re-Cert."

---

[8] When pressed, Nargis testified that he was not aware of any real-life incidents of inmates tunneling or hiding contraband behind posters, nor did he raise this concern with Johnson or Dietz.

Nargis followed up the next day with an email that contained the following bullet-points:

> o   Seems to be that everyone is in a tizzy to train their staff on PREA.  There is no requirement for us to be compliant with everything that the law calls for, but nevertheless it is federal law.  So we'll hit the basics of PREA training.
>
> o   Do not allow/condone inappropriate conduct between inmates.
>
> o   Do not allow/condone/engage in inappropriate contact between staff & inmate.
>
> o   If someone (staff or inmate) presents a concern about inappropriate contact, report it to me.

(Nargis Decl., Ex. G (dkt. #55-7).)

The County maintains that it did not adopt every provision of the PREA for various reasons.  For example, the PREA advises that an officer should always announce his or her presence before entering the inmates' living unit.  Polk County did not adopt this policy because it would give inmates warning of officer inspections that are intended to be unscheduled.  Polk County also did not adopt recommendations concerning staffing because the cost was prohibitive.[9]

### ii.   Inmate grievance process

Jail Manual Section I-200 provides a grievance policy for inmates to be used to express and resolve "issues relating to personal health and welfare of inmates, or the

---

[9] Captain Nargis estimates that it would cost up to $600,000 in additional salary and benefits to have at least one male and one female jailer in the bubble during every shift.  Plaintiffs challenge Nargis's ability to provide this estimate as a lay witness, as well as its reliability, pointing instead to a national study estimating the per facility annual cost of complying with the PREA as $49,959.  (Pl.'s Resp. to Def.'s PFOFs (dkt. #80) ¶ 56.)

operations and services for the facility." (Nargis Decl., Ex. E (dkt. #55-6) 1.) Among other complaints, defendants contend that this policy covers inmate grievances related to sexual assault or harassment, although plaintiffs point out it does not do so explicitly. Policy I-200 also state that "Inmates may pursue grievances without fear of reprisal or punitive action." (*Id.*) Jail Manual Section I-100, describing "inmate rights," provides that inmates have a right to, among other things, access courts, legal materials and the grievance procedure, protection from harm and freedom from sexual harassment by jail staff. (Nargis Decl., Ex. D (dkt. #55-4).)

Upon booking, each inmate is provided a 12-page Inmate Handbook, which contains the grievance policy and procedures of the jail. Page 10 of the Handbook sets forth a five-step grievance process. The grievance process begins with an inmate submitting a grievance -- with a reference to an unspecified "form" -- to an officer to see if he or she can "resolve the matter personally." (Nargis Decl., Ex. F (dkt. #55-6) 10.) If not, "the form will be forwarded to a Supervisor." (*Id.*) Plaintiffs contend that the only process for reporting assault was handing a piece of paper to the jailer on duty.[10]

At the bottom of that page, in both English and Spanish, albeit in smaller font than the rest of the text in the manual, the Handbook states:

> Every inmate has the right to be safe from sexual abuse and harassment. No one has the right to pressure you to engage in sexual acts. If you are being pressured, threatened, or extorted for sex, you should report this to staff immediately.

(*Id.*) This is the only PREA notice provided to plaintiffs.

---

[10] The County contends that plaintiffs could also verbally report assault, but provides no support for this representation. (Def.'s Resp. to Pls.' PFOFS (dkt. #94) ¶ 143.)

Plaintiffs contend that this is an abbreviated PREA notice and that the County must have opted to exclude certain information.   Specifically, plaintiffs were not informed (1) about what constitutes sexual harassment and abuse, (2) that the County has a zero-tolerance policy toward inmate abuse and/or harassment, (3) that there was a specific person at the jail to whom they should report assault or abuse, (4) that they could report the abuse or harassment in confidence, and (5) that they would not be retaliated against for doing so.   Plaintiffs contend that if they had been provided this information and the appropriate mechanism for reporting, they would have recognized Christensen's conduct as harassment and abuse, and they would have reported it.

### D. Christensen's Employment

Christensen was employed as a jailer with the Polk County Jail from July 1995 until October 2014.[11]   In 2000, Christensen was promoted to Sergeant, a position from which he voluntarily resigned in 2002, returning to the position of a jailer.   Christensen was designated a "Certified Jail Officer" by the Wisconsin Law Enforcement Standards Board, and he was recertified for this position every two years.   In that capacity, Christensen received training concerning sexual interactions with inmates, although it appears that Christensen did not attend the February 2014 PREA-specific training. There is *no* dispute Christensen knew that sexual interactions with an inmate was against the law.  Before engaging in inappropriate sexual contact with plaintiffs, Christensen was also aware:  (1) of the Jail's policy prohibiting sexual contact with inmates; and (2) that

---

[11] During the time period relevant to these lawsuits, Christensen also worked for the Amery Fire Department.  In 2010, Christensen was promoted to the Fire Chief.

there could be disciplinary actions as a result of such actions. Christensen further received, had access to and was required to read the Jail Manual. Still, Christensen testified as his deposition that he never received "training" from Polk County "that an inmate could not consent to sex with a jailer." (Christensen Depo. (dkt. #47) 142.)

Because Christensen would engage in sexual contact when no other guards were present, there is no evidence that other employees, staff members or jailers at Polk County Jail was aware of Christensen's sexual encounters with plaintiffs. When Nargis became aware of Christensen's sexual assaults, he reported being "shocked" because "[i]t did not fall in line with anything [he] knew of Darryl Christensen to be or support or stand for." (Def.'s PFOFs (dkt. #56) ¶ 85 (quoting Nargis Depo. (dkt. #48) 105).)

### E.  Prior Allegations of Sexual Activity with Polk County Inmates

In 2004, a female inmate complained to other officers and Nargis about Christensen entering the shower block ostensibly to retrieve cleaning supplies while she was showering. The inmate also complained that Christensen commented about her having a "nice butt," and said something like, "with someone as good-looking as you in here we have to look." (Bannink Aff., Ex. G (dkt. #86-21) 10.)

Nargis then spoke with Christensen about these complaints, who acknowledged that he had entered the block, but that he did not inspect the cell because he knew an inmate was showering because a uniform shirt was covering the observation window of the shower door. In his notes, Nargis reports that Christensen "appeared dumb-founded and was shaking his head as I told him" about the comments. (*Id.* at 11.) Christensen

also told Nargis that he had heard that the inmate accusing him of inappropriate comments was trying to set him up and that he was surprised by her actions given that he had treated her well by giving her soda and donuts. Nargis instructed Christensen that "it would be in his best interest to avoid entering B-pod unless he absolutely needed to," and Nargis reports that Christensen agreed. (*Id.* at 12.) The last entry in the notes indicates that Nargis was waiting for additional information from another officer, but no other action was noted as taken.[12]

In January 2012, another correctional officer Alan Jorgensen was accused of inappropriate sexual comments directed at and inappropriate contact with female inmates. Nargis and Moe conducted an investigation, and initially concluded that a letter of reprimand would be sufficient. In one meeting with Jorgensen, Nargis stressed that that "a letter in his file is not a major deal, that it should be a learning experience." (Pls.' PFOFs (dkt. #82) ¶ 81 (quoting Bannink Aff., Ex. D (dkt. #86-18) 11.)

After one of the inmates changed her story and acknowledged inappropriate contact, however, Nargis and Moe reopened the investigation, at which point five female officers alleged that Jorgensen had directed inappropriate sexual comments at them as well. Nargis then advised Jorgensen that "any further complaints by co-workers would be closely scrutinized. He was reminded to keep his conversation professional. Still, he was

---

[12] In addition to that inmate complaint, the notes reflect concerns about (1) Christensen reporting to work intoxicated on September 29, 2014; (2) making comments in court about hearings running behind schedule on September 26, 2014; (3) using a cell phone in the jail without authorization on June 20, 2014; (4) leaving his post unattended on July 26, 2010; and (5) discussing court events with inmates on May 25, 2009. (Bannink Aff., Ex. G (dkt. #86-21).) In addition, Christensen received a verbal reprimand and was provided re-training for using excessive force in April 2011. (*Id.* at 8-9.)

told that the Department would not be taking any action on the allegations at this time, other than reporting it to [employee relations] and they would be following up." (Bannink Aff., Ex. D (dkt. #86-18) 32.)

Nargis made these statements to Jorgensen despite also noting in his investigation file that he believed Jorgensen was "outright lying to us at times." (*Id.* at 15, 32 (again noting that Jorgensen was lying).) After a second letter of reprimand was issued based on the additional allegations, Jorgensen resigned. Jorgensen's resignation prompted the County to terminate their investigation, and no further action was taken to address the allegations against him or the Jail.

Separate from these incidents, Christensen testified at his deposition that he was uncomfortable supervising female inmates -- in particular, being able to see them naked in the shower or while getting dressed in their cells -- and that others shared his view. The County does not dispute that Christensen provided this testimony, but claims that jail management was not aware of his discomfort.

Beyond Jorgensen and Christensen, Jailers Scott Pittman, Tyler Briggs and Michael Ottosen and others admitted at their depositions to participating in sexual conversations with inmates. Nargis further testified at his deposition that he heard Christensen make "inappropriate sexual comments" about females, but characterized it as "typical tier talk amongst the staff, that's something that would have come up over the course of, what, 16 years I worked with him." (Nargis Depo. (dkt. #48) 83-84.) When asked to characterize what he meant by "tier talk," he stated "[j]ust talk among staff, bantering back and forth. Dark humor." (*Id.* at 84.) Later in his deposition, Nargis,

however, testified that he has not "been present or part of conversations of, that an inmate has a nice butt or that inmate has a nice body . . . .  I would not be part of that.  I wouldn't tolerate the staff talking about it."  (*Id.* at 87.)

### F.  Christensen's Sexual Contact with Plaintiffs

J.K.J. was incarcerated in the Polk County Jail during various times between 2012 and 2014.  Christensen's sexual advances began in 2012.  The majority of Christensen's sexual encounters with J.K.J. occurred in the X-Room and the bubble.  Specifically, Christensen called J.K.J. out of her cell to engage in sexual intercourse once and oral sex twice.[13]  Christensen told J.K.J. on numerous occasions not to tell anyone about their sexual interactions, and J.K.J. complied because she did not want to get him in trouble.

M.J.J. was incarcerated in the Polk County Jail nine different times between November 3, 2011, and January 22, 2014.  While M.J.J. was incarcerated, Christensen engaged in numerous, inappropriate sexual contacts with her, including engaging in sexual intercourse and oral sex.  Christensen would also call M.J.J. out of the cell, and stick his penis through the mail slot, directing her to touch it.  Christensen would further call her out of the pod and push her up against the glass, touching and kissing her, which led to either oral or vaginal sexual intercourse.  Christensen engaged in these sexual acts with M.J.J. in the booking room, X-Room, X-Room bathroom and the bubble.[14]  Like

---

[13] J.K.J. also went to the Amery Fire Department and had sexual intercourse with Christensen at the Fire Department, though her claims against Christensen do not appear to encompass that activity.

[14] Christensen would also engage in other lewd and lascivious conduct, including calling over the intercom to say that M.J.J. looked sexy, to request that she leave the towel down so he could see in the shower, and to ask her to put lotion on while topless.

J.K.J., Christensen repeatedly asked M.J.J. to tell no one about their sexual encounters, and M.J.J. did not until investigators from the Wisconsin Department of Justice ("DOJ") asked her about it.

### G. Internal Investigation

Polk County's investigation into Christensen's sexual assault began when a former jail inmate reported her own, sexual encounters with Christensen while incarcerated at another jail.  After those allegations were communicated to the Polk County Sheriff, the Chief Deputy Sheriff began an immediate, internal investigation.

On October 30, 2014, Christensen was interviewed by the Chief Deputy concerning the allegations and investigation.  After the interview, Christensen resigned from his position as a jailer.  Christensen was later criminally prosecuted, convicted of several counts of sexual assault and sentenced to 30 years in prison.


OPINION

In moving for summary judgment, defendant Polk County essentially concedes that a reasonable jury could find its former Correctional Officer Christensen violated plaintiffs' constitutional rights.   Instead, the County contends that plaintiff cannot demonstrate that any injury was due to action or inaction on the part of the County. Under *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658 (1978), municipalities and local government units are considered "persons" to whom § 1983 liability applies, but cannot be held liable on a theory of *respondeat superior*.  *Id.* 690-91.  As a result, rather than being held legally responsible for the acts of its employee, a local government may

19

be sued under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (reiterating holding in *Monell* that there must be a "link between a municipal policy or custom and the alleged constitutional violation").   Said even more concretely, to hold Polk County liable for constitutional violations here, plaintiffs must prove:  "(1) [they] suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the [County]; which (3) was the proximate cause of [their] injury." *Ovadal v. City of Madison, Wis.*, 416 F.3d 531, 535 (7th Cir. 2005).

Generally speaking, there are four bases for finding municipal liability: (1) a formal policy; (2) a well-settled custom or practice; (3) a final decision of a municipal policymaker; or (4) deliberate indifference for training or supervision.   1A Martin A. Schwartz, *Section 1983 Litigation: Claims* & *Defenses* § 7.06[A] (4th ed. 2015).   As far as the court can discern, and certainly so far as plaintiffs' surviving summary judgment is concerned, plaintiffs' claims against the County concerns the fourth category of deliberate indifference.   Specifically, plaintiffs contend, admittedly in a hodgepodge fashion, that the County acted with deliberately indifference by: (1) failing to train Christensen, other jail employees and inmates about the prohibition of sexual contact between correctional officers and inmates; (2) failing to supervise Christensen; and (3) failing to adopt PREA-related policies.   All three alleged failures, either independently or in combination, can serve as a basis for finding deliberate indifference for purposes of

establishing municipal liability under § 1983.  *See City of Canton,* 489 U.S. at 388 ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); *see also Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1029-30 (7th Cir. 2006) (explaining that proof of deliberate indifference can take the form of "failure to act in response to repeated complaints of constitutional violations by its officers"); *Harris v. City of Marion, Indiana,* 79 F.3d 56, 58 (7th Cir. 1996) ("[T]he failure to select or implement necessary practices can constitute a 'policy or custom' for purposes of *Monell* § 1983 suit, if that failure causes a constitutional violation.").

Given the "deliberate indifference" requirement, however, such a claim is "available only in limited circumstances."  *Cornfield by Lewis v. Consol. High School Dist. No. 230,* 991 F.2d 1316, 1327 (7th Cir. 1993); *see also Palmquist v. Selvik,* 111 F.3d 1332, 1344 (7th Cir. 1997).  Indeed, "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick v. Thompson,* 563 U.S. 51, 61 (2011) (internal citation omitted).  To prove deliberate indifference, "liability [must] be based on a finding that the policymakers have actual or constructive notice that a particular omission [] is likely to result in constitutional violations."  *Cornfield,* 991 F.2d at 1327.

This "notice" requirement may arise in either of two circumstances:

> First, a municipality acts with deliberate indifference when, "in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious*, and the inadequacy *so likely to result in the violation of constitutional rights*," that the deficiency exhibits deliberate indifference on the part of municipal policymakers.

> Alternatively, we may find deliberate indifference when a
> *repeated pattern* of constitutional violations makes "the need
> for further training . . . plainly obvious to the city
> policymakers."

*Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (quoting *City of Canton*, 489 U.S. at

390 & n.10) (internal citations omitted) (emphasis added).

Defendant contends that plaintiffs are pursuing a so-called "single incident"

theory -- the first circumstances identified in *Jenkins* above.  Regardless of which theory

plaintiffs pursue at trial, plaintiffs need to prove the risk of prohibited sexual contact was

"so obvious" that different training or supervision was required.  (Def.'s Opening Br.

(dkt. #57) 9.)   To do this, plaintiffs will have to prove that a policymaker or

policymakers had actual or constructive notice of an obvious risk.

### A.  Policymaker(s)

At summary judgment, plaintiffs focus on Nargis as a policymaker, arguing that

there is a sufficient basis for a jury to find that he was aware of the need for further

training, supervision and adoption of policies to curb sexual abuse by correctional officers

of inmates.  To qualify as a policymaker, however, it is not sufficient that Nargis "has

decisionmaking authority, even unreviewed authority, with respect to a particular

matter." *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014) (internal citations

omitted).  Instead, the County "must have delegated authority to [Nargis] to make policy

on its behalf."  *Id*.  "With an eye toward the applicable state statutes, rules, and

regulations as well as the relevant customs and practices," the Seventh Circuit directs

lower courts to consider: "(1) whether the official is constrained by policies of other

officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 799 (7th Cir. 2016) (quotation marks and internal citations omitted). Critically here, in light of Sheriff Johnson's essential abdication of any role in assuring both PREA and general sexual harassment policy compliance, the grant of authority may be *de facto*. *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 988 (7th Cir. 2013). The determination of whether a person has policymaking authority is a question for the court, which requires consideration of the particular area or issue at stake. *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 675-76 (7th Cir. 2009)

Plaintiffs allege that the County was deliberately indifferent with respect to training and the adoption of PREA-related policies, which is also the focus of the defendants. On this particular area or issue, the court agrees plaintiffs have established Nargis was a policy-maker. Indeed, the deposition testimony of Sheriff Johnson demonstrated that he fully delegated to Nargis the development and implementation of training. Even Deputy Sheriff Moe testified that *at most* he might have a hallway conversation with Nargis about training generally. At least on a *de facto* basis then, Nargis had policy-making authority over these training topics, much less PREA or sexual contract and harassment specifically.

This finding covers the development and implementation of PREA or related policies, providing notice of inmate protections and rights with respect to sexual harassment and abuse, and training of both correctional officers and inmates on those

topics.  From Sheriff Johnson's deposition testimony, he delegated to Nargis, again at least on a *de facto* basis, the authority for determining which PREA policies to adopt and to insure compliance with those policies.  As such, if plaintiffs demonstrate that Nargis acted with deliberate indifference with respect to either or both areas, then the County is similarly implicated.

The area of supervision presents a different set of facts.  Plaintiffs have failed to demonstrate that Nargis has policy-making authority with respect to the supervision of correctional officers, including whether to take certain disciplinary actions.  On the contrary, the record demonstrates that Moe was significantly involved with the supervision of correctional officers, perhaps best evidenced by Moe's involvement in the investigation of allegations involving Jorgensen, as well as with the determination of whether to take disciplinary actions.  Effectively, one could argue that Moe had policy-making authority over the supervision of correctional officers, so as to impute his knowledge of at least the allegations directed at Jorgensen to the County.  As indicated above, the parties focus on the particular area of training in their summary judgment briefing, rather than on supervision.  In light of this, the court will reserve on a finding as to whether Moe has policy-making authority over the area of supervision.

### B. Evidence of Deliberate Indifference

With that issue aside, the court now turns its attention to plaintiffs' evidence of deliberate indifference.  Viewing the evidence as a whole, the court finds that there is a sufficient basis from which a reasonable jury could find that the County was deliberately indifferent by ignoring a known or obvious risk of sexual harassment and assault of

24

female inmates by a correctional officer.  In particular, the knowledge Nargis gained about sexual comments by correctional officers to inmates and other female employees in investigating Christensen in 2002 and Jorgensen in 2012 arguably placed him on notice as to the need for further or different training, and the need to implement PREA-like policies concerning training, notice and supervision.

As an initial matter, plaintiffs point to prior allegations of sexual comments and touching by correctional officers directed to female inmates.  As detailed above in 2002, Christensen was alleged to have entered a bathroom where a female inmate was showering and to have made inappropriate, sexual comments about her body.  While Nargis investigated the allegations, he stopped short of making any definitive findings as to the allegations.  Instead, Nargis simply told Christensen to avoid entering a particular pod (presumably where the complainant was located).  According to Nargis's own notes, Christensen oddly stated that he was surprised by the inmate's allegations given that he had bought her "soda and donuts."  While this hardly seems like appropriate conduct between a jailer and inmate generally, in context, a reasonable jury could infer that Christensen's offer of soda and donuts was a possible come on, if not quid pro quo for the inmate's complacency with his inappropriate conduct, or at least Nargis had actual notice of a possible inappropriate arrangement.

More powerfully, Nargis and Moe's handling of the investigation into the allegations surrounding Jorgensen finds further support for an inference that both knew of inappropriate sexual conduct between a male correctional officer and a female inmate or other female jail employees.  Here, Nargis stated in his investigation notes that he

believed Jorgensen was lying, but Nargis and Moe opted to only issue him letters of reprimand and even down-played its significance to assuage Jorgensen's concerns. Putting aside the issue of whether the investigation and subsequent disciplinary actions were sufficient to address these allegations, jail administration apparently failed to consider whether additional training for Jorgensen on sexual harassment or increased supervision of Jorgensen, much less for correctional officers generally, was necessary. Ultimately, the record reflects that Jorgensen's resignation ended the investigation, but no assessment of whether jail policies regarding training and supervision needed to be rethought.

Plaintiffs also presented evidence to support a finding that jail administration turned a blind eye, and perhaps even fostered, a culture where inappropriate sexual comments were accepted as the norm. A number of correctional officers acknowledged in their depositions that they participated in sexualized conversations with inmates. Nargis's deposition testimony about "tier talk" further supports a reasonable inference that the County failed to take the threat of sexual harassment and assault by correctional officers seriously, even if Nargis later clarified his testimony as to whether he personally participated or heard derogatory comments about female inmates' bodies.

Finally, the circumstances surrounding the February 2014 PREA training -- the only PREA specific training available for jail employees -- also supports a finding that jail administration downplayed the importance of preventing sexual assault and harassment within the Jail. The email Nargis sent to staff the next day commented on everyone being in a "tizzy" about PREA training and described the need to only touch on the

basics.  As plaintiffs point out, correctional officers were not trained on "what constitutes sexual harassment/assault; on the policy of zero tolerance; how to fulfill their responsibilities regarding sexual abuse/harassment prevention, detection, reporting, and response; who the PREA coordinator or point person is; how to avoid creating inappropriate relationships with inmates; the dynamics of sexual abuse/harassment in confinement; how to detect and respond to signs of threatened and actual sexual abuse; and the right of inmates to be free from retaliation for reporting."  (Pls.' Opp'n (dkt. #81) 32.)

Plaintiffs further offer evidence of the County's failure to provide adequate notice to inmates on their right to be free from sexual contact and harassment, what constitutes sexual harassment, and how to report this conduct without fear of retaliation.  While the Inmate Handbook contains a statement about inmates' rights to be free from sexual harassment and abuse, the grievance policy -- the only mechanism provided for reporting such acts -- requires inmates to submit a form to the jailer on duty.   Even *after* Christensen's conduct came to light, the County refused to take steps to provide improved notice of what constitutes sexual harassment and what steps to take to report such abuse.   All of this, coupled with other evidence of insufficient training for correctional officers, supports a jury's inferring the County deliberately disregarded a known or obvious consequence of its inaction.

Outside of training, plaintiffs also contend generally that the County failed to adopt "PREA policies."  As defendant points out, there is no private right of action under the PREA.  *See, e.g.*, *Rivera v. Drake*, No. 09-CV-1182, 2010 WL 1172602, at *3 (E.D.

27

Wis. Mar. 23, 2010).  Instead, plaintiffs' reliance on the policies and guidelines in the PREA may be used to demonstrate industry standards, but this still falls short of demonstrating that the failure to adopt a policy (or all aspects of a policy) is constitutionally deficient.   More problematic, plaintiffs argue generally about the County's failure to adopt "PREA policies," but fail to detail what policies in particular are relevant, save for one:  "cross-gendered supervision."  (Pls.' Opp'n (dkt. #81) 48.)  Here, the court agrees with defendant that the County's failure to adopt PREA policies generally or cross-gendered supervision specifically does not by itself qualify as deliberate indifference, especially in light of cases rejecting cross-gendered supervision of inmates. *See Johnson v. Phelan*, 69 F.3d 144, 145-48 (7th Cir. 1995).  Of course, plaintiffs may present evidence of male correctional officers supervising female inmates to provide context for their claims.

In sum, the court finds that plaintiffs have put forth sufficient evidence from which a reasonable jury could find that the County's policy-makers were deliberately indifferent to the risk of sexual harassment and assault of inmates by correctional officers.  The court further finds that plaintiffs have put forth sufficient evidence from which a reasonable jury could conclude that there was a "causal link" between the County's deliberate indifference to training about sexual harassment, and abuse both for correctional officers and inmates and the violation of plaintiffs' constitutional rights.  Specifically, the jury could reasonably conclude that if the County had provided adequate notice and training to correctional officers and inmates on what constitutes sexual

28

harassment and abuse, and how to report it, plaintiffs may not have been sexually assaulted and harassed.

Importantly, the court is not suggesting that a jury *will* find deliberate indifference, much less causation, merely that it *could* on the record before it on summary judgment. Accordingly, the court will deny defendant's motion for summary judgment on plaintiffs' § 1983 *Monell* claims.

### C. State Law Claims

In addition to the § 1983 claim, defendant Polk County also seeks summary judgment on plaintiffs' claims against the County for negligent infliction of emotional distress and negligent supervision and training. As to those claims, the County argues it is not responsible for Christensen's acts because they fall outside of the scope of his employment.[15]

The court has no qualms in finding that Christensen acted outside of the scope of his employment, which forecloses plaintiffs' claim for negligent infliction of emotional distress based on Christensen's assault. Defendant, however, fails to explain how Christensen acting outside of the scope of his employment belies plaintiff's claim directed against the County for negligent supervision and training. In light of the court's finding that plaintiffs have put forth sufficient evidence from which a jury could find the County

---

[15] In its opening brief, the County also argued that it is entitled to immunity under Wis. Stat. § 893.80. (County's Opening Br. (dkt. #57) 22-24.) The County drops this argument its reply, however, failing to respond to plaintiffs' argument that that the ministerial duty or compelling danger exceptions apply. In light of this lapse, the court will not take up this alternate basis for summary judgment, but will allow the County to reassert it if the jury finds liability on the state law negligent training and supervision claim.

was deliberately indifferent to an obvious risk of sexual assault, the court will also allow plaintiff's claim of negligent supervision and training to go forward.

Finally, the County seeks a finding that it is not required to indemnify Christensen under Wis. Stat. § 895.46.  In light of the court's finding that Christensen was not acting within the scope of his employment, the court agrees with the County that plaintiffs' claim for indemnification fails as a matter of law.


ORDER

IT IS ORDERED that:

1) Defendant Polk County's motion for summary judgment ('428 dkt. #54; '433 dkt. #55) is GRANTED IN PART AND DENIED IN PART.  The motion is denied as to plaintiffs' § 1983 claims asserted against the County and negligent supervision in training and supervision claims.  The motion is granted as to plaintiffs' negligent infliction of emotional distress claim and the indemnification claim pursuant to Wis. Stat. § 895.46.

2) Plaintiffs' motion for leave to re-open discovery, supplement summary judgment response, investigate amendment of pleadings, continue trial date, and motion to compel and for sanctions ('428 dkt. #118; '433 dkt. #119) is GRANTED IN PART, DENIED IN PART AND RESERVED IN PART.  The motion is granted as to reopening discovery to allow plaintiffs to depose Steve Schaeffer and requiring the County to review documents again to ensure all requested documents have been produced.  The court reserves on the motion for sanctions.  In all other respects, the motion is denied.

3) Defendant Polk County is required to file a verification on or before January 10, 2017, indicating its review is complete and listing any additional documents produced to plaintiffs.

Entered this 3rd day of January, 2017.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge