UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

J.K.J.,                                    Case No. 15-CV-428-WMC

              Plaintiff,

    vs.

POLK COUNTY and
DARRYL L. CHRISTENSEN,

              Defendants.

    and

M.J.J.,                                    Case No. 15-CV-433-WMC

              Plaintiff,

    vs.

POLK COUNTY and
DARRYL L. CHRISTENSEN,                      Madison, Wisconsin
                                           January 31, 2017
              Defendants.       1:30 p.m.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF JURY TRIAL
AFTERNOON SESSION
HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY

APPEARANCES:

For the Plaintiffs:
        Eckberg Lammers, P.C.
        BY:  THOMAS J. WEIDNER
             LIDA M. BANNINK
        1809 Northwestern Avenue
        Stillwater, Minnesota  55082

           CHERYL A. SEEMAN, RMR, CRR
        Federal Reporter - U.S District Court
        120 North Henry Street, Room 410
          Madison, Wisconsin  53703
             1-608-261-5708

APPEARANCES:    (Continued)

For Defendant Polk County:
         Husch Blackwell, LLP
         BY:  CHARLES H. BOHL
         555 East Wells Street, Suite 1900
         Milwaukee, Wisconsin 53202

         Husch Blackwell, LLP
         BY:  PAUL D. CRANLEY
         33 East Main Street, Suite 300
         P.O. Box 1379
         Madison, Wisconsin  53701-1379

         Husch Blackwell, LLP
         BY:  KURT SIMATIC
         20800 Swenson Drive, Suite 300
         Waukesha, Wisconsin  53186

For Defendant Darryl L. Christensen:
         Crivello Carlson, S.C.
         BY:  SARA C. MILLS
         710 North Plankinton Avenue, Suite 500
         Milwaukee, Wisconsin  53203

Also Present:  Peter Johnson, Polk County Sheriff


                         ***

                     **I-N-D-E-X**

PLAINTIFFS' WITNESSES        EXAMINATION            PAGES

STEVEN MOE               Direct by Mr. Cranley        4-12
                         Cross by Mr. Weidner        12-12
SCOTT NARGIS             Adverse by Mr. Weidner      13-55
                         Direct by Mr. Cranley       56-71
                         Cross by Mr. Weidner        72-73
BRADLEY HOMPE            Direct by Ms. Bannink       74-87
                         Cross by Mr. Bohl          99-113
                         Redirect by Ms. Bannink   113-115
LYNELLE MANNING          Direct by Ms. Bannink     117-122
                         Cross by Mr. Bohl         123-125
                         Redirect by Ms. Bannink   125-126
STEVEN SCHAEFER          By Video Deposition       127-127


EXHIBIT DISCUSSION                                  87-94

1                    **E-X-H-I-B-I-T-S**

2   PLAINTIFFS' EXHIBITS                  IDENTIFIED   RECEIVED

3   Ex. 6   - Nargis 2/21/14 Email           32          -
    Ex. 10  - Handbook                        82          -
4   Ex. 14  - Policy Manual                   40          -
    Ex. 15  - Inmate Screening Form           37          -
5   Ex. 18  - Jorgenson Investigation         43          x
    Ex. 40  - 2010 Jail Inspection            85          -
6   Ex. 41  - 2011        "                   86          -
    Ex. 43  - 2013        "                  103          -
7   Ex. 44  - 2014        "                   "           -
    Ex. 45  - 2015        "                   "           -
8   Ex. 46  - 2016        "                   "           -

9   DEFENDANTS' EXHIBITS

10  Ex. 502 - Jail Policy C-200               64          93
    Ex. 503 - Jail Policy C-202               65          93
11  Ex. 504 - Jail Policy C-202/PREA          66          93
    Ex. 506 - Jail Policy 1-100               67          93

12

13                         * * *

14       (Called to order at 1:30 p.m.)

15          THE COURT:  You may proceed, Counsel.  Please

16  proceed.

17          MR. WEIDNER:  Your Honor, I believe I had rested.

18          THE COURT:  So that would be cross-examination --

19          MR. CRANLEY:  Thank you, Your Honor.

20          THE COURT:  -- or really direct examination.  As

21  you've probably already seen, a number of these witnesses

22  are being called adversely.  And this is now direct exam,

23  which the County is allowed to do in the plaintiff's case,

24  just as he has -- or they have with other witnesses.  You

25  may proceed.

1                    DIRECT EXAMINATION

2   BY MR. CRANLEY:

3   Q.   Mr. Moe, can you remind us again about your history

4   in the law enforcement profession?

5   A.   I started part time for the Polk County Sheriff's

6   Department in 1982.  And I worked in a part-time capacity

7   extensively until 1987, when I was given a permanent

8   position in the patrol division.  I worked patrol and

9   investigations until 1991, when I was promoted to chief

10  deputy.  And I remained in the position of chief deputy

11  until March of last year when I retired.

12  Q.   In your role as chief deputy, did you ever have

13  direct oversight of the jail; in other words, were you

14  ever in charge of the day-to-day operations of the jail?

15  A.   I wasn't necessarily in charge of the day-to-day --

16  oh, I'm sorry.  I was early in my -- after receiving

17  appointment of chief deputy on a couple of occasions.

18  There was a vacancy as jail administrator and I performed

19  that function until a replacement could be found.  And I

20  did that again several years later.  So early in my career

21  I had day-to-day responsibility, but generally in my

22  career I had oversight responsibility for the jail

23  administrator.

24          THE COURT:  So what would those two periods of

25  time have been roughly?

                    STEVEN MOE - DIRECT

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Just roughly, when would they have

3   been?

4          THE WITNESS:  Roughly a half of a year on each

5   time.

6          THE COURT:  When you said "early in your career,"

7   you're talking about what period of time?

8          THE WITNESS:  In the early to mid 90s.

9          THE COURT:  Thank you.  You may proceed, Counsel.

10  BY MR. CRANLEY:

11  Q.   And if you could scooch closer to the microphone.

12  A.   Sure.

13  Q.   Thank you.  You were asked some questions about your

14  involvement with the promotion of Scott Nargis to jail

15  captain.  Do you recall your testimony?

16  A.   Yes.

17  Q.   And I think you mentioned he had been acting jail

18  administrator for some time?

19  A.   Yes.

20  Q.   And remind us of the reason for that and how long he

21  was acting in that role.

22  A.   I don't recall exactly how long, but it was

23  extensive.  I would say it may have even been up to a year

24  or quite a while, anyway.  And he was acting jail

25  administrator because the jail administrator had a severe

                   STEVEN MOE - DIRECT

2-P-6

1  illness and was off work.

2  Q.   Did his performance in that role as acting jail

3  administrator play into the decision to hire him as the --

4  or I'm sorry, promote him to captain?

5  A.   I'm certain that it did.

6  Q.   You were asked about the training program that is

7  primarily devised by Captain Nargis, correct?

8  A.   Yes.

9  Q.   Are you aware of whether that program is reviewed at

10  all by the State of Wisconsin, Department of Corrections?

11  A.   I believe it is.

12  Q.   And has it been approved by the State of Wisconsin,

13  Department of Corrections?

14  A.   I don't want to give you the wrong answer.  Are you

15  asking me about the policies, the jail policies, or the

16  training?

17  Q.   I was asking about the training.

18  A.   Oh, training.  You know, I don't believe that there

19  is a specific training program that is dictated by the

20  State of Wisconsin.  I believe that their training is

21  generally corrections or jail related.  There may be some

22  subjects that are mandatory for the jail, but I don't

23  think that it by and large is all dictated.

24  Q.   Certain subjects are required to be covered in that

25  training for recertification purposes?

STEVEN MOE - DIRECT

1   A.   I believe so.

2   Q.   And with respect to policies, are those policies

3   reviewed by the Department of Corrections?

4   A.   I believe they are.

5   Q.   And have the Polk County policies and procedures for

6   the jail been approved by the Department of Corrections?

7   A.   I'm certain that they are.

8   Q.   I want to talk to you a little bit about the

9   Jorgenson investigation.  You indicated that you were

10  brought into the investigation by Captain Nargis on the

11  Monday after he'd received the report of the claim,

12  correct?

13  A.   Yes.

14  Q.   And that you were involved in some interviews with

15  Captain Nargis?

16  A.   Yes.

17  Q.   Do you recall about how many people were interviewed?

18  A.   A handful.  I'm going to say four or five, maybe

19  more.

20  Q.   And who were those people?

21  A.   They were female inmates that occupied the same cell

22  block as NS.

23  Q.   And what kind of information did you get from them?

24  Was it consistent?

25  A.   Well, it was not consistent.

STEVEN MOE - DIRECT

1   Q.    Can you describe some of the responses that you got

2   from them in interviewing them about the incident that NS

3   had reported?

4   A.    Well, I probably can't tell you who said what.  But I

5   know that our information that we received was

6   inconsistent in the sense that some of the inmates

7   suggested that there's nothing -- there was no friendship

8   or favoritism going on and some said yes that there was.

9         In fact some suggested that there was hand-touching

10  or, I believe in one case, some suggested that Jorgenson

11  touched the inmate's butt.  And there was a number of

12  allegations that were made and then there was a number of

13  that said no, there was nothing going on.

14  Q.    Did one or more of those inmates say that they did

15  not believe that there was any physical relationship

16  between Jorgenson and the inmate NS?

17  A.    Yes, I believe so.

18  Q.    You mentioned that when you reached a conclusion in

19  that investigation you believed that Jorgenson had

20  fostered a relationship with the inmate; do you recall

21  that?

22  A.    I do.

23  Q.    Was that -- did you believe that he had fostered a

24  sexual relationship with that inmate?

25  A.    No.  I believe he fostered a friendship relationship.

STEVEN MOE - DIRECT

2-P-9

1  Q.   Can you explain what it was that you believed had

2  been the nature of that relationship?

3  A.   Well, we believed that Allen had given undue, unfair

4  or simply too much attention to one of the female inmates

5  and that would be NS.

6  Q.   And at the time you made your disciplinary decision

7  to write a letter of reprimand, you had not yet heard from

8  inmate NS that she changed her story, correct?

9  A.   That's correct.

10  Q.   And what, if anything, did you do to investigate

11  further once you received that letter in which she changed

12  her story?

13  A.   I think most significantly perhaps the only thing was

14  to get back together with the Sheriff and I and Captain

15  Nargis and reevaluate and relook at the situation and look

16  at NS's letter and re -- take a whole fresh look at the

17  entire situation.

18  Q.   And what conclusion did you come to after taking that

19  fresh look?

20  A.   Well, we came to the conclusion that we were going to

21  maintain our original letter -- our original discipline

22  against Allen -- against Mr. Jorgenson.

23  Q.   Why did you believe that was the appropriate level

24  discipline to give him?

25  A.   Well, it's where our comfort level lied and that we

STEVEN MOE - DIRECT

1  felt that we may have had a difficult time proving

2  anything other than that.  We considered Mr. Jorgenson's

3  previous work history.  We just felt that newer

4  circumstances didn't significantly change the situation

5  and we maintained the level of reprimand for that

6  discipline.

7  Q.   Did you believe you had evidence on which you could

8  conclude that in fact there had been improper touching by

9  Jorgenson of inmate NS?

10 A.   No.

11 Q.   Why not?

12 A.   Just based on the credibility of everybody who was

13 interviewed and people that we spoke to.  It was very

14 difficult.  It was very difficult to know who to believe

15 and how much weight to put on each individual person that

16 we interviewed.

17 Q.   Why didn't you call DCI or some other outside

18 investigating body to pursue criminal charges?

19 A.   Well, we didn't believe that we had sufficient

20 evidence that would support a criminal charge.

21 Q.   And how many years have you been in law enforcement?

22 A.   Well, altogether, since 1982.

23 Q.   You were asked about a comment in the file that a

24 letter of reprimand was not a major deal.  Do you recall

25 that testimony?

STEVEN MOE - DIRECT

1   A.    I do.

2   Q.    Can you explain what you meant by that comment?

3   A.    Well, in the summary of the report it indicates that

4   either I or Captain Nargis or one of us, or perhaps both,

5   suggested to Allen that a letter of reprimand was not a

6   big deal.  But we had just concluded an investigation that

7   was stressful for Allen, it was stressful for us, it was

8   stressful for the inmates and for the co-workers and we

9   wanted to put that issue to rest.

10      After having confronted Allen, we felt that it was

11  important that we recognize and support Allen's prior work

12  history.  He was a good employee.  He was a go-to

13  employee.  We appreciated his efforts and his work, so we

14  wanted to salvage him as an employee.  He had, prior to

15  that, a good work record.

16      And we wanted Allen to know that, yes, you have

17  discipline on your record and it's -- it will follow you,

18  but a letter of reprimand is not the end of the world.

19  With your work record and you try hard and work hard, you

20  can recover from discipline in your file.  So in that

21  sense, a letter of reprimand wasn't a big deal.

22  Q.    Had you ever had occasion to investigate, prior to

23  the Jorgenson investigation, another incident of alleged

24  improper touching by a jail officer of an inmate at Polk

25  County Jail?

STEVEN MOE - DIRECT

 1  A.   No.

 2  Q.   And up until the time of the investigation of

 3  Mr. Christensen, did you have any other occasions to

 4  investigate improper touching allegations of that nature?

 5  A.   No.

 6          MR. CRANLEY:  Nothing further.  Thank you.

 7          THE COURT:  Any questions for this witness?

 8          MS. MILLS:  No, Your Honor.

 9          THE COURT:  Recross?

10                   CROSS-EXAMINATION

11  BY MR. WEIDNER:

12  Q.   You said that you wanted to recognize Allen's prior

13  work history with the Polk County Jail, is that correct,

14  the letter of reprimand?

15  A.   Yes.

16  Q.   And is that why -- is a letter of reprimand the least

17  severe disciplinary action that Polk County has?

18  A.   A verbal reprimand is considered the least form of

19  discipline.

20  Q.   This is one step up, is a written reprimand?

21  A.   Yes, sir.

22          MR. WEIDNER:  No further questions.

23          THE COURT:  All right.  You may step down then.

24  Thank you.

25          THE WITNESS:  Thank you, Your Honor.

                    STEVEN MOE - DIRECT/CROSS

1      (Witness excused at 1:46 p.m.)

2          THE COURT:  And the plaintiff may call its next

3  witness.

4          MR. WEIDNER:  Captain Scott Nargis.

5          THE COURT:  I think you're discharged.  There's

6  no need for Mr. Moe to stick around?  You're discharged.

7  Thank you, very much.

8          THE WITNESS:  Thank you.

9          THE COURT:  As you've obviously figured out,

10  Captain Nargis is one of those who are a sequestered

11  witness.  You can come straight forward.  Either way is

12  good, actually.  And just come around here and stand

13  before the court reporter, who will swear you in.

14      **SCOTT NARGIS, PLAINTIFFS' WITNESS, SWORN**

15          THE COURT:  You may proceed.

16          MR. WEIDNER:  Thank you, Your Honor.

17          THE COURT:  If you would just slide forward near

18  the mic, it makes it easier for the reporter.

19                  AVERSE EXAMINATION

20  BY MR. WEIDNER:

21  Q.   Mr. Nargis, you were first hired with the -- do you

22  mind if I call you *Mr. Nargis* or would you prefer *Captain*

23  *Nargis*?

24  A.   Either is fine, sir.

25  Q.   Mr. Nargis, you were first hired with the Polk County

SCOTT NARGIS - ADVERSE

1  Sheriff's Department in 1998?

2  A.    Yes, sir.

3  Q.    And when you were first hired, you were hired as a

4  jail officer?

5  A.    A dual role of jail and dispatch.

6  Q.    What role did you have with dispatch?

7  A.    Receiving incoming phone calls to the department, 911

8  calls, dispatching officers, recordkeeping of their calls,

9  fire, ambulance.

10 Q.    Would that be in the communications division of the

11 Sheriff's Department?

12 A.    Yes.

13 Q.    And were you a sworn peace officer?

14 A.    No, sir.

15 Q.    Have you ever been a sworn peace officer in the state

16 of Wisconsin?

17 A.    No, sir.

18 Q.    And you went through some initial jail training, jail

19 officer certification training, when you were hired

20 somewhere near 1998; is that correct?

21 A.    Yes, sir.

22 Q.    And you got your certification?

23 A.    Yes, sir.

24 Q.    And you've completed all the training processes to

25 maintain a current certification since that time?

SCOTT NARGIS - ADVERSE

1  A.   Correct.

2  Q.   You were promoted to sergeant, jail sergeant, in

3  2001?

4  A.   Yes, sir.

5  Q.   And when you were promoted to jail sergeant did you

6  take any additional professional training for any sort of

7  jail administration?

8  A.   There was a week-long jail leadership class at the

9  technical college in Rice Lake.

10  Q.   And the technical college in Rice Lake, was that when

11  you first started as a sergeant?

12  A.   Shortly after I was promoted, yes.  I don't recall

13  when specifically.

14  Q.   In some of the information there that you were given

15  were principles of subject control from an instructor; is

16  that right?

17  A.   No, sir.

18  Q.   What did you learn at that one-week school?

19  A.   I don't recall the specifics.  I do remember

20  particular styles of leadership were covered, a broad

21  range of topics.

22  Q.   The training that's provided in the jail is

23  determined -- the subject matter and frequency is

24  determined by you; is that correct?

25  A.   Currently, yes.

1    Q.    And it has been since you've been jail captain?

2    A.    Yes.

3    Q.    Do you review the subject matter with any of your

4    superior officers prior to the implementation of those

5    trainings?

6    A.    Not usually, no.

7    Q.    Is it up to you to determine the schedule or do you

8    review that with a superior officer?

9    A.    I'm sorry.  Do you mean the training schedule?

10   Q.    Yes.

11   A.    That's up to me, in part.

12   Q.    You brought a lot of the training in -- a lot of the

13   training was brought in-house, is that correct, to Polk

14   County?

15   A.    It's done in-house, the majority of it, yes.

16   Q.    And you are an instructor in three different areas;

17   is that correct?

18   A.    Currently I'm only certified to instruct in two

19   areas.

20   Q.    And what are those?

21   A.    Principles of subject control and professional

22   communication skills.

23   Q.    You have previously been a Taser instructor?

24   A.    Yes, sir.

25   Q.    And you no longer have that certification?

SCOTT NARGIS - ADVERSE

1   A.   Correct.

2   Q.   Who does the Taser training within your department?

3   A.   The entire department or just the jail division?

4   Q.   Jail division.  I apologize?

5   A.   Currently it's Officer Stacey Ptacek.

6   Q.   And when did you quit operating as the Taser

7   instructor?

8   A.   If I'm not mistaken, my certification lapsed last

9   year.

10  Q.   So would it have been -- you would have been the

11  Taser instructor up to last year?

12  A.   Through 2015, yes, one of them.

13  Q.   The other types of training that are given to

14  correctional officers at Polk County are CPR training

15  every two years?

16  A.   Yes, sir.

17  Q.   You do Taser training every year?

18  A.   Yes, sir.

19  Q.   You do suicide prevention training every year?

20  A.   Yes, sir.

21  Q.   You do risk factor identification training every

22  year?

23  A.   Yes, sir.

24  Q.   Blood borne pathogens every year?

25  A.   Yes, sir.

1    Q.    Medication distribution every year?

2    A.    Yes, sir.

3    Q.    And fire safety every year?

4    A.    Correct.

5    Q.    Are there any others that you can think of right now

6    that you do every year other than that list?

7    A.    I believe that is a complete list.

8    Q.    Some of the other trainings that you do are handling

9    rule violation procedures?

10   A.    Yes, sir.

11   Q.    The other training, disciplinary actions of inmates?

12   A.    Yes, sir.

13   Q.    Cutting down hanging inmates who may have hung

14   themselves in their cells?

15   A.    Yes, sir.

16   Q.    As well as physical struck practice?

17   A.    Correct.

18   Q.    Those are not required trainings, correct?

19   A.    Correct.

20   Q.    The other ones that I referred to are required

21   trainings by the State of Wisconsin certification program,

22   correct?

23   A.    No, sir.  Some are -- one is required by county

24   policy.  That would be the blood borne pathogens.  The

25   others are not required by the Training Standards Bureau

1  or the Law Enforcement Standards Board; they're required

2  by the Department of Corrections.

3  Q.   So the discretionary trainings, those subject matters

4  are determined by you --

5  A.   Yes, sir.

6  Q.   -- or the Polk County Jail?

7  A.   Yes, sir.

8  Q.   You have approximately 20 topics selected and

9  extracted from your policy manual that you do a daily

10 training program on; is that right?

11 A.   It's more like 90 topics, sir.

12 Q.   Did I say --

13 A.   20.

14 Q.   Oh, I'm sorry.  I thought I said 90.  90 topics?

15 A.   Yes, sir.

16 Q.   And those topics, do you maintain a list of what

17 those topics are?

18 A.   Yes.

19 Q.   And those 90 topics are a revolving number of

20 different policies, correct, that the county jail employs?

21 A.   Different sections of the *Policy and Procedure*

22 *Manual*, yes, sir.

23 Q.   And that list -- you basically give to someone a

24 calendar that says, "I want you to read these, the

25 following policy sections, and tell me what policy" --

1  "the heading of the policy section," correct?

2  A.   They're provided with a calendar.  Each day has a

3  number associated with it.  There is a shared drive on the

4  county computer system where they have to go into a folder

5  that's associated with that number; say, 25 for example.

6  Once they open that document, yes, they need to place the

7  title -- write the title in the box for that day, read the

8  document and then sign and verify that they have read it.

9  Q.   And you have control of that information?

10  A.   Yes, sir.

11  Q.   Do you know whether or not there was any -- which

12  specific topics were trained on at which specific dates?

13  A.   I can go back to the master calendar and discern

14  that, yes.

15  Q.   Have you, since the time of this action, gone back to

16  the master calendar to discern that?

17  A.   I'm sorry.  I don't understand your question.

18  Q.   Let's say since the time Darryl Christensen resigned

19  from the Polk County Jail, have you, from today's date

20  back to that date, have you gone through that master

21  calendar in Polk County to determine what subject matters

22  were in fact trained on?

23  A.   I didn't specifically set out to do that, but I do

24  that every month when I collect them from the staff.

25  Q.   And do you have that information with you today?

SCOTT NARGIS - ADVERSE

1  A.    No, sir.

2  Q.    Have you reviewed that information in preparation for

3  this trial?

4  A.    Not specifically in preparation for this, no.

5  Q.    And do you know -- when was the last time you

6  reviewed it?

7  A.    It would have been the first part of January to

8  review December's training from the staff.

9  Q.    Do you only review the previous month's?

10  A.    Yes.

11  Q.    Have you gone back and reviewed all of those subject

12  matters that you've trained on since Dale Christensen

13  resigned?

14  A.    I review them every month from the previous month.

15          THE COURT:  You're saying aside from your

16  standard practice of reviewing it at the beginning of each

17  month, the training of the prior month, have you made any

18  other effort to go back again and look again at any of

19  those materials?

20          THE WITNESS:  No, sir.

21          THE COURT:  Next question.

22  BY MR. WEIDNER:

23  Q.    You attend an annual -- oh, that information that you

24  receive on a daily basis that they fill out or that you

25  check on, that doesn't mean that they actually read the

1  policy, correct?

2  A.   They attest to the policy manual itself or to the

3  particular document associated with that daily topic.

4  Q.   Well, they particular identify daily policy?

5  A.   It's a topic; it's not a specific policy.  It is a

6  section out of the different policy areas.

7  Q.   All right.  But there's no proof that they actually

8  read the content of the policy by that recording process,

9  correct?

10  A.   Aside from them signing the bottom of the document

11  verifying that they have, no.

12  Q.   Would it surprise you if Mr. Christensen usually

13  didn't read the content of the policies?

14  A.   I would be surprised by that, yes.

15  Q.   You didn't, in the process of the transfer of your

16  job from one jail administrator to the next, did you

17  receive any training from -- I believe it's Cindy Moore?

18  A.   I did not.

19  Q.   She's a prior jail administrator?

20  A.   Correct.

21  Q.   Did you receive any on-the-job training from

22  Deputy Moe?

23  A.   Specifically related to transferring into the jail

24  administrator's position, no.

25  Q.   You attend annual jail administration conferences; is

2-P-23

1  that correct?

2  A.    When I can, yes.

3  Q.    And you've done so since approximately 2010?

4  A.    Excuse me.  Yes, with the exception of October this

5  past year.

6  Q.    You did at least through the time that Darryl

7  Christensen resigned from the Polk County Jail?

8  A.    Yes, sir.

9  Q.    And when you go to those conferences you attend

10  breakout sessions; is that correct?

11  A.    Yes, sir.

12  Q.    And I think one of the breakout sessions you like to

13  go to is an individual named *Gordon Graham*; is that

14  correct?

15  A.    Yes, sir.

16  Q.    And Gordon Graham teaches an idea or principle of

17  high-risk, low-frequency training; is that right?

18  A.    Yes, sir.

19  Q.    And that means that -- I think that things that are

20  low risk aren't generally going to get you in trouble; I

21  think you've said that in the past; is that right?

22  A.    Yes, sir.

23  Q.    So you train in the high-risk situations?

24  A.    High-risk or low-frequency situations.

25  Q.    And what would a low-frequency situation be?

```
 1  A.    A particular low-frequency situation, which also
 2  happens to be a high-risk, would be an inmate suicide
 3  attempt.
 4  Q.    So you train -- you focus training on that?
 5  A.    That's what the daily training program is designed
 6  for, is to focus on those areas of the policy, yes.
 7  Q.    Sexual assault in prisons you don't determine to be a
 8  high risk; is that correct?
 9  A.    I don't work in a prison, sir.
10  Q.    I'm sorry.  I stand corrected.  I mean your jail.
11  A.    I disagree with that statement.
12  Q.    You believe that it is a -- do you believe that
13  sexual assault in jails is a high-risk situation?
14  A.    Certainly.
15  Q.    You also believe it's a low-frequency situation?
16  A.    Yes, sir.
17  Q.    According to Mr. Graham or that principle, those are
18  the items that you would train on, correct?
19  A.    High risk, low frequency, yes.
20  Q.    And you focus training on that, on high-risk,
21  low-frequency situations?
22  A.    That's what the daily program is intended to do, yes.
23  Q.    Have you ever been to -- you are in charge of
24  policies and procedures that go into your jail manual,
25  correct?
```

1   A.   Yes, sir.

2   Q.   And your jail manual section C-202 covers

3   fraternization with inmates/PREA; isn't that correct?

4   A.   I believe that is the correct policy section, yes.

5   Q.   And was it your decision to change, in July of 2012,

6   or revise section C-202 to include the word *PREA*?

7   A.   Yes, sir.

8   Q.   Now, you are not required by federal law to implement

9   PREA in your jail, correct?

10   A.   To my understanding, yes.

11   Q.   And you elected to put this section in on PREA; isn't

12   that correct?

13   A.   Yes, sir.

14   Q.   No one mandated it, no one required it, correct.

15   A.   Correct.

16   Q.   This is a policy you adopted and initiated within

17   your program, correct?

18   A.   Correct.

19   Q.   Have you ever had any or been to any specific

20   training on PREA?

21   A.   No specific training that I can recall.

22   Q.   But you do recall discussions that you had at the

23   regional jail administrators meeting on PREA, correct?

24   A.   I do recall that it came up a number of times, yes.

25   Q.   And at those meetings -- and for the jury's

1  information, the regional jail administrators meetings are

2  put on by whom?

3  A.   I can only speak for the region that we're in, but

4  that has always been facilitated by the jail inspector

5  with the Office of Detention Facilities of the Department

6  of Corrections.

7  Q.   And one of the people that -- I believe your jail

8  inspector was Mr. Hompe, correct?

9  A.   For a time, yes.

10  Q.   He's no longer your jail inspector, but throughout

11  the period of time during these sexual assaults --

12  A.   Excuse me.

13  Q.   Do you need to get some water, sir?

14  A.   I'm fine.  Thank you.

15        THE COURT:  There is some to your right if you

16  want it.

17        THE WITNESS:  Thank you, Judge.

18  BY MR. WEIDNER:

19  Q.   The time that we're talking about between 2011 and

20  2014 Mr. Hompe was your jail inspector, correct?

21  A.   I don't recall when he started, but I believe that is

22  an accurate statement.

23  Q.   And when you went to these regional jail

24  administrators conferences at times they discussed PREA or

25  the PREA standards, correct?

1  A.    In a broad sense, yes.

2  Q.    Did you ever receive any materials on the PREA

3  standards?

4  A.    I don't -- I can't say that I received materials on

5  PREA standards.  I have sought out information on PREA

6  myself.

7  Q.    Were they offered to you at anytime in your regional

8  jail administrators meeting by Mr. Hompe?

9  A.    I don't recall.

10  Q.    You're not denying or agreeing to that; is that

11  correct?

12  A.    That's correct.

13  Q.    Did you ever go to an annual jail administrators

14  conference?

15  A.    Yes.

16  Q.    Did you receive any information regarding PREA

17  standards at the jail administrators conference?

18  A.    Not that I recall.

19  Q.    The same thing: you're not admitting or denying,

20  correct?

21  A.    Correct.

22  Q.    I believe, sir, you indicated previously it was

23  discussed more frequently, meaning PREA was discussed more

24  frequently, near the implementation of PREA, correct?

25  A.    Correct.

1  Q.    And do you mean by "implementation of PREA," do you

2  mean when those standards were put into effect in 2012?

3  A.    Yes, sir.

4  Q.    So you were aware that PREA existed prior to its

5  implementation or passing it in 2012, correct?

6  A.    In broad terms, yes.

7  Q.    You knew it was coming?

8  A.    Yes.

9  Q.    People had talked about it?

10 A.    Yes.

11 Q.    In fact were you aware that it was originally enacted

12 in 2003 and they were doing studies and programs up to

13 about 2012?

14 A.    I couldn't have told you it was 2003, but I did know,

15 yes, it had been enacted earlier.

16        THE COURT:  And when you say "it had been

17 enacted," you mean the statute itself, not the standards?

18        MR. WEIDNER:  Correct.

19 BY MR. WEIDNER:

20 Q.    And you did nothing to prepare for that

21 implementation, correct?

22 A.    That's not correct.

23 Q.    So during these frequent conversations, isn't it true

24 that you told me in your deposition that you did nothing

25 to prepare for its implementation?

SCOTT NARGIS - ADVERSE

1  A.   I may have said that.  But as you just noted, the

2  PREA section was added to the jail policy prior to the

3  standards being enacted.

4  Q.   And when were those standards enacted?

5  A.   It was August of 2012.

6  Q.   When you put those standards, PREA standards, into

7  your policy, had you had any training on how to implement

8  those standards?

9  A.   No, sir.

10  Q.   Did you provide any training to your staff between

11  the time you put those standards into your policy, PREA

12  standards, and its implementation?

13  A.   Specific training, no.

14  Q.   Now, isn't it true, sir, that you believe that you

15  can't do all of what PREA standards are out there,

16  correct, you can't implement them all?

17  A.   I'd say it's a more accurate statement that I don't

18  believe it's feasible in a small county jail to enact them

19  all.

20  Q.   And that, sir, is because of the other budgetary

21  constraints?

22  A.   In part, yes.

23  Q.   And it is too expensive to implement some of those

24  standards identified in PREA?

25  A.   Some, in my opinion, yes.

SCOTT NARGIS - ADVERSE

1  Q.   And which standards are those, sir?

2  A.   Specifically off the top of my head, having an audit

3  from an outside PREA expect is one of those areas.  Just

4  off the top of my head I can't think of anything else

5  right now.

6  Q.   Did you designate a PREA officer in your facility?

7  A.   No, sir.

8  Q.   Would that cost any money --

9  A.   I believe so.

10  Q.   -- to identify an individual to know PREA?

11  A.   To identify them, no.

12  Q.   Are there any other standards in PREA that you're

13  aware of that you could not attain due to budgetary

14  constraints at the Polk County Jail other than the one you

15  identified with an auditor?

16  A.   Off the top of my head I can't think of it.

17  Q.   Did you ever discuss the implementation of PREA with

18  the Sheriff prior to putting it in the policy manual?

19  A.   I know we have discussed it.  I can't tell you if it

20  was before or after the addition to the policy manual.

21  Q.   The Sheriff's time is too valuable to cover each

22  point of PREA; isn't that correct?

23  A.   It's a matter of opinion.

24  Q.   Didn't you tell me that in your deposition?

25  A.   I very well may have, sir.  I can't recall

1  specifically.

2  Q.   The one training session that you have had regarding

3  PREA was a session that you had in -- for your staff, was

4  in February of 2014, correct?

5  A.   Yes, sir.

6  Q.   That's roughly 18 months after you put it in your

7  policy manual?

8  A.   Yes, sir.

9  Q.   And you conducted that training yourself, correct?

10  A.   Correct.

11  Q.   And you conducted that training without handing out

12  any materials on PREA, correct?

13  A.   I believe that is correct.

14  Q.   You covered PREA by orally and not showing a

15  presentation, correct?

16  A.   I believe that's correct.

17  Q.   You don't -- isn't it true, sir, you do not know how

18  long that PREA presentation lasted on February -- in

19  February of 2014, correct?

20  A.   That is correct.

21  Q.   You did in fact send out an e-mail after that

22  training session, for those that weren't in attendance and

23  for those that were in attendance, to summarize what the

24  training was; isn't that correct?

25  A.   Yes, sir.

1  Q.   And in fact Mr. Christensen never attended that

2  meeting, did he?

3  A.   That's correct.

4        MR. CRANLEY:  Your Honor, objection.  I think

5  we're -- it seems cumulative at this point and I object to

6  relevance.

7        THE COURT:  I'm inclined to agree, but I'll give

8  you some limited leeway to wrap this up.

9        MR. WEIDNER:  Somehow this is off.

10       THE COURT:  You want that screen on?

11 BY MR. WEIDNER:

12 Q.   I'm showing you what's been marked as Exhibit 6.

13 This front page is identified as 636.  This is an e-mail

14 that was sent to a variety of jail staff on February 21st,

15 2014; isn't that correct?

16 A.   Yes, sir.

17 Q.   And you in fact state it's a summary of yesterday's

18 training or "recap," as you state.  You identify under the

19 "PREA (Prison Rape Elimination Act)."  You identify in

20 that first sentence, it "Seems that everyone is in a tizzy

21 to train their staff on PREA."  Sir, who are you referring

22 to when you say "everyone" in that sentence?

23 A.   I believe I mentioned to the staff, going off this

24 outline, that I was referring to the other jail

25 administrators in the state that were communicating about

1  it via our closed e-mail system.

2  Q.   And when you say "tizzy," do you use that term in a

3  sense of there's a sense of urgency?

4  A.   No, sir.

5  Q.   How is it that you use that word, sir?

6  A.   I use that word to mean that there's a bit of a

7  scramble for, in this particular case, time and attention

8  that seemed to be misplaced.

9  Q.   So you identified then that you believed -- you

10  identify you'll hit the basics of PREA training, correct?

11  A.   Yes.

12  Q.   And who was it that identified those three items

13  beneath it as the *basics*?  Is that your synthesis?

14  A.   Yes, sir.

15  Q.   And you believed the basics to be "Do not

16  allow/condone inappropriate contact between inmates"; is

17  that correct?

18  A.   That is one of them, yes.

19  Q.   The second one is "Do not allow/condone/engage in

20  inappropriate contact between staff & inmates," correct?

21  A.   Yes.

22  Q.   And the third is, "If someone (staff or inmate)

23  presents a concern about inappropriate contact, report it

24  to me," correct?

25  A.   Yes, sir.

1  Q.   That's the extent of the training, correct?

2  A.   I can't say whether we spoke any more, if discussion

3  went off on a tangent from those bullet points or not.

4  Q.   You can't -- you won't deny or admit that there was

5  any more training, correct?

6  A.   I can't say, yes.

7  Q.   Have you had discussions with the jail

8  administrator -- excuse me, I'm sorry, the jail inspector

9  regarding PREA standards?

10 A.   It has come up in discussions, yes.

11 Q.   Has it come up in personal discussions between the

12 two of you or in a general discussion setting?

13 A.   Both.

14 Q.   Have you read all of the PREA standards that apply to

15 jails?

16 A.   I can't recall with certainty if I've read all of

17 them.

18 Q.   This e-mail that I had just read or -- strike that.

19 The information that you're providing to your staff on

20 PREA is what was given to you orally by the jail

21 inspector, Brad Hompe; isn't that correct?

22 A.   No, sir.

23 Q.   And what did you base your training on?

24 A.   PREA itself.

25 Q.   Sir, you don't recall whether or not you've read all

```
 1   of PREA that applies to your jails, correct?

 2   A.    Correct.

 3   Q.    Sir, you also disagree with the safety item of PREA

 4   standard, correct?

 5   A.    Yes.

 6   Q.    And that safety item is that you don't think it's a

 7   safe practice for a guard to announce entry into a cell or

 8   something to that effect; is that correct?

 9   A.    Correct.

10   Q.    And are there any other -- that's for safety reasons

11   of the guard, correct?

12   A.    Yes.

13   Q.    And are there any other safety concerns that you have

14   with PREA standards that you can think of at this point?

15   A.    Not that I can think of right now, no.

16   Q.    Do you know whether or not it's a principle of the

17   PREA standards to give information to incoming inmates in

18   the jail?

19   A.    I believe it is.

20   Q.    And to identify that they should be free from sexual

21   assault?

22   A.    Yes.

23   Q.    And do you agree with the PREA principle or standard

24   that says it's a zero tolerance workplace?

25   A.    Yes, sir.
```

1  Q.   Zero tolerance for sexual assault?

2  A.   Yes.

3  Q.   Zero tolerance for sexual harassment?

4  A.   Yes.

5  Q.   Have you ever been offered PREA posters that say

6  such, by Mr. Hompe, the jail inspector?

7  A.   I don't believe I was ever offered that by Mr. Hompe.

8  Q.   Did you know they exist?

9  A.   Yes.

10  Q.   Did you ever put any up to inform your inmates in the

11  jail?

12  A.   No.

13  Q.   And you didn't do this for multiple reasons, correct?

14  A.   Correct.

15  Q.   And I think you've told me in the past you didn't do

16  this because you think that inmates can hide contraband

17  behind them, correct?

18  A.   Correct.

19  Q.   And that you think they may tunnel out behind those

20  PREA posters, correct?

21  A.   Not that they might tunnel out, but there could be

22  damage to the facility it's hiding.

23  Q.   I think your specific words to me, sir, were they

24  could tunnel out; do you recall that?

25  A.   I do recall that.

SCOTT NARGIS - ADVERSE

1   Q.   Have you seen the size of the PREA poster?

2   A.   Yes.

3   Q.   How large are PREA posters?

4   A.   I can't say.  One foot by two and-a-half feet

5   perhaps.  There's -- my understanding is there's a number

6   of different sizes.

7   Q.   Would there be a budgetary constraint to putting up a

8   PREA poster?

9   A.   Nothing comes to mind.

10  Q.   Would there be a budgetary constraint on the inmate

11  process -- inmate screening process to provide them

12  information on PREA?

13  A.   They are provided information.

14  Q.   And the information that you're speaking of, sir, is

15  in the handbook, correct?

16  A.   Correct.

17  Q.   At the bottom of page 10 of the handbook, correct?

18  A.   I believe that's the page number.

19  Q.   Sir, I'm showing you what's been admitted into

20  evidence as Exhibit 15.  Whoops.  Do you recognize that,

21  sir?

22  A.   I do.

23  Q.   Now, that's an inmate screening form that is filled

24  out by one of your jailers on intake, correct?

25  A.   In addition to the transporting officer, yes.

SCOTT NARGIS - ADVERSE

 1   Q.    And I don't know what you mean by that, sir, because

 2   my question is specifically, it's filled out by an intake

 3   officer?

 4   A.    As well as a transport officer.

 5   Q.    Okay.  Do you mean at the same time two people are

 6   talking to this individual?

 7   A.    No, no, sir.  The arresting or transporting officer

 8   is responsible for completing the top portion of the form

 9   in relation to anything that may have happened during that

10   time of transport.  The intake officer is responsible for

11   completing the bottom portion.

12   Q.    I get it.  So you have an intake person sit down and

13   at least go through the bottom portion of that form,

14   correct.

15   A.    Correct.

16   Q.    And do you anywhere -- do they sit down and ask any

17   other questions other than filling this form out?

18   A.    Yes.

19   Q.    And what form is that?

20   A.    There's an inmate medical screening that produces a

21   form, but there are numerous other questions they obtain

22   their information from booking.

23   Q.    Now, they sit down and spend quite a bit of --

24   somebody from your jail facility sits down and spends

25   quite a bit of time with an inmate on booking -- in

1    booking, correct, on intake?

2    A.    Yes.

3    Q.    At least 15 minutes?

4    A.    It varies.

5    Q.    Is it more than 15 minutes?

6    A.    Generally, yes.

7    Q.    All right.  So my assumption that at least 15

8    minutes, but maybe more.  Does the jail officer spend more

9    than 20 minutes on intake with a --

10   A.    It depends.

11   Q.    Would they spend less?

12   A.    Yes.

13   Q.    But not less than 15?

14   A.    It depends.

15   Q.    At any time there are they shown any sort of -- are

16   inmates shown videos regarding how to remain free from

17   sexual assault?

18   A.    No.

19   Q.    At intake no?

20   A.    No, sir.

21   Q.    Are they ever during their incarceration?

22   A.    I can't speak for what they turn on the TV, but we

23   don't provide a video, no.

24   Q.    Is there anywhere in your initial intake process that

25   any one of your staff reviews the inmate handbook with,

1  page by page, with the inmate?

2  A.   I can't tell you with accuracy what every one of my

3  jail staff -- how they perform the intake process.   I

4  don't believe any go over the handbook with them, just

5  instruct them to read it.

6  Q.   You have a uniform -- you try to maintain uniform

7  processes, correct?

8  A.   Correct.

9  Q.   So generally speaking, to the best of your

10  information, your guard or your jail staff does not review

11  the inmate handbook page by page with the inmate?

12  A.   That's correct.

13  Q.   So you don't know whether or not the inmates would

14  ever read page 10 of this 12-page document?

15  A.   There's no way I could know that.

16  Q.   And would you agree, sir, that it's been stated

17  before that the policy manual, which is Exhibit 6 -- or

18  14, excuse me, and the multiple policies in here are never

19  handed to an inmate?

20  A.   Correct.

21  Q.   Sir, you believe that Darryl Christensen was liked by

22  his co-workers; isn't that correct?

23  A.   I believe he was, yes.

24  Q.   You've identified his performance as, day to day, as

25  lackadaisical?

1    A.    Yes.

2    Q.    You also identify that he likes to have a good time,

3    correct?

4    A.    Correct.

5    Q.    And that his rapport with his co-workers was good,

6    correct?

7    A.    Correct.

8    Q.    Sir, how many sexual harassment or sexual assault

9    allegations have you had to investigate in your jail over

10   time?

11   A.    I would say one.

12   Q.    And is that Allen Jorgenson?

13   A.    Yes, sir.

14   Q.    And Allen Jorgenson is a friend of yours, correct?

15   A.    We're friendly.

16   Q.    And Mr. Jorgenson is no longer employed at the Polk

17   County Jail?

18   A.    Correct.

19   Q.    And you did an entire investigation into Allen

20   Jorgenson's conduct, correct?

21   A.    Myself and Chief Deputy Moe, yes.

22   Q.    We've heard a lot of testimony with regard to that,

23   so I'm going to try to condense that, okay?  You

24   interviewed -- you were informed that there may be a

25   problem of an inappropriate relationship that Darryl

SCOTT NARGIS - ADVERSE

2-P-42

1  Christensen -- or excuse me, Allen Jorgenson had with an

2  inmate identified by initials NS?

3  A.   Correct.

4  Q.   You investigated that, correct?

5  A.   Yes.

6  Q.   You found out that Allen Jorgenson takes an extended

7  amount of time when he's working in the max -- master

8  control to affix a camera on the minimum security area

9  known as K pod, correct?

10 A.   There were three, I believe it was, three separate

11 occasions while he was working in master control that I

12 checked, yes.

13 Q.   In each of those three times that you checked when he

14 was working in master control you came to the conclusion

15 he had affixed an inordinate amount of time on K pod where

16 the women are housed in minimum security, correct?

17 A.   Correct.

18 Q.   You didn't look up any more, did you?

19 A.   No, sir.

20 Q.   So the three that you looked at, you found to be true

21 that's what he did, correct?

22 A.   It appeared to be an inordinate amount of time, yes.

23 Q.   There is also an allegation, sir, that Mr. Jorgenson

24 touched the buttocks of an inmate, correct?

25 A.   Correct.

1   Q.    Showing you the front of Exhibit 8 -- 18, excuse me,

2   can you see that document?

3   A.    Yes, sir.

4   Q.    Do you know what that document is?

5   A.    Yes, sir.

6   Q.    What is that document?

7   A.    This document was generated following the

8   disciplinary process for Officer Jorgenson detailing, as

9   you can see, each of the individual questions, essentially

10  a checklist to make sure that we were thorough in the

11  investigation and all things were considered for the

12  decision we've made.

13  Q.    Did you fill that document out?

14  A.    Yes, sir.

15  Q.    You prepared that document.  And do you store that

16  document, in the ordinary course of your business, at the

17  Polk County Jail?

18  A.    Yes, sir.

19  Q.    Sir, the initial portion of this was a summary that

20  you completed and the second page of that appears to

21  have --

22          MR. WEIDNER:  Your Honor, for the Court --

23          MR. CRANLEY:  He's already overruled our

24  objections.

25       (Discussion held off the record.)

SCOTT NARGIS - ADVERSE

 1          THE COURT:  Let's have a sidebar.  If you could

 2   bring those pages with you, Counsel.

 3       (At sidebar.)

 4          THE COURT:  You're going to have to enlighten me

 5   as to exactly what you're attempting to do and then I'll

 6   indicate how we should proceed.

 7          MR. WEIDNER:  The problem was I hadn't realized

 8   it was on.  We didn't have an agreement and that was one

 9   that wasn't admitted.

10          THE COURT:  Okay.

11          MR. WEIDNER:  When I realized it I turned it off.

12   I asked counsel if we stipulated to this and that --

13          THE COURT:  What exhibit is it?

14          MR. WEIDNER:  It's No. 18.

15          MR. CRANLEY:  18.  It's the report of the

16   Jorgenson investigation.

17          THE COURT:  I have no longer got confidence in my

18   list because I say that was stipulated to, 18.

19          MR. CRANLEY:  No.  I think there's a little bit

20   of confusion because my understanding was we had objected

21   to it and you overruled our objection.

22          THE COURT:  That's a different question than what

23   had been stipulated to.  If the parties advised me that

24   what you did was stipulated to it, it's deemed admitted.

25   If what you had intended to do was -- I don't know what

SCOTT NARGIS - ADVERSE

1  else you would have intended to do.  Because I ruled on

2  the objection, that was gone, so we wouldn't stipulate to

3  anything more.

4          MR. CRANLEY:  Correct, we didn't stipulate to it.

5          THE COURT:  But you did.  You gave me a list, we

6  read it out in open court, which collided that document.

7          MR. CRANLEY:  I don't think so, but --

8          THE COURT:  What is it you want to do with this?

9          MR. WEIDNER:  Notice, it's all about notice.

10  It's his investigation and notice that they had a finding

11  of sexual assault.

12          THE COURT:  When you say "his investigation" --

13          MR. WEIDNER:  It is completely notice.

14          THE COURT:  -- you've established that.

15          MR. WEIDNER:  And I haven't gone through -- I

16  didn't go through it with Moe or anyone else because he

17  wrote it.

18          THE COURT:  But you've established that it's his

19  investigation and I will admit it for that purpose.  Your

20  objection -- well, I've already ruled on the objection, so

21  we are good.

22      (End of sidebar.)

23          THE COURT:  Occasionally there are rules of

24  evidence that need to be addressed.  We've addressed it

25  and you may proceed, Counsel.

SCOTT NARGIS - ADVERSE

1  BY MR. WEIDNER:

2  Q.   Sir, this is your investigation summary of the

3  allegations of fraternization and misconduct by Allen

4  Jorgenson; is that correct?

5  A.   Yes, sir.

6  Q.   And it summarizes accurately all of the investigation

7  that you completed?

8  A.   Yes, sir.

9  Q.   And part of that was done by Chief Deputy Moe at the

10  same time, correct?

11  A.   Yes.

12  Q.   Sir, this investigation was initiated because of a

13  complaint by an officer indicating there is a disturbance

14  about Allen Jorgenson with female inmates, correct?

15  A.   Yes.

16  Q.   And the complaining officer was Dolly Fjorden,

17  correct?

18  A.   Kathleen Fjorden is her legal name, but yes.

19  Q.   Kathleen Fjorden.  And you did a complete

20  investigation, along with Chief Deputy Moe, and you came

21  to the conclusion, sir, that a written reprimand was in

22  order; is that correct?

23  A.   Yes, sir.

24  Q.   Because you felt, sir, that for -- strike that.

25  Isn't it -- you indicated, sir, that there were some, on

1  the bottom of page 3746, were you involved in this

2  conversation?  It says, "CD Moe informed Jorgenson that

3  there was some potentially serious consequences involved

4  in this situation."

5  A.   I was.

6  Q.   And did you see him do that?

7  A.   Did I see him inform him of that?

8  Q.   Did you witness that?

9  A.   I was present.

10 Q.   But he did not feel that Officer Jorgenson's job was

11 in jeopardy, correct?

12 A.   Correct.

13 Q.   And you further state that you established a few

14 things and some of those things were that you did not

15 believe that the reporting party, NS, was credible,

16 correct?

17 A.   Correct.

18 Q.   And that -- but you did believe that you established

19 through your investigation that Officer Jorgenson flirts

20 with female inmates?

21 A.   Some of the female inmates, yes.

22 Q.   That you believe that Officer Jorgenson, at best, had

23 some kind of arranged or relationship between him and

24 inmate, correct?

25 A.   Correct.

1   Q.    At worst he fostered and encouraged it, correct?

2   A.    Correct.

3   Q.    After discussing this with Sheriff Johnson and Chief

4   Deputy Moe, you indicated that you advised him you would

5   be preparing a letter of reprimand for this action as

6   discipline, correct?

7   A.    Yes, sir.

8   Q.    And did you, along with Chief Deputy Moe, try to

9   assure Officer Jorgenson that the letter in his file was

10  not a major deal?

11  A.    Yes, sir.

12  Q.    So the both of you tried to persuade him of that?

13  A.    We tried to assure him of that.

14  Q.    And is a letter of reprimand not a big deal -- I'm

15  sorry, major deal?

16  A.    A major deal, I don't believe so.

17  Q.    And so the one time that you had a sexual assault,

18  investigated it and found out that there may have been an

19  inappropriate relationship, you treated it as not a major

20  deal?

21  A.    That's not correct.

22  Q.    Shortly after you came to this decision identified in

23  your note, more information came to light, right?

24  A.    Correct.

25  Q.    And you got a letter from NS that indicated to you

SCOTT NARGIS - ADVERSE

1  that there was -- that she changed her story, right?

2  A.    Yes.

3  Q.    And you actually asked Sergeant Schaefer to verify

4  what she was talking about to determine whether or not she

5  was telling you the truth, correct?

6  A.    I don't recall if I asked him or if he had done that

7  on his own.

8  Q.    And he verified her story about what she had done and

9  confirmed that she may be telling the truth at this point;

10  is that right?

11  A.    I believe that's correct.

12  Q.    So that was additional information.  Did you involve

13  the Sheriff in the decisions or the discussion of the

14  additional information you received?

15  A.    I don't recall at what point the Sheriff's

16  involvement was.  I know that during the course of the

17  initial investigation, then receiving the additional

18  information, things were discussed with him, but I don't

19  recall at what points.

20  Q.    You do not recall whether or not you had additional

21  conversations with him after the initial suggested

22  reprimand; is that correct?

23  A.    Correct.

24  Q.    Who did the investigation after the initial -- after

25  you received the letter from inmate NS?

SCOTT NARGIS - ADVERSE

2-P-50

1   A.   Chief Deputy Moe and myself continued with it.

2   Q.   And on page 3751 of this document you indicate that

3   Sheriff Johnson is involved at some point; is that right?

4   A.   Yes.

5   Q.   And that at this point Sheriff Johnson pointed out

6   that "The behavior he just admitted was exactly the issue

7   we're talking about."  When you say "he admitted," you're

8   referring to Officer Jorgenson?

9   A.   Yes.

10  Q.   "Even if there is no touching, his behavior is

11  inappropriate and unprofessional," correct?

12  A.   Yes.

13  Q.   You did not change the decision to level the

14  discipline at a letter of reprimand, correct?

15  A.   Correct.

16  Q.   In fact you said that was the end of the issue at

17  this point, correct?

18  A.   Correct.

19  Q.   Sir, I'm showing you the previous page identified as

20  3750 in Exhibit 18.  Sir, you reminded Officer Jorgenson

21  that this was quite serious, including touching of an

22  inmate?

23  A.   That the allegations were serious, yes.

24  Q.   And that they could be considered a crime?

25  A.   Correct.

1  Q.   Did you at all refer this out for criminal

2  investigation?

3  A.   No, sir.

4  Q.   Did you have that opportunity to refer it out for

5  criminal investigation?

6         THE COURT:  By that he means, if you thought it

7  justified it, you could have referred it?

8         THE WITNESS:  Oh, yes, sir.  Had we thought it

9  justified it, we would have.

10 BY MR. WEIDNER:

11 Q.   When you say "we," who all came to this conclusion?

12 A.   Myself and Chief Deputy Moe.  I don't recall if the

13 Sheriff was consulted about that or not.

14 Q.   And Chief Deputy -- where would you have referred

15 it -- where would it have been investigated if you had

16 referred it?

17 A.   We would have spoken with the district attorney.  And

18 if the district attorney did not feel it would be proper

19 for his office to prosecute it, I assume he would ask one

20 of his -- one of the surrounding counties.

21 Q.   What about additional criminal investigation like was

22 done with Mr. Christensen's?

23 A.   That would have, I assume, been handled by an outside

24 agency.

25 Q.   Now, there was some discussion earlier that

SCOTT NARGIS - ADVERSE

 1  Mr. Jorgenson resigned shortly after these allegations?

 2  A.   Correct.

 3  Q.   And do you know whether or not he resigned because of

 4  these allegations?

 5  A.   I recall having a discussion -- I take that back.  I

 6  don't recall if it was a discussion or if he had sent me a

 7  message of some sort.  He stated that he did not like the

 8  person that he was becoming working in the corrections

 9  field, but did not specify that it was related to this

10  incident.

11  Q.   He continued to work with Polk County after you

12  issued the letter of reprimand, correct?

13  A.   For a few weeks, yes.

14  Q.   And there was a separate investigation that was going

15  on of him in HR, correct?

16  A.   Correct.

17  Q.   And that was handled by the HR director, Andrea

18  Jerrick, correct?

19  A.   Yes.  I was involved with it as well.

20  Q.   And those were separate allegations from these,

21  right?

22  A.   Correct.

23  Q.   And after that investigation by Ms. Jerrick

24  concluded, what was her recommendation?

25  A.   I don't recall offhand, sir.

SCOTT NARGIS - ADVERSE

1  Q.   Did she recommend termination of Mr. Jorgenson?

2  A.   I don't recall offhand.

3  Q.   It was only after that investigation concluded that

4  his resignation was provided, correct?

5  A.   I believe that's accurate.

6  Q.   Sir, what are the levels of discipline available to

7  you for inappropriate behavior of one of your jail staff?

8         THE COURT:  Counsel, we've gone through this with

9  another witness.  And I'm concerned that the focus is

10 shifting from the claim here having to do with

11 Mr. Christensen's conduct to that involving Mr. Jorgenson.

12 And I think we've heard enough on that subject and you

13 should move on to the claim at hand.

14        MR. WEIDNER:  Certainly, Your Honor.

15        THE COURT:  Thank you.

16 BY MR. WEIDNER:

17 Q.   Sir, you yourself have engaged in what's called --

18 what you refer to as *tier talk*, correct?

19 A.   Yes, sir.

20 Q.   And you have heard -- in fact heard Mr. Christensen

21 make inappropriate or sexual comments about females; is

22 that correct?

23 A.   Females in general, yes.

24 Q.   And you have also engaged in tier talk which is not

25 necessarily flattering talk amongst co-workers in the

 1  tier; is that fair to say?

 2  A.    Yes.

 3  Q.    And have you heard, sir, Allen -- or excuse me,

 4  Darryl Christensen comment about an inmate's rear end

 5  while you were a supervisor?

 6  A.    I don't recall specifically him commenting about an

 7  inmate's rear end, but it could have happened.

 8  Q.    Do you recall telling me in your deposition that

 9  happened?

10  A.    I don't.

11  Q.    Do you recall ever hearing comments, as a supervisor,

12  about Darryl Christensen commenting about an inmate's

13  breasts?

14  A.    Yes.

15  Q.    Do you believe, sir, that you need to be part of what

16  you identify as *tier talk* on occasion as a supervisor --

17  A.    On occasion, yes.

18  Q.    -- to become a leader or a trusted leader within that

19  group; is that correct?

20  A.    That's part of the reason, yes.

21  Q.    At some point, sir, during Ms. Juleen's incarceration

22  with your facility were you dating her probation officer?

23         MR. CRANLEY:  Objection.  Relevance.

24         THE COURT:  I'll sustain that.

25         MR. WEIDNER:  Pardon?

SCOTT NARGIS - ADVERSE

1          THE COURT:  Let's have a sidebar.  I take that

2  back.  You can answer that question, but we're not going

3  to go much further down this road.  But you can answer

4  that question.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Your answer is "yes"?

7          THE WITNESS:  No.  I'm sorry.  I was saying "yes,

8  sir" to you, Judge.

9          THE COURT:  Okay.  Why don't you pose your

10  question again.

11  BY MR. WEIDNER:

12  Q.  At some point during Ms. Juleen's incarceration at

13  Polk County, were you dating Ms. Juleen's probation

14  officer?

15  A.  I would have to look at the dates of her

16  incarceration to be able to answer that.

17          THE COURT:  But there was a period of time when

18  you were dating the probation officer?

19          THE WITNESS:  Yes.  I don't know if Ms. Juleen

20  was ever incarcerated during that time or not.

21          MR. WEIDNER:  Thank you.  I have no further

22  questions.

23          THE COURT:  Direct.

24          MR. CRANLEY:  Thank you, Your Honor.

25

SCOTT NARGIS - ADVERSE

1                    DIRECT EXAMINATION

2  BY MR. CRANLEY:

3  Q.   Good afternoon, Captain Nargis.

4  A.   Good afternoon, sir.

5  Q.   I want to go very briefly through your background

6  again.  If you could just tell us your educational

7  background, please, for the jury.

8  A.   Graduate of Washington High School in Germantown

9  1989.  I attended one year at the University of

10 Wisconsin-Milwaukee before enlisting in the Army.  Once I

11 completed active duty I returned to the University of

12 Wisconsin-Eau Claire where I graduated in 1987 with a

13 bachelor's degree in criminal justice.

14 Q.   And how long were you in the Army?

15 A.   Four years of active duty, four years in the Guard

16 and Reserves.

17 Q.   And what positions did you hold in the Army and

18 National Guard?

19 A.   While on active duty I was an intelligence analyst,

20 military intelligence analyst.  I spent one year in the

21 National Guard as a medic, although I never received

22 training on that, before I transferred to the Army Reserve

23 as an interrogator.

24 Q.   Can you tell us a little bit about what an

25 interrogator does?

1  A.    Certainly.  An interrogator questions, in our case

2  prisoners of war, civilian internees, relative to the

3  discovery of information.

4  Q.    And were you honorably discharged from the National

5  Guard?

6  A.    Yes, sir.

7  Q.    And what was your rank at the time?

8  A.    E-5 sergeant.

9  Q.    And what year was that in?

10  A.    1998.

11  Q.    Did you, thereafter, begin your job or your career in

12  the corrections field?

13  A.    I actually started with the Sheriff's Department in

14  March of '98 and got out in September of '98 from the

15  military.

16  Q.    And at that time it was both dispatch and the jail

17  were run together, correct?

18  A.    Yes, sir.

19  Q.    And was there a time that you -- that those split

20  apart into separate divisions of the Sheriff's Office?

21  A.    Yes.  I believe it was the early part of 2001 when we

22  separated and I remained in the jail.

23  Q.    Was that a choice that you made at the time?

24  A.    Yes.

25  Q.    We've talked about your role in devising the training

1    or working on training with inmates -- or I'm sorry, with

2    jail officers.  I want to just have you give us an

3    overview of what the training program is, starting with

4    when a jail officer or corrections officer is hired.

5    A.    Sure.  There are essentially four facets to our

6    training in the Polk County Jail.  When an officer starts

7    they're placed in what's called a *field training program*.

8    They're assigned to an officer, an experienced officer, to

9    help them learn, basically get on-the-job training.

10   That's an eight to ten-week program depending on how

11   quickly the person picks up different aspects of the

12   process: working with the jail software, et cetera, where

13   they learn the basics of the policies, the procedures; how

14   to handle the duties of each of the different posts we

15   work, interacting with inmates, safety concerns, things of

16   that nature.

17        Second facet would be the state jail training

18   requirement, the 160-hour course.  Try to get the officer

19   through that as quickly as possible.

20        And we do -- the third aspect would be

21   recertification training.  Officers are required to have

22   24 hours of continuing education every year in order to

23   maintain their certification status.  And that's the

24   purpose of our in-house training program is to get hours

25   towards that.

1        Fourth one would be the daily training program we

2   discussed briefly before.

3   Q.   Thank you.  You mentioned interacting with inmates as

4   being part of the training that you do in the field

5   training program?

6   A.   Yes, sir.

7   Q.   What do you mean when you talk about interaction with

8   inmates by jail officers?

9   A.   Appropriate ways to maintain distance, both for

10  physical safety as well as maintaining a professional

11  distance; not giving out personal information,

12  professional communications, things of that nature.

13  Q.   That includes not engaging in inappropriate

14  relationships with inmates, correct?

15  A.   Correct.

16  Q.   And that would certainly include an inappropriate

17  sexual relationship, I assume?

18  A.   Absolutely.

19  Q.   That's something that's covered in your field

20  training?

21  A.   It should be part of the process when they go through

22  those sections of the policy, yes.

23  Q.   Review of the policy manual is part of the field

24  training?

25  A.   Yes.

1  Q.   Let's talk about the daily training program that you

2  have.  Is that something that's required by any particular

3  governing body, the state or anyone else?

4  A.   No, sir.

5  Q.   That's something you've developed on your own?

6  A.   Yes, sir.

7  Q.   That's in addition to the curriculum that's

8  identified and required by the state for certification and

9  recertification, correct?

10  A.   Correct.

11  Q.   And you were asked some questions about Gordon

12  Graham?

13  A.   Yes, sir.

14  Q.   Can you explain how that philosophy fit in with what

15  you're doing in your daily program?

16  A.   Certainly.  The presentation was made in regards to

17  again risk, risk management, risk mitigation.  The

18  high-frequency events, something we do on a daily basis,

19  aren't necessarily worrisome issues: passing out meals,

20  things like that.

21       Low-frequency events that are high risk are where we

22  need constant reminders of how things are supposed to be

23  done.  So I identified sections of the policy relevant to

24  that.  I could give you examples of the topics if you'd

25  like.  But the point being that every day the average is

1   five minutes a day to review one of these sections of

2   policy.  Obviously some are longer, some are shorter.

3   Q.   Is there anything besides just policy sections that

4   are included in that daily training?

5   A.   Yes.  There's, I want to say, 15 videos from the

6   Department of Justice on performing different tactics and

7   techniques that are used in our subject control system,

8   POSC.

9   Q.   So those are part of the 90 --

10  A.   Correct.

11  Q.   -- the 90-subject rotation that you go through?

12  A.   Correct.

13  Q.   Do you expect that your jail officers, when they

14  review the number on the calendar and open up the file and

15  write down the name of the topic that they're handling and

16  then sign it, that they're acting with proper ethical

17  standards?

18  A.   Absolutely.

19  Q.   You expect them to be honest about doing that?

20  A.   Yes.

21  Q.   And to act professionally as professionals?

22  A.   Yes, sir.

23  Q.   Have you ever been asked to present that training

24  program anywhere?

25  A.   Yes.  I presented it at one of the state jail

1 administrator conferences.

2 Q.   And how did that come to happen?

3 A.   If I'm not mistaken, it was a subject that I had

4 discussed with the jail inspector.  And I believe that he

5 was part of the planning committee for the conference that

6 year and he asked me to present on it.

7 Q.   Was that Jail Inspector Hompe?

8 A.   Yes, sir.

9 Q.   You mentioned earlier that you were a certified

10 trainer on professional communication skills.  Did I hear

11 that correctly?

12 A.   Correct.

13 Q.   And what does professional communication skills

14 entail?

15 A.   It's a broad range covering -- it covers specific

16 techniques for dealing with arbitration as it relates to,

17 in our setting, working with inmates; dealing with

18 mediation, dealing with crisis management; but also

19 provides guidelines and tips for staying positive in the

20 job and communicating in a professional fashion with

21 co-workers, inmates, visitors to the facility, other

22 professionals.

23 Q.   So again part of that would include training on

24 maintaining an appropriate and professional relationship

25 between a jail guard and an inmate?

SCOTT NARGIS - DIRECT

1   A.   Correct.

2   Q.   You were asked some questions about PREA.  You

3   understand what PREA is?

4   A.   Yes, sir.

5   Q.   You mentioned that you had sought out on your own

6   some resources to educate yourself on it?

7   A.   Yes, sir.

8   Q.   What did you mean by that?

9   A.   There is an online site -- I think it's through the

10  *PREA Resource Center*, I think it's the website -- that has

11  the full Act in there with what the guidelines are.

12  Q.   What do you believe Polk County Jail's obligations

13  are with respect to PREA?

14  A.   What I was informed by the jail inspector is that we

15  are not obliged to --

16          MR. WEIDNER:  Objection.  Hearsay.

17          THE COURT:  I'll sustain that objection.

18  BY MR. CRANLEY:

19  Q.   Are you obligated to implement every provision within

20  the PREA guidelines?

21  A.   To my knowledge, no.

22  Q.   Did you, however, implement some ideas out of PREA?

23  A.   Yes, sir.

24  Q.   Can you give me an example of some of those?

25  A.   As noted earlier, we revised the jail policy

SCOTT NARGIS - DIRECT

1  *Fraternization With Inmates* to include a section on that

2  spelling out prohibited behaviors, edited the section to

3  the inmate handbook.

4  Q.   Is there anything about the Wisconsin Administrative

5  Code or Wisconsin statutes that requires you to include

6  that language in your policies?

7  A.   Not that I'm aware of, sir.

8  Q.   Is there anything that required you to update your

9  inmate handbook to include that warning at the bottom?

10 A.   Not that I'm aware of, sir.

11 Q.   I want to take a brief look at a couple of these

12 policies that we've talked about.

13 A.   Certainly.

14 Q.   And I could start with Exhibit 502.

15       MR. CRANLEY:  Can everybody see that now,

16 including the jury, Your Honor?

17       THE COURT:  Yes.  You can tell if you look at

18 that monitor.

19       MR. CRANLEY:  Oh, good.  Thank you.

20 BY MR. CRANLEY:

21 Q.   What is this policy and what is its purpose, Captain

22 Nargis?

23 A.   This is the policy on *Supervision and Management of*

24 *Inmates*.  The purpose is to provide a guideline for

25 management of inmates.

SCOTT NARGIS - DIRECT

1   Q.   And what, in general, does this policy address?

2   A.   In general it talks about everything from your

3   general interaction to conducting -- if I remember

4   correctly, in this policy, it talks about conducting

5   walk-throughs; as it notes, in the general philosophy,

6   control compliance, consequence consistency, and how to

7   deal with those issues.

8   Q.   All right.  Let's turn to the next policy, No. 503.

9   Now, this is -- we've looked at this before.  I don't want

10  to belabor it -- this is the PREA policy as it existed --

11  I'm sorry, the *Fraternization with Inmates* policy before

12  it was updated to include the PREA language, correct?

13  A.   Correct.

14  Q.   And does this policy prohibit improper relationships

15  with inmates?

16  A.   If I recall correctly, yes.

17  Q.   If I direct your attention to letter A on page 1?

18  A.   Yes.

19  Q.   All right.  Does that indicate what relationships are

20  prohibited between inmates and staff?

21  A.   Yes, sir.  It defines them.

22  Q.   And could you tell me what it is that -- what it says

23  about appropriate relationships with inmates?

24  A.   It says that prohibited relationships: you cannot

25  live in the same household with the prisoner, cannot work

SCOTT NARGIS - DIRECT

1  for a prisoner, cannot employ a prisoner, cannot extend

2  promise or offer special consideration or treatment to a

3  prisoner, have personal contacts other than those required

4  by your duty, being in intimate social or physical

5  relationship or providing or receiving goods or services.

6  Q.   And intimate social or physical relationship with a

7  prisoner would certainly include a sexual relationship,

8  true?

9  A.   Yes, sir.

10 Q.   All right.  Turn to the next policy, 504.  Am I

11 correct this is an update of the previous policy --

12 A.   Correct.  Yes.

13 Q.   -- effective in July 2012 --

14 A.   That's correct.

15 Q.   -- just before PREA regulations went into effect?

16 A.   Correct.

17 Q.   And turning to the section on PREA, which is on page

18 3 of the exhibit, these are the regulations -- or these

19 are the policy provisions you added based on your review

20 and understanding of PREA?

21 A.   Yes, sir.

22 Q.   And what generally does this require?

23 A.   It requires that, in general, requires reporting any

24 suspicion or information related to, as it states in

25 letter A, an employee or inmate being involved in sexual

1  misconduct.

2  Q.   Are your policies required to be reviewed and

3  approved by the Department of Corrections?

4  A.   Yes, sir.

5  Q.   Are substantial revisions to the policies required to

6  be reviewed?

7  A.   Yes, sir.

8  Q.   Was this a substantial revision that was reviewed?

9  A.   Yes, sir.

10 Q.   When you make a revision, such as this, to your

11 policies, is that something that you notify the staff of?

12 A.   Generally I'll either e-mail that specific policy

13 noting the revisions or send an e-mail stating to check

14 the policy manual here for revisions related to what --

15 Q.   And is this Policy C-202 one of those low frequency,

16 high risk or was it high risk, high frequency?

17 A.   This would be high risk, low frequency.

18 Q.   High risk, low frequency.  This is one of those

19 policies that would be part of that rotation?

20 A.   I believe it is.

21 Q.   And very quickly I want to look at 506.  This is the

22 *Inmate Rights* --

23 A.   Yes, sir.

24 Q.   -- policy?  And on this copy we're looking at the

25 most recent revision was January 2011, true?

1  A.   Yes.

2  Q.   I want to turn to page 3 of the exhibit and just

3  point out bullet point No. 5 and ask you a question about

4  it.

5  A.   Yes, sir.

6  Q.   Could you read that section?

7  A.   "Under no circumstances will any inmates be the

8  object of verbal, physical, emotional, psychological or

9  sexual harassment by facility staff.  Any officer engaged

10 in such actions is subject to disciplinary charges and/or

11 termination."

12 Q.   This is a policy that every jail officer required to

13 follow?

14 A.   Yes, sir.

15 Q.   And this is considered to be and communicated to your

16 jail officers a right that inmates have in the Polk County

17 Jail?

18 A.   Yes.

19 Q.   Was this section of the policy present, if you know,

20 before the January revision date that we saw as the most

21 recent thus far?

22 A.   I believe this portion was included, yes.

23 Q.   How many inmates come through the Polk County Jail on

24 an annual basis?

25 A.   Over the course of the last nine years, the average

1  is about 1,550 a year intakes.

2  Q.   Do you know how many total inmates come through the

3  Polk County Jail in that duration of time you're talking

4  about?

5  A.   14,100 I believe was the total I saw.

6  Q.   And in that time have you had any other instances of

7  sexual misconduct by any jail officer other than Darryl

8  Christensen?

9  A.   There was one allegation with Officer Jorgenson.  But

10  other than that, no.

11  Q.   With regard to the investigation concerning Officer

12  Jorgenson, you received reports from Officer Fjorden,

13  correct?

14  A.   Yes.

15  Q.   And from Sergeant Schaefer?

16  A.   Yes.

17  Q.   And those were rather lengthy reports?

18  A.   I believe so.

19  Q.   And you got them from them because you were out of

20  town or it was on a weekend or something?

21  A.   I believe the incident occurred on a Saturday and

22  they were e-mailed to me.  I could see them on my phone,

23  but I didn't get a chance to really dive into them until I

24  was back on duty.

25  Q.   You were asked some questions about the video

1  information that you observed with the camera being

2  trained somewhere?

3  A.    Yes.

4  Q.    How is it that you came to know that that was the

5  case?

6  A.    If I recall correctly, there was some information in

7  Officer Fjorden's report or statement that he spends an

8  inordinate amount of time there or leering into the cell.

9  I don't know, it was a tool available to me, so I decided

10  to look into it.

11  Q.    So as part of your investigation, one of the first

12  things you did was to go and review the video evidence

13  that was there?

14  A.    Yes.

15  Q.    And then you interviewed some seven or eight inmates

16  in the jail?

17  A.    Yes, sir.

18  Q.    And you made contact with one or two former inmates

19  who you thought might have relative information; isn't

20  that true?

21  A.    Yes.  I think their names were mentioned during our

22  investigation and then made contact with them.

23  Q.    Why did you believe that a written reprimand was an

24  appropriate disciplinary action?

25  A.    Well, as was indicated in my documentation, we felt

SCOTT NARGIS - DIRECT

1  pretty strongly that there wasn't an inappropriate

2  relationship that was fostered.  We did not have -- we had

3  contrary statements from inmates about what was or wasn't

4  happening.  We had contradictory statements from the

5  alleged victim herself.  We had no evidence to move

6  forward with anything further based on the inappropriate

7  relationship and showing favoritism.  And taking into

8  account Officer Jorgenson's work history up to that point,

9  we deemed that was the appropriate remedy.

10  Q.   Did Officer Christensen attend training appropriately

11  during the course of his employment?

12  A.   Generally speaking, yes.

13  Q.   You kept track of that sort of thing and kept it in

14  his file?

15  A.   Yes.  This is more of just a recollection as I sit

16  here now: I can recall a time or two where he missed

17  mandatory training.  But generally speaking, he attended.

18  Q.   He was properly certified as a corrections officer?

19  A.   Yes.

20  Q.   And he was recertified each year?

21  A.   Yes.

22  Q.   Did the conduct that he's admitted to having engaged

23  in here violate the policies of Polk County?

24  A.   Yes.

25  Q.   Did it violate the training that he received from you

1  and from others at the Polk County Jail?

2  A.   Yes.

3          MR. CRANLEY:  Thank you.  That's all I have.

4          THE COURT:  All right.  Any recross?  I'm sorry.

5  Ms. Christensen, did you have any questions -- or Ms.

6  Mills?

7          MS. MILLS:  No, I do not.

8          THE COURT:  I'll come back to you later on cross.

9                    CROSS-EXAMINATION

10  BY MR. WEIDNER:

11  Q.   Sir, you can't say with any certainty that C-202 is

12  in your rotation of those 90 topics, can you?

13  A.   Sitting here, off the top of my head, no, sir.

14  Q.   Sir, speaking of the nine years of experience that

15  you have with -- I'm uncertain as to why this isn't on.

16          THE COURT:  You probably switched off -- you got

17  it.

18          MR. WEIDNER:  Thank you, Your Honor.

19  BY MR. WEIDNER:

20  Q.   You've known him for nine years, correct?

21  A.   I'm sorry.  I've known who, sir?

22  Q.   Mr. Jorgenson.

23  A.   Oh, longer at this point, yes.

24          THE COURT:  But at that point it was

25  approximately nine years?

 1           THE WITNESS:  Yes.

 2  BY MR. WEIDNER:

 3  Q.   Sir, you felt he was being less than honest to you,

 4  don't you, in that investigation?

 5  A.   Yes, sir.

 6  Q.   And on page 3751 you say, "I feel compelled to note

 7  that based upon my training and experience and based on

 8  knowing Officer Jorgenson for nine-plus years, it's my

 9  opinion he was not only less than honest about things, he

10  was outright lying to us at times," correct?

11  A.   Yes, sir.

12           MR. WEIDNER:  Thank you.  No further questions.

13           THE COURT:  Unless there's anything more, you may

14  step down.

15           THE WITNESS:  Thank you, Judge.

16      (Witness excused at 3:08 p.m.)

17           THE COURT:  Plaintiffs may call their next

18  witness.

19           MS. BANNINK:  Call Bradley Hompe.

20           THE COURT:  Mr. Hompe, if you would come straight

21  forward and through that swing gate.  And then work your

22  way around in front of the court reporter and just stand

23  before the court reporter for sworn.

24           **BRADLEY HOMPE, PLAINTIFFS' WITNESS, SWORN**

25

1                        <u>DIRECT EXAMINATION</u>

2   BY MS. BANNINK:

3   Q.   Good afternoon, Mr. Hompe.

4   A.   Hi.

5   Q.   Please state your name.

6   A.   Brad Hompe.

7   Q.   And where were you employed up until last year?

8   A.   Wisconsin Department of Corrections.  I still am.

9   Q.   You are.  Okay.  And when did you first start with

10  the Department of Corrections?

11  A.   March 1995.

12  Q.   And can you explain how your career progressed with

13  the Department of Corrections?

14  A.   Sure.  I was a correctional officer and promoted

15  through the prison system from officer to sergeant,

16  lieutenant, captain, unit manager, deputy warden and

17  warden.  And then following working in the institution I

18  was a jail inspector and now I'm a complaint examiner.

19  Q.   And from what time period were you a jail inspector?

20  A.   From December 2009 until -- excuse me -- last -- I

21  guess would have been August.

22  Q.   And what duties did you perform as a jail inspector?

23  A.   We had to inspect each jail annually for code

24  compliance for the administrative code that governs jails

25  in Wisconsin.  We also did investigations if there would

1  be a death or a suicide.  We did some training and

2  sponsored some training conferences, answered some inmate

3  complaints, and pretty much just helped them out with best

4  practices in the jail.

5  Q.   Are there multiple jail inspectors throughout the

6  state of Wisconsin?

7  A.   Yes, five.

8  Q.   Were you assigned to a specific territory?

9  A.   Yes.

10 Q.   And did that territory include Polk County?

11 A.   Yes.

12 Q.   How many facilities were included within your

13 territory?

14 A.   17 county jails and three juvenile facilities.

15 Q.   And during which period did you complete inspections

16 for the Polk County Jail?

17 A.   2010 through 2015.

18 Q.   Are you familiar with what the Prison Rape

19 Elimination Act is?

20 A.   Yes.

21 Q.   And was this -- you'd indicated that you provide some

22 technical assistance?

23 A.   Yes.

24 Q.   Was this one of the areas that you would provide

25 assistance to jails within your territory?

BRADLEY HOMPE - DIRECT

1  A.   The department did as a whole, yes.

2  Q.   Tell me about what, briefly, what the Prison Rape

3  Elimination Act is.

4  A.   My understanding of it is, it was an act that

5  directed that some standards be developed that would help

6  basically eliminate -- or not necessarily eliminate, but

7  stop sexual harassment and sexual abuse in jail and prison

8  settings.

9  Q.   What did you tell jails as to whether or not this was

10  a requirement placed upon them?

11  A.   Well, we had no authority over that, the DOC, so it

12  was not under my purview.  As far as complying with PREA

13  standards, whether or not they had to comply, I didn't get

14  involved in that.

15  Q.   But you -- strike that.  From your perspective as a

16  jail inspector, PREA was not mandated under your purview,

17  correct?

18  A.   Yes.  Correct.

19  Q.   Can you tell me the basics of what PREA requires?

20  A.   Well, like I said, there's a set of standards.  But

21  generally it basically -- the basics are you need to have

22  a reporting system for inmates that are in your custody to

23  report the allegation.  We have to have some way to vet

24  that investigative process and some staff training so

25  staff understand their responsibilities for preventing

BRADLEY HOMPE - DIRECT

1   sexual harassment or sexual abuse.

2   Q.   Do you consider yourself an expert on the subject of

3   the Prison Rape Elimination Act?

4   A.   No, not at all.

5   Q.   But you did provide resources available to the jails

6   within your county?

7   A.   Yes.

8   Q.   What resources did you provide with regards to PREA?

9          MR. BOHL:  Objection.  Relevance.

10         THE COURT:  I'll overrule it.  You can answer.

11  A.   Again it wasn't me specifically; it was the

12  department.  We provided -- we got a grant that put

13  together some training, so we put together a training

14  process for all the jails to use.  So that would have been

15  one of the processes.  We also sponsored some training

16  regionally.  And some of the other things we did is we

17  provided posters that could be put in jails and some

18  samples some handbook language.

19  Q.   Explain what those posters consisted of.

20  A.   Basically it was a zero tolerance for sexual

21  harassment or sexual abuse in the facility.

22  Q.   Do you know how big those posters were?

23  A.   I couldn't tell you exactly, but probably twice the

24  size of this screen, same width.

25  Q.   So maybe, what is that, three feet?  Strike that.

1  A.   All right.

2       THE COURT:  Just for the record, you would say

3  it's about how much?

4       THE WITNESS:  I would say it's about twice as

5  high as this screen, the same width.  I don't know what

6  that would be, 10 by 24, something like that.

7       THE COURT:  Inches?

8       THE WITNESS:  Yes.

9  BY MS. BANNINK:

10 Q.   Were there some services that offered additional

11 resources that you -- strike that.  Did you make the

12 jails -- did you inform the jails about additional

13 resources that could be provided outside the Department of

14 Corrections?

15 A.   Yes.  We shared frequently e-mails as far as, like,

16 the *PREA Resource Center* is an online area where they can

17 find lots of things regarding the Act and the standards.

18 Q.   Would you have given this information to Polk County?

19 A.   Yes.  It went out to all the jail administrators.

20 Q.   What source of communication did you -- in what mode

21 did you communicate with the jail administrators with this

22 information?

23 A.   E-mail.  There was also discussion on the Listserv

24 regarding the topic.

25 Q.   Was it a common discussion, the topic?

BRADLEY HOMPE - DIRECT

 1  A.   I guess you'd have to explain what you mean by

 2  "common."

 3  Q.   In 2012 when the -- strike that.  Are you aware of

 4  when the standards came into effect?

 5  A.   Not exactly.

 6  Q.   Near the time that those standards came into effect

 7  was the topic discussed regularly amongst jail

 8  administrators?

 9  A.   Yes.

10  Q.   And you indicated that the Department of Corrections

11  received a grant?

12  A.   Yes.

13  Q.   Are you aware of did they conduct studies with that

14  grant?

15          MR. BOHL:  Objection.  Relevance.

16          THE COURT:  I'll sustain that objection.

17  BY MS. BANNINK:

18  Q.   As a result of the grant did the Department of

19  Corrections create additional materials for jail

20  administrators within the state of Wisconsin?

21  A.   Yes.

22  Q.   Did they -- and you indicated they created posters?

23  A.   We obtained the posters.

24  Q.   Did they create any other resources?

25  A.   What I recall is a PowerPoint training for PREA that

                    BRADLEY HOMPE - DIRECT

1   was developed and made available to all the jail

2   administrators.

3   Q.    What would the purpose of that PowerPoint have been?

4   A.    For staff training.

5   Q.    Did you -- was there any cost for the jail

6   administrators to obtain that PowerPoint from the

7   Department of Corrections?

8   A.    No.

9   Q.    Was there any cost for jail administrators to obtain

10  the posters --

11  A.    No.

12  Q.    -- from the Department of Corrections?

13  A.    Not at all.

14  Q.    Did you, with your position as the jail inspector,

15  did you provide conferences for jail administrators within

16  your territory?

17  A.    The Department of Corrections did.

18  Q.    Did you discuss the Prison Rape Elimination Act at

19  those conferences?

20  A.    Are you speaking of the jail administrators

21  conference or the meetings?

22  Q.    The meetings.  I apologize.

23  A.    Yes.  We discussed it at regional meetings.

24  Q.    Has it also been discussed at the jail administrator

25  conferences?

BRADLEY HOMPE - DIRECT

1   A.    Yes.

2   Q.    Are you aware of whether or not Captain Nargis was

3   present throughout those meetings?

4   A.    For the jail inspector meetings, yes, some of them.

5   Q.    Are you aware whether or not Captain Nargis was

6   present at the annual conferences?

7   A.    Generally, he was.

8   Q.    Were there any outside -- you've recommended or you

9   indicated that there was one outside vendor that had PREA

10  resources.  Were there any others that you would have

11  recommended to administrators?

12  A.    I wasn't aware of any other.

13  Q.    Was it difficult to find information with regards to

14  the Prison Rape Elimination Act for jail administrators

15  within your territory?

16  A.    No.

17  Q.    Upon request -- I believe you had indicated this --

18  did you provide any training to jail administrators within

19  your territory?

20  A.    Specifically to administrators, no.

21  Q.    Did you provide training with regards to correctional

22  officers?

23  A.    Yes, I have.

24  Q.    What kind of training did you provide?

25  A.    Well, what I provided generally for the jail

1 | themselves, suicide prevention was one of the topics and

2 | what we call *avoiding inmate manipulation or*

3 | *professionalism*.  That would have been directly for the

4 | jails.

5 | Q.   And what did the inmate manipulation and

6 | professionalism consist of?

7 | A.   Basically it was, you know, avoiding what we term are

8 | *con games*.  It's basically a professionalism class:

9 | Appropriate things that you do and don't discuss in front

10 | of your clientele, how to respond to inappropriate

11 | comments or behavior from them so that you don't end up in

12 | a inappropriate relationship.

13 | Q.   And did you charge anything for providing this

14 | training?

15 | A.   No.

16 | Q.   Did Polk County ever request this training?

17 | A.   Not that I recall.

18 | Q.   Was the training ever provided to Polk County, to

19 | your knowledge?

20 | A.   Not that I recall.

21 | Q.   Showing you what's been marked as Exhibit 10, have

22 | you seen this before?  It's on your screen.  I apologize.

23 | A.   That appears to be the handbook from the Polk County

24 | Jail, yes.

25 | Q.   And you have seen this handbook before?

BRADLEY HOMPE - DIRECT

1   A.   Yes.

2   Q.   I draw your attention to page 10 of Exhibit 10.   Do

3   you see that statement there at the bottom?

4   A.   Yes.

5   Q.   And what is that?

6   A.   It appears to be a portion of a PREA notice that we

7   had advised jails they could put in their handbooks.

8   Q.   And did you advise the jails -- you indicated that

9   you advised the jails as to information that could be put

10  in their handbooks.  Was the information that you provided

11  to them more than what you had just seen on page 10?

12  A.   Yes.

13  Q.   When you completed your annual inspections, what laws

14  or regulations were you operating under?

15  A.   Wisconsin Administrative Code DOC 350.

16  Q.   What kinds of things does DOC 350 require?

17  A.   Well, there's a large number of requirements, but it

18  covers food service, living conditions, discipline,

19  physical plant.

20  Q.   Were the -- you indicated the general familiarity

21  with PREA.  Are there requirements of PREA included

22  underneath DOC 350?

23  A.   No.  PREA is not referenced in 350.

24  Q.   Now, switching gears a little bit, you completed

25  annual inspections for the Polk County Jail from 2010 to

1  2015, you indicated?

2  A.   Yes.

3  Q.   Did you -- were there any recurring issues that the

4  Polk County Jail had?

5  A.   Two that I recall were staffing and supervision and

6  wellness checks.

7  Q.   Explain the staffing and supervision concern.

8  A.   Well, the county board only approves X number of

9  staff for the jail and they had -- which did not allow

10  them to have supervision around the clock as far as

11  sergeants, nor did it allow them to have specialty

12  positions.  So the sergeants they did have were actually

13  doing the work of those specialty positions that many

14  jails have.

15  Q.   And did that -- the staffing concern, was that an

16  issue?  Do you recall which years exactly that was an

17  issue?

18  A.   I don't without looking.  For the record, that's a

19  recommendation versus a -- we don't control their

20  staffing.  There's no numbers dictated by code.

21  Q.   What would be indicating a concern with -- what would

22  be the word -- strike that.  What is the concern with low

23  staffing numbers?

24  A.   Obviously you need the correct number of staff in a

25  jail to insure that all activities are met, the rounds are

 1   done, enough people respond to emergencies.  But I think

 2   specifically I noted supervision.

 3   Q.   And does that provide safety issues?

 4          THE COURT:  Let's ask it differently.  Why did

 5   you think it was a concern that there wasn't adequate

 6   staffing of supervisors?

 7          THE WITNESS:  What --

 8          THE COURT:  Why did you note it as a concern?

 9          THE WITNESS:  Basically they weren't able to

10   provide a sergeant on all their shifts; so there was no

11   supervision available on-site, which was a concern.

12   BY MS. BANNINK:

13   Q.   Showing you what's been marked as Exhibit 40, can you

14   tell me what this document is?

15   A.   It's a 2010 jail inspection report.

16   Q.   And is this something that you created?

17   A.   It should be.  You can look at the signature just to

18   verify.  Yes.

19   Q.   Turning to page 4, which is Bates 3432, does it look

20   like this is a document you created?

21   A.   Yes.

22   Q.   This would have been your report from 2010?

23   A.   Yes.

24   Q.   Drawing your attention to page 3, did you note any

25   additional concerns, other than staffing, in this

BRADLEY HOMPE - DIRECT

1   inspection?

2   A.   Yes.

3   Q.   And what concerns did you note?

4   A.   I recommended additional cameras and recommending

5   that when they do wellness checks that they actually enter

6   the units so they insure they look into every cell and

7   area.

8   Q.   Are you aware of whether or not, during your

9   inspections from 2010 to 2015, you noted any areas of

10  noncompliance?

11  A.   Without looking at the document, I don't recall.

12  Q.   I'm showing you what's been marked as Exhibit 41.

13  This appears to be another of your inspection reports,

14  correct?

15  A.   Yes.

16  Q.   And from 2011?

17  A.   Yes.

18          THE COURT:  Could I ask counsel how much more you

19  have of this witness?

20          MS. BANNINK:  I'm almost done.

21          THE COURT:  You're almost done?

22          MS. BANNINK:  Yes.

23          THE COURT:  All right.

24  BY MS. BANNINK:

25  Q.   Showing you Bates page 3463, does that refresh your

BRADLEY HOMPE - DIRECT

1  recollection with regards to whether you had indicated any

2  areas of noncompliance?

3  A.   Yes.

4          MR. BOHL:  Excuse me.  What page number was that?

5          MS. BANNINK:  3463.

6  BY MS. BANNINK:

7  Q.   And what was the issue of noncompliance?

8  A.   They did not have a staffing agreement with the

9  county board, which is required by code if you're going to

10  double cell.

11         MS. BANNINK:  No other questions.

12         THE COURT:  All right.  We will take our

13  afternoon break.  We'll reconvene at ten minutes to four

14  and we'll see you then.  All rise, please.

15     (Jury out at 3:30 p.m.)

16         THE COURT:  I apologize for your having to come

17  back.  But if you could be back here in that seat at ten

18  to, that would be appreciated.  Thank you.

19     If the parties want to be seated for a moment.  We

20  seem to have developed a disagreement over what was

21  stipulated or even what stipulation means.  The

22  stipulation was clearly about admission.

23     You can go ahead.  It's fine.

24     The stipulation was clearly about admission.  I had

25  originally noted that there was still an open question as

BRADLEY HOMPE - DIRECT

1    to Exhibit 1 and 2, but I was told there had been a

2    stipulation and that they were now admitted.  Is that

3    correct?

4              MR. CRANLEY:  That's correct as to 1 and 2.

5              THE COURT:  All right.  I was told that 16 is

6    still open, but that the relevance objection was

7    withdrawn.  And 17 and 18 I had noted originally was

8    stipulated for admission, but at sidebar I was told by

9    counsel for the County that -- I guess I'm not sure what

10   you meant when you agreed to stipulate to those or perhaps

11   you're saying you didn't stipulate to them.

12             MR. CRANLEY:  My recollection is, Your Honor,

13   that there were a number of -- several documents like that

14   where we had objected, you overruled our objection, and so

15   that's where they stand.  We didn't stipulate to their

16   admission.

17             THE COURT:  I would not have written down

18   *stipulation* unless someone had told me during this process

19   that -- in fact it was at the first day of trial that it

20   had been stipulated to admission.  Do the plaintiffs have

21   a different recollection?  Do they agree that it's not

22   admitted or it wasn't stipulated to?

23             MS. BANNINK:  As to which exhibits?

24             THE COURT:  17 and 18.

25             MS. BANNINK:  I do not recall a conversation with

1  regards to the stipulation.  I know that they filed the

2  motions in limine.  I'm not sure --

3              THE COURT:  That's fine.

4              MS. BANNINK:  -- beyond that.

5              THE COURT:  So 17 and 18 will not be deemed

6  admitted.  I did allow plaintiffs to use portions of

7  Exhibit 18 I believe and the question is as to whether or

8  not I'm going to admit it into evidence; and, if so, what

9  parts.

10             MS. BANNINK:  It was my understanding that Your

11 Honor had admitted it.

12             THE COURT:  I allowed it to be shown to the jury

13 after a foundation had been laid.  I had not ruled on its

14 formal admission.  The question is whether I admit some or

15 all of it into evidence.

16             MR. WEIDNER:  Your Honor, if I might address

17 that.  I went through --

18             THE COURT:  Portions of it with --

19             MR. WEIDNER:  -- portions of it and rather

20 extensively read aloud from it with the understanding that

21 that was admitted.

22             THE COURT:  Well, I didn't rule on admission.  I

23 told you you could use it with that witness.  It was

24 Nargis, wasn't it?

25             MR. WEIDNER:  Yes, it was, Your Honor.

1          THE COURT:  All right.  So you went through

2    portions of that with Nargis and the question is whether I

3    admit some or all of Exhibit 18, since apparently there

4    was not a stipulation, contrary to what I thought I had

5    been told.  And your basis for moving its admission is

6    what?

7          MR. WEIDNER:  It's a written document provided in

8    the typical, ordinary course of the business for his

9    investigation held that they rely on and refer to

10   throughout their procedures and process.

11         THE COURT:  The concern I have, and it was the

12   objection raised as to prejudice that I had reserved on,

13   is the same one I expressed in front of the jury this

14   afternoon and that is undue emphasis on the Jorgenson

15   investigation.  I think the jury has heard ample amount.

16   I don't know why I would emphasize it more by giving them

17   the entire investigative report, which may well have

18   information that really isn't relevant at all.  But I'm

19   very concerned about overemphasizing it, so at this point

20   that exhibit is out, unless there's some reason to allow

21   you to provide those portions that the jury was allowed

22   to see.

23         And while you characterize them as *extensive*, there

24   was a few pages and portions of pages that they actually

25   saw.  And I don't think it really changes the dynamic by

1    simply letting that testimony stand through Nargis.  That

2    testimony, I agree, is relevant.  But the entire document

3    I'm not sure has sufficient relevance to overcome

4    prejudice or at least to place undue emphasis on what, at

5    best, is a satellite event showing knowledge by the

6    County.  So at this point it is not admitted, but I will

7    continue to reserve if there's some greater relevance that

8    I'm not aware of that would overcome potential prejudice.

9        Since we're on the subject then, the other exhibits I

10   do not have admitted, in addition to 17 and 18, are 23,

11   24, 27, 28, 29, 35, 36, 37, 38, 47, 48, 49 through 60, 73,

12   74, 83, 87 through 102, 104 and 105.  Any corrections to

13   that list for the plaintiff?

14           MS. BANNINK:  104 and 105 were stipulated to,

15   correct?

16           MR. CRANLEY:  That's correct.  Those are the jail

17   videos.

18           THE COURT:  Any other corrections for the

19   plaintiff?

20           MS. BANNINK:  It had been my -- I don't know that

21   anyone has addressed Exhibit 17.  I had thought that

22   Exhibit 17 was admitted.

23           THE COURT:  That was in the category of

24   stipulated --

25           MR. CRANLEY:  That is correct.

1          THE COURT:  -- so it is stipulated to admission.

2   All right.  Perhaps what happened is I somehow had heard

3   both when you told me 17 was stipulated to.

4          MS. BANNINK:  And did you indicate 20 through 24

5   were not stipulated?

6          THE COURT:  I had 23 and 24 were not.

7          MS. BANNINK:  23 and 24.  Okay.  And those were

8   withdrawn, so --

9          MR. CRANLEY:  And 29 was withdrawn as well, Your

10  Honor.

11         THE COURT:  23 and 24 are withdrawn and 29 I have

12  as withdrawn.  All right.  Any other corrections for the

13  plaintiff?

14         MS. BANNINK:  27 and 28 were also withdrawn.

15         THE COURT:  Are you in agreement on that one as

16  well?

17         MR. CRANLEY:  Yes, Your Honor.

18         THE COURT:  All right.  I will deem those

19  withdrawn.

20         MS. BANNINK:  I think there were actually quite a

21  few on your list.

22         THE COURT:  And next were 35 and 36, which are

23  declarations of Nargis.

24         MS. BANNINK:  35 and 36 were withdrawn.

25         THE COURT:  37, 38 I assume are the same?

```
 1              MS. BANNINK:  Same.

 2              THE COURT:  I show the next open exhibit was 51,

 3    the DCI investigation photos.

 4              MS. BANNINK:  And then so we end with Exhibit 46

 5    and then all exhibits from 47 to 60 were withdrawn.

 6              THE COURT:  Are you in agreement?

 7              MR. CRANLEY:  That's correct.

 8              THE COURT:  Very good.  I had objections

 9    withdrawn.  That explains the confusion.  You said through

10    60?

11              MS. BANNINK:  Yes.

12              THE COURT:  Very good.  Thank you.  That would

13    leave 73.  I'm not sure that that's going to ever come in.

14              MS. BANNINK:  73, 74 were withdrawn.

15              THE COURT:  All right.  And 87 through 101, which

16    are just deposition transcripts.

17              MS. BANNINK:  Were withdrawn.

18              THE COURT:  And are 87 and 88, which are notice

19    of claims?

20              MS. BANNINK:  Withdrawn.

21              THE COURT:  All right.  And 102?

22              MS. BANNINK:  And 102 is withdrawn.

23              THE COURT:  All right.  As to defendants', I have

24    501 open.

25              MR. CRANLEY:  That was withdrawn.
```

 1            THE COURT:  501 was withdrawn.  All right.  I

 2  have the next exhibits, 503 through 508, admitted.

 3            MR. CRANLEY:  502 through 508, yes.

 4            THE COURT:  503 through 508 admitted.  Then 509

 5  and 510 are open?  I don't have any notation as to those.

 6            MR. CRANLEY:  What are those?

 7            THE COURT:  *Polk County Jail Inmate Handbook* and

 8  certificates of training completed by Darryl Christensen.

 9            MR. CRANLEY:  Those are duplicates of others, so

10  those are withdrawn.

11            THE COURT:  All right.  I have 511 through 514

12  admitted by stipulation.

13            MR. CRANLEY:  Correct.

14            THE COURT:  And 515 through 521 are open.

15            MR. CRANLEY:  Through 529 actually are all out.

16            THE COURT:  I have through 528 out.  So 515 are

17  all withdrawn through 529?

18            MR. CRANLEY:  Yes.

19            THE COURT:  All right.  Very good.  I still have

20  an open question, although there's been a stipulated

21  admission of 350, as to whether the entire exhibit should

22  go in.  531, the national standards, are open at this

23  point.

24            MR. CRANLEY:  Everything else on our list, Your

25  Honor, was those types of documents and they were all

1   withdrawn; only used for impeachment, if it at all.

2          THE COURT:  Okay.  So 530, is that withdrawn or

3   is that stipulated to admission?

4          MR. CRANLEY:  We did stipulate to it.

5          THE COURT:  That's fine.  So from 531 through

6   547 --

7          MR. CRANLEY:  Through 546.

8          THE COURT:  -- through 5 --

9          MR. CRANLEY:  Through 546.

10         THE COURT:  -- through 546 -- all right.  I'm

11  with you -- those are all withdrawn.

12         MR. CRANLEY:  Correct.

13         THE COURT:  Thank you.  I appreciate your taking

14  the time to go through this.  I have 547 admitted by

15  stipulation, 548 through 553 admitted by stipulation, and

16  then 554 is a demonstrative that may or may not be

17  offered.

18         MR. CRANLEY:  Correct.

19         THE COURT:  All right.  Very good.  Anything more

20  for the plaintiffs before we take our break?

21         MS. BANNINK:  I have written on my exhibit list

22  that 31 was admitted over objection.  Yeah, I recall

23  Mr. Weidner moving to admit 31 and it was admitted over

24  objection.  I'm not sure if you had listed that one.

25         MR. WEIDNER:  It was a handwritten --

1        THE COURT:  Yes, it was admitted.  31 was

2   admitted through Moe.  That's correct.  Anything more for

3   the plaintiff?  This isn't your final opportunity if you

4   want to raise something at another break, but I'd like to

5   provide the parties with some break.

6        MS. BANNINK:  Nothing further.

7        THE COURT:  All right.  Anything more for the

8   defense.

9        MR. BOHL:  Not from the County.

10        THE COURT:  We'll reconvene at five to hour.  And

11   would you let the jury know that we're going to be an

12   extra five minutes?

13        (Recess at 3:42 p.m. until 3:55 p.m.)

14        THE COURT:  Just for the parties' benefit in

15   thinking about the remaining jury instruction issues, I

16   think it may make more sense for me to lay out what I

17   understand the law is in writing.  So rather than talk

18   this evening, I will endeavor to get that opinion out to

19   you and then we'll talk about that and any other issues

20   the parties may still have tomorrow.

21        MR. BOHL:  Your Honor, might I attempt to save a

22   little time?  I would like to show Mr. Hompe Exhibits 43

23   through 46 simply for the purpose of refreshing his

24   recollection.  I want to show him a sentence on each one.

25   It's going to be quicker for everyone if I just give him

1    the paper.

2           THE COURT:  You can absolutely do that at the

3    beginning of your testimony.  Just come up, set them down.

4    And then when you get to it, ask him.  If he doesn't

5    recall, you can point him to the page.

6           MR. BOHL:  Okay.

7           THE COURT:  All right.  Very good.  We can bring

8    the jury out.

9           MR. CRANLEY:  Your Honor, one other issue with

10   the deposition.  I don't know if we're going to get to the

11   video deposition this afternoon still.

12          MR. WEIDNER:  Hoping to.

13          MR. CRANLEY:  Because there is some material in

14   there that pertains to Jorgenson and the investigation

15   relating to --

16          THE COURT:  I've ruled on all the objections.  If

17   it's in there, it's staying in there, unless you had

18   already objected to it.

19          MR. CRANLEY:  No, but the deposition was done

20   before we had your ruling on the motions in limine.

21          THE COURT:  You're saying it's inconsistent with

22   one of my motions in limine --

23          MR. CRANLEY:  Well, your motions in limine --

24          THE COURT:  -- or are you talking about my ruling

25   this afternoon that I didn't want it dwelled on any more?

1          MR. CRANLEY:  No, a week or so ago when you gave

2    us rulings on the motion that kind of pared down the

3    evidence of some of these prior acts.  We didn't have that

4    at the time we took the deposition.

5          THE COURT:  That's why we do the preparation we

6    do in advance and why I provided everyone with what would

7    be allowed.  Other than addressing the objections and

8    removing those materials out, if you felt it needed to be

9    pared down substantially, you should have raised that at

10   that time.  Do you have sufficient witnesses to complete

11   that portion?

12         MR. WEIDNER:  Which portion, Your Honor?

13         THE COURT:  The remainder of the day through 5:30

14   without using the --

15         MR. WEIDNER:  We are going to release two

16   witnesses, Your Honor, because they'll be redundant, and

17   we'll play the video in their stead.

18         THE COURT:  And then who will you have tomorrow?

19         MR. WEIDNER:  I will have Jeff Eiser, our expert

20   witness, and that's it.

21         THE COURT:  And he's not available to testify

22   tonight?

23         MR. WEIDNER:  Today, correct.

24         THE COURT:  All right.  I'm sorry, but that would

25   have been something you needed to raise before this, so

1    I'm going to allow them to go ahead with that.

2              MR. CRANLEY:  That's fine.

3              THE COURT:  You can bring out our jury.

4         (Jury in at 4 p.m.)

5              THE COURT:  And you may proceed with

6    cross-examination -- direct.  I'm sorry.

7                        CROSS-EXAMINATION

8    BY MR. BOHL:

9    Q.   Good afternoon.  I'd like to get your current title

10   correct.  What is your current title?

11   A.   Corrections complaint examiner.

12   Q.   Is it okay if I call you *Mr. Hompe*?

13   A.   Sure.

14   Q.   Mr. Hompe, you were deposed in this case, were you

15   not?

16   A.   Yes.

17   Q.   Do you recall being asked this question and giving

18   this answer:

19        "QUESTION:  Would you classify Polk County as one of

20   the better-run jails in your area?"

21   A.   Yes, sir, I recall that.

22   Q.   "ANSWER: Yes."

23   A.   Correct.

24   Q.   That was true when you said it, right?

25   A.   Yes.

1   Q.   And you haven't changed your mind since then, have

2   you?

3   A.   No.

4   Q.   The Polk County Jail was one of the better-run jails

5   in your area, right?

6   A.   Correct.

7   Q.   Now, can you refresh our recollection on what your

8   area was?

9   A.   Western Region, 17 counties in Wisconsin.

10  Q.   So that was 17 county jails and you had some juvenile

11  facilities, too, didn't you?

12  A.   Yes.

13  Q.   Now, I'd like to just briefly run through your

14  substantial credentials.  You were a correctional officer

15  at the Winnebago Correctional Center?

16  A.   Yes.

17  Q.   What kind of facility is that?

18  A.   Minimum security male.

19  Q.   You were captain at Taycheedah?

20  A.   Yes.

21  Q.   By "captain," I mean the rank of captain.

22  A.   Yes.

23  Q.   What is Taycheedah?

24  A.   Female correctional institution.

25  Q.   Maximum security?

BRADLEY HOMPE - CROSS

1   A.   At that time it was max, medium and minimum.

2   Q.   And you were also warden of Stanley Correctional?

3   A.   Yes.

4   Q.   When were you warden of Stanley Correctional?

5   A.   Excuse me?

6   Q.   When were you warden of Stanley?

7        THE COURT:   What dates, approximately.

8   A.   2007 to 2009.

9   Q.   Now, am I correct that warden is the captain of the

10  ship, the highest rank?

11  A.   At the facility, yes.

12  Q.   You ran the Stanley Correctional facility?

13  A.   Yes.

14  Q.   Now, what kind of facility is that, in layman's

15  terms?

16  A.   Medium security male.

17  Q.   How big is the population?

18  A.   1,550.

19  Q.   How big was the staff that you supervised?

20  A.   288.

21  Q.   Now, going way back in time there was a time when you

22  were a lowly detention facility specialist?

23  A.   Yes.

24  Q.   When was that?

25  A.   It would have been 2009 through this past August.

BRADLEY HOMPE - CROSS

 1  Q.   Would it be fair to say that you moved up from the

 2  bottom to the top of the ranks in the Department of

 3  Corrections?

 4  A.   At one time, yes.

 5  Q.   How long were you inspector?

 6  A.   From December 2009 until this past August.  I'm not

 7  sure what that totals up to be.

 8  Q.   Now, you conducted annual inspections of the Polk

 9  County Jail?

10  A.   Yes.

11  Q.   And the purpose of the inspection was to determine

12  whether the Polk County Jail complied with DOC 350 and any

13  applicable Wisconsin statutes, right?

14  A.   Yes.

15  Q.   Can you tell us, in layman's terms, what DOC 350 is?

16  A.   It's the administrative code chapter that governs

17  county jails.

18  Q.   And a county jail is required by law to comply with

19  DOC 350; is that correct?

20  A.   Yes.

21  Q.   And it covers -- well, I guess there are 35 different

22  sections; does that sound about right?

23  A.   Yes.

24  Q.   And it goes from construction plans all the way down

25  to canteen, right?

1  A.    Yes.

2  Q.    And when you conduct these annual inspections, do you

3  have sort of a checklist to determine whether each

4  important requirement was being complied with?

5  A.    Yes.

6  Q.    Now, I'd like to approach the witness, Your Honor,

7  and give you Exhibits 43 through 46, but let me back up in

8  response to one of your questions on direct examination.

9  I believe you said you didn't recall the results of every

10  annual inspection; is that true?

11  A.    Correct.

12  Q.    I'm going to ask you how the Polk County Jail did in

13  the 2013 inspection.  And if you need to refresh your

14  recollection, please look at Exhibit 43.

15  A.    Well, generally I can say substantially compliant.

16  Without going through every topic, I can't tell you what

17  was met or not met in every area.

18  Q.    But you can say that your overall verdict was that

19  "The Polk County Jail is substantially code compliant as

20  approved to hold adult offenders," right?

21  A.    Yes.

22  Q.    That's what you wrote in your report?

23  A.    Yes.

24  Q.    Now, how about 2014, did you reach the same

25  conclusion at the end of your 2014 audit?

1   A.   Yes.

2   Q.   How about 2015, did you reach the same conclusion at

3   the end of your 2015 audit?

4   A.   Yes.

5   Q.   How about 2016, did you reach the same conclusion at

6   the end of your 2016 audit?

7   A.   Yes, with areas of concerns noted.

8   Q.   And what were those areas of concerns that you noted?

9   A.   That was the supervision that we had previously

10   discussed, limited issues with sanitation, the time frames

11   for well-being checks and the fact that they were not

12   taking place from within the living unit, and again just a

13   recommendation for additional cameras.

14   Q.   None of those related to the prevention of sexual

15   assaults, do they?

16   A.   You're asking my opinion?

17   Q.   Yes.

18   A.   It could be.

19   Q.   And which one could be?

20   A.   Cameras.

21   Q.   And this criticism was made by you in 2016?

22   A.   Yes.  I think it's documented previous as well.

23   Q.   Now, you're familiar with the interior of the Polk

24   County Jail?

25   A.   Yes.

2-P-105

1  Q.   You've been there many times?

2  A.   A few, yes.

3  Q.   Would you describe it as a modern facility?

4  A.   Yes.

5  Q.   Isn't it true that inspectors of the Department of

6  Corrections consulted with the Polk County architects in

7  the design of the jail?

8  A.   Yes.

9  Q.   Is that a good thing or a bad thing?

10  A.   A good thing, I would assume.

11  Q.   Was Polk County required to consult with the DOC when

12  it built the jail?

13  A.   Yes, by code.

14  Q.   And it did that?

15  A.   Yes.

16  Q.   Now, let me direct your attention to a particular

17  area that I believe we all understand is the bubble, which

18  looks into a number of pods, including the female max pod.

19  Are you familiar with that area?

20  A.   The control center?

21  Q.   Not the control room; max --

22          THE COURT:  You may think of it as the control

23  center.  Not the principal one next to the intake area,

24  but the bubble.

25          THE WITNESS:  Okay.  The max control.

BRADLEY HOMPE - CROSS

1          MR. BOHL:  Yes, exactly.

2    BY MR. BOHL:

3    Q.   Is there anything about max control that violates DOC

4    350?

5    A.   Not to my knowledge.

6    Q.   Now, you're aware that an officer could sit in the

7    bubble and visually inspect a number of different pods,

8    right?

9    A.   Yes.

10   Q.   Male pods?

11   A.   Yes.

12   Q.   And female pods?

13   A.   Yes.

14   Q.   That doesn't violate DOC 350, does it?

15   A.   No.

16   Q.   That's a fairly common practice, isn't it?

17   A.   Yes.

18   Q.   Does staffing the bubble with one officer violate DOC

19   350?

20   A.   No.

21   Q.   That would be a fairly typical and common practice in

22   Wisconsin jails?

23   A.   Yes.

24   Q.   Now, there's a provision of DOC 350 that requires

25   regular wellness checks at irregular intervals, right?

BRADLEY HOMPE - CROSS

 1  A.    Yes.

 2  Q.    And the -- there's a time period there, right?

 3  A.    Yes.

 4  Q.    What's the time period?

 5  A.    60 minutes or less.

 6  Q.    But the inspections are supposed to be at irregular

 7  intervals, right?

 8  A.    Yes.

 9           THE COURT:  Every 60-minute period?

10           THE WITNESS:  Yes.

11           THE COURT:  And *wellness* being check on the

12  officer in the bubble or what's the wellness for?

13           THE WITNESS:  Check on the inmate.

14           THE COURT:  So the person in the bubble should

15  check on each inmate.  What do you mean by a wellness

16  check?

17           THE WITNESS:  It's basically -- it's an overall

18  accountability check, first of all, to make sure the body

19  is there living and breathing and okay, they're safe.  And

20  obviously when they do those rounds they would also do a

21  security check of the facility.  But it's conducted by an

22  officer that should be going into the housing unit and

23  checking on those individuals.

24           THE COURT:  So inside each pod?

25           THE WITNESS:  Correct.

                    BRADLEY HOMPE - CROSS

1  BY MR. BOHL:

2  Q.   And this is supposed to take place within 60

3  minutes --

4  A.   Yes.

5  Q.   -- at irregular intervals?

6  A.   Yes.

7  Q.   And the code specifically requires irregular

8  intervals, right?

9  A.   Yes.

10 Q.   One of the reasons why the code requires irregular

11 intervals is so the inmates won't know when the guard is

12 coming, right?

13 A.   Yes.

14 Q.   And one of the reasons why you don't know -- why you

15 don't want the inmate to know when the guard is coming is

16 because if they're doing something they're not supposed to

17 be doing, you don't want to give them an opportunity to

18 hide it, right?

19 A.   Yes.

20 Q.   And another reason why you want the inspections to be

21 at irregular intervals is because you don't want the

22 inmates to be able to set up an ambush?

23 A.   Yes.

24 Q.   And security for the guards in jails and prisons,

25 that's always an issue, right?

1   A.   Absolutely.

2   Q.   There can be physical assaults on the guards, right?

3   A.   Yes.

4   Q.   Now, in response to questions on direct examination

5   you mentioned a course in inmate manipulation?

6   A.   Yes.

7   Q.   Could you describe that?  That was a course of study?

8   A.   It's a training class for correctional staff.

9   Q.   How long does this class take?

10  A.   Well, I mean, depending on the instructor, you could

11  run it for two hours, you could run it for eight hours,

12  depending on the content you want to share.

13  Q.   Is inmate manipulation a recurring issue in

14  corrections?

15  A.   Yes.

16  Q.   Can you explain that to us?

17  A.   Well, generally inmates attempt to familiarize

18  themselves with staff in order to gain information about

19  them and become more familiar with them, which could lead

20  to having some power over the staff.  That's -- that

21  covers at least a portion of that training.

22  Q.   Is this a recurring problem in the correctional

23  setting?

24  A.   Yes.

25  Q.   Guards and correctional officers are taught not to

 1   divulge personal information about themselves in dealing

 2   with the inmates?

 3   A.    Yes.

 4   Q.    And does that have something to do with this inmate

 5   manipulation?

 6   A.    Yes, avoiding it.

 7   Q.    Can you explain that to us?

 8   A.    Can I give you an example?

 9   Q.    Sure.

10   A.    Basically an example would be not talking about your

11   family vacation or that you're going on vacation or have

12   been on vacation, because then they have additional

13   information about you that they have no business knowing.

14   The next thing you know, they try to use that against you,

15   you know.

16        A good correctional officer would not necessarily

17   fall for that, but they could attempt to manipulate the

18   officer using that information: say, well, I know this

19   about you and you talked about this; and if you don't do

20   this for me, I'm going to tell them that I know this; and

21   how else would I know this unless you inappropriately

22   discussed it in front of me.

23   Q.    Is the issue of inmate manipulation taught in the DOC

24   certification training for jailers?

25   A.    DOJ does the certification for county jails.  They

                    BRADLEY HOMPE - CROSS

1  have a professionalism training and inmate supervision

2  training.  It's not necessarily titled *avoiding*

3  *manipulation*; same principle.

4          THE COURT:  Just so we're clear, DOJ is the

5  Wisconsin Department of Justice?

6          THE WITNESS:  Yes.

7  BY MR. BOHL:

8  Q.   But the issue of inmate manipulation is taken up in

9  the certification training, even if it's under another

10  heading?

11  A.   Yes.

12  Q.   Now, at your deposition you said there were three

13  things a county jail should do to prevent sexual

14  misconduct: it should, one, inform the inmates of their

15  rights; two, train the staff on how to handle reporting;

16  and three, make sure you have an investigative process.

17  Does that sound about right?

18  A.   Yes.

19  Q.   The DOC, under 350, has to approve county jail

20  policies, right?

21  A.   The manual, yes.

22  Q.   And the Polk County manual was in compliance with DOC

23  350, wasn't it?

24  A.   Yes.

25  Q.   Weren't all three of those issues dealt with in the

1  Polk County policies and procedures?

2  A.   I don't recall specifically.

3  Q.   Well, if they hadn't been, they shouldn't have been

4  approved, right?

5  A.   Well, the three things you mentioned are not -- those

6  not 350 issues; those are PREA issues.

7  Q.   Well, let me ask it a different way: If the Polk

8  County policies and procedures addressed all three of

9  those issues, that would be a good thing, right?

10  A.   Yes.

11  Q.   And if Polk County put PREA language in its inmate

12  handbook, that would be a good thing?

13  A.   Yes.

14  Q.   And if Polk County amended its supervision policies

15  to put PREA language in that supervision policy, that

16  would be a good thing?

17  A.   Yes.

18  Q.   Now, one provision in PREA requires that when a male

19  officer enters a female pod that the male officer announce

20  the fact that they're coming in, right?

21  A.   I'm aware of that, yes.

22  Q.   That violates DOC 350, doesn't it?

23  A.   That doesn't violate the code.  As you discussed

24  earlier, it may violate the intent.

25  Q.   The intent is that the inspection be a surprise,

 1  right?

 2  A.   Yes.

 3          MR. BOHL:  That's all I have.  Thank you, very

 4  much.

 5          THE COURT:  All right.  Any recross?  I'm sorry,

 6  did you have questions?

 7          MS. MILLS:  I did not.

 8                  <u>REDIRECT EXAMINATION</u>

 9  BY MS. BANNINK:

10  Q.   Mr. Bohl went through the various policies or your

11  various jail inspections spanning from 2010 through 2015,

12  correct?

13  A.   I have 2013 through '16 in front of me.

14  Q.   '13 through '16.  Okay.  So starting in 2013, did you

15  indicate whether supervision was a concern in your

16  summary?

17  A.   Yes, I did.

18  Q.   And the same in 2014?

19  A.   Yes.

20  Q.   '15?

21  A.   Yes.

22  Q.   And '16?

23  A.   Yes.

24  Q.   And again you had indicated that the policies or

25  the -- you operate under DOC 350, correct?

1  A.   Yes.

2  Q.   And that does not -- that does not include PREA

3  standards; is that right?

4  A.   Correct.

5  Q.   With regards to the specific PREA provision where a

6  male officer is supposed to announce presence prior to

7  entry of a female pod, have you provided information on

8  ways that jails can comply with this provision,

9  alternative ways to comply with this?

10  A.   I have.

11  Q.   And what would that be?

12  A.   Either make an announcement at the beginning of the

13  shift that both sexes of officers could be in your

14  presence or put it in the handbook.

15  Q.   And that would avoid the security concerns indicated

16  by Mr. Bohl?

17  A.   Yes, that would.  That would eliminate the need for

18  the announcement.

19  Q.   The other part of the course that you had provided

20  to -- that you had trained on, did that include

21  professionalism?

22  A.   Yes.

23  Q.   And explain what that would consist of.

24  A.   Well, just maintaining your professional center, not

25  getting either too weak or too overly strong with the

```
 1  inmates.  Some staff could have a habit to be overly

 2  strict when there's not a need to and some may be overly

 3  lenient.  And again, those things can be used against you

 4  at a later time from those inmates.

 5  Q.   Is it possible that divulging information could

 6  lead -- divulging personal information from a jailer could

 7  lead to security threats not only from inmates attempting

 8  to manipulate jailers, but also jailers creating too close

 9  relationships with inmates?

10  A.   Yes.

11          MS. BANNINK:  No further questions.

12          THE COURT:  Before I turn you over for redirect,

13  just to get back to this wellness check aspect, is that

14  appropriate to be done by the person in the bubble; in

15  other words, an officer needs to do it at random times --

16          THE WITNESS:  Correct.

17          THE COURT:  -- every 60 minutes?  So it's fine if

18  it's the same person who is generally in the bubble?

19          THE WITNESS:  It can be any staff member.  But if

20  you have a max control bubble, that's a maximum security,

21  it shouldn't be left.

22          THE COURT:  You shouldn't leave the bubble --

23          THE WITNESS:  Right.

24          THE COURT:  -- during your shift?

25          THE WITNESS:  Right.
```

BRADLEY HOMPE - REDIRECT

1          THE COURT:  So you would expect normally another

2  officer would come in at random?

3          THE WITNESS:  Yes.

4          THE COURT:  Thank you.

5          MR. BOHL:  Nothing further.

6          THE COURT:  All right.  You may step down then

7  unless there's questions from the jury.  Thank you.

8      (Witness excused at 4:23 p.m.)

9          THE COURT:  And you may call your next witness.

10          MS. BANNINK:  Lynelle Manning.

11          MR. BOHL:  Your Honor, could we approach a

12  sidebar?

13          THE COURT:  Yes.  Ms. Manning, if you could wait

14  a moment, we will get to you.

15      (At sidebar.)

16          MR. BOHL:  Your Honor has ruled Ms. Manning

17  cannot testify about her sexual relationship with

18  Mr. Christensen unless it took place in the jail.  She was

19  deposed.  And the way I read the deposition, she said

20  there was just a back rub.

21          THE COURT:  I'm not sure I understand.  What's

22  your concern?  If I've ruled, it's not going to come into

23  evidence.

24          MR. BOHL:  My concern is they're calling her.

25          THE COURT:  You're not calling her for that

 1   purpose obviously?

 2           MS. BANNINK:  No, Your Honor.

 3           THE COURT:  Okay.  Very good.  Thank you.

 4       (End sidebar.)

 5           THE COURT:  And if you could come forward -- I

 6   realize you've got to get everyone to do that -- and stand

 7   before the court reporter and she will swear you in.

 8        **LYNELLE MANNING, PLAINTIFFS' WITNESS, SWORN**

 9           THE COURT:  And if you could just move forward

10   towards the mic.  And you may proceed, Counsel.

11                      DIRECT EXAMINATION

12   BY MS. BANNINK:

13   Q.    Please state your name.

14   A.    Lynelle Manning.

15   Q.    And were you employed by the Polk County Sheriff's

16   Department?

17   A.    Yes, I was.

18   Q.    When were you employed with the Polk County Sheriff's

19   Department?

20   A.    May 11th of 2015 to January 25th of 2016.

21   Q.    In what capacity were you employed?

22   A.    A jailer.

23   Q.    Tell me about the formal training that you received

24   while employed with the Polk County Jail.

25   A.    I believe there was a checklist of different items we

                    LYNELLE MANNING - DIRECT

1  had to go through regarding process.  I followed around a

2  senior jailer who had been there for a significant period

3  of time.  And then after a couple weeks they let me work

4  on my own with them following me until I was released to

5  my own post to work on my own.

6  Q.   Did you ever go on to any formal training outside of

7  the jail?

8  A.   Not through the jail, no.

9  Q.   Did you ever attend what's called a *jail school*?

10 A.   I did not.

11 Q.   Were you -- did you have an intent to attend the jail

12 school?

13 A.   Yes.

14 Q.   Tell me about that.

15 A.   To my understanding it was the jail's responsibility

16 to enroll me and send me to jail school.  Due to staffing

17 issues, I was never sent to jail school.

18 Q.   And you were employed for how long?

19 A.   About 20 months.

20 Q.   Does that mean that you were never certified as a

21 correctional officer --

22 A.   Correct.

23 Q.   -- during that 20-month period?

24 A.   Correct.

25 Q.   Is there a time when you were working day shift?

LYNELLE MANNING - DIRECT

1   A.   Yes.

2   Q.   Explain what your training was during that day shift.

3   A.   For the first --

4   Q.   Sorry.  Go ahead.

5   A.   -- for the first couple weeks I specifically worked

6   with Mike Ottosen, followed him around.  He showed me what

7   I was supposed to do regarding cleaning, mail, basic

8   process, intake procedure.  That was the initial start of

9   my training.  He signed off on it once.  I had efficiently

10  done those duties on my own.

11  Q.   And how long were you in that day shift?

12  A.   Three and-a-half months.

13  Q.   And then what happened when you moved to nights?

14  A.   As far as what?

15  Q.   Training.

16  A.   I was on my own post.  The night crew that I worked

17  with, we trained, you know, with POSC independently and

18  they worked with me because I had no formal training.  So

19  to insure the safety of our fellow officers, they worked

20  with me specifically.

21       THE COURT:  I think you said you trained with

22  POSC?

23       THE WITNESS:  Yes.

24       THE COURT:  What is that?

25       THE WITNESS:  Principles of Subject Control,

LYNELLE MANNING - DIRECT

 1  which is the standard jail I guess physical ability to

 2  restrain an inmate or --

 3          THE COURT:  Or how to properly stand next to them

 4  and keep them in control?

 5          THE WITNESS:  Correct.

 6          THE COURT:  And that was physical training that

 7  other officers gave you when there was time?

 8          THE WITNESS:  Correct.  Yes.

 9          THE COURT:  Thank you.

10  BY MS. BANNINK:

11  Q.   Are you familiar with the Prison Rape Elimination

12  Act?

13  A.   Yes, I am.

14  Q.   How are you familiar with this Act?

15  A.   I have a bachelor's degree in criminal justice.

16  Q.   Did you receive any training with regards to this Act

17  from the Polk County Jail?

18  A.   Not that I recall.

19  Q.   Did you participate in the intake procedure?

20  A.   Yes.

21  Q.   What did that consist of?

22  A.   Taking the inmate out for medical questions, basic

23  demographic information, fingerprints, photo, basically to

24  put them in our system.

25  Q.   Did you ask them questions?

LYNELLE MANNING - DIRECT

1   A.   Yes.

2   Q.   How long did that questioning portion last?

3   A.   Anywhere between 45 minutes to an hour and a half,

4   depending on how compliant the individual was.

5   Q.   Intake procedure, was this something you participated

6   in with regularity?

7   A.   Yes.

8   Q.   At the time of intake, did you provide an inmate

9   handbook?

10  A.   Yes.

11  Q.   And the jury has seen that, which is Exhibit 10.  I

12  won't show it again, for efficiency purposes.  Did you

13  read through the contents of that handbook?

14  A.   I did when I first started.

15  Q.   Did you say did or didn't?

16  A.   I did.

17  Q.   Did you read through that with the inmates?

18  A.   No.

19  Q.   At the time of intake did you provide the inmates

20  with any information with regards to PREA?

21  A.   Not that I recall.

22  Q.   Did you show them any videos about PREA?

23  A.   No.

24  Q.   Did you tell them that they had -- that the Polk

25  County Jail has a zero tolerance policy of sexual assault

 1 | towards inmates?

 2 | A.   No.

 3 | Q.   Did you tell them that they have a right to be free

 4 | from sexual assault?

 5 | A.   No.

 6 | Q.   Did you explain to the inmates what sexual abuse or

 7 | harassment consists of?

 8 |          MR. BOHL:  Objection.  Leading.

 9 |          THE COURT:  I'll sustain the objection.  It's

10 | late in the second day to start making leading objections,

11 | but you're welcome to make them, and that was leading.

12 | BY MS. BANNINK:

13 | Q.   Did you provide any information, given your knowledge

14 | of what the Prison Rape Elimination Act consists of, did

15 | you provide any information consistent with that Act at

16 | the time of intake?

17 | A.   No.

18 |          MR. BOHL:  That's still leading.

19 |          THE COURT:  It's close, it's closer to, but it is

20 | leading.  What information did you provide them, if

21 | anything, at intake as to PREA?

22 |          THE WITNESS:  Nothing specifically.  We gave them

23 | the handbook, gave them their information and brought them

24 | to their cell.

25 |          THE COURT:  All right.  Next question.

                    LYNELLE MANNING - DIRECT

1      MS. BANNINK:  No further questions.

2      THE COURT:  All right.

3                  CROSS-EXAMINATION

4  BY MR. BOHL:

5  Q.   You have a bachelor's degree in criminal justice?

6  A.   Correct.

7  Q.   Where did you get that?

8  A.   Rasmussen.

9  Q.   And where is that?

10 A.   Lake Elmo, Minnesota.

11 Q.   When did you get that?

12 A.   I completed my degree in 2015.

13 Q.   What month in 2015?

14 A.   September.

15 Q.   Do all correction officers in Wisconsin county jails

16 have bachelor's degrees in criminal justice?

17 A.   I don't know.

18 Q.   You were pretty well qualified, weren't you?

19 A.   Yes.

20 Q.   Polk County was intending to send you to DOC jail

21 school when the opportunity arose, right?

22 A.   That's my understanding.

23 Q.   Well, that's what they told you?

24 A.   Right.

25 Q.   Do you have any reason to believe that wasn't true?

```
 1  A.   My understanding is, due to staffing issues, other

 2  individuals that were hired after me were sent because I

 3  was already on a post and we didn't have staffing to cover

 4  individual posts, which is why I was not sent immediately

 5  upon implement.

 6  Q.   Did they tell you whether the fact that you already

 7  had a bachelor's degree in criminal justice had anything

 8  to do with you not being sent immediately?

 9  A.   Not that I recall.

10  Q.   Now, when you did booking, you gave the prisoners who

11  were booked a copy of the jail manual?

12  A.   Yes.

13  Q.   And you say you read the manual yourself?

14  A.   Yes.

15  Q.   Now, the Polk County Jail has a policy and procedure

16  manual, doesn't it?

17  A.   Yes.

18  Q.   And did you get a copy of that?

19  A.   We had a copy available in the booking room.

20  Q.   And it was also accessible on the computer, wasn't

21  it?

22  A.   Yes.

23  Q.   And you read that, didn't you?

24  A.   When I first started, yes.

25  Q.   When you were working in the Polk County Jail, did
```

LYNELLE MANNING - CROSS

1   you ever hear inappropriate, sexually-verbal exchanges

2   among the jailers?

3   A.    Between the jailers or between jail staff and

4   inmates?

5   Q.    Between jail staff and inmates.

6   A.    No.

7   Q.    From time to time you worked with Darryl Christensen?

8   A.    Yes.

9   Q.    He seemed friendly toward everyone?

10  A.    Yes.

11          MR. BOHL:  That's all I have.

12          THE COURT:  All right.  Any redirect?  Did you

13  have questions?  I apologize, Ms. Mills, I should ask each

14  time.  Did you have any follow-up?

15                  REDIRECT EXAMINATION

16  BY MS. BANNINK:

17  Q.    You indicated that Mr. Christensen was friendly

18  towards staff, correct?

19  A.    Correct.

20  Q.    Are you aware of how long Mr. Christensen had been

21  employed with the Polk County Sheriff's Department?

22  A.    I recall it was a long time, but I don't know

23  specifically.

24  Q.    With regards to relationships between staff, were

25  they fairly close?

1   A.   Yes.

2           MS. BANNINK:  No other questions.

3           THE COURT:  All right.  You may step down then.

4   Thank you.

5       (Witness excused at 4:35 p.m.)

6           THE COURT:  You may call your next witness.

7           MS. BANNINK:  Steve Schaefer by video deposition.

8           THE COURT:  By video deposition.  And while

9   they're queueing that up, you may recall I gave

10  instructions at the beginning of the trial, which may seem

11  a long time ago, although it's only been two days.  The

12  instruction was that there would be certain times when you

13  would hear testimony either through reading of transcript

14  or of video of a deposition where a witness is unable to

15  testify.  In this case Mr. Schaefer is unavailable, but

16  the parties agreed and they have taken a deposition under

17  oath and you should treat this testimony as if

18  Mr. Schaefer were testifying here in court to the same

19  effect.

20      And whenever you are ready, Counsel, you can queue

21  that up.  And you should be able to see it well enough on

22  this monitor.  It's really more a matter of listening than

23  what's on.

24          MR. WEIDNER:  I think we may need to move the

25  computer quite possibly to here for volume.  I'm not sure.

LYNELLE MANNING - REDIRECT

 1          THE COURT:  If you're going to use it, you can

 2  use any mic.  I can't really amplify sound.

 3      (Video deposition of Steven Schaefer played at

 4  4:37 p.m. until. 4:43 p.m.)

 5          THE COURT:  Why don't we pause it for one moment.

 6  Are you able to hear this reasonably well?

 7          JURORS:  (Nodding.)

 8          THE COURT:  All right.  We've done what we can.

 9  We will just leave it at that.

10      (Discussion held off the record.)

11          THE COURT:  It seems like something you can hear

12  particularly well, particularly with the assistance of

13  video, but I was just checking to see whether we could do

14  better with the volume.

15      (Video deposition of Steven Schaefer played at

16  4:44 p.m. until 5:32 p.m.)

17      (Sidebar held off the record at 5:30 p.m.)

18          MR. WEIDNER:  Your Honor, we could stop at this

19  point.

20          THE COURT:  All right.  Very good.  And if you

21  would please note that just so we're certain where we pick

22  up in the morning.  There's about 30 minutes more of this

23  testimony.  And so we will start there in the morning and

24  then proceed with the remaining live testimony for the

25  plaintiff.

          STEVEN SCHAEFER - VIDEO DEPOSITION

1        Again this evening -- you're yet to get the full

2   picture.  You obviously haven't heard anything from the

3   defendants, nor my instruction on the law, nor the

4   parties' arguments as to how the law compares.  So to the

5   extent you can, just let this information percolate.  Have

6   some faith that the law will be fairly straightforward and

7   that the parties will be able to put this hodgepodge of

8   evidence together in a way that they think is meaningful

9   for each side and to help you ultimately resolve the case.

10  And with that, we will see you tomorrow morning at

11  8:30 a.m.  All rise, please.

12        (Jury out at 5:32 p.m.)

13        THE COURT:  If the parties would be seated.  As

14  far as the deposition goes, you think you'll be done by

15  nine with the remaining portion of the deposition?

16        MS. BANNINK:  So we're at 53:55 and it goes to

17  127.29.

18        MR. WEIDNER:  30 minutes, Your Honor.

19        THE COURT:  All right.  So we should be done by

20  nine.  And then your Mr. Eiser will be your last witness;

21  is that right?

22        MS. BANNINK:  I'm sorry?

23        THE COURT:  Mr. Eiser will be your last witness?

24        MR. WEIDNER:  I believe so, Your Honor.

25        THE COURT:  You've got control over this much.

1  Do you contemplate calling anyone else in your

2  case-in-chief?

3          MR. WEIDNER:  No, Your Honor.

4          THE COURT:  Okay.  Thank you.  And so I would

5  anticipate you'll be done midmorning, maybe a little bit

6  after the break?

7          MR. WEIDNER:  Yes, Your Honor.

8          THE COURT:  All right.  And does the County have

9  an estimate of what its remaining case will be?  I know

10  you've been doing a lot through directs of witnesses

11  called adversely.  But do you have an idea what the

12  remainder of your case will likely be?

13          MR. BOHL:  It will not take long, Judge.  While

14  some inspiration may come to us over the evening hours, I

15  currently contemplate calling only the expert witness.

16          THE COURT:  All right.  Understood.  So it could

17  be that we'll have, unless there's some limited

18  rebuttal -- even with limited rebuttal we should have the

19  liability case to the jury after lunch.  I assume you

20  haven't changed your response, you anticipate a fairly --

21          MS. MILLS:  Well, I need to call Mr. Christensen

22  and I would need to call the plaintiffs; just very limited

23  on the plaintiffs, but for Mr. Christensen I planned on

24  calling him.

25          THE COURT:  Well, you've complicated matters in

1  two ways.  One is there were directs done of your client

2  and I had assumed that you were following that same

3  practice, since I wasn't advised that's the case.  You're

4  not going to be able to refurrow the same ground.  I can't

5  recall, did you ask any questions of your client?

6          MS. MILLS:  Just probably three or four cross

7  questions, in particular.

8          THE COURT:  Well, they're not cross, but I get

9  your point.  I will allow you to put him back on the

10  stand.  But you're going to have to be very crisp and

11  address areas not covered already.  Are we clear?

12          MS. MILLS:  Yeah.

13          THE COURT:  All right.  And I will allow you to

14  call the plaintiffs adversely, but again we're not going

15  to refurrow new ground.

16          MS. MILLS:  I may not even call them.  But at

17  this point I'm 75 percent thinking I will.

18          THE COURT:  All right.  Factoring that in, then

19  perhaps we won't get to instructions and to closings

20  tomorrow afternoon, but perhaps we will.  So I think we

21  should arrive here at 8:15 tomorrow morning to address any

22  remaining proposed changes to the instructions, the

23  closing instructions on liability.  Is that acceptable to

24  both sides?

25          MR. WEIDNER:  Yes, Your Honor.

1          MR. CRANLEY:  Yes.

2          MS. MILLS:  Yes.

3          THE COURT:  Very good.  I will see you then at

4    8:15 to take up those issues and then we will proceed with

5    testimony at 8:30.  Thank you all and we are adjourned for

6    the evening.  You're free to move about as you wish.

7          (Adjourned at 5:36 p.m.)

8                              ***

9          I, CHERYL A. SEEMAN, Certified Realtime and

10   Merit Reporter, in and for the State of Wisconsin, certify

11   that the foregoing is a true and accurate record of the

12   proceedings held on the 31st day of January, 2017, before

13   the Honorable William M. Conley, Chief Judge of the

14   Western District of Wisconsin, in my presence and reduced

15   to writing in accordance with my stenographic notes made

16   at said time and place.

17   Dated this 13th day of February, 2017.

18

19                        _____
                                    /s/

20                        Cheryl A. Seeman, RMR, CRR
                          Federal Court Reporter

21

22

23   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
24   under the direct control and/or direction of the
     certifying reporter.

25